UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-CV-10876-LTS

KAREN CALABRESE-KELLEY,

Plaintiff,

v.

TOWN OF BRAINTREE, BRAINTREE
POLICE DEPARTMENT, OFFICER JOHN
P. McNAMARA,
SERGEANT CHARLES F. BATA, OFFICER
DAVID J. CLARK and BRAINTREE
POLICE DISPATCHER, JANE DOE,

Defendants.

_____

DEPOSITION
OF
KAREN CALABRESE-KELLEY

Taken On:
Monday, July 16, 2018
10:19 a.m. - 1:52 p.m.

Taken At:
Lousion, Costello, Condon & Pfaff, LLP
101 Summer Street, 4th Floor
Boston, Massachusetts 02109

Reported By:

Dunn Reporting Services, Inc.
617-422-0005

2

APPEARANCE:


On behalf of the Plaintiff:


    JEB S. PENKA, ESQUIRE
    Cohen Law Group
    500 Commercial Street, Suite 4R
    Boston, Massachusetts 02109
    Phone: (617) 523-4552




On behalf of the Defendant:


    JOSEPH A. PADOLSKY, ESQUIRE
    Louison, Costello, Condon & Pfaff, LLP
    101 Summer Street, 4th Floor
    Boston, Massachusetts 02109
    Phone: (617) 439-0305

3

INDEX OF EXAMINATION

WITNESS:  Karen Calabrese-Kelley

EXAMINATION                                              PAGE

Direct Examination by Mr. Padolsky                         5

Cross-Examination by Mr. Penka                           149


- - -

E X H I B I T S

- - -

NUMBER                    DESCRIPTION                  PAGE

1                         Diagram                        67

2                         Medical Records               120




(Original exhibits retained by Mr. Padolsky)

4

P R O C E E D I N G S

Deposition taken before Lauren R. Tozzi, RPR, Stenographic Reporter and Notary Public in and for the Commonwealth of Massachusetts at Large, in the above cause.

S T I P U L A T I O N S

It is hereby stipulated by and between counsel for the respective parties that all objections, except objections as to the form of the question and motions to strike, shall be reserved until the time of trial.  It is further stipulated that the witness shall read and sign the deposition within (30) days of receipt of the transcript.

- - -

MR. PADOLSKY:  Usual stipulations?

MR. PENKA:  You bet.

MR. PADOLSKY:  Usual stipulations.

MR. PENKA:  30-day read and sign, you want to do?

MR. PADOLSKY:  Yeah.  Is 30 days enough?

THE WITNESS:  Yes.  Should be fine.

MR. PENKA:  We talked about the 30 days already.

MR. PADOLSKY:  Okay.

5

THE COURT REPORTER:  Please raise your right hand.

(Oath administered.)

THE WITNESS:  I do.

Thereupon,

(KAREN CALABRESE-KELLEY)

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PADOLSKY:

Q    So, have you been deposed before?

A    Years ago.

Q    Okay.  If you could state your name and spell your last name for the record?

A    Karen Kelley.  Karen Anne Calabrese-Kelley. And it's hyphenated.  C-A-L-A-B as in boy, R-E-S as in Sam, E dash Kelley, with an E-Y.

Q    And how long ago were you deposed?

A    It was like -- maybe around '98 or '99.

Q    Was that the only other time?

A    Yes.

Q    What was that deposition for?

A    My ex-husband's friend had -- it was this incident where he was like -- we were at the Westin in

6

Waltham. And we had left and we were driving off, whatever. And then, all of a sudden, he was in an altercation. And we were just standing there, like, waiting for this to end. And the guy was -- stabbed him and almost killed him. So, he then was suing like the security of Waltham, the Westin, I think it was, and all of that. I mean, it was so long ago but that was -- I was a witness.

Q    To the friend's stabbing?

A    Yes.

Q    What was the friend's name?

A    Marc Donato. And he won, actually, I believe.

Q    So, you were deposed in that case?

A    Yes.

Q    Do you remember who the attorneys were?

A    I don't, but I did have to come in town. So, it was somewhere like, over like near the -- it would be the equivalent of -- what is it? The Wall Street. The banking section, whatever. I don't know if it's Congress, or, it's over there somewhere.

Q    The Financial District?

A    Thank you. My God. I couldn't think of that. Yes.

Q    So, I asked if you have been deposed before,

7

just because there's a few deposition basics.  This is a court proceeding and you have just been sworn to an oath, although, it's a lot less formal than being in court.  We are here in a conference room.  We have here a stenographer taking everything down that you say, that your attorney says, that I say.

But, the basics are:  Just wait for me to finish any questions that I have.  Don't assume what I might be asking, and I'll do the same for your answers. If you, at any point, do not understand the question that I ask, just ask me to rephrase the question or ask it again.

A    Okay.

Q    And a lot of attorneys will say, "Try not to give nonverbal answers."  You can gesture as you normally would or give a head nod, or a shake, as you normally would.  But, I would ask that you accompany that with a verbal answer, so that the stenographer can take that down for the record.

And then, lastly:  From time to time, you might hear an objection from your attorney.  Unless that objection is followed by an instruction, that's what we call a "form objection."  And we didn't state it for the record, but all objections except as to form and

8

privilege are reserved until the time of trial.

So, if you hear your attorney object, you can answer the question, if you understand it.  And if you don't understand, then feel free to ask me to rephrase the question.  Okay?

A    Yes.

Q    Do you go by any other names, other than Karen Calabrese-Kelley?

A    No.  It's usually Karen Kelley.  It's just quicker.

Q    And what is your maiden name?

A    Calabrese.

Q    And date of birth?

A    ███████████

Q    And what is the last four of your social?

A    2655.

Q    And your current home address?

A    12 Boathouse Lane, Dedham, Mass.

Q    And for how long have you lived there?

A    Just one year.  Almost a year.

Q    And who do you live there with?

A    My four children.

Q    And where did you live prior?

A    43 Bellaire, B-E-L-L-A-I-R-E -- excuse me --

9

Road, West Roxbury, Mass. 02132.

Q    And how long did you live at 43 Bellaire?

A    Almost 20 years.

Q    And who did you live there with?

A    Until 2009 -- at one point, my ex-husband, four kids, until 2009.  After 2009, it was myself and my four kids.  Obviously, not the whole time because I didn't have kids, initially.

Q    Right.  Do you currently work?

A    I babysit.

Q    Professionally?

A    Yeah.  Like for -- yes.  Throughout the school year, I have a little boy that I watch on a regular basis.  Yes.

Q    Do you run it as a --

A    No.  It's more as -- I mean, I get paid but it's not like an actual business.  It's just more babysitting, like if you babysat for a child or something.

Q    Sure.

A    You just -- it's on a regular basis.

Q    Did you establish a business entity for babysitting?

A    No.

10

Q    And how do you get paid?

A    Cash, mostly.

Q    You babysit for one kid during the school year?

A    Yeah.  One child, three days a week.

Q    Any other babysitting?

A    No, not -- not like that.  No.

Q    And how much do you get paid?

A    $15 an hour.

Q    Do you have any other form of income?

A    Alimony and child support.  Well, it's child support, but it's broken down into two categories.

Q    Any other form of income?

A    No.

Q    What's your current marital status?

A    Divorced.

Q    And I presume that was to Mr. Kelley?

A    Yes.

Q    Is it William?

A    Yes.

Q    When -- when did you marry William?

A    April of 1993.

Q    And for how long were you married?

A    We separated December of 2009 and the divorce

was final December of 2011.

Q   And you said you had four kids?

A   Yes.

Q   Are they all with William?

A   Yes.

Q   And what are your kids' names?

A   My oldest is ███████████████████   They are all Kelley.  Do you want her age or anything like that?

Q   Please.

A   She's 19.  Birthday is ████████.  And then, my son is ███████████████████.  And his birthday is ██████████████; 17.  And then ███████████████████ And her birthdate is ████████, and she's 14.  And then ███████████████████.  She's twelve and her birthday is ████████

MR. PADOLSKY:  So, I don't think we have a protective order in this case?

MR. PENKA:  No.

MR. PADOLSKY:  But, I'm happy to agree to keep the kids' dates of birth's and minor children's names confidential.  I'm not sure how you want to mark that, but we can note my agreement on the record.

MR. PENKA:  While we are talking about it, do

12

you want to talk about stipulations on the record, or do you want to do it off the record regarding their testimony?

MR. PADOLSKY:  Let's go off the record for a second.

(Thereupon, a discussion was held off the record.)

BY MR. PADOLSKY:

Q    So, I really don't mean anything by this question.  This is a standard deposition question, just to make sure that the testimony that I'm getting today is testimony that we can rely upon at some point in this case or at trial.

Have you taken any drugs or alcohol, prescription or medication, that would impair your ability to understand the questions that I'm asking today?

A    No.

Q    Thank you.

What did you do to prepare for today's deposition?

A    I just read, re-read my notes, because one of first things I did after the incident happened is, I documented everything.  I mean, I know it inside and

13

out.  I really didn't have to do much.

Q    What notes did you read?

A    Just what I wrote that weekend after it happened.  I mean, I know it inside and out.  I wouldn't even have to read the notes, so just wanted to confirm.

Q    Are you talking about notes in a notebook or a notepad?

A    Oh, I wrote it in an e-mail to myself.

Q    I don't -- I don't think I have seen these notes?

A    They are just more doodles.

Q    Have you produced the notes to your attorney?

A    I don't think so.  They were just more my own.

Q    And you still have them?

A    Somewhere.

Q    I just ask that you preserve them and produce them to your attorney?

A    That's fine.  All it is was my interrogatories or whatever I was asked.

Q    Oh, okay.  That's fine.  I just -- we try to gather everything we can as part of the case.

A    Because I remember reading, as a victim, you want to make sure you document everything, so I did.

Q    So, you read your notes in your e-mail to

14

yourself?

A    Uh-huh.

Q    And did you do anything else to prepare?

A    No.

Q    Okay.  Going to go through some foundational stuff.  Could you give me your educational history starting from high school?

A    Graduated high school.  I went to college.  I have a degree, a Bachelor's degree in sociology, criminology with a double minor in psych and history.

Q    Any other education after college?

A    No.

Q    Where did you go to high school?

A    Dedham High School.

Q    And where did you go to college?

A    Bridgewater State.  Now it's Bridgewater University.

Q    And when did you graduate high school?

A    High school, 1985.  College, 1990.

Q    And when you got out -- when you got out of college, did you take a job?

A    I did.  I worked as a residential counselor for gosh, well, it was the economy was horrible, so getting a job was horrible.  I originally was like a

15

fill-in for DYS lockup, one in Cambridge.  And then, in October, I got a full-time job with a company called Communities for People.  And I was the residential counselor, and I did overnights with emotionally disturbed teenage girls.  And I did that until, gosh, like probably almost a year and a half.

Q    So, you did that for about a year and a half?

A    Approximately, yes.

Q    Full-time, nights?

A    Yeah.  It wasn't like every night.  The schedules were like three, four nights.

Q    And what did you do after that job?

A    I then went into sales.

Q    For which company?

A    I worked for, it was called Direct Sell.  And this is like when the phones were the size of bricks.  So, it was Cellar One and 9X.  And we were an agent of Cellar One.  And I did that for -- I'm trying to think.  That was like '92 to, probably about the same.  Maybe about a year and a half, two years.

And then I did like, I left to take like a job like mortgages or something.  And I didn't -- I can't even tell you who it was with.  And I just didn't like it.  It wasn't a good match for me.  I didn't like it.

16

I didn't enjoy it.

And then I found another job.  And I worked for a company called Venture Distributing, which is a nonalcoholic division of United Liquors.  And I did that for a few years.  I'm trying to think how many now. Probably about two and a half or something.  And then I left that to -- well, actually, the company ended up, that division ended up, was going under.

So, then I worked for a company called Goldwell.  And I did that approximately for two years as well.  And then I stayed home once I had my first.

Q    What did you do at Goldwell?

A    I did sales and marketing.

Q    And for how long?

A    Approximately two years.

Q    How -- what year was it that you stopped working?

A    '98.

Q    The birth of your first child?

A    Yes.

Q    Were you ever in the military?

A    No.

Q    Have you been a party to any lawsuits prior to this lawsuit?

17

A     I'm trying to think.  Not that I'm aware of.
I mean, I should know something like that.  No.  Not --

Q     I'm excluding if you had to file an action for
a divorce or if you were a party to a divorce action.

A     Yeah, no.  I'm just trying to think.  Years
and years ago, but I don't think I recall the lawsuit.
I had a lawyer, but I never went anywhere with it.
Spoke with the Mass. Commission of Discrimination,
because as the company was folding, I -- my numbers and
stuff were higher than a male colleague's.  And then
I -- and salary came up.  And I was the only female
working there and he was getting more money.  So, he
ended up with a bigger package or something than I would
have, but I don't think that was considered a lawsuit.
No.

Q     Do you know if you ever filed a charge of
discrimination with the MCAD?

A     He may have.  I'm sorry.  We are talking like
1990 -- we are talking like 24 years ago.

Q     '94?

A     Yeah.  Or '93.  I don't know.  It's right
around there, if he did, but --

Q     Was that against Communities for People?

A     No.  Venture Distributing.  That would be like

18

'94 to like '95.  No, it was '92.  '90 to '92.  And then like '92 to '94.  And then '94 to '95, '96.  Right in there because I worked for two, two and a half years. They were kind of -- I don't know the exact dates, but it's within that time frame.

Q    And what was the result of that --

A    It didn't end up going anywhere.

Q    -- matter?

A    I got what I got.

Q    There was a settlement?

A    No, no.  Just, that's why I don't think it was so much a lawsuit.  I don't remember getting any more money.  They went under, so I don't know if that was part of it.  I honestly --

Q    So, you got a severance when they went under; is that correct?

A    No.  They were going under.  And they were, at the time, eliminating positions to try to salvage, and it didn't work.  And so, at that time, I -- that's when I found out they were getting more money.  So, the more money, you are going to get more from unemployment.  You are going to get more from whatever.  So, that's why I had spoke with the lawyer.  And I know we spoke with them, but I don't know if we filed anything or not.

19

Q    Do you remember the lawyer's name?

A    I couldn't even tell you.  No idea.  Clearly, I didn't -- it wasn't like I got it.  It was more of I -- you know, he might have written a letter to them stating but I'm not sure.  I honestly can't tell you.

Q    Got you.

A    I didn't, obviously, win millions or get anything more than that.  I just, clearly, it -- that's it.  Sorry.  I wish I could give you more.

Q    That's okay.  Any other lawsuits that you can recall being a party to?

A    No.  Just the one where I was deposed, where the other person was suing.

Q    So, in that case, you were a witness; is that correct?

A    But, I never went to court or anything.  I was only deposed, so I don't --

Q    Are there any other suits that you were a witness to?

A    No.

Q    Have you filed any claims against, for example, like an automobile insurance carrier?

A    No.  Homeowners, I had to file for, but not auto.  You mean, other than -- maybe I'm confused what

20

you are asking.  If I got into an accident and I needed to have it fixed, and I filed a claim; is that what you mean?

Q    Yeah.

A    Oh, yeah.  I have been in a car accident where I paid to have, you know, my insurance company paid to have my car fixed.  Yes.

Q    Have you filed any personal injury claims?

A    No, no.

Q    And the claim that you filed against your homeowners, was that a personal injury claim?

A    No.  Just hot water heater, ice dams, and all that stuff.

Q    Other than your divorce, have you appeared in court for any matter?

A    This matter that -- the actual criminal case that they charged me.

Q    Any other cases in which you have appeared in court?

A    No.  They are all related to my divorce.

Q    Where was your divorce filed?

A    Suffolk Probate Family Court.

Q    Did you have to testify in that matter?

A    We didn't go to trial.

21

Q    Do you know if you had to testify at all?

A    What do you mean?

Q    Were you ever put on the witness stand --

A    No.

Q    -- and sworn in?

A    We were sworn in and she had spoken to us, but I never had to go on the witness stand.

Q    When you say "she," who are you talking about?

A    The judge.  During the divorce, I had an attorney.  After the divorce, for different things going in, I was pro se.  So, I had spoken to the judge that way.

Q    Understood.  How many times have you been sworn in, in that matter, if you recall?

A    Honestly, I -- most people have a file.  We have a box.  So, I have been to court tons of different times for one thing or another.  And, mainly, you'd go in and they would have, you know, one time we went in and they were uncontested.  And you go in, and it would be one thing or another, and it would get continued. And so, even though I may have been to court for, you know, say, one thing for six times.  It was for the same issue, just getting delayed, or postponed, or whatever.

Q    So, you can't recall how many times you have

22

been sworn in during the course of that proceeding?

A    I honestly can't -- I'm sworn in at the beginning.  But, how many times have you been -- have I gone to court and been sworn in?

Q    Yes.

A    I could not even begin to tell you.

Q    Have you ever appeared to give testimony at what's called an administrative body; do you know what I mean by that?

A    Explain.  No, I'm not sure.

Q    So, you know the MCAD?

A    Mass. Commission Against Discrimination.  Yes.

Q    And that is an administrative agency.  Do you understand that to be the case?

A    Okay.

Q    Have you ever had to give testimony before an administrative body like the MCAD?

A    See, this is where it goes back to the other case.  I remember having to go there but I don't remember -- but I don't remember if it ever was, to be honest with you.

Q    Do you know if you had to give testimony at all?

A    I honestly don't remember if I had spoke with

anybody.  I just remember going there.  I know I had the attorney wrote the letter, but I don't think it ever, like, went further than that.  I'm not quite sure, honestly.

Q   Outside of your own cases, have you had to give testimony before any administrative bodies?

A   Not that I'm aware of.  No.

Q   Aside from this case, have you been arrested before?

A   No.  Oh, sorry.  Back in that thing with the Marc Donato, the kid was attacking.  I kicked the kid because he was stabbing him.  And then they -- I had to go to the police station.  They didn't fingerprint me.  They didn't do a mugshot.  I drove myself and stuff there in our own car, because he was going in the ambulance.  And they didn't do anything.  They let me go, but I did have to go to court.  And it got continued without a finding or something.  I think it was like 30 days.

Q   So, you were summonsed to court in that case?

A   Yeah.

Q   And on what charge?

A   For kicking him, whatever that would have been.  That was in 1997, because that did show up when

24

the judge had asked me that, or, he just didn't ask much questions, so --

Q    And you said the result of that was a continuance without a finding?

A    I just -- I didn't know any better.  They just -- it went away.  Yeah.

Q    Was that the result, though?

A    Yeah, I guess.  That's what they said.  Yeah, just continue to stay out of trouble for 30 days and that's the end of it.

Q    Do you remember what you agreed to in the colloquy; do you know what I'm -- do you know what that means?

A    I don't.

Q    Do you recall a prosecutor reading a set of facts before you agreed to the continuance without a finding?

A    I don't.  All I remember is like, I had to go up and stand next to the judge.  Like a bunch of people just went up at different times.  And he said -- oh, I guess she said something when I was standing there.  And he said, "Continue without a finding, 30 days."

Q    So, do you remember what the prosecutor said?

A    I don't remember.  That's 20 years ago.  I'm

25

sorry.

Q    Which courthouse was that?

A    It happened in Waltham, so I'm not sure.  I don't recall.  Waltham, maybe.  Is there a courthouse in Waltham; or, maybe, would that be Cambridge, maybe?

Q    I think it depends.

A    I don't know.

Q    Other than this incident in '97, involving a Marc Donato, any other arrests?

A    No.

Q    Any other police interactions; did you answer that question?

A    Oh, I thought you were going to -- it looked like you were thinking.

Q    In fairness, I was, because you were married to a police officer; correct?

A    Yeah.

Q    So, I'll state for the record that I did pause because I thought it might have been a weird question to ask, but if you understand what I'm asking?

A    Obviously, not in a social way.  Never have called the police or anything like that, no, on him. This was the first time I called the police on him.  I have called like his boss.  Since the divorce, like, off

26

the record.  I have called for, you know, just to ask them to please -- to please, you know, if they could speak to him, because I can't afford to have him lose his job or anything like that.  So, and I never called the police on him prior to this and I will never call them again, which is really sad.

Q    So, outside of social interactions with your husband or your husband's colleagues or friends, and outside of what you have just described, had you any -- have you had any other police interactions in your lifetime that you can recall?

A    Other than like, say, if I got pulled over for speeding or something like that, no.  Nothing like that, that I can think of.

Q    Do you have any specific thoughts on the police, in general?

A    Now or before this incident?

MR. PENKA:  Objection.

BY MR. PADOLSKY:

Q    Now?

A    I respect police.  I respect cops.  I respect all authority.  I just would not call for help from them.  If someone is breaking into my house, maybe, but I would never in a million years.  My husband could be

27

beating me to death and I wouldn't be calling.  So, I mean, I know a lot of cops.  I'm friends with a lot of cops.  I don't think differently of what they do. I respect what they do but, unfortunately, I wouldn't call for help.

Q    Any other thoughts on the police?

MR. PENKA:  Objection.

A    I'm not quite sure I understand what you are looking for or are asking.  I do -- you know, no.  Like I just stated, I respect them.  You know, I follow the law, I always have.  I would not talk back to a police officer.  I have always been respectful.  I just would never call one for help if it involves my ex-husband.

BY MR. PADOLSKY:

Q    Other than your ex-husband, do you have any friends who are police officers?

A    Sure, lots.  Lots of people I know.  I was in West Roxbury for a zillion years.  Every other person is a fireman or a cop, so --

Q    Any close friends?

A    Like, I have a few girlfriends that are cops and they are very nice.  That's what I'm talking about. I don't think poorly of the police by any means.

Q    Your close friends that you are referring to

28

that are police officers, where do they work?

A    Well, I mean, I'm not saying -- they are not like my buddies.  I hang out with them.  I, you know, have their phone numbers in my phone, but they are not like the ones I grew up with all the time.  They are in Boston as well.

Q    Any family members that are police officers?

A    No.  Firemen, but not police officers.

Q    Other than the interaction at issue in this case, do you know any Braintree Police Officers?

A    I don't, personally.  No.

Q    Any other interactions with Braintree Police outside of this case?

A    No.

Q    Do you know David Clark?

A    Only through this case.

Q    And what about John Macnamara?

A    Only through this case.

Q    And how about Charles Bata?

A    Only through this case.

Q    No other persons that work for the Braintree Police Department that you know?

A    Not that I'm aware of.

Q    Do you recall everything in the criminal case

29

underlying this matter?

A    I do.

Q    Do you recall testifying that you have had a very volatile relationship with Mr. Kelley?

A    I believe so.  I believe that's the word I used.

Q    What did you mean by that?

A    There's no communication whatsoever.  We don't speak.  He'll do like, even for parenting, there's no coparenting with him.  I will tell my son, you know, "You cannot do that."  He's grounded because of grades, and he'll turn around and tell him that, you know, "Oh, your mother is ridiculous," or stuff like that.  So, it's just a very -- there's no -- it's just, it's not a good -- not a good setup or a good relationship.

Q    And how long has that been the case?

A    I mean, even married, we basically lived two separate lives.  I was with the kids and did everything with the kids, and he was working or doing whatever. So, after the divorce is when it got, you know, I mean, obviously, throughout the marriage, it wasn't good at all.  You know, there were periods where it was okay. But, after the marriage, like if you had asked me previously, you know, five years before my divorce, you

30

know, would you -- would I see my relationship the way it is now?  I probably would have said no.  I would have thought he would have done the right thing for the kids and everyone else.  So, that's what it comes down to. He's not a good father.  He doesn't do the right thing and he makes poor choices.

Q    So, safe to say, you described your relationship post-marriage as volatile?

A    I mean, there are periods throughout the marriage that were volatile, too.

Q    And while you were married, how long was that going on?

A    Like I said, it would be spurts.  You know, we'd get along for a while and then not, and then we would, and then we wouldn't.

Q    Is there anything specifically that happened that leads you to describe your relationship as volatile?

A    Just, I -- I'm not quite sure I understand, like, what you mean.  Like, I mean, there was an episode when we were married that he had pushed me.

Q    When was this?

A    I'm not even sure, honestly.  It was -- God. I don't know.  It was towards the end, I believe.  Like,

31

maybe a couple of years before the end, a few years before the end.  I, honestly, it just was never a healthy relationship.  Let's put it that way.

Q    So, what happened the time that he pushed you?

A    He was drunk.  Nothing.  I walked away and didn't talk to him for God knows how long.

Q    Was this at home?

A    Yes.

Q    And what did you do when he did that?

A    When he pushed me?

Q    Yeah.

A    I walked away and then I just -- he probably passed out, and I didn't speak to him for a few days or however it was.

Q    How long before you were separated did this happen?

A    I don't recall.

Q    Do you recall how old the kids were?

A    I was just trying to think of that and I honestly, I -- I don't.  I don't remember.

Q    And do you know if they were home when this happened?

A    It was at night and I know they were sleeping, because I was worried that they would have heard.  So,

32

and I'm trying to think if I might have actually been pregnant with my last one, so that would have been 2006. But, honestly, I think, around 2006. But, they did not hear. That was my main concern. I don't know how they didn't hear because we were screaming. But, I went and I checked on them, and they were all sound asleep after, so --

Q    Any other incidents of the type?

A    Just, I don't. That's the main one that I can actually recall.

Q    Was it a frequent occasion that Mr. Kelley and you would argue at home?

A    Towards the end, definitely. Yeah, I mean.

Q    So, you just said a second ago that you don't know how the kids didn't hear that situation because you were screaming?

A    Oh, that time, they didn't know that he had pushed me. That's what I thought you were asking me. "Did the kids know?" And I said, "No." They knew we fought. God, yeah. Probably the whole neighborhood knew we fought.

Q    Was there a lot of screaming?

A    We are loud anyways, just loud in a normal conversation. Everyone talks over everybody but, yeah,

33

just a lot of -- loud in general but, yeah, a lot of screaming.

Q    How frequent was -- were these fights?

A    I don't know.  Like I said, there would be periods where we would get along, and then there would be periods where he, you know, all we do is fight.

Q    Okay.  Focusing your attention on the 21st of February, 2014; what did you do in the beginning of that day?

A    I can tell you exactly what I did.  It was a beautiful, sunny day.  It was February and I went to see The Lego Movie in Sharon.  I met my sister there at the movie theater.  That movie theater, it's not there anymore, on Mechanic Street in the Shaw's plaza or something.

I went there and we came home.  And the kids just did whatever, and they were getting ready to go with their father.  And my daughter called him to ask him if he could drive her -- it was like right around 6:00.  And he had asked her -- she was calling to ask if he could drive her friend, because he was supposed to drive them, her to skating, and my son to a birthday party.  And she called to ask if he could drive her friend home after skating.

34

And, at that point, he had said he -- let me just back up a little bit. He had already been court ordered, previously court-ordered to give me two hours' notice if he was going to be late, because he had had -- this is a perfect example, one of the times we were in court previously. He had always been late and whatnot, so he was court-ordered to give a two-hour notice.

So, my daughter called him at 6:00. His parenting times, on weekends, are from 6 p.m. Friday to 6 p.m. Sunday. She called him just to ask him that, and he told her he was going to be really late, or late, or whatever. And then, she said -- I must have asked how long, because they were worried. They wanted to make their things. One had to be there quarter to 7, and one had to be there at 7.

Q    Sorry to interrupt. Did he say the reason why he was going to be late?

A    I wasn't speaking to him. I don't think he gave her one, to be honest with you, at that time.

Q    And did she -- which daughter was this?

A    My oldest.

Q    Which is ▮▮▮▮▮▮▮

A    Yes.

Q    And did she tell you about the conversation

35

she had just had?

    A    Well, I could hear her.  Like, "I'm going to be late.  I'm going to be late."  So, then she hung up and said, "Dad said he's going to be about 45 minutes late."

    Q    Okay.

    A    So, then we wait until about probably, we waited 40, 45 minutes.  They were having a heart attack because my son was going to be late and he needed to get to the party.  And she was anxious because she had to meet her friends skating.  So, I left and I took them all with me.  And I drove my son to Jamaica Plain and then my daughter to Hyde Park.

        And in between, I would have to pull over to answer texts.  And I said, "I'll let you know where you can get them, because we had to leave.  We waited, you know, so now I'll let you know where and when."

        And I couldn't keep, you know, I didn't know when because I had to get everybody there.  And if I kept pulling over to text, I was never going to get there.  So, at some point, I texted him and told him to meet me at the Kmart parking lot because I was heading down to South Shore that night.  And I said to meet me at the Kmart parking lot at 8:15.  And he was not happy.

36

He just kept texting back and I just, at that point, it was like 8:15.  And if you are not going to be there, well, then, basically, I guess you are not going to take the kids.

He then was threatening me and threatening that I can bring them up to Reading.  And I better be at the house.  And I said, "8:15 at the Kmart parking lot."

Q    I'm going interrupt again.  Does he live in Reading?

A    He did at the time.  He moved like, over the winter, to Billerica.

Q    What was -- what was his address in Reading?

A    I believe it was 4 Summit Drive.  The condo number, like 215.  I'm not a hundred percent sure about that but I'm fairly certain that's what it is.

Q    And how long did he live there?

A    Well, at least since we were divorced.  Since we separated.  I'm not sure about prior.

Q    Was it the first place that he moved to after the separation?

A    Well, I believe he lived with his old partner in South Boston for -- this is what he stated -- for a couple of months, but I'm not quite sure.  And I have no idea what that address is.  I forget.

37

Q   Who was the old partner?

A   Oh, gosh.  Arthur -- oh, my gosh -- Witkins.
I think Witkins.  It's like Witkins.  Arthur Witkins,
W-I-T-K-I-N-S.  I'm not sure.  Arthur Witkins.

Q   So, you told me that he lived with his old
partner, Arthur, for a few months?

A   That's where I was to forward the mail.

Q   And then -- and then to this address in
Reading, 4 Summit Drive?

A   Then, after that, I think he may have moved,
officially moved in the spring of -- that would be 2010,
maybe, somewhere.  That part, that, I don't know what
went on.

Q   Was this an apartment or a condo?

A   Where; in Reading?

Q   In Reading.

A   A condo, I believe.  I have never been there.

Q   And do you know if he lived with anybody?

A   His girlfriend then and still.

Q   And what's her name?

A   Maura, Maura Monahan.

Q   Do you know how long he's been with her?

A   Since after we were -- allegedly since after
we separated.  So, your guess is as good as mine on that

38

one, so --

Q    How long after?

A    Supposedly like about a month.

Q    And he has a new address?

A    And I don't know that one.  It's -- they bought a house.  It's -- I honestly, I would have to look.  I think it's like -- I'm not even going to guess because I -- I haven't -- I don't -- there's no need for me to send anything there.

Q    But, you -- you said a moment ago that you knew it was in Billerica?

A    Oh, yes.  In Billerica.  Sorry.  I don't know the street address.  Marion, or I don't even know.  I'm not going to guess.

Q    So, I interrupted you when you were talking about text messages, and one I think you were recounting, where you said he told you to bring the kids up to Reading?

A    He said that if they are not there by whatever time or at the house, 43 Bellaire Road, that I can bring them up to Reading, and he would meet me at some gas station or something like that.  And I just, I wasn't going to Reading.  I was already in Braintree, basically, at that point, anyways.

39

Q    Sure.  So, same similar question to that, which I asked at the beginning of the deposition:  Did you take any -- any drugs, alcohol, medication the day of February 21st, 2014, prior to this point?

A    If I had, it would have been like amphetamine salt, which is like Adderall.  And I don't know if I was on anxiety medicine at that time, because I know I was like, I tried, you know, we were trying some and it didn't really work.  And you are adjusting and stuff like that.  And I think around that time, whatever, so I honestly don't know if I was.

Q    Were you, at some point prior to February 21st, 2014, prescribed some form of anxiety medication?

A    Oh, yeah.  Like Zoloft, and then it wouldn't work or, you know, it would have side effects like gain weight or something, so I didn't want to take it.  So, I either wouldn't take anything, you know.  I spoke with my doctor and see, you know, if I could just breathe and do what I need to do.  And a lot of times, that ended up working.

Q    So, Zoloft was one.  Any others?

A    Oh, God.  Like, honestly, this is -- and this is a bit of information that I didn't realize happened,

40

that if a doctor dies and he's in his own practice, those records do not go anywhere.  So, honestly, the psychiatrist that was prescribing had passed away the previous June and he -- I have no way to get my records. And I honestly, I tried different things and stuff over the years.  And most of them were weight gain so, automatically, I didn't want to do that anymore.  So, different things I tried for different reasons.  And, usually, it means you gain weight, which depressed you anyways, which kind of makes you anxious so it defeats the purpose.

Q    How long prior to February 2014 were you taking anxiety medication?

A    I really, like I said, it was -- I think at that point, I think I really hadn't been on any because I was trying to -- I knew I was on the Adderall.  As far as anxiety meds, I -- like, I haven't been on them in so long, for a while.  You know what I mean?  Well, probably like six, seven months now, I want to say.

Q    So, on the day of the 21st of February, you said it's more likely than not that you took -- did you say amphetamine salts?

A    It's amphetamine.  It's a generic Adderall.

Q    And you were not -- you are not certain, as

41

you are sitting here today, whether or not you were also taking anxiety medication on that day?

A    I'm not certain, no.  I had, like I said, tried it in the past but, after I did.

Q    And were there any other prescription medications that you were taking on the 21st of February, that you can recall?

A    No.  I mean, I don't think I had any like, you know, strept or anything like that.  That would have been like the only other type of medicine.  I don't believe I was sick then, so no.

Q    And do you know if you consumed any recreational drugs that day?

A    I have never done a drug in my life, never.  Never even smoked.

Q    And how about alcohol?

A    No.

MR. PADOLSKY:  If you don't mind going off the record, just need a bathroom break.

MR. PENKA:  Yeah.

(Thereupon, a recess was had from 11:07 a.m. to 11:13 a.m.)

BY MR. PADOLSKY:

Q    So, you still -- we left off where you said

42

you texted with your ex-husband about the location of the kids and him wanting you to come to Reading. So, what happened after that?

A    Oh, those were his threats. I had already stated we were going to Kmart, and that's where I was going. And he was obviously in that direction, anyhow. I just don't think he wanted to drive past West Roxbury. But, we had met there one other time for a drop-off as well.

Q    Do you remember when that was?

A    I know it was like in December, but I'm not sure. It was like, maybe, two years earlier or something. Maybe a year or two earlier.

Q    And do you know if that went smoothly or --

A    No. I mean, he had supposedly -- he had, I think it was a work Christmas party. He said he had to work but I know he wasn't working. He was at a party. And he met them after, and just took them, and went our separate ways. That's why I figured we could do it here again in a public place.

Q    Kmart parking lot in Braintree?

A    Uh-huh.

Q    So, what happens next?

A    So, prior to -- I was early, so before going

43

to the Kmart parking lot, I took my kids to Burger King, got them dinner.  Went through the drive-thru, had it in the car.  Went to the parking lot and we sat there and waited, which was fine.  They were eating, and we were parked, like in one of the spots.  And he pulled in a little bit like a few minutes, like maybe five, ten minutes later.

And he pulled across.  They have like the parking spots that face each other and then between each of those, they have where the cars can drive up.  So, he was across the way where the cars could drive up.  So, it wasn't like he pulled in right next to me.  It wasn't like he pulled in in front of me.  He pulled in across one of the ways.

So, at that point, I got the kids out.  I took out the hockey bag, the hockey stick and the book bag, my oldest daughter's book bag, with her laptop in it.  And so, we are outside.  My driver's side door is facing Kmart.  Route 3 is to the right.

I put the bag, the stick and the book bag, because I must have taken them out.  That time I took them out.  They got out.  It was my minivan on the passenger side.  So, we were all three of us were standing outside the car, waiting for him to get out.

44

And just, you know, then I could just send them right over. But, it was dark, like for some reason we just couldn't see the car. He was just sitting there. And we are like waiting, and it's like, why aren't you getting out?

So, then they start waiting and it seemed -- it probably seemed later than it was because then they were whining that they were cold, so I got them back in. I got back in as well, and I left the stuff outside the car. I didn't take it out and put it back in again.

Also, I'd like to note we had been in court the day before. I was trying to modify the agreement. I can't remember what it was about. But, so he was already really annoyed, because -- I can't remember what it was about, but I do remember we went the day before. I had filed it in like the previous July, and this is February. I don't know if we had gone in between. They messed something up. We went the day before.

And they had us being uncontested as opposed to contested. And then they were giving us a July date, and I had filed because I needed one of the temporary hearing; orders, hearing, whatever, for July -- April they gave us. And he was so angry about that as well. So --

45

Q    So, you were in court on the 20th of February?

A    Yes.

Q    In which courthouse?

A    Suffolk Probate.  That's the only courthouse all our divorce stuff is in.

Q    And this was for?

A    I was trying to modify the divorce agreement.

Q    And how were you trying to modify it?

A    I knew you were going to ask me that.  I believe -- it went on for so long, so now I can't remember.  I think it was, I wanted him to have to -- I think I wanted him to have to pay for half the co-pays or to pay for -- oh, what it was, in my agreement, if he -- I get more money.  Basically, he fronts me more money each week throughout the year.  And for doing that, at the end of the year, he gets like things he wouldn't get, like he could writeoff the mortgage.  He could writeoff three of the four kids, and he could writeoff all but $50 of my child support and alimony for tax purposes.

So, he, at the end of the year, would get back like $14,000.  So, you know, it was a wash.  And in the agreement, it states that if he is in the rears by December 30th, I -- he does not get to claim the kids.

46

I then get to claim all four children.  He had been in the rears.  And he had been in the rears previously as well.  And this was actually from the year before, but he was in the rears that year, too, I believe.

And what I was trying to do was have him have to use that money that he wouldn't normally, would not get that amount of money.  Have the accountant say, "Okay.  You are going to get $5,000, you know, for the kids."  He broke it all down what he would get for what.  And I wanted the Court to say, okay, I'm willing to get, have him give him that money, but it's put aside and that's to be used for my daughter's braces.

It was too complicated, anyways, I think.  So, but that's what I wanted, because I --

Q    So, you --

A    Because it would have been mine, and I would have -- because I owe every year because I have no deductions and he gets to claim his alimony.  So, either they wanted to do that.  I wanted to then -- and I could have then just written them off, but I wanted the judge to say, "You know what?  You lost those deductions.  That money you would have gotten from them is like $5,000.  I want you to use that to money to pay for the braces," as opposed to me having to pay for half and him

47

having to pay for half, because I didn't have the money at the time, at that point anyhow. So, I figured you know what? You know, the government is going to get it one way or the other. So, I said you might as well let him claim it, but have the judge state and say, you know --

Q    So --

A    -- that money is used for braces. That's why I was in court. That was what I was trying to do.

Q    So, you were asking the judge to issue an order that directed him to put the tax savings aside?

A    The money he would have got for claiming the kids. It's actually -- it's so stupid and complicated, anyways. I just figured that he normally would get -- he normally gets about 5,000 back. 5, $6,000 in deductions for the kids. I believe that was the amount that had come up in the past. And I wanted the judge to say -- because it wasn't his at that point. He was in the rears, so he did not have those deductions.

Q    Did you claim the kids in the year's taxes that you are talking about?

A    No, because I didn't bother doing that, because I should have, but, because I legally have that right. But, then I went to court and I said, you know,

48

"I will claim them" --

Q    Do you know if he claimed them in that year?

A    In the end, he ended up getting to claim them. The judge was like -- I obviously made it confusing or something.  But, yeah, he was in the rears, she stated. But, I guess he thought it was better that he gets all that money and I owe a little less.  Because I might have owed a hundred something dollars less.  But, it was more the point, because he should -- because I gave up a good amount I got.  And I gave up a bunch to get the divorce agreement, so he needs to follow it, because I follow it.  I follow everything.  I'm just like that.

So, if he's not going to follow it, then he shouldn't be rewarded for it.  And then take that money and put it to good use.  So, but by the time we got to court, at that point, if I'm having a problem explaining it now, it was like even worse.  I'm like, when I'm speaking to her, I just can't get my point across, I guess, clearly on that case.

But, we have a really difficult agreement. It's confusing.  It's like a thousand dollars a week, but it's broken down in two components.  Now it's not, because I sold the house, but it was a mortgage component and non-mortgage component.  The non-mortgage

49

component would be the money I would give to the DOR. The mortgage component would be the money he withheld every week to pay the mortgage. And so, and then it just -- at the end of the week, it was -- at the end of, you know, at the end of the week, it was a thousand dollars. But, it just -- it's complicated. It's very -- it was like 50-something pages long, so --

Q    Did he have a lawyer for the divorce?

A    He did. I had a lawyer for the divorce as well, but he did as well.

Q    Who was your lawyer?

A    My lawyer was Marc Grimaldi from Bretta & Grimaldi. They were out of Medford.

Q    And who was William's lawyer?

A    Kurt Bletzer, I believe.

Q    Do you know how to spell that?

A    I think it was like B-L-E-T-Z-E-R, maybe. I think he's out of Brighton because I had to go once to the office.

Q    Do you know how you spell Marc Grimaldi's last name?

A    And it's Marc with a C again. And it's, I believe like it sounds. G-R-I-M-A-L-D-I. And I think it was Bretta & Grimaldi, B-R-E-T-T-A, or one T. One

50

way or the other, but --

Q    Sorry.  They are doing construction downstairs.

A    That's fine.

Q    So, you were in court on the 20th of February in Suffolk Probate.  What happened that day?

A    Nothing because then we waited, waited.  You go and then they had us being as uncontested, so we couldn't do anything.  So, this is after -- I'm not sure if we had gone in the fall and something else. Something wasn't sent or something.  So, we were back again.  And then this time, it was uncontested.  I mean, we, obviously, it was contested, but they had us as being uncontested, so that didn't work.  So, then they gave us another date of July.  And I had said, you know, I needed to get this done sooner.

And there might have been a couple of other things I was looking to do.  I'm just trying to think off the top of my head, any modifications.  But, honestly, I would have to go back and look, like stupid little things.  But, I needed answers sooner than July, especially for the braces.  So, we were able to get like -- I was able to get an April date.  And he was just livid.  And he had already sent me an e-mail, "Just

51

leave it like it is.  Why can't you just leave it like it is?"  And things like that.  He was already angry about the day before so --

Q    I don't think I asked you this earlier:  Have you always had custody of the kids?

A    Yes.  I had sole custody, legal and physical.  And then my lawyer convinced me to, you know, to give him joint legal to -- that was already two years and my father's pension that, at that point, we literally were like, you know, and the court, we were going to trial that day when we kind of settled it.

Q    So, when did you -- when did your sole custody, legal and physical start?

A    Well, when he left in December --

Q    Of 2009?

A    Yeah.  We ended up going to court in May, end of May of 2010 for the temporary orders, and that's when it was given to me.

Q    So, temporary order in 2010?

A    Uh-huh.

Q    Is when you first --

A    Got support, like got all the guidelines of, you know, everything.  And I had that for two years.  And then, to settle, he's like okay we'll just give him

52

joint legal.

Q    You said that the divorce was final in December of 2011?

A    Yes.

Q    And when you said to settle, are you talking about settling the divorce case?

A    Yeah.  We were going to trial that day and prior, like in the courthouse, in the -- they were trying to work it out and, at that point, just to write up something.

Q    An so, in December 2011, you agreed to -- what was it?

A    I don't know what you mean.  Which part? Like, which part did I agree to?

Q    In terms of custody.

A    Oh, I agreed to sole, physical and joint legal, where I had sole everything before.

Q    And has this been the case since December of 2011?

A    Yeah.  I should have gone back but I have not gone back to get -- to make sole legal anymore.

Q    Any changes in your arrangement at all since that day?

A    No.

53

Q    In terms of custody of the children?

A    Oh, no.  No.  They still live with me.  They see him every other weekend and Wednesdays for like three hours.  Although, the older ones don't really want to go anymore.

Q    I should have asked this earlier.  Well, you said that you babysit for one -- one kid?

A    One little boy.  Yep.

Q    And for how long have you been doing that?

A    Oh, I've usually always had somebody.  But, this little boy, I have had now for I think like, probably like either two or three years.  Three years because, he was two.  He's five.

Q    Do you know when you started to watch this boy?

A    That's what I'm trying to think.  It was like in September.  It was September and I just don't remember, because he was one, two.  He was two but he is five.  But, so I don't know if it's like two years or three years.  It might be three years now I have had him.

Q    2015 sound about right?

A    Maybe, yeah.  Probably about right.

Q    And --

54

A    If not '15, it's '16.  Honestly, I'm trying to judge by what grade and stuff he was in when I -- but, it was like the pre, pre-K1, like the K0.  It's a different school, so he was in K0.  And then, I think it was K1.  Okay.  So, he was in K0.  And then, last year, he was in K1.  And this year, he's going to K2.  So, it's two years probably, I think.  Three grades but, two years.  It just seems longer.

Q    And you said you had watched kids prior to this current child?

A    Yes.  I had another little girl.  And at that point, I'm having two little boys and a little girl.  And the two little boys were kind of like, their mother was a nurse, type of thing.  It was more like, you know, she called me the morning of, "Well, Brian is going to stay home from work today, so you don't need to" -- you know what I mean?  It was not like a set schedule.

Q    Sure.

A    And then, I watched my friend's daughter.

Q    So, prior to the current -- what's the current boy's first name?

A    Patrick.  Prior to Patrick, I had kind of joint, but never really -- not really ever at the same time, Persia.  Little girl, Persia.  And two little

boys, Jack and Shane.  Jack and Shane were more sporadic.  It was kind of like their mom was going to school, initially.  And then she did get a job but the hours were odd, so it was not anything set.

Q    And so prior to Patrick, you were watching all three kids or was it the two boys?

A    Jack and Shane, like I said, originally I had them more often.  I had them probably for a couple of years as well.  Originally, it was more of a set schedule, because she was going to school.  So, I would have them like after school before she got back or before school.  And then, after she got a job, it was kind of more sporadic.  And so, when it was more sporadic with her, I started watching, kind of, Persia.  But, Persia was more -- I think I had her more like in the summer.  And I don't usually watch anybody in the summer.  But, I had stuck her on our pool membership, so she would come with us and stuff like that.  Her and my daughter were friends, and so it was just easier.

But, like, I didn't watch -- like, right now, I'm not watching Patrick in the summer.  And same with Jack and Shane.  I didn't have them in the summer either.  So, Jack and Shane and Persia kind of overlapped.  And the only overlapping part was when I

56

sporadically had them, if it happened -- I did have Persia in the school year, too, but it was only three school days in the week.  I could not tell you what days.

If Jack and Shane's mom ended up getting scheduled and it was that same day, but that was it.  It was never like I had Persia, Jack and Shane, and they are coming every day 7:00, and then after school, whatever.  So, it was never really like -- Patrick is probably the most set schedule out of everybody I have ever had, so --

Q    So, with Jack, Shane and Persia, it was more informal?

A    Yeah.

Q    Or as needed?

A    Jack and Shane ended up being as needed. Initially, it was kind of like, say, like in the first half of the year.  You know, just like being in school, you get a new schedule, you get new classes.  So, you know, I would know when I had them, until she finished, because she had already been in.  This was her last year.  I don't know who watched them prior to this but, you know, it was her last year.  So, I had them, you know, pretty steadily that year.  And then, after she

57

graduated, I didn't have them in the summer.  And then after she graduated, it was sporadically.  And that's kind of when I started having Persia.  And Persia was kind of like three days a week.  But, it would kind of alter because it varied, because her father, like, worked out of the house, but it would be different days so --

Q    So, when did you start watching Jack and Shane?

A    I'm trying to think when I started babysitting.  I'm trying -- I don't know.  I don't know if it was how long after the divorce.  It wasn't -- it wasn't because mine was still like little.  My youngest was three at the start of my divorce and stuff, and I had four of them.  So, it was probably like when they were a little bit older and in school all day, so I don't know.  I don't know.  Probably, maybe, I don't think I had them while the divorce was going on, so it would have been after 2011.  So, maybe 2012.

Q    And until when did you watch Jack and Shane?

A    Oh, God.  I -- I don't even know.  It was like definitely a year straight.  I can't remember if it was a year straight or two years straight while she went to school.  And then like sporadically, kind of, for the

58

school year.  And then Persia was in that same time frame, and then Patrick had been the past however many.

Q    Any other children that you have watched?

A    Other than just my friends' kids, just watching them, you know, to watch them.  But, no, not like where I get paid.

Q    And any interruptions in taking care -- in the babysitting at all?

A    You mean, in 2016, where I didn't have anybody?

Q    Were there any interruptions at all in babysitting?

A    I don't understand what you mean.

Q    In terms of, yeah, in between having a kid or --

A    Because it was hard.  I think with Jack and Shane, I can't really say there was an interruption, because they were kind of sporadic.  But, I guess between them and Persia, there might have been a little bit of one because they were sporadic, even though I was watching them.  You know, because there was a while where I was watching them sporadically.  And then Persia, and then I started watching Persia.  So, if you want to count that sporadically as an interruption.

59

But, you know, I might not watch them for two weeks. And then, you know, maybe the third week, I'd have them a day, and maybe not for two more weeks. That's why I had to find somebody else. I needed an income, so --

Q    Sure. Other than what you just said, was there anything else that interrupted your babysitting of the kids?

A    No. Like, no, because I did Persia until the end of the school year. And then I already had Patrick lined up for the next school year, so --

Q    So, going back to February 21st of 2014. I think you said you were in the Kmart parking lot, where we left off, and that Mr. Kelley had pulled up into the parking lot, but was at a spot that --

A    I didn't want to just tell the kids to run across. He wasn't out of his car or anything. He just sat in his car in the dark and --

Q    And for the record, he was at a spot that was not directly next to your car?

A    At that moment, at that time, yes. He was across and where the kids would have gone. And he didn't get out the car. And, honest, I was a bit nervous anyways because of his texts. And I already knew he was mad about the day before, and he just sat

60

there and didn't get out.  And I thought that was really strange.  So, when the kids started to cry, like whine, "We are freezing.  We are freezing."

So, I put them back in and I went around and I got back in.  And I was texting to tell him to move.  He then, all of a sudden, just pulled forward.  And he pulled parallel to me.  I think it was about three or four spaces down.  His driver's door facing Route 3, so we are facing opposite direction.

Q    What happens next?

A    So, at that point, I was a little weary.  I got them out on my side of the car this time.  The stuff was still outside.  I never put it back in the car.  And I walked them to the back of my car.  I said goodbye. He had gotten out this time.  And now it wasn't sending them across the parking lot like that.  I just sent them over to him.  And he was, last I had seen him, I got back in, and he was trying to put them back in the car.

And I get ready to go, and I hear this big commotion.  So, I rolled down the passenger's window and I hear my daughter ▮▮▮▮▮, who is severe anxiety.  And at that point, she was not able to take her meds because my ex-husband -- this is one of my regrets with giving the legal -- decided he just was preventing her.  He

61

finally allowed her to see this new doctor.  And the doctor was still trying to allow him -- allow her -- convince him to allow her to have the meds.  She'd seen the same doctor that passed away, as I did.  She had seen the therapist, but this is the one that prescribes.

And so, she was -- I hear this huge commotion and she's so upset and screaming.  And I said, "███████, what's wrong?"  And she's like, "The bags, the bags." And I'm like, "Your father is going to put them in the car.  Don't worry."  And I hear Mr. Kelley say, "No, I'm not."  And she starts screaming even more.

He probably would have but I -- I mean, you don't do that to your child, but that's who he is.  And so, I could not leave for the weekend with my daughter like that.  Okay.  See you later.  No.  That's just -- so, I get out of the car and I went -- I think I went around the back.  And I grabbed the hockey stick and the bag first, and then I was going to come back for the other one.

I did not look at him.  I did not say two words to him.  I said nothing.  I went nowhere near him. He was still trying to get ████████ and ████████ was outside the car.  And I did see he was trying to push her in because she was trying to get out.  I walked

62

around the back of the car as far away -- I did not look at him, speak to him.  I cannot say that enough.  I wanted absolutely no contact with him.

I went around the back of the car.  And as I came up around like the rear of the driver's side, as I, you know, rounded there, and out of the corner of my eye, I see him like running.  In the process, he had knocked my daughter to the ground.  I didn't know that then.  He came running around the back of the car and he said, "Get the" -- can I say it or --

Q    You can say whatever you like.

A    "Get the fuck away from my car," and he pushed me.  And I just remember thinking, "Oh, my God.  I cannot believe he just did that."  And I was just like, I went down on my knee.  And I think -- I don't know if the bag and the stick, whatever it was.  And I went right down, hit the cement, but I went right down on it. And I just remember like, "I cannot believe he did that."  And he did that with my kids around.  I didn't know if they saw it.  I just -- but that's what I was thinking.

And then I threw the stick down because it was still in my hand, and the bag was still in my hand.  And that's probably why I didn't brace myself.  It might

63

have went out or, whatever, when I went down.  But, I ran and I said, "I'm calling 911.  I'm calling the police."  And I ran back to my car and I went around.  It must have been the front of his car.  And I went back to my car.

And as I was running back, I saw ▆▆▆▆▆ on the ground crying.  And I'm like, "▆▆▆▆▆, come here," and so she came running.  And I said -- ▆▆▆▆▆ was still kind of in the door, but you could see her.  She was in the car.  And I said, "▆▆▆▆▆, come here."  And then, he had came back at that point and made her stay in there and close the door.  And ▆▆▆▆▆ was in his car and I had ▆▆▆▆▆.  And ▆▆▆▆▆ was crying because she's on the ground still.  And then, she came over and then I put her into, you know, she got into my car.  And that's when I had called the police.

Q    I'm going to interrupt you there.

A    Sure.

MR. PADOLSKY:  Off the record.

(Thereupon, a discussion was held off the record.)

BY MR. PADOLSKY:

Q    So, back on the record.

I'm going to give you a piece of white paper,

64

for the record, and just ask you to draw the portion of the Kmart parking lot that your vehicles were parked in. And draw a diagram depiction of your vehicles.

A    Okay.  I think this is kind of like where the doors were, like the middle of Kmart, maybe.

Q    If you could just write the label.

A    You can't tell by my pictures.  Okay.  And then it was -- I'm not exactly sure.  This would be like the parking space.  This is where the cars drive up. These are parking spots.  I'm actually a good artist but you can't tell from my work now.

Okay.  And then I keep going.  Obviously, they are going all the way down, but these are just parking spots.  And I believe it was somewhere like here, where I was.

Q    So, just using the yellow highlighter or the pink highlighter is fine.  So, for the record, you are using the pink highlighter to designate where your vehicle was parked?

A    I'll make a code for you at the top.

Q    Thank you.

A    It would be the yellow car.  So, initially then, it's probably over more diagonal, though, a little more diagonal.

65

Q    If you could just use --

A    I'll use yellow.  Sorry.

Q    Just indicate that that's the first spot that he was parked at in the key.  Use a different color for the next spot.

A    Okay.  Okay.

Q    And if you could use the red and blue pen. The red could be -- we'll say the red will be you and the blue will be a representation of Mr. Kelley.

A    Okay.

Q    Just to indicate -- just to indicate after the part of the evening where you testified that you got out of the vehicle, after rolling the driver's -- the passenger's side window down.

A    Okay.

Q    And hearing your daughter.  You got out of your vehicle and walked over to Mr. Kelley's vehicle. At that point in time, if you could just use the blue.

A    Oh, that's not -- I'm sorry.  The blue pen?

Q    Yes.

A    Okay.

Q    To indicate the direction that you walked and the location of the altercation that you testified to.

A    Want me to draw the bags and stuff, too, where

66

that is?

Q   You could, yes.

A   I have no more colors.  I'm just going to draw -- I'll draw them in a different color because it's going to be -- I don't know.  We don't have enough colors here.  Let's see.  These are, I'll just do a box and I'll put that over here.  All right.  Hockey equipment, hockey stick, bag and book bag.  It wasn't a backpack.  It was a book bag, where the top was a tote.  Okay.  That's that.  And that's me.  Okay.  So, I got out, grabbed the bag.  Mr. Kelley is red?

Q   Yes, ma'am.

A   He is here.  I grab the things and then I continue to walk over here.  And I got to, probably, like right about here and that's when Mr. Kelley came running around and pushed me.  That's kind of -- let me do the key here.  Okay.

Okay.  That make sense?

Q   It's pretty good.  A pretty good rendering.

A   Okay.

Q   If you could take the yellow highlighter and just highlight the location of the push.

A   Probably around like right there.

Q   Okay.

67

A    Towards that side of the car.

Q    Okay.  That's -- thank you.

A    I don't know exactly.  Still outside of the car by the time I fell.  Or, you know what I mean?  Probably midway through the car, almost, is where I would have landed.  I don't know.

Q    Okay.

A    Back towards the middle.

Q    So, why don't we have this marked as the first exhibit?

A    But, you are going to think that's his car too, so I'll write "push."

Q    That's fine.  It will be indicated on the record.

A    There you go.

        (Thereupon, Exhibit Number 1 was marked for
    identification.)

BY MR. PADOLSKY:

Q    Thank you.

        So, tell me everything that you can recall at the time that you testified that Mr. Kelley pushed you to the ground?

A    I got up.  I then -- I won't write on it, but let me see where am I.  So, he pushed me and I just, the

68

bag, just, I let go of; and the hockey stick, I tossed. I just remember it and I just -- it was when I hit the ground, they were still in my hands, both of them, because I couldn't like stop myself from falling right on the knee.  So, I dropped whatever, dropped it, tossed it, whatever.  And I then ran around the back of the car and I -- that's -- this is the only -- this is the first time I said anything, I believe, to him at all.  We don't normally speak.  We communicate through texts and e-mails.  And that's when I said I'm calling, either 911 or the police, whatever I said.  And then I ran over, and that's when ███████ was on the ground right from next to where he started.

Do you want me to make a little -- ████████ was right here.

Q    Draw a blue circle to indicate ███████████ location.

A    I'll just write "███████" next to me.  So, she's like right next to like the door from where he started, apparently.  And so, she was crying, and so I ran around, so that I just ran.  And that's when I said I was calling the police.  And as I got here, I seen that she was crying, and I run back to the far side of my car.  And I told her to come over, and she came

69

running, and I put her on this side here.

And I yelled for ▇▇▇▇ to come but he had gone -- I don't know how he got back to his car or whether he went that way or that way.  I just remember he stopped ▇▇▇▇ from coming out.

And then I was shaking and I was so nervous. And I called 911, and I believe I got the state police first and they transferred me to Braintree.  And at this point, he was not on his phone.  I seen him scrolling or something like that, through it, and wasn't on it.

So, I'm talking to the dispatcher.  And then, when I was on the phone with her, I then saw him, you know, on the phone after I had been on with her for a bit.  And --

Q    So, what do you recall of that conversation with the dispatcher?

A    So, I called the dispatcher.  Well, I called 911.  And I had the state, they got me the state police first.  And then they transferred me to Braintree and it was a lady dispatcher.  And, like I said, I was the only one on the phone at that time.  And I am telling her -- I don't know if I -- I think I said my ex-husband like pushed me or I don't know.  I told her what had happened and she, you know, asked me, you know, I guess, my name

70

all this stuff.

And it seemed like I was talking to her the whole time, but I guess, apparently, she must have said, "Hold on" or whatever, and went back, and after hearing the 911 tapes and stuff.  So, I was on the phone with her and I had said that my ex-husband had, you know, assaulted me.  And, you know, she's asking me where I am, things like that.  And she probably asked like who was with me, like my kids or whatever.

And I told her that he was a police officer and I must have said where, too, or something.  I just remember her saying, "Well, does he have his weapon with him?"  And he supposedly was coming from work, and I just remember looking over and he had a big gray sweatshirt on and jeans.  But, then I was like all paranoid.  I'm like, "He's not going to draw it."  Like, I was thinking they were all going come and have their weapons drawn.  I didn't want my kids, you know, getting scared.  And I'm like, "But, he wouldn't pull it or something."

So, then she was talking to me and I don't know how long.  Everything seems so much longer at the time, but was talking to her for a bit.  I mean, enough to give her all this information.  And then she must

71

have left and came back on, and things like that.  And then she -- I remember her saying, "Okay.  Do you see the police cars?"  I think she said, like, "You should see two of them."  And I didn't see any of them.  There was nothing coming in.  And she was like, "You don't see them?"  And it was like, "Nope."  And after a few seconds, it was like, "Oh, I see them now.  I think there's three or something," I said.  And she said, "Okay.  Well, wave them down."

So, I was waving them down and they -- one went, whatever, past me to my ex-husband.  Pulled over by his car, on the other side of his car, I think.  And then, one had stopped.  And then, I don't know if the third one like, he -- I don't know if he came over or whatever.  It didn't matter.  I just know that I spoke with an Officer McNamara.

Q     Were you still on the phone with the dispatcher at this time?

A     No.  The minute they got there and I waved them down and they pulled up, she ended -- ended the call.

Q     Did you have any other interactions with the dispatcher?

A     No, that was it.

72

Q    Do you claim that the dispatcher harmed you in any way?

A    Yeah.

Q    How?

A    Can I answer this?  Am I allowed to ask my attorney?

Q    So, if you need to take a break, you can take a break --

A    Well, indirectly, in the end.  Yeah, she harmed me quite a bit.

Q    How do you say she harmed you?

A    Clearly, the information I found out after the fact, on hearing the 911 tapes and the turret tapes. She most certainly harmed me.

Q    How so?

A    Like, it was very clear in her tapes that they were calling offline.  "Oh, Well.  If you want to know more information," to Sergeant Bata, the arresting, deciding arresting officer.  "If you want to -- a domestic call at, you know, Kmart, blah, blah, blah." And he's like, "Okay."

        And she's like, "Well, if you want to know more, call me offline."  And he said, "Why?"  And she says, "It's an off duty."  And he says, "One of ours?"

73

And so, I can go into more, but I don't want to.  If you hear it, you can listen to it yourself and you can figure it out.

Q    Well, I just want to know how you say she harmed you?

A    How legal is it to have a little private conversation from one cop to another, off-duty cop, offline, saying, "Oh, you know, it's another cop."  Obviously, clearly, it would be recorded, then we should be able to hear the conversation, that offline conversation.

Q    So, that's, the offline conversation is one of the reasons; right?

A    Oh, yeah.

Q    Are there any others?

A    I don't know off the top of my head.  It's just different things.  The remarks she kind of made, like snickering at the end when they said, "Oh, you know, she's closing out the call," or whatever it might be, or whatever they call it.  And she's talking to Officer McNamara, I believe, at that point, because he was the one that brought me in.  And she said something about, oh, you know, whatever.  Basically, in a nutshell, like, "Okay.  What's the deal here?"  And he's

74

like, "Oh, bringing the prisoner in."  And she laughed like "Okay."  It was a big joke.

Q    Are there any other ways?

A    How, like, did it effect me?  Well, I believe she was -- she has a lot to do with the whole issue.  I mean, she didn't follow protocol, clearly.

Q    How so?

A    Let's see.  I -- I know lots of -- I have different things but I don't want to, like, say it because it's --

Q    Well, this is the time.

A    Why?  I mean, so what, you can go back to her and she can kind of make up some lame little excuse of things that she did?

Q    Well, no.  You brought a lawsuit; right?

A    I have.

Q    And this is your deposition and this is the time at which you tell us, for the record, how it is you say that the defendants harmed you.  So, I don't want to -- I want to give you a full opportunity to say what it is you think that the dispatcher did to harm you specifically.  So, you said --

A    Just, she was part of the entire problem.  She was the root.  She was the original part of the problem.

75

I, you know, those officers are big boys.  You know, they -- you know, he -- we don't know what they were talking about when they got off the phone.  And I could say other issues, but I just -- I don't know.

She caused a lot of the problem.  She didn't follow protocol.  You don't talk offline.  If you do, where is that recorded call?  It should have been part of discovery.

Q   So, it was the offline call; right?  You said she was snickering and laughing at some part?

A   At the end, it was kind of like a snicker, "Okay."  You know, like --

Q   Is there anything else specifically that you said she did to harm you?

A   And I don't quite understand what you mean by "harm me."  Just her behavior.  Her not following protocol.  Her, you know, "Oh, it's another cop.  Let's talk offline."  You know, she contributed to the overall problem.

Q   When you say, "Not following protocol," are you referring to the offline conversation?

A   A few other things as well.

Q   What else?

A   She never even wrote a report.

76

Q    Anything else?

A    I -- I don't -- I mean -- I mean, specifically, like harm me?  The harm, meaning, how did this whole thing affect me, or what she did wrong to have this affect me?

Q    Anything that you take issue with in relation to --

A    I take issue to the fact that I called for help and --

Q    -- with relation to the dispatcher's conduct?

A    The entire time she's on the phone with me and she's somewhat, you know, civilized and whatever.  And you think you are calling someone for help.  You get her on the other end.  You hear the other end, and she's sitting there telling the dispatcher, "Oh, yeah."  I mean the officer.  "Call me offline."  You know, "It's another cop" and this and that.  And then snickering at the end like, kind of like, "Oh, yeah."  Like a good old boys club and she's part of it.

And just, she contributed to it, basically, to the whole what happened to me.  She should have been, "This is what it is."  You know, it shouldn't have mattered that he was a cop.  It should have mattered that I called looking for help.  What does it matter

77

that he was a cop?  I called in because someone assaulted me.  I called her first for help.  And if she can't do that job, she shouldn't be doing that job.  She shouldn't be like, "Oh, it's a cop."  I can see for safety reasons why.

"Yes, there's another police officer involved. He's an off-duty cop.  We do not know if he has his weapon.  His ex-wife doesn't think, you know, he will draw it.  Be careful."  That should have been the call.

It shouldn't have been: "Oh, yeah.  It's an off-duty.  If you want to know more about this call, call me offline."

"Well, why is that?

"Oh, because it's a cop.  It's an off-duty."

"One of ours?"

So, see it from my point of view?  I'm bleeding.  I call for help.  Never called for help before, like called, actually 911 for help.  I finally do because, in Boston, I probably wouldn't have gotten it, but who knows.  I finally do and then this is what she does.  So, I mean, I don't know what else you want me to say.

Q    Just what you recall.

A    And I just did.  If I think of anything else,

78

I'll add it to my 30 days after, but right now --

Q    That's everything?

A    That I can think of.

Q    With respect to the dispatcher?

A    That I can think of.  Yeah.

Q    So, you made mention of an observation that you made while you were on the phone with dispatch of Mr. Kelley.  What did you observe?

A    Well, when I was on the phone talking to her, he wasn't even on the phone yet.  Saw him scrolling, whatever.  And then after I was on the phone for a few, a little bit, he then -- then I saw him on the phone. So, I mean --

Q    Are there any other observations that you made of him during this time frame?

A    No, because I was over here and I wasn't really trying -- I wasn't looking at him.  I was upset. And I was just checking on my daughter, and she was still crying, and she had calmed down in the car.

Q    Did you make any other observations that you can recall during that time frame?

A    I don't know what you are looking for.  Like what type of an observation; like was he walking around, was he doing whatever?  I just --

79

Q    Just observations that you specifically recall.  If there are no others, then you can say that.

A    Not that I'm aware of.  He was kind of like pacing or something over by his car.  Other than the fact that I just, when I was calling, I was looking over because I said I was calling the police.  And I was on the phone and I saw him going through his phone like he was looking for a number or something.  And then I turned around and was on the phone talking.  And then, well, I didn't even turn around.  I was still kind of watching because I was nervous, but out of the corner of my eye.  And then I, later on, saw him on the phone.

Q    What happened -- what do you recall happening next?

A    Like I said, I waved the police down.  And I then -- Officer McNamara is who I was speaking with.  He came over, and he was an older gentleman, and he seemed somewhat nice.  And then I was embarrassed at that point, too.  I remember off and on crying.  And I said "Oh, I'm embarrassed" because I hadn't called the police.  I obviously felt the need for the help.

And so, they arrived, and then when I told them that, I told them.  You know, I was crying.  I was upset.  I was embarrassed.  I told them about my

80

daughter, how he knocked her to the ground. He never, at any time, even asked my daughter how she felt or if she was okay.

He was just then kind of talking at me. And then I do remember he said something like, "Oh, don't be embarrassed. It happens lots of times." I think he even said, "Oh, it happened outside the police station one time."

And so then, I start to cry and then I would be okay. And then I talked to him a little bit more. And then he asked me like what happened or something, and I basically told him. He was late. He didn't, you know, he was supposed to call. The kids had places to be. I was supposed to be somewhere down in that area later. It didn't affect me one way or the other, as far as, I mean, I could have gone later. But, the kids were really upset and I was almost back towards the highway anyways. So, at that point, I had just kept going. And that's when I had told him I would meet him at the Kmart, because we had done that another time as well. So, I didn't think it would be an issue this time.

So, I had told him, basically, that and stuff. And then I remember him saying something like, "Well, weren't you like, you know, kind of mad or whatever that

81

he was late?"  And I said, "I'm sure I was, you know, annoyed but I wasn't the one that was put out.  You know, put out.  I'm where I need to be."  And then, at that point, I'm thinking, "Oh, that was odd," but --

Q    So, at this point in the conversation, it was just you and Officer McNamara?

A    Yeah.  I'm not sure if Officer Bata had walked over quickly at first, but then went to talk to my ex-husband.  Because he came, seemed to come a little bit after them.  I'm not quite sure how much but, like, he had come talked to -- and I wasn't watching him, so I don't know if he had spoken to my ex-husband first.  Or, I thought he had come to see me first, but I know he was going back and forth.  And then he did seem to talk to my ex-husband more than he did to me.  So, I was talking to Officer McNamara and telling him what was going on.

And then I remember when Officer Bata had come over, they were asking me, again, what had happened. And he asked me something about, like, the bag and the hockey stick or something.  And I said that I had had it in my hand, and when I fell, it went out.  It went out. At this point, I have no idea what the heck -- I'm just telling him this.  Obviously, after, I'm like I can't even believe he twisted it into that.

82

Q    I'm going to interrupt you just for a second. If you could just try to use names as best you can, instead of using "he."

A    Oh, I'm sorry.  I thought I said it.  Okay.

Q    So, when the conversation that you were just speaking of, was that with Officer McNamara?

A    Officer Bata and McNamara.  Officer Bata, at some point, had come back over and asked me or he had came over.  At some point, he was asking me what happened.  Officer McNamara was with me the entire time.

Q    Okay.

A    The only person that would come back and forth would be Sergeant Bata.

Q    Okay.

A    So, at some point, Sergeant Bata, I told him what had happened.  And I said how I was carrying those over and I was going back to get the book bag.  The whole purpose of me doing this was to make my daughter just feel like, okay, it's not over here in the parking lot.  It's next to his car and he'll have to pick it up when they leave.

Q    So, at some point, Sergeant Bata came over to you and Officer McNamara?

A    Yeah.  I'm not quite sure if it was -- at some

83

point he did.

Q    And he asked you what had happened?

A    He asked me what had happened and I told him exactly what I told you.  And I stated specifically I did not look at him.  I did not speak to him.  I wanted nothing to do with him.  I just wanted my daughter to calm down.  And I said how I picked up the hockey stick and the bag, and I told him what happened.  And they said, "Well, were you holding the hockey stick?" Something like, "How were you holding it?  Were you holding it with one hand or two?"  Or, something to that effect.  And I didn't know if it was one or two.  The bag was kind of heavy.  So, honestly, I don't know.  I just had both things in my hands.

And then I said, "When I fell or something." And he said, "Well, what happened to the hockey stick?" I said, "Well, it went out.  I'm assuming it swung out when I fell."  And he then said, "Well, did it go out in one hand or two?"  And I couldn't remember.

And he asked how it swung.  And I said, "I don't know.  I don't know if it was like a swinging or if it went out."  I honestly, I was just telling him what happened.  And, at the time, I wasn't thinking that he's going to twist this around.  And because I told the

84

truth.  And so, the next thing I know, he walks off, I think, at that point.  And then he came back at another point.

Q    Before you go any further --

A    Officer Bata.  I'm sorry.  Sergeant Bata walked off.

Q    Have you told us today everything that you can recall of that conversation with Sergeant Bata?

A    Yes.  That's everything I can recall.  I might have said -- I know I said I was embarrassed and all that to Sergeant -- I mean to Officer McNamara.  I think Sergeant Bata -- Officer McNamara was more like, you know, the calming down, but asking questions.  Where, I think Sergeant Bata was all business, coming over asking exactly, and stuff like that.

Q    So, have you told us everything you can recall of that conversation with Sergeant Bata?

A    Yeah, everything.  But, then I was going to tell you there was more because he came back over.

Q    Okay.  So, he left?

A    At some point, yeah.  When I told him originally what had happened, I know he had walked off. He walked off a couple of times.  It could have been more.  It could have been less, but I know at least like

85

two or three times.  He seemed to be over at my ex's car more, because I just seemed to be alone with Officer McNamara more.  He then came back over at some point and said -- and I had showed them my injury.  I showed all of them.  I showed Sergeant Bata when I told him what had happened.  I told Officer McNamara.

Q     What was the --

A     I showed them.  I had a bloody -- I had a bloody knee.

Q     Any other injuries?

A     I had fallen on my hands, like when I had the thing.  It was because I wasn't dropping it, I went straight down.  And it just like, I don't even know.  It was just like my hands, but I didn't go to the hospital really so much for that.  It was the knee.

Q     Those injuries were, you say, were caused by your husband; right, or your ex-husband?

A     When he pushed me, yes.

Q     Did you take a picture of these injuries?

A     I did.  And I will get to that and tell you exactly why I had to take a picture.  Yes.

Q     Is it just one picture or multiple?

A     I took one picture.

Q     Do you still have that?

86

A    I do.  It was -- if you are going to get there, because that comes up.  If you just want to wait, because I can --

MR. PENKA:  Karen, let him ask the questions.

THE WITNESS:  Okay.  Sorry.

BY MR. PADOLSKY:

Q    Do you still have that picture?

A    I do.  It should be in your evidence.

MR. PADOLSKY:  I don't think I have it.

MR. PENKA:  It's either attached to your complaint or --

THE WITNESS:  The only pictures prior --

MR. PENKA:  Karen.

THE WITNESS:  Oh, I'm sorry.

MR. PENKA:  If you don't have it, that's -- it was either attached to the complaint or it came through in that, because it was only the one picture of her knee.

MR. PADOLSKY:  Okay.

THE WITNESS:  I can get it for you.

MR. PENKA:  Karen.

THE WITNESS:  I'm sorry.

BY MR. PADOLSKY:

Q    So, Sergeant Bata went over -- after the first

87

conversation that you had with him, left your vehicle. Where did he go from there?

A    Back to my ex-husband's vehicle.  I'm not sure if he had already spoken to him at that point or not, but he was going back and forth.  But then, it seemed like he was over there more after he had spoken with me.

Q    At some point, did he come back to your vehicle?

A    Yes.  He came back and he took --

Q    When he was away from your vehicle, could you hear any of his conversation?

A    No.  I wasn't even looking.  No.

Q    Could you see whether he was having a conversation with somebody or what he was doing, in particular?

A    I wasn't looking over there.

Q    So, at some point, he came back to your vehicle?

A    Yes.

Q    And do you know how long after he left, it was that he came back?

A    I don't know.

Q    So, he comes back to your vehicle; what do you recall happening next?

88

A    He had like a flashlight or something.  And all he says to me is, he goes, "Turn around."  And so, I turned around and he flashed the light up and down.  And he goes, "Turn back."  And then he goes up and down.  And he said, he goes, "If you fell, you'd be wet.  Your pants would be wet."

And I said, "They are wet."  And I showed him where, right below my knee.  There was a wet spot, and I pointed at it, and I showed him it.

And he goes, "That's not big enough."  And I said -- and I was just kind of surprised.  And at that point, I'm pretty sure I said, "What, do you think I did this to myself?"  And he just walked off without another word.

Q    Any other conversations with Sergeant Bata?

A    At the end.  But, I just wanted to add, like, throughout this time, I was telling -- I may have even told him, but I know I was telling Officer McNamara I was like nervous, because now it's probably like almost a quarter of 9.  And, initially, I also told Officer McNamara that my daughter needed to be picked up at 9.  It was Hyde Park skating rink and I didn't want her waiting outside by herself, so I was getting really nervous about someone picking her up.

89

Q    Who was supposed to pick her up?

A    Well, if the dropoff had gone well, her father was going to pick her up.

Q    So, you said this to Officer McNamara?

A    Yeah, yes.  I was just getting concerned because it was getting later and I didn't want her -- at this point, it's almost quarter of.  And so, anyways, after Officer -- I mean, Sergeant Bata had walked off after I said that.  I'm not sure how much longer after that.  It didn't seem like that much longer.

The next thing I know, they were taking ████████████ of the other side of the minivan and loading her up into my hex husband's car, and then they were like driving off.  And then, Sergeant Bata must have walked over at that point.  And, at that point, I just started to cry again.  And I'm like, "I can't believe no one is going to help me."

Q    Who's driving off?

A    My ex-husband with the kids in the car.  I'm sorry.

Q    So, your ex-husband leaves with the kids?

A    Yes.

Q    And who's left?

A    Just me.

90

Q    Any officers?

A    Yep.  Well, I'm not sure if the other officer that he had spoken to, who I later found out was Clark, if he was there or not.  But, I was still with Officer McNamara, and Sergeant Bata walked back over to us.

Q    Did you have any interaction with Officer Clark?

A    No, not at that time.

Q    At any time?

A    Later, when I found out he wrote the report, I realized that after I was bailed out in the waiting room, he was the officer that came out to take a picture of my knee.

Q    Other than that, did you have any interactions with Officer Clark?

A    No, no.

Q    Do you recall any conversations with Officer Clark?

A    No.  I don't think there was.  Even when he took the picture, I don't think there was any conversation.

Q    Other than what you have already testified to, can you recall any other interaction or conversation with Officer Clark, whatsoever?

91

A    No, none.

Q    So, your husband drives off.  The officers, Clark, McNamara and Sergeant Bata are remaining in the parking lot?

A    I don't know where Officer Clark is, really, at this point.

Q    So, at this point, as far as you know, Sergeant Bata and Officer McNamara are still remaining in the parking lot with you?

A    Yes.  Officer McNamara is there.  And I believe Sergeant Bata had just walked back over.  And that's when I started to cry.  And I said, "I can't believe no one is going to help me."  And Sergeant Bata goes, "Come here," like, "Step over here."  And I'm thinking, you know, he's going to be like, you know, "You just got to worry about the kids, and this and that."  And it was just going to, you know, they weren't going to do anything to him again or anything like that.

And he says, "Turn around."  And I was like, "What?"  And stuck the cuffs on me, and then I just started hysterically crying.  And I remember I kept repeatedly saying, "Why, why, why?"  And then he says, "You said you hit him with the hockey stick."  And I was hysterically crying.  And I said, "I never said that."

92

And that was the end of my conversation with Sergeant Bata.

Q    Do you recall anything else he might have said during that time frame?

A    No, but Officer McNamara turned around after being so nice and goes, "You are lucky we waited until your kids left to do this."

Q    Do you recall them saying anything else?

A    No, I don't.

Q    Do you recall if you said anything else?

A    No.  I was hysterically crying.  I did not saying anything.  I was not -- and I just want to be so clear on this.  I was not disrespectful.  I did not resist.  I was just so hysterical.

Q    Were you anxious during that time frame?

A    That's an odd question.  What do you mean by, "Was I anxious?"

Q    Were you experiencing any anxiety during that time frame?

A    Which time frame; after they arrested me?

Q    Well, before that?

A    Well, I started getting all upset because, after my ex-husband drove off, I realized that no one was going to help me.  And I was just sick to my stomach

93

and I just started to cry.

Q    Did you experience any anxiety before you placed the 911 call?

A    Yes.  I was very nervous and, just, I never called the police on him before.  I didn't know what was going to happen.  I just, all I was thinking is I wanted to get some help.  And, yes, I was having anxiety.

Q    How does your anxiety affect you?

A    I get all -- I don't know.  I'm just very all nervous and shaky.  And, just, it's your stomach.  It's like huge knots.  You want to throw up.  You feel like there's an elephant sitting on your chest.  You -- it's a horrible feeling and you can't shake it a lot of times.

Q    Does it effect you mentally at all?

A    No.  Not mentally, like whatever.  It just, you get all like -- I get very weepy and like nervous and almost just, I don't know how to describe it other than that.  It's just like you just, like, I don't know.  An elephant sitting on my chest.  I'm like, Oh, my God.  You feel sad like you are worried.  It's like an anxious feeling.  Anxious is probably the best word I can describe it with.

Q    Do you feel -- so, you have described quite a

94

few physical sensations to your anxiety.  Do you feel --
does your anxiety affect the way that you process
information?

A    At this point, like here, I was just crying so
hysterically.  I was just so shocked.  I could not grasp
why this was happening.  And I was just crying
hysterically.  And then I started -- I ended up getting
sick and throwing up.

Q    This was after Sergeant Bata told you that you
were -- to turn around and that he was going to arrest
you?

A    Yeah.  And he -- yep.

Q    Before that, you said that you were
experiencing some anxiety before you placed the 911
call?

A    Because I had never done that.  I was like
nervous.  Like, I didn't -- I didn't, you know, there
was a lot at risk even.  Like, I just didn't, you know,
I would not make a call like that or, you know, want to
get people in trouble or do whatever.  I'm not going to
make a fake call.  I'm not going to, you know, risk
anything.  You know what I mean?  So many things.  And I
would not -- I don't know.  I just -- I was just so
anxious and nervous.  I had just been pushed and I was

95

so horrified and scared.  I was only trying to calm my daughter down.

I had no interaction with him and I just, was just so still like shocked.  Like, I can't believe he just did that to me.  And then I was like, "I'm afraid. I'm going to call 911."  I did not want my kids to have to see something like that and think that that's okay. And I didn't know that they didn't see it or whatever, or if they did see it.  But, I don't think anybody should think that that's okay.

Q    So, when you are experiencing anxiety, does that affect the way that you process information?

A    No.  It doesn't so much effect the way I process information as it does, it's just like -- I just feel like, if I'm talking, I might sound shaky and things like that.

Q    Does it affect the way that you receive information?

A    No.

Q    So, after Sergeant Bata told you to turn around and that you were under arrest, what happened next?

A    They cuffed me.  And like I said, I just lost it and was hysterically crying.  And I just kept asking,

96

"Why, why, why?"  He didn't even tell me.  And I kept having to say, "Why, and why, and why?"  And he finally just said, "Because you said you hit him with the hockey stick."  And I just lost it even more, because I'm like, "I did not."

It just blew my mind because you call the police for help.  That was the last thing that I ever thought would've happened.  Maybe in Boston because it's his friends but --

Q    Do you know if he has any relationship to the Braintree Police Department?

A    I have no idea.

Q    He, for the record, is Mr. Kelley.

What else do you recall Sergeant Bata or Officer McNamara saying after?

A    Just that --

Q    After this point?

A    Just that Officer McNamara had then said, "You are lucky we waited until your kids left to do this," or something.  But, "You are lucky we waited until your kids left."  I know that.  And he goes, "To arrest you or to do this."  And I was just sick.  Like, I was just -- just crying.  I mean, I just continued to cry at that point.

97

And then they put me into the back of the SUV. And just an, FYI:  It's not cloth.  It's like the plastic, heavy thing.  If you have kids, that slides. That's what the seat was made out of.  I do remember that as well.

Q    Do you know whose cruiser it was?

A    I believe it was Officer McNamara's.

Q    Do you recall the ride back to the station?

A    It was like two seconds.  Not really.  I just remember coming in through the back and pulling in the back of it, like the back of the police station.

Q    Do you recall any conversation while you were in Officer McNamara's cruiser?

A    No, I don't recall that.

Q    Was anyone else present in the cruiser?

A    No.

Q    What happened back at the station?

A    I remember they walked me in, and there was a long bar.  And then they cuffed both of my hands to the bar.  And then I didn't see where he went ever again.  I never saw him again.  I didn't see any of them, actually, again.

Q    So, back at Kmart, after Sergeant Bata told you to turn around and that you were under arrest, aside

98

from the arrest and the statements that you take issue with, did they do anything else to you?

A    No.  They put me in the back of the SUV.  And I remember seeming like I was sitting there for a while at Kmart.

Q    Okay.

A    In the back of the SUV.

Q    Anything else?

A    I just remember them, like, they must have asked me for my keys or something, to lock up my car, because I know they locked it up.  But, nothing else, other than something like that.  No.  Didn't speak to anyone else.

Q    And the arrest, itself, and the putting you in the vehicle, aside from any comments or anything, that went without issue?

A    Yeah.  I mean, yeah.  I just remember, yeah, going in the vehicle.  Yeah.  Other than that, they just put me in the --

Q    So, once you were back at the police station, you say that you were handcuffed to a pole?

A    Like a long bar along the wall.

Q    Was this in a booking area?

A    I guess, yeah.  There was like a hall and I

99

think the bar was, like, in the hall part, right at the entrance to the booking area.  I don't know.  And I just saw that I was at the -- you know, you'd walk, like, in this hall.  And I think there's the pole with the bar, in there or something.  And the room was, like, there.

So, they handcuffed both my hands to the bar. And, at this point, I was crying and I was trying to tell them I was throwing up.  And so the guy -- some officer.  I don't know anyone's name here -- pushed the barrel for me.  And every time I went over to puke, it like hurt my arms and I was trying to tell them that.  I told them that, and so they undid one of them so I was able to throw up in the barrel.

Q    And this was a booking officer that did that?

A    I guess, or whoever was in that booking area. Yes.

Q    Do you take any issue with anything that the booking officer said or did?

A    No.  Only the one, because there were like two or three of them in there, I think.  One was like behind the window thing.  And one was like doing, like the finger prints.  And it's not what you think, like, it was computer.  And he did those.  And they did the mugshot.

And then the guy behind the window, whatever, where he was trying to make me sign all these papers. And then he had said, "You need to sign."  And I was -- I knew enough to ask what these were.  I was still hysterically crying, but I had asked on this.  And he said, "Oh, something about your rights."  And I said, "No one never read me my rights so I'm not going to sign them."

Q    So, you were presented with some paperwork?

A    Uh-huh.

Q    At booking?

A    Uh-huh.

Q    And one of the pieces of paper was a rights notification form?

A    Uh-huh.

Q    Do you recall which rights, in particular?

A    My Miranda rights.

Q    And you refused to sign that?

A    Because they weren't read to me.  And I had started, I think, at this point, to calm down.  I don't think I was crying as much now, or I might have even almost stopped.  And I just remember that.

And then now, all of a sudden, there was a girl came in or something, the booking room or whatever

101

it was.  And they asked me like questions, like, you know, was I suicidal and all this stuff.  And they had asked me if I had, if I was on meds or something like that and, you know, if I took whatever.  And they asked me if I had any conditions, I said that I have anxiety.  And then I said that I -- I think I said to them, too, that I might have -- that I take ADHD meds and stuff.

Then I remember they took my shoes.  And I also remember they already did my fingerprints and my mugshot.  And I remember I had asked when I was there, if somebody could look at my knee.  And they, I remember them saying that.  Because at no time, even after I showed them my injury and stuff like that, did Sergeant Bata or Officer McNamara ever ask if I needed any medical attention.  Even right in the beginning, because that was the first thing I showed them.  At no point did they say, "Do you think you need to see a doctor?  Do you think you need to see anything?"  Nothing.  Clearly, they didn't believe it.  So, nothing.

So, I asked when I was at the police station, if I could have someone look at my knee.  And they said they -- I think they said something like they don't have that here but they could call someone.  Do you -- do I want them to call someone?  And I said yes.  So, I

102

remember that.

And then -- so, then I also remember like -- I remember there being like an older lady. And it was like Mary or Marie. It was Mary or Marie, I forget. I think it was Mary. And I had to go to the bathroom. And so, I think -- I think, at this point, it was going to be when I was in my cell, anyhow, so she had to go with me. And it was in the cell, which are cinder blocks. And there's a door and there was a window on the door. So, she had gone in and kept an eye on me. She was an older woman and she was very nice.

And so, I remember I was sitting there all night. Never got a phonecall. And I kept saying, you know, "I want someone to take a picture of my knee." Ignored me. The guy walked by, I asked him. He's like a young kid. I said, "Can you please get Mary?" And he was a cop, just a young cop. And I said I wanted a picture of my knee taken. And "Go sit down" or whatever he screamed. And, at that point, I started to cry again.

And then I had asked multiple times to have my picture taken. And then every so often, I would just get so upset. I would calm down for a little bit and then I would get all hysterical again.

103

And then the ambulance or the EMTs came.  And they were two younger kids, like younger guys.  So, one came in and I remember the other one standing in the doorway, with Mary in the doorway.  And I remember asking him if he could take a picture.  And he said he didn't have the equipment.

And I still remember -- this is odd, the things you remember.  He was talking normal and I got all hysterical again, and the poor kid started to stutter.  And I just felt like, "I'm sorry."  I just felt like -- I just remembered that.  And he was very nice and you know, did whatever.  Cleaned it up, and gave me ice and like a gauze, and something like that.

And they were asking me, and they said, "Do you want to go to the hospital?"  And I said, "Yes." And they were like, "Okay.  Well, you do know if you go to the hospital, you will go as a prisoner.  And then you will have to come back here, and you will still have to wait."  And I was like --

Q    Who said that?

A    The EMTs.  And even Mary said, you know, kind of said the same thing.  And so, then I was all upset again.  And I was like, "Well, all right.  I'll go after."  They said, "Why don't you then just go after?"

104

And I said, "Okay."  And I said this.  And I said, you know, "I want -- I will definitely go after but I want you to write in your report that I did want to go."  I never even saw any EMT report, so I don't know if they existed.  We didn't get any as part of discovery.

And so, I was there and then I remember, I think there was like a drunk girl next to me or something.  I don't know how I knew that, but I don't know if she made a noise or whatnot.

And Mary would come back and forth.  And she was very, very nice.  And I kind of told her what was going on and how my ex is a cop.  And I finally called for help and no one is going to help me.  And, literally, still hysterical to the point where, "Karen, if you don't calm down, they may not let you out."  And then I'm like even more, because it didn't dawn on me. Oh, okay.  Friday night.  I could be in jail until Monday.  I wasn't thinking like that.  And so, I managed to calm myself down.  It was about three hours later. Still no phone call.  Still no pictures.  No nothing. I --

Q    Let me ask you:  Did you read the Miranda rights form?

A    No.  He said -- all he said to me is, "You

105

need to sign this."  And I said, "They didn't read me the rights."  And he goes, "You got to sign."  And I said, "They didn't read me my rights.  I'm not going to sign it."

Q    You were presented with the form, though?

A    Oh, yes.  It was right there.

Q    Did you read it?

A    Briefly, I knew what it was.

Q    Did you agree to sign it, though?

A    They didn't read them to me.  Not even that officer didn't read them to me.  It just said that I was -- the form, it didn't say my Miranda rights.  It said that they were read to me.  I'm almost positive on that.  He was saying, "They read you your rights."  And I was saying, "No, they didn't."  So, I wasn't going to sign the form.  And I believe it just said that I was read my rights.

Q    So, you were talking about how you had a conversation with Mary, and she mentioned to you that --

A    She's like, "You got to calm down."  Because if I'm so hysterical, they are not going to let me out.  So, I was finally able just to like finally calm myself down.  I never, ever -- I'm PTA president.  I'm room parent.  I volunteer.  I coach.  This is not who I am.

106

I wouldn't even know -- I thought there was going to be bars. I couldn't have even told you. And it was really upsetting.

And so, when they finally did let me out, I was in the booking room. They had already taken my pocketbook and whatever. And I just actually happened to have cash with me. So, I think it was like $40, I had to bail myself out with. And so, I was in there then. And they had, I just remember this old guy came in. And they referred my questions to him. And I said, "I want to file" -- however it came out. It was a cross-complaint. I don't know if I called it that at the time. I said, "I want to file charges against him." They go, "A cross-complaint?" I said, "I guess, yes. I want to file charges against my ex-husband."

And then the cop said to this guy, and he was like an old guy. And I still remember it was February, and he like white socks on. And he had white socks on with sandals, like the little old man sandal things. I just told you, weird things I'll remember. I'll remember really specific things.

And he goes, "Your lawyer has to do that in court on Monday." And I then said, "I want to file a restraining order against my ex-husband." And they

referred to him again.  Apparently, I guess he was the bail bondsman.  And they referred to him.  And he said, "You got to go do that where you live."  And then, now that lady, Mary, stated because my ex-husband was on the joint terrorism task force with the FBI.  And Mary stated, she got very upset and came to my defense and stated, "Her husband is on the FBI.  She's not going to get help."  Blah, blah, blah.  You know, to that effect. I didn't listen to her, really, or anything, obviously.

So, at this point, I'm now like calm and it's like setting in what they did.  So, when I got my stuff back, I'm still in the booking room.  I'm the only prisoner or whatever.  I'm out.  I'm already bailed out, getting my stuff together.  And I just, all of a sudden, I'm like, you know what?  Took my phone out.  I took my picture of the officer's arm and the wall.  I took a picture of my knee.

And then they said something.  And I stated, "Well, you know what?  You weren't taking them and I'm going to make -- prove I had this injury while I'm here."  And they go, "You can't do that."  Something about other people, prisoners.  There was no one even in there.  And he goes, "You got to go wait out in the lobby."  I said, "That's fine."

108

Q    Who said that?

A    One of the officers.

Q    Do you know who?

A    I have no idea.  I have no idea.

Q    Was it Sergeant Bata, Officer McNamara or Officer Clark?

A    No.  I never saw Officer Clark until about two minutes.  I never saw after Officer McNamara handcuffed me to the pole, whatever.  After he walked me in, whatever.  And then I had never seen Sergeant Bata after the -- from Kmart.  So, never saw any of them.

But, so then I go out to the lobby and I turn around and take a picture of the -- they have a glass door with the emblem on it, going back into like the booking area.  Took a third picture there.

So, my friend was getting me.  That's when I, like, got my stuff back and I called for a ride.  So, I was sitting there waiting, because they had left my car at the Kmart parking lot.  And so I was in the lobby waiting.  And my friend was a little longer than he was supposed to be, so I'm just sitting there.  And then, all of a sudden, I think it's two police officers come out and they have the camera now.

And I'm already bailed out, and they then took

109

a picture of my knee, and that was it.  And the only reason I knew it was Sergeant Clark -- I mean Officer Clark is because, when I got the police report, it was written by him.  And he stated that he was the one that took the picture of my knee.  And then I was later bailed out.

And those pictures, as much as we requested them, never managed to make it to court.  So, the undated, not-timestamped pictures of my injury that I just got now, and when we got discovery from the Braintree Police, although my criminal attorney had repeatedly requested them.  So, any pictures of my knee prior to just recently, were the ones that I took.  So, any of the pictures that were in the criminal case, that was the one of my knee that I took.

MR. PADOLSKY:  Just take another quick break.

(Thereupon, a recess was had from 12:39 p.m. to 12:44 p.m.)

BY MR. PADOLSKY:

Q    So, you were telling us about how you were -- had to go back and get your car, or were waiting for a friend to pick you up, and the friend was taking a bit longer than expected?

A    Well, by the time -- he's in a wheelchair.

110

So, by the time he got there and stuff, and got out and whatever, he -- I mean, you know, it probably wasn't that, that long. It was probably 15 minutes, anyways. At least 15 minutes.

Q    Who is the friend?

A    His name is Tim Kelly.

Q    Is he related to your husband?

A    No. There's no E. It's Y; no E-Y.

Q    So, Tim Kelly arrives at the police station?

A    I mean, it could have been 20 minutes after I was bailed out. It was enough time that I was sitting and waiting.

Q    And what happened next?

A    Well, then, while I was waiting, there was like a woman there waiting. Another guy, drunk, had come in and it was apparently his third offense. I had seen that in court on Monday. And they walk out, "Oh, he's nothing but a gentleman" and whatever. So, I was kind of just like, "Wow, that's nice."

So, I then was waiting and waiting. And then my ride comes, and then I go to get my car. I actually called Boston Police at that point, because I wanted to know about a restraining order. And I spoke with a gentleman on the phone and he seemed nice. He said,

111

"Well, you will have to come in, you know, come in tomorrow or, you know, whatever tomorrow, and we can do it then, an emergency one." But, then, that was just a brief call. I then got in my car and I then went to South Shore Hospital. I --

Q    How long was the ride from the police station to Kmart parking lot?

A    Are you familiar with that area at all?

Q    A little bit.

A    You know how it's a rotary exit a little bit? Kmart is on one side. Now it's like Nordstrom Rack. On the other side of the rotary, is the police station, so it's two minutes.

Q    Do you recall any conversation you had with Tim Kelly?

A    At that point, I was just probably started to cry. I don't know. I just probably told him what had happened, basically, in a nutshell. You know, that he, my ex-husband had pushed me and I fell. I cut my knee. I ran and I called the police. Possibly the one time I finally called for help and then they arrested me.

Q    Is that all you can recall?

A    That's all I can recall. I was, you know, in tears at that point. I think I was kind of like, just

112

was still in shock, but I was upset.  You know, I probably filled him in much more later, I'm sure.  But, at that point, I just, you know, it was a long story. At some point, I summed it up as quick as I could.  And I said I wanted -- well, when I talked to him on the phone and I said I wanted to go to the hospital and stuff.  So, he knew that's where we were going, but I drove myself and he followed me.

Q    So, you mentioned while you were waiting for Tim to arrive, you called Boston Police?

A    No.  It was after he arrived, when I was going out to my -- out to the car.  I then -- I then just thought -- I must have just thought of it.  It dawned on me then and then I was outside.  Before I got in the car, I had called.

Q    And how long was that call?

A    It was brief.  It was just, I just basically said, "You know, my ex-husband is a police officer.  He assaulted me in Braintree and I wanted -- they arrested me but I'm the victim and I'm scared."  And they said that I would have to file it in West Roxbury, you know, where I lived.  And he says, "Okay.  Well, you know, I'm sorry."  And he said, "Well, okay.  You can come in. Your best bet is to come in tomorrow."  And, you know.

113

Q    Do you know if you called on a recorded line?

A    I don't remember.  I didn't call 911, so I would have called -- I thought all the lines were recorded.

Q    Did you make any efforts to recover that recording, if one was -- if the phonecall was actually recorded?

A    No, because it had nothing to do with my defense.

Q    Did you speak to anyone else between the time of your release and the time that you got in Tim Kelly's vehicle?

A    Oh, I was going to say I didn't speak to anybody, but the phone call, that was it.

Q    Nobody else?

A    No, no.  I didn't start -- like, my youngest, I had a million missed phone calls from my older daughter because, obviously, my youngest must have told her.  And I didn't call her that night, I don't believe. Because now it's late and I don't know.  She might have actually called me, but it wasn't at that point.  It would have been either on the ride to the hospital, whatever, but that was -- and then I remember, she was saying, "Did you get arrested?"  And I just told her,

114

"No."

Q    So, you get a ride to Kmart, you told Tim that you were going to go to South Shore Hospital?

A    And when I called him, obviously, on my own phone out in the lobby, after I had already been bailed out, after I was never given a phonecall.  I called him and told him, and I said I wanted to go, or I needed to go to the hospital.  So, he knew.  I think he knew, I'm pretty sure he knew when he got me, that that's where we were going.

If I didn't tell him on the phonecall, I told him when I got in the car, but I think I told him in advance that I wanted to go to the hospital.

Q    And --

A    Because I think --

Q    And did you say South Shore Hospital specifically?

A    No.  Well, no.  I'm not from that end or whatever, so it must have been just assumed.  I knew where it was and stuff.  And it was the closest one so --

Q    So, you get back to your vehicle?

A    Uh-huh.

Q    And the first -- what's the first thing you do

115

after that?

A    I drive to the hospital.

Q    South Shore Hospital?

A    Yes.

Q    And tell me what happened at South Shore Hospital?

A    Was at the hospital.  I was in the emergency room.  I don't know how long.  It wasn't that long of a wait.  I thought it was going to be a ton but it wasn't that long, but it must have been crowded because they put us in this odd room.  And I just remember the fluorescent lights.  And at this point, after crying and crying, I will get migraines.  And I, all of a sudden, just started getting the worse headache I've ever had in my entire life.  It, literally, was the worst headache. And then it was the stupid fluorescent light.  And it wasn't even -- it was almost like a makeshift room.

        And then I was like, and just waiting, and I told the doctors what had happened, this and that.  So, they were going to go send me down to X-ray.

Q    So, who did you -- which doctors did you see when you first got to the hospital?

A    Oh, I don't know.  Like, you know, you go to the triage, they -- whatever.  I was in the emergency

116

room, so you go to the triage.  And then, whoever the doctor on-call is, I guess.

Q    Did you see any nurses?

A    Yeah, yeah.  I had nurses, obviously.

Q    Do you know, do you happen to remember if they were male or female?

A    I'm pretty sure the nurses were female.

Q    How many?

A    I don't know.  Because I was there until like 4:00 the next -- I was there until like 10:00 the next morning, or 9:00, or something.

Q    So, you can't recall how many nurses?

A    I don't.  Because my head was so bad and it started to get so bad.  I remember one nurse wasn't that nice, because I just, I couldn't -- I, literally, I thought my head was -- I thought I was going to die, it hurt so bad.  I then -- so, then they were going to send me down to X-ray but then my head and my face went numb. So, then I had to, I think, go get like an MRI or something, whatever.  I think it was a CAT scan or an MRI.  It must have been a CAT scan because I didn't go in the tunnel, I don't think.

But, at that point, I started to throw up, and throw up, and throw up.  And I remember I wanted

117

something for the pain, but they wanted -- they needed me to go get the CAT scan or whatever the heck it was first.  And I remember it was a guy that brought me down to the CAT scan but I was just, literally, puking and puking.  And he put my head up and he was very nice. And I just remember his voice and he was very nice.

Q   Do you know if the guy that you were referring to was a doctor?

A   No.  I think he was just like the X-ray tech or the CAT -- like, he might have done it, but I don't remember.

Q   Had you seen the doctor by this point?

A   I'm not sure.  I think, yeah.  I think, originally, the doctor was the one who originally said that he wanted me to go get X-rays and stuff.  But, then they had to put off the X-rays because my face was numb. They didn't know what was going on.  And so, they brought me down for that and I just started throwing up, and throwing up, and throwing up.

So, you could have been the guy and I wouldn't have known because I didn't even look at him.  But, I just remember it was a guy, and his voice, and he was very nice.

Q   You are talking about the X-ray tech?

118

A    Yeah.  And whoever they are, called and --

Q    So, the doctor was a male?

A    It was a male doctor.  I do remember that as well.  Yes.

Q    Do you recall anything else about this doctor?

A    He thought it was horrible what happened to me.

Q    Do you know if his name was Adam?

A    I don't.  I honestly do not remember his name.

Q    Does Adam Campbell sound familiar?

A    No.

Q    But, you recall when you first met with the doctor that you told the doctor what happened?

A    And I told the nurse.  They asked me what happened, so I had to tell them what happened.  Even though I probably told the nurses, as well, because usually, you will tell the nurses first.

Q    But, did you also say to the doctor what happened?

A    Yes.

Q    Have you ever looked at your medical records from that visit?

A    Just way back, initially.  I got -- I had to get them to bring for -- to court, like way originally,

119

originally.

Q    And did you take any issue with any of the statements that are written in your records?

A    When you say "records," I don't know what you mean.  All I saw was the report.  Like, the -- just that I was there, what they did and things like that.  I don't believe I saw any statements, what they wrote.

Q    Did anything, in particular, stand out to you when you looked at the records?

A    No, no.  I mean, like I said, I looked at them briefly when I was trying to get them and --

Q    When was this?

A    That like Monday.  I think it was that Sunday, Monday, I was trying to get them.  I'm trying to think if it was then.  I was trying to get them over the weekend, or something, to bring them to court.  I'm trying to think.  I remember trying to get them and calling to see if I could get them.

Q    And did you get them?

A    I did end up getting them, and it was just a million little lines, and a million -- you know what I mean?  It wasn't like -- it was just a billion different things.  I honestly didn't really so much read them.

Q    So, I'll -- why don't we mark this as the next

120

exhibit.  And I'll represent to you that, through a subpoena in this case, I received the exhibit of records that I'm about to show you.  But, I'm going to give you an opportunity to look through these records.

    A    Okay.  Now, you mean?

    Q    Now.

    A    Okay.

    Q    And you can take as much or as little time as you like.  But, the question I'll have for you is whether these are the records you also got?

    A    Okay.  But, they might be.  That's what I'm talking about.  They are all --

    Q    Hold off for a minute.  You'll have a chance to look at the records.

    A    Sure.

        MR. PADOLSKY:  Why don't we mark them first?

        (Thereupon, Exhibit Number 2 was marked for identification.)

        THE WITNESS:  I cannot even read these.  My God, honestly.  Is this like you want me to go read whatever directly; but, is this just like basic stuff?  Where is it?  It might help if you tell me where I need to --

BY MR. PADOLSKY:

121

Q    So, the representation that I can make to you on the record is that I received this packet of medical records from South Shore Hospital after I sent them a subpoena for all of your records, for the release that you had signed.

A    I mean --

Q    But --

A    A lot like, I didn't see little notes or things like that.

Q    But, let me just for the record say, continue: So, I have marked everything that I have received from South Shore Hospital records, which is what we have marked as Exhibit 2 to this deposition.  And the only -- what I would like for you to do, is just to scan through those records so I can ask you whether or not these are the same records that you received from the hospital shortly after your release?

A    Okay.  It's not, though.

Q    So, I see that you are looking through each record page, which you can continue doing, if you need the time.  But, having looked through however many pages you have looked through so far, are these the same records that you recall receiving from South Shore Hospital after you were released?

122

A    I don't ever recall seeing like the narratives, like here.  It was more of like -- what I had had is what would have been presented at trial.

Q    Okay.

A    I don't -- I mean, I could have.  I didn't look at them that often.  I mainly got them to give to whoever.  I looked briefly but I don't recall seeing any, like I said, narratives.

Q    So, sitting here today, your memory is that you don't really have a memory, before, of seeing narratives?

A    Yeah.  I really, I mean, it was more like it looked like -- and it didn't even look like this.  It was more of like stuff that I couldn't understand.  Like it was more of like hospital stuff, like code, their language or whatnot.

Q    Sure.

A    I'm not saying I didn't, because that wasn't an issue for me.  But, I don't recall it being set up like this, but like I said --

Q    So, it's possible that the narratives were contained in the earlier records that you received, but you have no specific memory of them?

A    I'm pretty certain I don't remember seeing a

123

whole page or anything like this with the narratives on it.

Q    So, actually, if I could keep you at, I think the page you are on right now.  Up at the top, it says in slightly larger font, "Signed," at the top of the page?

A    Yep.  Hold on one second.  This?  No, I have never seen this before.

MR. PENKA:  Karen, let him ask the question.

THE WITNESS:  Sure.

MR. PENKA:  He's setting it up.  Okay?

BY MR. PADOLSKY:

Q    So, right at the top of the page, it says, "Signed."  Do you see that?

A    Yep.

Q    And it has hospital name and address.  And it has in all capital letters, "EMERGENCY DEPARTMENT DICTATION."  Do you see that?

A    I'm sorry?

Q    In all capital letters, it says, "EMERGENCY DEPARTMENT DICTATION?

A    Yep, yep.

Q    And then it has patient, your name, an MR number, an account number, your date of birth, the

124

dictating physician.  Do you see that --

A    Yep.

Q    -- up at the top?  And it says that the dictating physician was Adam Campbell?

A    Okay.

Q    Do you see that?

A    I do see that.

Q    Do you have any reason to believe that Adam Campbell was not the doctor that saw you?

A    I don't know.  Like I said, that name is not familiar to me.

Q    But, you did see a male doctor in the emergency room triage?

A    I believe, yes.  He was a young guy.  I do remember he was fairly young.

Q    And you said, a moment ago, that you told him what happened?

A    I told him that he assaulted me.  And I'm reading this here and that is not what I said.  So, this is -- this definitely, most certainly, was not in the original papers.  This is -- this is -- I didn't even -- he didn't even get into detail with this.  I spoke with the social worker after.  And, again, I told them.

I never, at any point said -- what did it say

125

I said?  "He leisurely continued to approach her, at which point" -- this is a lie.  This is a lie.  I don't know who Adam Campbell, whether he's a doctor or not.  I never, at any point, said this.  At any point, did I ever say this.

Q   So, which parts do you say you didn't say?

A   I'm skimming it.  "Presents to emergency room with complaints of physical assault by her ex-husband.  Patient states that while needing" --

Q   Hold on.  I'm sorry to interrupt you, but it's going to be tough for the stenographer.

A   Oh, I'm sorry.  Let me read it again.

Q   So, I'll ask the question.  And if you can read the report in a way that will allow the stenographer to get what you are saying.  Ms. Kelley?

A   I'm so sorry.  You said -- okay.

Q   So, which parts -- and you can take as much time as you need to read through the report.

A   Okay.

Q   But, which parts do you say you did not say?

A   Well, I need to finish reading that to see.

Q   Sure.

A   Do you want me to go as I'm reading it or do you want me to wait until the end and go back and tell

126

you?

Q    Why don't you read it and go back and tell me?

A    Can I -- I can't write on this.

Q    I wouldn't write on the exhibit.

A    Okay.  That's fine.  Okay.  First, no time did I threaten to hit him.  I didn't even speak to him, other than saying --

Q    So, which statement in this report are you referring to?

A    "Patient states that she did have her child's hockey stick, as the child plays hockey."

Q    If I could ask you to read it slower so the court reporter can take it down?

A    Sorry.  I never said I said -- I never stated, it says:  "She states she threatened to hit him with the hockey stick if he did not get away from her."  I did not say that because I did not speak with him.

"He leisurely continued to approach her." That, I most definitely did not say, because he ran around the car at me.  And I didn't see him until I heard him and I looked, and that's when he pushed me. Well, at least it didn't say I hit him, because I didn't.

I don't understand this next line because it

127

says, "At this point, her ex-husband the back to his vehicle." That doesn't even make sense, so I don't know what that's supposed to mean. I believe three squad cars came.

Q    Just tell me which, which lines you say you did not say to Dr. Campbell?

A    I never ever stated that I -- what does it say I said? It says I told him to stay away from me, or something like that, or I'd hit him. I didn't say anything to him. I did not even look at him. And he certainly did not leisurely continue to approach me. And that, so I do not understand why that would be there, because that is not what happened.

And I also did not ask for a social worker. I wouldn't think to ask for a social worker. If they said, "Would you like to speak to one?" And I did see the social worker. At 4 in the morning he came in. Or, no, it was probably like in the morning. Morning, like 8 or 9.

And why is there no note of my headache and the CAT scans, unless it's somewhere else?

MR. PENKA:  Karen, the question is about --

THE WITNESS:  Okay. That's -- that's --

MR. PENKA:  If I may, Joe, will you restate

128

your --

MR. PADOLSKY:  Sure.

MR. PENKA:  -- question?

And please listen, Karen.

THE WITNESS:  I'm listening.

MR. PENKA:  Listen to the question and answer the question, please.

THE WITNESS:  Yep.

BY MR. PADOLSKY:

Q    So, the only thing I'd like, at this point -- I understand there's about 26 pages of medical records here?

A    Okay.

Q    But, looking at this one specific page and what appears to be Dr. Campbell's dictated notes --

A    Okay.

Q    -- which of these statements under the initial comments, do you say you did not say to Dr. Campbell?

A    This here is the initial comments, the page that says, "Signed emergency room dictation?"  That paragraph there, is that the initial comment?

Q    Just under "History of present illness."

A    Yep.

Q    "Initial comments."

129

A    Oh, I'm sorry.  I didn't see that.

I never said for him to get away from me or I'll hit him.  I never spoke to him.

Q    Okay.

A    And he leisurely did not come near me, at no point.  He hadn't come near me at all.

Q    So, you never said that he leisurely approached you?

A    Seriously, he leisurely approached me?  No, I never did.

Q    Okay.  What else?

A    Like I said, I don't understand what: "At this point, her ex-husband the back to his vehicle."  I don't know what that means.

Q    Okay.

A    I was on the other side of his vehicle and I ran back to mine, if that's what he meant.  I don't know.  And I did call the police.  Mainly, the fact that I never spoke to him.  So, I never said I was going to hit him.  And he most definitely did not leisurely approach me.

Q    Is there anything else in this statement that you say did not come from you?

A    That just makes me upset.  Some of the things,

130

obviously, it's not how I would say it or talk.  But, I did say that I was so upset and I can't believe that they arrested me and all of that.

I never said I banged the back of my head on the ground.  They actually asked me, and I actually said that I do not believe that I ever hit my head.  Because I fell straight down forward, so I never said that I banged my head on the ground.

Q    Okay.

A    Actually, as a matter of fact, I think I remember that they had asked me if I banged my head because I had such a headache, and I remember saying, "No, I do not recall."

Q    Okay.  Anything else?

A    I don't know.  I'm just reading.  And this is the very first I have seen of this.  So, I did say -- I'm sure I did say that, you know.  I wouldn't quote that, that he always gets away with it.  I might have said, you know, "No one will ever help me," or something to that effect.

Q    Right now, we are just focusing on what you now say is contained in this, that you did not say to Dr. Campbell?

A    No, I know.  That's written in here.  I was

131

just going over that.  It says, "He always get away with it."  That's what I said, it says I said.  I did not ask to speak to a social worker.  I wouldn't know to ask to speak to a social worker.

Q    Is there anything else?

A    Not at this moment.  If I went back and read it, I might see more.  I'm just really upset that that actually says that, because that is not what happened.

Q    When you say "that," can you be specific?

A    Yes.  I never spoke two words to him.  I never stated, "If you come near me, I'm going to hit you with the hockey stick."  And I certainly, certainly, never stated, "He leisurely continued to approach her, at which point."

He knocked my daughter to the ground when he came running after me.  So, that is completely false and I do not understand why, how that could even be misinterpreted.

Q    So, it also says you swung the hockey stick at him, but you are not sure if it struck him?

A    Where does it say that?

Q    It's about six lines down.

A    This says:  "He leisurely continued to approach her, at which point she swung at him.  She

132

states that she did not strike him."  I never swung it at him and I never hit him.

Q    Is it possible that you said to the doctor that you swung the stick, but the stick did not hit Mr. Kelley?

A    No.  What I probably would have said is, when I fell, like I told the police, the stick went out.  I don't know if it would have hit him or not.  This is the only thing I can come up with because, all of a sudden, four days later, he has bruises.  But, at this point, I know I didn't swing at him, and I know I didn't hit him.

Q    So, I'm not going to characterize the gesture that you just made.  I want to give you the opportunity to do that.

A    What did I do?

Q    As you just said, "The stick went out," you gestured.  And I don't want to characterize it because I don't want to mischaracterize it.  Can you explain in your best words --

A    Sure.

Q    -- the gesture that you just did for the court reporter?

A    Meaning, like almost like a block.  It's like holding it like that.  Like you are falling and it goes

133

out like almost straight in front of you, as opposed to a swing or however, when you are -- I don't know if it went out like that or whatever.  I just fell and whatever happened in the process.

But, I did not hit him.  I did not swing at him.  If the stick swung when I fell or whatever, when I went down, I have no idea.  But, I never at any time swung a hockey stick at him.  I never even spoke to him.  So, that's why I don't even understand why it would say, "If you come near me, I'm going to hit you."

Q    Did you tell the police that the stick swung forward or went forward, but that you were not sure if it hit him?

A    They asked me -- no.  At that time, I -- I didn't even know that he was, quote, "hit" or anything, because I hadn't hit him or swung at him.  So, I just told them when I fell, they had asked me like, "Where was the hockey stick?  How did this and that?"

And I briefly said -- I said, "I don't know. It was in my hand when I fell and it went out."  And I didn't know if it was in one hand or two.  And I didn't know if it went like -- if I still had it.  Because, at one point, I think I might have been -- I don't know if I was carrying the stick and bag with both hands.  I

134

don't remember.

And this is what they did, and they were asking me this. And I said -- they said, "Well, and when you fell or whatever, did it go out, or did you swing it?" And I said, "I don't know if I swung it or if it went out that way." And I wasn't even thinking. I didn't -- what was the -- you know, why would you ask me that? I was just answering like this.

Q   So, just a moment ago, you gestured again as you were saying?

A   The same gestures as what I did. Straight or a swing, because that's what they said.

Q   Okay. And then, were there also questions about intent that the police had asked you?

A   No.

Q   Whether you intended to hit him?

A   No. They -- that's why I was so shocked when they said I hit him with the hockey stick. They did not ask me.

Q   Did you make a statement about your intent not to hit him?

A   I stated to them, "I did not speak to him. I did not go near him." I told everything that I just said today.

135

I picked it up.  I walked around.  I didn't even look at him.  And then, when I was around the car, you know, around the back, out of the corner of my eye, I saw him running.  And as I kind of looked, he had gotten -- and that's when he screamed, "Get the fuck away from my car," and then he pushed me.

Q    So, when you saw him running, did you react in any way?

A    No.  I was -- it was like out of the corner of my eye.  And he probably like, you know, it wasn't that far.  It's across the car, right around the back.  Out of the corner of my eye, I seen him like running.  And then he screams, "Get the fuck away from my car."  At that point, he just came, had reached me, I guess, and pushed me.

Q    As he was coming towards you, did you have any impulsory actions?

A    No.  It was so fast, I was just shocked. Like, I didn't have anything.  I didn't have the opportunity to do anything.  That's why I went down on my knee.

Q    So, you -- the question, though, is:  As you noticed him coming towards you, did your body impulsively move in any way?

136

A    No, because it seemed like it was almost -- I don't know.  I might have turned.  I don't know that much.

MR. PENKA:  Karen, don't speculate.

THE WITNESS:  Okay.

MR. PENKA:  He asked a question.

THE WITNESS:  Obviously, when I looked, I must have somewhat turned towards him, just because you see him out of the corner of your eye, and he screamed something.  Human nature, I must have turned.  Did I purposely turn?  No, definitely not.

BY MR. PADOLSKY:

Q    And when you were turned towards him, do you know if you were still holding the bag and the stick?

A    Yeah.  I still had it in my hand, I believe.

Q    Did you tell this to the police officers?

A    They didn't really ask me much.  They, basically, said -- I mean, all I recall is just basically what I told you, exactly what I told you.

And he ran around and, you know, I didn't look at him, didn't talk to him.  I went around the back.  He went around the back, screamed at me, and pushed me.  That was it.  And they said, "Well, did the hockey stick, when he pushed you, go out?"  Or something like

137

that.  That's how the hockey stick came into play.  They asked me and that's when I was answering the questions.  And whenever they arrested me, I was shocked.  And after the fact, to find out that they said that I said that, I was even more shocked.

Q    Was there anything else that you saw that night, that could have caused bruising on Mr. Kelley's thigh?

A    I think it was his calves.

Q    Calves.  I'm sorry.

A    And the back thigh.  No, they didn't even look at his injury.  They didn't even check it.

Q    But, that wasn't the question.  Did you see anything --

A    No.

Q    -- that could have caused injury like that, that evening?

A    No, no.  I wasn't even looking at him.  No.  I don't know.  He could have come there with it.  He could have gotten it four days later.  No.

        MR. PENKA:  Karen --

BY MR. PADOLSKY:

Q    Are you aware of any other incidents or causes for that bruising that was on his legs?

138

A      No.   Could have happened Friday night, Saturday or Sunday.   I don't know.

Q      You did, though, see that there was bruising on Mr. Kelley's legs, at some point after --

A      I saw the pictures.

Q      -- after the accident?

A      I saw the pictures that were taken, like, by the police, like, four days later.   Yes, I saw those.

Q      Did you say to the officers, that any statements about whether or not the hockey stick came into contact with Mr. Kelley?

A      No.   I wouldn't have, because I didn't hit him, so I wouldn't have said that it did.

Q      Different question, though.

A      Okay.

Q      Did you make any statements to the officers about whether or not the hockey stick came into contact with Mr. Kelley?

A      I do not recall.   I don't believe so.   I don't know.   I don't think I did.

Q      Do you remember if they asked you whether it came into contact with him?

A      No.   They -- No.   That's why, when they arrested me, I was so shocked, because I just told them

139

what I told you.  And he said, "Well, you said you hit him with the hockey stick."  And I said, "I never said that."  I didn't even say anything after that because I had never said that.  I did say it, "No, I never said that," but I was crying hysterically at that point.

Q   But, they did say you -- he said that, "You hit him the with the hockey stick;" correct?

A   Who is he; my ex-husband?

Q   The officers.  Was it Sergeant Bata or Officer McNamara that said to you?

A   Sergeant Bata.

Q   Said to you, "Mr. Kelley told us that you hit him with the hockey stick."

A   No, they never even said that.  They just said -- no.  That's the thing, they just basically said, they just told me that I hit him with the hockey stick. They said that I said I swung the hockey stick at him or something to that effect, and I said I never did.  Well, I was hysterically crying.  I was saying -- I said, "I didn't say that."

Q   I just have a few other questions.  I'm going to mark this as the next -- or you know what?  We don't necessarily have to mark it yet.

I will show you a copy of your interrogatories

140

or your Answers to Interrogatories in this case.

MR. PENKA:  Karen, put that away.

THE WITNESS:  I'm so sorry.  You need that; right?

BY MR. PADOLSKY:

Q    I'm going to show you Interrogatory Number 25. If you need to look through the entire document, you can, but my question is going to be just about Question 25.

A    I object --

MR. PENKA:  Read it to yourself.

BY MR. PADOLSKY:

Q    Look at your answer to Number 5.  Who is investigator James Burke?

A    5 or 25?

MR. PENKA:  Right here.

THE WITNESS:  Okay.  That was the investigator the criminal attorney hired.

BY MR. PADOLSKY:

Q    Okay.  Do you have any reports from Mr. Burke?

A    It would have been with all of the stuff that was at trial.  I never met him.  I never saw him.

Q    Have you ever seen a report from him, Mr. Burke?

141

A    I did see something, I think, at one point when he went -- just that he went to go get stuff and like whatnot.  He was the one that --

MR. PENKA:  Objection.  Privilege.  Who told you?  If you are getting into a conversation that you had with your criminal attorney --

THE WITNESS:  Oh, who told me?  Are you asking me; my attorney?

MR. PENKA:  I'm directing you not to answer about questions, about conversations that you had with your criminal attorney prior to trial.

THE WITNESS:  Anything about this investigator was through my attorney.  I never met him.  I never spoke to him.  I did not hire him.  I did not tell him to get anything.  Anything that he got, that he was looking for, it was through my criminal attorney.

BY MR. PADOLSKY:

Q    So, I won't ask you about conversations you had with your criminal attorney, whether it's about Investigator Burke or otherwise.

But, did you ever see any writings of Investigator Burke?

A    Just evidence, papers that were in the whole

142

file that I half read and half -- there wasn't anything that, you know, whatever from him that I got.  It wasn't, like I'm like, oh, here's some secret thing. Whatever you have from him, that I saw, would have been in that file.  It wasn't anything that stood out to me. If I saw something from him, it might have been just papers they were showing me.

Q    Do you remember if he wrote a report at all?

A    I have no idea.

MR. PADOLSKY:  I have a copy, if you want.

MR. PENKA:  It's fine.

MR. PADOLSKY:  So, I'm not going to mark this as an exhibit.

THE WITNESS:  Oh, you were just asking me to see that for his name; was that why?

MR. PADOLSKY:  That's why.

THE WITNESS:  Oh, all right.  I thought --

MR. PENKA:  Can we go off the record for a second?

MR. PADOLSKY:  We can.  And I'm going to take a two-minute break, and then I think I might be done.

MR. PENKA:  Okay.  Great.

MR. PADOLSKY:  So, I will be right back.

143

(Thereupon, a recess was had from 1:25 p.m. to 1:31 p.m.)

BY MR. PADOLSKY:

Q    Okay.  Did you treat for any injuries or any distress that you had as a result of this incident?

A    Yes.  I --

Q    How so?

A    I was -- previously, I had seen a therapist. After this, I had like so much more intense sessions. I -- it affected every part of my life.  Everyone found out.  It was in the police log.  And I thought maybe no one would know because it was in Braintree.  And then someone's sister lives in Braintree.

And Karen Calabrese-Kelly, 46, from 43 Bellaire Road, West Roxbury.  I mean, it's not like it was just a Karen Kelley from wherever.  Found out, everybody knew.  It was embarrassing, humiliating.  I was room parent at the school at that point.  I had already passed the CORI, but I knew the school all knew. So, I was afraid they weren't going, you know, to continue to let me do that.  I couldn't go on the next year.  It affected me in every way.  It was horrible.

Q    You said you had already passed the CORI?

A    They do it in September.

144

Q    And you had already passed it?

A    Yes.

Q    So, were you allowed to continue in the program?

A    They did let me.  I mean, I had been volunteering at the school for years.  So, I mean, they didn't question me.

Q    And you said that you saw a therapist before this incident?

A    I -- yeah.

Q    Who was that?

A    Carol Zimmer.

Q    And have you seen anyone else before this accident?

A    Maybe years ago.  I had spoken to someone years ago, but I had spoken with Carol.

Q    What's Carol's credential?

A    Licensed therapist.  She's a psychologist or therapist.  I'm not sure.

Q    Is she a psychiatrist?

A    No.  She doesn't prescribe now.

Q    Did you have a psychiatrist before this incident?

A    I had the one because you need someone to

145

prescribe the ADHD meds.  I had the one that my daughter had that died.  He was mine originally and then she --

Q    What was his name?

A    John Goodman.  I don't know if it's the same name as the guy on TV, but I think.  Goodman.  It might not be John, though.  But, it definitely was Dr. Goodman.

Q    Any other psychiatrist prior to this incident?

A    Not that I recall.

Q    And how about after?

A    At the time, I was trying to get my -- I found a child psychiatrist for my daughter.  And he had just finally allowed her to see him, but he hadn't prescribed her meds yet.  But, I can't remember if I was seeing him or not to get my meds, or if my primary prescribed them at that point.  I don't remember.

Q    What was that doctor's name?

A    Dr. Nemzer, like N-E-M-Z-E-R, maybe.  He's since retired.

Q    Any other mental health professionals that you saw prior to February 2014?

A    None that I can recall.

Q    And the -- you said you had seen therapists since that date?

146

A    Yes.  I saw Carol for quite sometime after, too.

Q    How frequently?

A    Either once a week or once every other week.

Q    And what about a psychiatrist?

A    That's where I don't remember if it's Dr. Nemzer was writing mine as well.  If it was, it's just to write the prescription.  It just would have been is it working; is it not?  But, it might have been my primary.  My primary does it now, so I can't remember.

Q    Who is your primary?

A    Dr. Randi with an I, because it's a female.  Kierstein and it's K-I-E-R-S-T-I -- S-T-E-I-N.

Q    Where does she practice?

A    Dedham Medical.

Q    And how long has she been your primary?

A    Oh, I don't know.  Like 20 years, maybe.  18, 19 years.

Q    And Carol Zimmer, where does she practice out of?

A    She's -- she originally was in Dedham.  And then they moved to -- she went into practice with my daughter's therapist on their own.  They were both in the same group practice in Dedham.  And they went out on

147

their own.  It was prior to this, I believe.  They went out on their own in Walpole.  So, I was going to Walpole, at the time, I believe.

Q    What was the name of the practice?

A    I don't remember.  It was just, I think, they just rented two offices out of the place.

Q    Do you continue to see your therapist?

A    I haven't seen Carol in a while.  It ended up being -- as I said, co-pays were so ridiculous.  Probably the past, maybe, year and a half or something.  It just kind of -- I couldn't afford to keep going between mine all my kids, because I pay a hundred percent of all the co-pays.  So, it ended up being like, some months were like $400 a month.  Others were, you know, 2-something, between all, everything, or 300.  It varied and it got really expensive for myself.  So, I ended up having to just make sure that my kids were getting everything that they had, so --

Q    What was your co-payment?

A    I believe it was 20 a visit for her.

Q    When was the last time you saw Ms. Zimmer?

A    I'm not sure.  Maybe a year and a half ago or something, maybe.  I, honestly, I don't know.

Q    Have you contacted her at all since the last

148

visit?

A    No.

Q    Did you think that your husband was going to get arrested?

A    I didn't know what to think.

Q    On February 21st, 2014?

A    I didn't know what to think.  I remember being afraid that he was going to be arrested.

Q    Is that why you called 911?

A    I called 911 because I was terrified.  And then, after the police got there and they were talking, and things were settling down, I -- I do remember thinking, getting nervous that, you know, he was going to get arrested.  I mean, I have would have liked, you know, I wanted help is what I wanted.  I didn't, wasn't thinking so much about what was going to happen after. I just wanted help at the moment.

Q    You were reporting the crime?

A    I was.

Q    And you had no expectations on whether or not he would be arrested as a result of that crime that you reported?

A    I wasn't thinking about that at that point.  I just wanted help.

149

MR. PADOLSKY:  Thank you.  That's all I have today.

I will say that I don't believe that I have Ms. Zimmer's records.  So, I think that I need to have a discussion with your attorney about that and see if we can work something out with respect to those records.

So, for the sake of today's deposition, I'm going to say for the record that I'm suspending but it will be for that limited purpose, if it turns out there's records that are produced and I'd like to ask you some questions about those records.

MR. PENKA:  Certainly.  I have a few.

CROSS-EXAMINATION

BY MR. PENKA:

Q    Ms. Kelley, or would you prefer Ms. Calabrese?

A    Ms. Kelley is fine.

Q    Ms. Kelley, you previously were asked questions about your relationship with your ex-husband, wherein Attorney Padolsky asked you about, quote, "A volatile relationship."  Do you remember being asked those questions?

A    I do.

Q    And do you remember answering those questions?

150

A    I do.

Q    And could you define for your own, for our purposes and for, in your own mind, what does "volatile" mean to you?

A    Volatile, a number of things.  I mean, obviously, physical, but like in your face screaming. Coming home drunk and like starting a fight.

Q    So, Ms. Kelley, volatile, to you, is screaming and you said physical?

A    Uh-huh.

Q    And you said coming home drunk.  Do you have any other, in your mind, what volatile would mean?

A    And like not knowing what, like, if you say something, what the reaction could be or that type of thing.  Just --

Q    Living in fear?

A    Yeah.

Q    Okay.

A    And walking on eggshells and just being afraid.

Q    Okay.  Now, specifically pointing your attention to the night of the incident, February 21st 2014, do you have a specific recollection of taking medication related to anxiety that day?

151

A    I don't recall.  I don't know.

Q    Okay.  And you previously testified that it was more likely than not, that you took Adderall that day; is that correct?

A    Yes.

Q    And is that because you have a prescription for Adderall?

A    Yeah.  And I still take Adderall.

Q    And what is your prescription?

A    The amount?

Q    Correct.

A    I don't know.  I'm sorry.

Q    Okay.  But, it's safe to say that you took that prescribed amount that day?

A    Yeah.  I take what I'm supposed to take.

Q    And you based that on because, generally, on a day-to-day basis, you take the amount you are prescribed?

A    Yes.

Q    Okay.  Now, in that incident, do you ever recall swinging a hockey stick at your husband?

A    No.

Q    Did you see your ex-husband push one of your children to the ground?

152

A    I did not see it.  No.

Q    Did you see one of your children on the ground?

A    Yes, I did.

Q    At the time the officers responded, did you see Officer Bata do anything upon his arrival?

A    No.

Q    Okay.

A    Oh, Officer Bata?  I'm sorry.

Q    Sergeant Bata?

A    Sergeant Bata.

Q    Upon his arrival, did you see him doing anything at that time?

A    No, I didn't see.

Q    Okay.  When you went to the ground, you were -- were you pushed to the ground?

A    I was pushed to the ground.

Q    And you fell.  Did you -- which way did you fall?

A    I fell like straight down, face forward.

Q    Face first, head first; how did you fall?

A    Straightforward, down on my knee.  If I was to go one way or the other, it was forward.  And my hands did go at some point.

153

Q    And to do that, your husband, your ex-husband had to make contact with your body; is that correct?

A    Yes, he pushed me.

Q    And where did he push you, specifically?

A    Maybe on my right shoulder, towards my back, over that way.

Q    And so, you just said your back, your back or your right shoulder.  Why -- why was that facing your husband at that time?

A    Well, because like I say, I stated before, out of the corner of my eye, I saw him running.  And then he screamed at me, and I turned and looked in that direction.

Q    Okay.  So, Ms. Kelley, you saw out of the corner of your eye, you saw him?  You saw him coming at you; correct?

A    Yes.

Q    And, at that point, did you turn away from him?

A    No.  It happened so fast, I just --

Q    So, were you facing him?

A    I started to turn, I think, to see.  Because he screamed and, at that point, he got to me.

Q    Okay.  Ms. Kelley, would you listen to my

154

question, please?  I'm trying to understand.  When you first saw your husband begin to approach you, how were you facing; were you facing towards him or away from him?

A    I was facing -- I had come around the car.  I was facing like straight.  I was just going to put the bags down.

Q    Ms. Kelley, for your person, your body, you're situated; was your ex-husband behind you or in front of you?

A    Oh, he came running around the back of the car towards me, and that's what I'm saying to you.

Q    Was he behind you or in front of you?

A    He was behind me.

Q    Okay.  So, as he's behind you, he comes to push you; correct?

A    Yes.

Q    Okay.  And that's when he made contact with your back or the back of your shoulder?

A    Yeah.  Like, yeah.  He came up from behind and just pushed me on my --

Q    And you felt, did you feel him touching you?

A    Yes.

Q    And you felt him touching you in your back or

155

on your back right shoulder?

A    Yes.

Q    And then you fell?

A    Yes.

Q    What hit the ground first?

A    I believe my knee.  And then everything else went down.

Q    So, your knee hit the ground first.  And then you said everything else does, in your hands next?

A    Well, I still had the bag and stuff, so I guess at the same time.  That all went down at the exact same time as my hand.

Q    So, I'm asking about your person.  I'm not asking about the bag.  After your knee hit, what then hit the ground of your body?

A    My hand, I believe.  My left hand and then my right hand.

Q    So, your left and then your right hand?

A    I believe.  My left hand definitely hit it.

Q    Were you sprawled out in any fashion?

MR. PADOLSKY:  Objection.

A    I don't know.

BY MR. PENKA:

Q    Did you -- how was your -- what -- you stated

156

your knee hit the ground.  You stated your left hand hit the ground.  You stated your right hand may have hit the ground as well.  Did any other parts of your body make contact with the ground?

A    I do not believe so.

Q    Okay.  So, you did not hit your head?

A    No.

Q    Okay.

A    Not that I remember.

Q    Ms. Kelley, there was some discussion regarding your anxiety and whether or not you were experiencing anxiety during the time of this incident; is that correct?

A    Were there questions about that?  Yes.

Q    Yes.

A    Yes.

Q    And you answered questions surrounding details around that time where you were anxious; correct?

A    Yes.

Q    And does your anxiety affect your memory in any way?

A    No.

Q    Does your anxiety affect your ability to see in any way?

157

A    No.

Q    Does your anxiety affect your ability to hear any way?

A    No.

Q    Does your anxiety affect your ability to feel or touch in any way?

A    No.

Q    Okay.  After Sergeant Bata, Officer McNamara and Officer Clark arrived, did you, at any time, tell the police that you swung a hockey stick?

A    No.

Q    At any time, did Sergeant Bata, Officer McNamara or Officer Clark, state to you that your ex-husband alleged that you had swung the hockey stick?

A    No.

Q    That was a doozy.

All right.  If you could take Exhibit 2 from the court reporter, please.

A    Me?

Q    Yeah.

A    What, this Exhibit 2?

Q    Yes.

A    Okay.

Q    All right.  And I want you to have it.

158

A    Okay.  Thanks.

Q    All right.  And if you could go to the one, two, three, four, five, six, seventh page, please.  And do you see the seventh page; are you there?

A    Pain management technique?

Q    Correct.

A    Okay.

Q    And do you see an entry below that states: "User, Katherine McLaughlin, RN?"

A    Yeah.

Q    Is that correct?

A    Yes.

Q    And do you see a date?

A    Yes.

Q    And do you see a time?

A    Yes.

Q    Okay.  And that date and time, for the record, is 2-22-14, 3:24 in the morning; is that correct?

A    Yes.

Q    All right.  And if you would take a moment under "History of presenting illness," could you read that to yourself, and when you are done reading, could you look up, please?

A    Okay.

159

Q    And is that -- those three lines, is that how you characterize what was wrong with you that evening?

MR. PADOLSKY:  Objection.

A    I'm just -- let me just confirm.  Does LOC means loss of consciousness?

BY MR. PENKA:

Q    If I represented to you that it did, did you tell them that you lost consciousness?

A    No.  No, I didn't.

Q    Okay.  And the last phrase in that history of presenting illness, what does that say?

A    The last phrase?

Q    The last phrase, the last three words.

A    Oh.  "Denies hitting head."

Q    Okay.  And did you deny hitting your head?

A    Yes.

Q    Okay.  And if I could, directing your attention, Ms. Kelley, to the document from PA Adam Campbell, the document that says, "signed," up above, where Adam Campbell wrote a narrative.

A    Oh, okay.

Q    Do you see that document?

A    I see it.

Q    And Attorney Padolsky asked you questions

160

reading that document?

A    He did.

Q    Okay.  And you took issue with some of the statements in this document; correct?

A    I did.

Q    Okay.  If I could direct your attention to the one, two, three, four lines up from the bottom.  Could you read -- there's a sentence contained in that entire line.  Could you read that to yourself and look up when you are done?

A    Okay.

Q    Okay.  And, Ms. Kelley, is that statement -- is that statement true to your recollection, as you sit here today?

A    No.

Q    Okay.  For the record, that sentence reads: "In addition, she also states that she struck the back of her head on the pavement."  Is that true?

A    No.

Q    Did you state that to Adam Campbell?

A    I did not.

Q    And that would be consistent with the notes from Katherine McLaughlin that you previously read, wherein, that states:  "Denies hitting head."  Correct?

161

A     Yes.

Q     You previously testified, Adam Campbell, you have no recollection of that name?

A     I did.  I do not.

Q     Did the male doctor you testified to who saw you, did he introduce himself as a doctor?

A     He must have.

Q     Were you aware -- did, at any time, a physician who was treating you in the emergency department introduce himself as a physician's assistant?

A     I don't recall.

MR. PENKA:  All right.  I'm good.

MR. PADOLSKY:  I don't have anything else. Thank you.

(Witness excused.)

(Deposition was concluded 1:52 p.m.)

162

COMMONWEALTH OF MASSACHUSETTS
COMMONWEALTH OF MASSACHUSETTS
COUNTY OF SUFFOLK

I, Lauren R. Tozzi, RPR, Stenographic Reporter and Notary Public in and for the Commonwealth of Massachusetts at Large, do hereby certify that the aforementioned witness was by me first duly sworn to testify the whole truth; that I was authorized to and did report said deposition in stenotype; and that the foregoing pages are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

Dated this 31st day of July, 2018.

_____

Lauren R. Tozzi, RPR

163

DEPOSITION ERRATA SHEET

Karen Calabrese-Kelley

v.

Town of Braintree, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20_____.


_____
Karen Calabrese-Kelley

164

DEPOSITION ERRATA SHEET


Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

Page No._____ Line No._____ Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

164

DEPOSITION ERRATA SHEET

Page No. 15 Line No. 15 Change to: "Direct Cell"

Reason for change: Homonym

Page No. 28 Line No. 8 Change to: Second Cousin Sean Martin is a Boston Police Officer.

Reason for change: Refreshed Memory.

Page No. 35 Line No. 17. Change to: That communication happened via text message.

Reason for change: Additional Clarification

Page No. 36 Line No. 11 Change to: winter 2017

Reason for change: Clarification

Page No. 37 Line No. 21 Change to: Moynihan

Reason for change: Spelling

Page No. 43 Line No. 10+11 Change to: "DRIVE THROUGH"

Reason for change: Clarification

Page No. 44 Line No. 3 Change to: "couldn't see HIM IN the car."

Reason for change: Clarification

SIGNATURE _____ DATE: 9/3/18

Dunn Reporting Services, Inc.
617-422-0005

164

## DEPOSITION ERRATA SHEET

Page No. 44 Line No. 7 Change to: "later" to "longer"

Reason for change: Clarification

Page No. 46 Line No. 2 Change to: "the rears" to arrears

Reason for change: homonym

Page No. 49 Line No. 1 Change to: "give to" to "receive from"

Reason for change: clarification

Page No. 59 Line No. 21 Change to: "gone." to "gone across the parking lot."

Reason for change: Clarification

Page No. 63 Line No. 12 Change to: add "he" before close

Reason for change: Clarification

Page No. 79 Line No. 21 Change to: "police on him before." from "police."

Reason for change: Clarification

Page No. 107 Line No. 9 Change to: "they didn't" from "I didn't"

Reason for change: clarification

SIGNATURE: _____ DATE: 9/3/18

Dunn Reporting Services, Inc.
617-422-0005

164

## DEPOSITION ERRATA SHEET

Page No. 107 Line No. 10 Change to: "calmer" from "calm"

Reason for change: _____

Page No. 110 Line No. 1 Change to: "got out of his house" from "got out"

Reason for change: _____

Page No. 111 Line No. 4 Change to: "brief call outside of Tim's car."

Reason for change: _____

Page No. 139 Line No. 4 Change to: Remove "it,"

Reason for change: clarification

Page No. 140 Line No. 10 Change to: Remove answer, Deponent was reading document.

Reason for change: _____

Page No. 143 Line No. 21 Change to: "I couldn't be one the next year."

Reason for change: _____

Page No. 144 Line No. 21 Change to: Remove the word now.

Reason for change: _____

SIGNATURE: Karen Calabro-Kelley  DATE: 9/13/18

Dunn Reporting Services, Inc.
617-422-0005