Page 1

Volume:  I
Pages:  1 to 48
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 1:17-EV10876-LTS

                                          )
KAREN CALABRESE-KELLEY,                   )
            Plaintiff,                    )
                                          )
      vs.                                 )
                                          )
TOWN OF BRAINTREE, et al.,                )
            Defendants.                   )
                                          )

            DEPOSITION OF CHARLES F. BATA, a
witness called on behalf of the Plaintiff,
taken pursuant to Rule 30 of the Massachusetts
Rules of Civil Procedure, before Susan E.
DiFraia, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Cohen Law
Group, 500 Commercial Street, Boston,
Massachusetts, on Thursday, July 26, 2018,
commencing at 10:00 a.m.

Page 2

APPEARANCES:


COHEN LAW GROUP
500 Commercial Street, Suite 4R
Boston, MA 02109
BY:  Jeb S. Penka, Esquire
Tel: 617.523.4552
E-Mail:  Jeb@cohen-law-group.com
Attorney for the Plaintiff.



LOUISON, COSTELLO, CONDON & PFAFF, LLP
101 Summer Street
Boston MA 02110
BY:  Joseph A. Padolsky, Esquire
Tel: 617.439.0305
E-Mail:  Jpadolsky@llcplaw.com
Attorney for the Defendants.



ALSO PRESENT:

        John McNamara




                * * * * *

Page 3

E X A M I N A T I O N S

Witness                                                        Page

Charles F. Bata

Direct Examination         By Mr. Penka                          4


E X H I B I T S

Exhibit                      Description                  Page

 1                           Narrative report               39

Page 4

P R O C E E D I N G S

CHARLES F. BATA

a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

MR. PENKA:  Joe, usual stipulations?

MR. PADOLSKY:  That's fine.

MR. PENKA:  30 days to read and sign?

MR. PADOLSKY:  Mm-hmm.

DIRECT EXAMINATION

BY MR. PENKA:

Q.  **Good morning, sir.  My name is Jeb Penka.  I represent Karen Calebrese-Kelley in this matter.  A few ground rules:  Have you ever been deposed, sir?**

A.  I have not.

Q.  **So as we go forward, a couple of things to make it easier on the court reporter that you see is taking everything down, we'll try to -- I'll try to speak and let you answer, and if you**

Page 5

wait for my full question, like I'm sure you've done in courtroom testimony before as well.

A. Okay.

Q. If you don't understand a question, please ask me to rephrase it or to restate it because if you answer we're going to assume that you are answering the question that I ask.

A. Okay.

Q. You're free to take a break at any time, free to talk to your attorney at any time. I just ask you if the question is before you, that you answer the question before you take the break.

A. Okay.

Q. All right?

A. Sure.

Q. Any questions before we begin?

A. No, sir.

Q. All right. Sir, could you state and spell your last name for the record, please.

A. It's Charles Bata, B-a-t-a.

Q. And Sergeant Bata, before you arrived today, did you discuss this deposition with anyone?

A. Just my counsel.

Q. Okay. And did you review any documents prior

Page 6

Q. to this deposition in preparation?

A. Today?

Q. Today?  Over the weekend?

A. No.

Q. Have you consumed any drugs or alcohol in the last 24 hours that would impair your ability to testify today?

A. No.

Q. Are you on any prescription medication?

A. Yes.

Q. Okay.  And would that medication affect your ability to testify today?

A. No.

Q. All right.  And where do you live?

A. I --

MR. PADOLSKY:  I'm going to object to that question.

MR. PENKA:  Sure.

MR. PADOLSKY:  You can state the city, but don't state the actual address which is exempt from public disclosure.

A. And Hanover, Massachusetts.

Q. Thank you, sir.  And are you married?  Single?

A. Married.

Page 7

Q.  And do you have children?

A.  One.

Q.  One child?

A.  Yes.

Q.  How far did you go in school?

A.  Master's degree.

Q.  Where was that from?

A.  Western New England College.

Q.  What was your degree in?

A.  Criminal.

Q.  Prior to your Master's you obtained your
Bachelor's?

A.  Yes, Bridgewater State.

Q.  What --

A.  Political science.

Q.  What year was that?

A.  '91.

Q.  '91 was the Bachelor's and when was the
Master's?

A.  I'm not sure, '94, '95.

Q.  Mid 1990's or so.

A.  Yes.

Q.  And you're currently employed, sir?

A.  Yes.

Page 8

Q.   Where are you employed?

A.   The Town of Braintree.

Q.   And what is your occupation?

A.   I am a sergeant with the Braintree Police
Department.

Q.   And how long have you been with the Braintree
Police Department?

A.   This is my 25th year.

Q.   And how long have you been a sergeant?

A.   Fourteen years.

Q.   Fourteen years.

          Prior to being a sergeant, what was your
designation or rank?

A.   Patrolman.

Q.   Do you have a badge or ID number with the
department?

A.   I have and ID number; I don't have a badge
number anymore because I have rank.

Q.   Because you have rank, okay.  Prior to becoming
a -- so the last 25 years -- so that was after
your Master's degree you became employed by the
town of Braintree?

A.   I got my Master's while I was employed.

Q.   While you were employed, okay.  And prior to

Page 9

getting your Master's, did you go to the Police Academy?

A. Yes.

Q. And where was that academy?

A. Plymouth.

Q. And what sort of training did you go through at the Police Academy?

A. Basic recruit training.

Q. Okay.  And as an officer prior to becoming a sergeant, what were your duties with the Town of Braintree?

A. I was in patrol; I was also a canine officer.

Q. And what would that entail?

A. Answering general calls.  The patrol part is -- answering general calls, could be shoplifting, domestics, could be -- you know, whatever the gamut is.

Q. Sure.  And as a canine officer what would your duties entail?

A. Search and rescue, finding, you know, suspects, and drug work.

Q. Prior to becoming a sergeant, what did you have to undergo to become a sergeant?

A. You had to take a civil service exam, obviously

Page 10

a lot of studying, and that's basically what the requirement is.

Q.  So you took the exam, you did fairly well?

A.  I did.

Q.  And the town of Braintree then tapped you to be a sergeant?

A.  Yes.

Q.  And so sometime in 2004 you became sergeant?

A.  Correct.

Q.  And what are your supervisory duties as a sergeant?

A.  I am the patrol supervisor of the relief shift which is two nights, two afternoons.

Q.  What is the timing?

A.  For myself it's 10:15 p.m. to 6:00 p.m. on nights, 2:15 a.m. to 2:15 p.m. on my afternoons.

Q.  And you do that --

A.  It's four, two off, one more, so I still work --

Q.  So over a two week period it's whatever --

A.  Correct, it just moves.

Q.  So as a patrol supervisor, are you familiar with the duties and responsibilities that go

Page 11

along with that?

A.  I am.

Q.  And in a general responding to a call, a general call, what -- take me through what your duties would be as the supervisor?

MR. PADOLSKY:  Objection.  You can answer.

A.  It depends on the call.

Q.  Sure.  Just for the sake of argument, let's call it a shoplifting call.

A.  In general, I don't recall too many shoplifting calls unless they need a supervisor.

Q.  So as supervisor it would have to rise to a level that you would need to appear?

MR. PADOLSKY:  Objection.

A.  It varies.

Q.  Okay.  So as a supervisor, are you familiar with the domestic violence general order issued by the Town of Braintree?

A.  I am.

Q.  And you've reviewed it prior in your -- in your duties as supervisor?

A.  Yes.

Q.  So in a domestic violence situation, are you

Page 12

always required to appear?

A.   Yes.

Q.   Okay.  And that's because you're a supervisor?

A.   Yes.

Q.   Will you be dispatched as the first responding officer?

A.   No.

Q.   Okay.  So a patrol officer will be dispatched?

A.   Yes.

Q.   And then because it's domestic violence, they'll call you in?

A.   Yes.

Q.   So as you were saying, a simple shoplifting call you wouldn't be called in but domestic violence it rises to the level that a supervisor is needed?

A.   Yes.

Q.   And when you're dispatched to a domestic violence called, what do you do in preparation of arriving on the seen?

        MR. PADOLSKY:  Objection.

A.   Preparation?  I'm not sure what you mean.

Q.   Do you request any records, do you request any warrant checks prior to getting to the scene?

Page 13

A.   Usually we ask if there's a restraining order in effect or any particular information that the dispatchers may have.

Q.   **So the dispatcher is tasked with obtaining the necessary information?**

A.   Yes.

Q.   **Because they're talking on the 911 called, and they relayed that to you?**

A.   Yes.

Q.   **Would they relay that to the first officer on the scene or directly to you?**

A.   It's usually a general broadcast.

Q.   **So it would go to every responding officer or everyone whose on duty?**

A.   Everyone on duty will hear it.

Q.   **So you check for restraining orders?**

A.   Yes.

Q.   **And that's done prior to arriving on the scene or once you arrive?**

A.   Whenever they can get it to us, however long it takes them to look.

Q.   **So you arrive on the scene, what are your duties at that point?**

A.   It depends on who's there first.  If I'm there

Page 14

first or second, it just comes down to if somebody is already speaking to the subject, victim, etc.; if not, I may speak to somebody and assist.

Q.  Okay.  So if a responding officer has already appeared and is speaking with one of the individuals involved, what would be your duty at that point?

A.  I would either speak with the other party involved or I would speak with the officer on scene already and see what the information they've gathered it -- gathered is.

Q.  And so what is the investigation process like when you arrive on scene?

            MR. PADOLSKY:  Objection.

A.  It's to try to find as much information about the incident that happened.

Q.  And how do you do that?

A.  Mostly by speaking to the people on scene.

Q.  Everybody whose on scene?

A.  As much as possible.

Q.  What about minor children?

A.  It varies.

Q.  Will you speak to them if they're -- is it a

certain age cut off that you'll speak to them?

A. There's no bright line.

Q. But in your estimation, if you feel like they have information to give, you'll discuss it with them?

MR. PADOLSKY: Objection.

A. I'm not usually the one who speaks with them.

Q. It would be the first responding officer because as their supervisor you're just kind of overseeing?

A. Yes.

Q. When it comes to deciding to make an arrest, what are your guidelines?

A. Probable cause.

Q. And what does that entail?

A. Determining what's more probable than not that a crime has been committed.

Q. And you base that on your investigation?

A. Yes.

Q. And the depth of the investigation, what does that depend on?

MR. PADOLSKY: Objection.

A. Multiple factors, I would say.

Q. Like what?

Page 16

A.   Like cooperation of the witness or the victim; obviously if there's other witnesses available to us, anything that may be -- that we may be able to use to help us understand what happened.

Q.   **How do you determine who's the victim?**

A.   Well, in a domestic situation we try to -- after speaking to the parties we try to determine who the aggressor is and then get both sides of the story, and obviously make a determination.

Q.   **Okay.  If someone -- strike that.**

**Now, in an instance where -- in an instance of a domestic violence where there may have been dual combatants, we'll say, is there an edict as to dual arrests?  What are your guidelines when it comes to that?**

MR. PADOLSKY:  Objection.

A.   Dual arrests are discouraged.

Q.   **And why is that?**

A.   It has a tendency to -- to have the abused party reluctant to call us, seek the help that they need and/or deserve.

Q.   **If you do make a dual arrest, are there**

Page 17

guidelines that go along with that?

A.   It requires an extra report as to why we did it.

Q.   And who's responsible for that extra report?

A.   The officer that made the arrest.

Q.   The arresting officer?

A.   Correct.

Q.   In regards to domestic violence calls that involve allegations against law enforcement personnel, do you have specific guidelines for that?

          MR. PADOLSKY:   Objection.

A.   We do.

Q.   And how does that vary from the general domestic violence guidelines?

A.   The extra policy really regards if the involved offender is the law enforcement person, not if it's the victim.

Q.   And if the offender is law enforcement personnel, what are your duties and guidelines at that point?

A.   There would be notification to the law enforcement officer's agency.

Q.   And, ostensibly, may affect his or her standing

Page 18

as an officer?

MR. PADOLSKY:  Objection.

A.  I guess.

Q.  You've never encountered that situation?

A.  I'm not administrative where I would make that decision.

Q.  So you never encountered that situation where you would have to make a decision like that?

MR. PADOLSKY:  Objection.

A.  I don't understand.

Q.  You said you're not administrative, so you've never had to deal with the situation where someone's reported either a law enforcement personnel under your supervision or you've had to report?

MR. PADOLSKY:  Objection.

A.  I've had incidents with law enforcement in the past.

Q.  Okay.  And did you report to their agency?

A.  Yes.

Q.  What do you do with the law enforcement personnel's firearm in a domestic call?

A.  If they're the offender or the victim?

Q.  If they're the offender.

Page 19

A.   It would be seized.

Q.   **And would it be returned?**

A.   Yes.

Q.   **After a safety check?**

A.   Sorry.  If they're under arrest, it would be returned to their department, not necessarily to the person.

Q.   **And what if they were -- what if that was their -- if it was their government issued firearm, correct, it would be returned?**

A.   Yes.

Q.   **What if it was their own firearm?**

A.   If they were under arrest and charged, we would hold onto it.

Q.   **And you would then return it --**

A.   I don't know that.

Q.   **You don't know that.  Okay.  After a domestic call, as a supervisor, what are your duties then?**

          MR. PADOLSKY:  Objection.

Q.   **Do you have duties at the culmination, everything is done, you've cleared it all, arrests have been made, do you have duties after that?**

Page 20

A.   No.

Q.   **You have no other duties to review anything?**

A.   That's for the watch commander.

Q.   **That's for the watch commander, okay.  So that's a different supervisor?**

A.   Yes.

Q.   **What is the difference between your supervisor and the watch commander supervisor?**

A.   I am the street supervisor, the watch commander is overall inside, does the bookings, report review, all that stuff.

Q.   **So at the culmination of a call like that, you would be back on the road doing your duties?**

A.   Yes.

Q.   **And the watch commander would come in and review everything and make sure everything was done to the regulations, correct?**

A.   Yes.

Q.   **Now, sir, in 24 years, have you ever been the subject of an internal affairs investigation?**

A.   Not that I'm aware of.

Q.   **Okay.  Has anyone ever filed a complaint against you in your -- with the department in the course of your employment?**

Page 21

A.   It's possible, but I don't know.

Q.   **You've never been notified of one?**

A.   Not that I can remember.

Q.   **Okay.  Has another officer ever filed a complaint against you?**

A.   Not that I'm aware of.

Q.   **Okay.  Have you ever been a part of a lawsuit before?**

A.   No.

Q.   **Either in a personal capacity or as an officer?**

A.   No.

Q.   **Okay.  Are there any instances where you've run afoul of rules or regulations but no complaint has been instituted against you?**

         MR. PADOLSKY:  Objection.

A.   Not that I'm aware of.

Q.   **Have you ever felt that you've violated any rules and regulations?**

         MR. PADOLSKY:  Objection.

A.   Not that I'm aware of.

Q.   **Okay.  All right.  All right.  Sergeant Bata, if I may, could I call your attention to February 21, 2014?**

A.   Okay.

Page 22

Q.   All right.  And that's the date of an incident that gives rise to this lawsuit, okay?

So do you recall what your assignment was or what you were doing on that day?

A.   I was the patrol supervisor for the relief shift.

Q.   And that relief shift you've testify previously runs from 2:10 to 10:15?

A.   That day I believe it did, yes.

Q.   So you are the supervisor.  What -- do you recall a call coming in at that time roughly around 8:30?

MR. PADOLSKY:  Objection.

A.   Yes.

Q.   And do you recall what that 911 call was?

A.   Possible domestic situation.

Q.   And do you recall where that possible domestic situation was?

A.   K-Mart parking lot.

Q.   What was your cruiser number that night?

A.   Should be 817.

Q.   Are you always in the 817 car?

A.   As long as it's in service.

Q.   And so you received a dispatch call for a

Page 23

potential domestic violence at K-Mart, correct?

A.   Yes.

Q.   Then what did you do?

A.   I responded to the call.

Q.   Were you the first to respond?

A.   No.

Q.   Who had responded?

A.   Officer McNamara.

Q.   Officer McNamara was the first to respond?

A.   I believe he was first, yes.

Q.   Were you and Officer McNamara dispatched at the same time?

A.   Yes.

Q.   On that general radio call you were discussing earlier?

A.   Yes.

Q.   Okay.  Was anyone else dispatched at that time?

A.   Officer Clark, David Clark.

Q.   And so Officer McNamara arrived first?

A.   Yes.

Q.   What information did you get prior to responding or prior to arriving on the scene?

A.   That it possibly -- well, that it either possibly involved or involved an off-duty

Page 24

police officer.

Q.   And how did you get that information?

A.   Over the radio.

Q.   At that point when you received that over the radio, was there any other requests made by the dispatcher?

A.   I'm not sure.

Q.   Did the dispatcher ask you to go off line?

A.   Yes.

Q.   Why would the dispatcher ask you to go off line?

MR. PADOLSKY:  Objection.

A.   I have no idea.

Q.   Has the dispatcher ever asked you to go off line before?

A.   Yes.

Q.   In what instance has the dispatcher asked you to go off line before?

A.   I don't remember.

Q.   Is it customary to go off line?

MR. PADOLSKY:  Objection.

A.   Sometimes.

Q.   And why would you go off line in those instances?

Page 25

A.  I don't -- medical information, personal stuff, something like that.

Q.  So information that may need to be protected from the general police pool?

A.  You'd have to ask them.

Q.  They make that request -- okay.

Have you ever requested to go off line?

A.  Yes.

Q.  And why did you request to go off line?

A.  Most of the time privacy issues.

Q.  So in this instance the dispatcher asked you to go off line, correct?

A.  Yes.

Q.  And did you go off line?

A.  Not initially.

Q.  She made another request for you to go off line?

A.  No.

Q.  So she request to go off line?

A.  Yes.

Q.  You said -- what was your response to that?

A.  "Could you just put it on the air."

Q.  And what was the dispatcher's response to you saying, "Put it on the air"?

Page 26

A.   She gave me the call on the air.

Q.   Did she then ask you to go off line again?

A.   No.

Q.   You don't recall her making a request to "call me on 8602"?

A.   No.

Q.   Okay.  So you got the information over the air, you arrive on scene, what did you do?

A.   I spoke with Mr. Kelly.

Q.   And Mr. Kelly was the off-duty officer you referenced?

A.   Yes.

Q.   And did you know where he was off-duty from?

A.   Not when I arrived, no.

Q.   When you arrived there -- did you take any steps to inquire if Mr. Kelley had a firearm?

A.   I don't remember.

Q.   Okay.  To your knowledge, did any of the officers who responded before you inquire of Mr. Kelley's firearm?

A.   Not to my knowledge.

Q.   So you arrived on the scene and you began to speak to Mr. Kelley.  What were your observations prior to speaking to Mr. Kelley?

CHARLES F. BATA   KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL          7/26/2018

Page 27

A.   That there were two parties there, the male and
     female parties, two separate cars, a few spaces
     apart.

Q.   Did you observe anything else at that time?

A.   I believe initially, no.

Q.   So you begin to speak with Mr. Kelley, where
     were the other two officers who had already
     responded at that point?

A.   I can only recall officer McNamara at the
     moment but he was speaking to Mrs. Kelley, Mrs.
     Kelley Calabrese, whatever it is,
     Calabrese-Kelley, whatever it is.

Q.   It's fine.  Thank you, sir.

A.   I just -- sure.

Q.   So you began to speak to Mr. Kelley and what
     did Mr. Kelley tell you?

A.   Just he was there for a child custody swap and
     his wife hit him with a hockey stick.

Q.   Okay.

A.   They had a dispute.

Q.   Did he tell you how she hit him?

A.   She slashed him, like.

Q.   And a slash for those who may not play hockey
     is a --

CHARLES F. BATA   KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL        7/26/2018

Page 28

A.   Two hander.

Q.   **Two hander; downward motion?**

A.   Across, I guess, downward across.  I'm not --

Q.   **Okay.  Did Mr. Kelley tell you it was customary that they exchanged children at K-Mart?**

A.   I -- it wasn't customary, but I don't know if he told me that.

Q.   **Okay.  You came to learn that after the fact?**

     MR. PADOLSKY:  Objection.

A.   Yes.

Q.   **And so to your knowledge today, Officer McNamara was with Mrs. Kelley, Officer Clark was there, but we're unsure where he might have been.  You were speaking with Mr. Kelley. After he told you about the hockey stick, did you observe the hockey stick anywhere?**

A.   I did.

Q.   **Where was it?**

A.   It was in the back seat of his car.

Q.   **Generally a hockey stick isn't the only equipment; was there a hockey back?**

A.   There was.

Q.   **Where was that?**

A.   In the back seat as well.

Page 29

Q. Did Mr. Kelley tell you how either item got in the back seat?

A. I don't recall.

Q. So after you spoke with Mr. Kelley, did he tell you why there was a hockey stick or a hockey bag?

A. He stated that his wife wanted him to take the bag that belonged to his daughter.

Q. And do you recall seeing children there that night?

A. I do.

Q. And do you recall which children they were?

A. I don't.

Q. Did Mr. Kelley state that the hockey bag went with one of the children that was with him or with Mrs. Kelley?

A. I'm sorry, can you say that again.

Q. So there were two children on the scene, correct?

A. Yes.

Q. Did Mr. Kelley indicate that the hockey equipment was for one of those children?

A. It wasn't.

Q. He was saying that it did not belong to either

Page 30

of those children?

A.   Yes.

Q.   And did he say he was going to take that hockey
     bag and that hockey stick?

A.   He said he wasn't going to take it.

Q.   Do you recall why he said he wasn't going to
     take that?

A.   Because he didn't have that daughter.  He did
     not have custody of that daughter and she
     wasn't going to be with him.

Q.   So another daughter who was not present had
     hockey?

A.   She had equipment.

Q.   And he wasn't going to have that daughter so he
     didn't want that equipment?

A.   Yes.

Q.   And did he want -- did you ask him why the
     equipment ended up in his car?

A.   He told me.

Q.   And what did he tell you?

A.   He said his wife, the ex-wife was adamant that
     he take it.

Q.   Okay.

A.   And she came to the car and tried to put it in

Page 31

the car.

Q. Was she successful in putting it in the car?

A. No.

Q. So sometime between Mrs. Kelley trying to put the hockey equipment in the car and you arriving, somebody put it into Mr. Kelley's car?

A. I'd assume so.

Q. Because it --

A. It was in the car.

Q. So after you talked with Mr. Kelley, what did you do?

A. I went over and spoke with Officer McNamara.

Q. And Officer McNamara as you testify was with Mrs. Kelley?

A. Yes.

Q. And what transpired at that point?

A. He informed me of what he learned from Mrs. Kelley.

Q. And what did he tell you?

A. He told me that -- he told me that they had an altercation, that she was -- they were exchanging the kids, and it became physical between the two of them.

Page 32

Q.   Okay.  And to your knowledge, Officer McNamara obtained that information from Mrs. Kelley?

A.   Yes.

Q.   Did you do any -- after you spoke with Officer McNamara, did you speaking with Mrs. Kelley?

A.   Yes.

Q.   And what did Mrs. Kelley tell you?

A.   She -- during the conversation I had asked her about the hockey stick and she stated that she had hit her husband with the stick.

Q.   She stated she hit her husband with the stick?

A.   Mm-hmm.

Q.   Did she state in what manner she hit her husband?

A.   When I spoke to her she said she did not know if she hit him with one or two hands.

Q.   Okay.  Where did Mr. Kelley say he was hit?

A.   You mean on his person?

Q.   Yes.

A.   On his legs.

Q.   Did you look at his legs?

A.   Not on the scene.

Q.   Why not?

A.   It's a very public place.  We're not going to

Page 33

ask somebody to take their pants down in the middle of a parking lot, and also bruises don't show for about two or three days so it's usually a follow-up situation.

Q. In your experience, have you seen injuries from hockey sticks?

A. No.

Q. Okay. Is it possible that there would have been some sort of mark?

A. Anything is possible.

Q. Okay. But you didn't take a look?

A. I did not.

Q. Did Mrs. Kelley have any injuries?

A. I do not know.

Q. Did Mrs. Kelley tell you that she had been forcibly pushed by her husband or ex-husband, excuse me?

A. She didn't tell me.

Q. Did you learn that at the scene?

A. Not at the scene, after.

Q. To your knowledge, did Mrs. Kelley tell Officer McNamara that she had been pushed by her husband?

A. I am not sure.

Page 34

Q.   So at that time you spoke with Officer McNamara
     and Mrs. Kelley, did you go back to Mrs.
     Kelley?

A.   I believe I did.

Q.   Okay.  And what happened at that point?

A.   At that point I think we made a determination
     and we allowed him to take the children.

Q.   And what was that determination?

A.   That Mrs. Kelley was going to be placed under
     arrest.

Q.   Why did you make that determination?

A.   I felt she was the aggressor.  He and her both
     confirmed that she had struck him with the
     hockey stick which would be probable cause that
     it was an ABDW.  He was by his car, she
     approached him.  I just felt she was the
     aggressor in the situation.  So because of
     that, that's why the determination was made.

Q.   So let's take that one by one because probable
     cause is a set of factors; it's not a magic
     bullet, right?

A.   Mm-hmm.

Q.   So one factor you're citing is that he was by
     his car?

Page 35

A.   Yes.

Q.   And he had told you that he didn't have his daughter that weekend who had the hockey equipment, correct?

A.   Yes.

Q.   So he wasn't going to take the hockey equipment?

A.   Yes.

Q.   And forgive me, what's the next factor you cited?

        MR. PADOLSKY:   Objection.

A.   I'm sorry?

Q.   So one was the -- the alleged assault occurred near his car?

A.   Yes.

Q.   What else led you to believe that he was at -- she was the aggressor?

A.   His statements that she struck him, also her statements that she struck him.

Q.   And what about her statements that he had pushed her?

A.   He had -- her statement -- the response to the -- the investigation to that was that she was trying to put the hockey bag in the car and

Page 36

he didn't want her near the car, so he never approached her.  He never went to her car.  She took it upon herself to go to him and, you know, push the issue with the situation and I -- he -- during the altercation, you know, she was -- it's my determination she was the aggressor, going to him.

Q.   So bringing the hockey bag to him was another big factor to you?

MR. PADOLSKY:  Objection.

A.   Trying to force it into the car, it was a factor for me.

Q.   Because he told you he wasn't taking the hockey bag because he didn't have the daughter who had hockey?

A.   Yes.

Q.   Did he tell you why they were at K-Mart for the pickup?

A.   Yes.

Q.   What was that reason?

A.   They were supposed to meet up elsewhere but someone was running late.  I don't remember who.

Q.   So you made the determination that Mrs. Kelley

Page 37

was the aggressor, what did you do next?

A.  We had the children go with Mr. Kelley, he left, and we placed her under arrest.

Q.  Did you read her her rights at that time, her Miranda Rights?

A.  I don't recall.

Q.  And then what happened after she was placed under arrest?

A.  She was transported to the police station.

Q.  Did you transport her?

A.  I did not.

Q.  Who transported her?

A.  I do not know, I'm not sure.

Q.  So she was placed under arrest, she was transported, and that was the end of your involvement with the situation?

A.  Yes.

Q.  You went back on the road?

A.  Yes, I never came off.

Q.  I apologize.

A.  That's okay.

Q.  Okay.  And did you write a report for this incident?

A.  No.

CHARLES F. BATA   KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL          7/26/2018

Page 38

Q. Do you know who wrote the report for this
incident?

A. Officer Clark.

Q. Did you review Officer Clark's report?

A. I believe I did.  I'm not sure.

Q. Is it your -- as a supervisor, is it your duty
to review it?

A. No.

Q. That would be the watch commander's duty?

A. Yes.

Q. In the course of -- you said you might have
reviewed it.  If you did review it and saw
inconsistencies in the report, would you file a
supplemental report?

MR. PADOLSKY:  Objection.

A. It's possible.

Q. Okay.  So is it safe to say if you did review
the report, which you may have, that you would
have filed a supplemental report to correct
inconsistencies?

MR. PADOLSKY:  Objection.

A. I can't say that.

Q. Okay.  Has there ever been and instance where
you've reviewed a report and filed a

Page 39

supplemental report for inconsistencies?

A. Not that I can think of, no.

Q. I'm going to show you a document. Take a second to review it, go ahead and look up whenever you're ready.

MR. PADOLSKY: Are we marking this?

MR. PENKA: Yes, we'll mark it.

(Narrative marked as Bata Exhibit 1 for identification)

Q. All right. All set?

A. Yes.

Q. Do you recognize that document?

A. Yes.

Q. What do you recognize that document to be?

A. It's the narrative from the police report.

Q. And who offered that narrative?

A. Officer David Clark.

Q. And you stated this is the report you would have seen before?

A. Yes.

Q. Do you recall seeing this report before?

A. I do.

Q. And about when did you review this report before?

Page 40

A. I do not recall that.  I don't have the date.

Q. At the time that you reviewed that report, did you find any inconsistencies here?

MR. PADOLSKY:  No.

Q. So to your knowledge this is exactly what was told to you the night of the incident?

MR. PADOLSKY:  Objection.

A. I was only part of the investigation, but yes.

Q. Sure.  So let's go to the third paragraph in the report there.  "William" -- who is Mr. Kelley, correct?

A. Mm-hmm.

Q. "William stated to us that he had been divorced from Karen for two years.  He has custody of the kids starting at 6 p.m. on Friday.  He stated he was supposed to pick them up in West Roxbury.  Karen had calls and said she was running late in the South Shore area."

Did he state that to you?

A. Yes, I believe so.

Q. So he did state to you that Karen had called him and stated she was running late and was in the south shore area?

A. I don't -- I don't recall who stated.  I know I

Page 41

remember hearing they met there because of somebody being late.  I'm not sure who was the party.

Q.   Okay.  If we could look at the third line on the fourth paragraph that begins "He stated," do you see where I am?

A.   I do.

Q.   "He stated that Karen had gotten out and tried to give him a hockey bag and stick that belonged to is his other daughter that he did not have this weekend."  Is that consistent with what you remember happening at the scene?

A.   Yes.

Q.   So Mr. Kelley told you he did not have his daughter who had the hockey bag and stick as we discuss?

        MR. PADOLSKY:  Objection.

A.   Yes.

Q.   The next sentence is short, but it says, "He would not take it," is that correct?

A.   Yes.

Q.   And in your recollection, Mr. Kelley would not take that hockey bag?

A.   That's what I was told.

Q.  By Mr. Kelley?

A.  Yes.

Q.  Now, in looking at this report, Sergeant Bata,
    I can't help to notice that the paragraph
    regarding the items that -- the statements that
    William made is about double the size of the
    statements that Karen made, that Mrs. Kelley
    made; is there a reason for that?

        MR. PADOLSKY:  Objection.

A.  No.

Q.  Is there any cause to believe that -- in the
    next paragraph where it says, "She stated that
    William pushed her first," is there any cause
    to believe that that was inconsistent?

        MR. PADOLSKY:  Objection.

A.  Inconsistent with what?

Q.  With what Mrs. Kelley told you?

A.  I don't know.

Q.  Okay.  So it's possible that Mrs. Kelley stated
    to someone at the scene that Mr. Kelley pushed
    her first?

A.  It's possible.

Q.  Okay.  But you don't recall whether that was
    stated directly to you or to another officer?

Page 43

A.   I do not.

Q.   Okay.  On one of the last lines of that paragraph it states, "She had a cut on one of her knees."  Do you remember seeing that cut?

A.   I don't.

Q.   Okay.  The sentence following that says, "It did not appear that the ground caused it, but her bumping the car door might have."  Did you make that determination or assessment?

A.   No.

Q.   Who would have made that assessment?

A.   I don't know where that came from.

Q.   Okay.  Assuming that it was Officer Clark who wrote this narrative, is it safe to say that that was his assessment?

          MR. PADOLSKY:  Objection.

A.   It's possible.

Q.   Okay.  Do you know who reported the incident first that night?

          MR. PADOLSKY:  Objection.

A.   I don't.

Q.   Do you know how many 911 calls there were for the incident?

A.   No.

CHARLES F. BATA   KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL          7/26/2018

Page 44

Q.   How many dispatchers are on duty in that relief shift?

A.   There would have been two that night.

Q.   Okay.  And do you recall who they were?

A.   No.

Q.   If I suggested to you that they were Amanda Wood and Christopher Parker, would that make sense?

A.   It's possible, but I don't necessarily know who's working.  There's a lot of fluctuation with overtime and time off.

Q.   But in February of 2014 Amanda Wood and Christopher Parker were dispatchers for the Town of Braintree?

A.   I want to say I believe so.

        MR. PENKA:  Off the record.

        (Discussion off the record)

        MR. PENKA:  Back on.

Q.   So to your knowledge, you don't know how many 911 calls there were regarding this incident?

A.   No.

Q.   If I suggest to you that Mrs. Kelley placed the first 911 calls -- that there were two 911 calls, would it affect your assessment of the

Page 45

situation who had called 911 first?

A.   No.

Q.   So it's not a first reporting kind of scenario in a domestic issue?

A.   No.

Q.   Because that doesn't affect your investigation at all?

A.   No.

Q.   Sergeant Bata, do you recall testifying in the criminal matter that resulted from this arrest?

A.   I do.

Q.   And at that time do you recall whether or not Mrs. Kelly's attorney asked you if you knew Mr. Kelley was off-duty?

A.   I don't recall.

        MR. PENKA:  I don't know if we're going to mark this but --

Q.   I just want to ask you about your last answer there, and I'll submit to you that that is the trial transcript of the criminal matter versus Karen Kelley?

A.   The last question?

        MR. PADOLSKY:  For the record, we're on Page 2-29.

Page 46

Q.   Yes, the last question and answer.

          (Witness reviewing document)

Q.   Okay.  And the bottom of that -- your last answer, there's something to the effect of, "I don't tolerate that" or --

A.   "I don't have any tolerance for that."

Q.   Could you explain to us what you meant by that?

A.   That means I don't care if the person is a police officer or not, if they're -- if they're the suspect in the crime, it doesn't matter to me.  I'm not treating them differently, so --

Q.   So whether that dispatcher wanted to go off line or not didn't matter to you?

          MR. PADOLSKY:  Objection.

A.   I don't -- I don't -- the dispatcher didn't -- the dispatcher tried to give it to me off line but I asked for it off -- on line, so then -- so no, it didn't.

Q.   Other than the trial testimony, did you have any other contact with Mrs. Kelley or Mr. Kelley?

A.   I believe I saw him at court.  But, no, no contact other than -- no, the same thing.  I saw both of them in court.  I didn't have any

Page 47

interaction with them.

Q.  So outside of the incident that we discussed and once you -- you know, once you finished the call, I believe -- I believe the status would be cleared on an incident report?

A.  Yes.

Q.  So once the calls was cleared, that was it, you had no further contact?

A.  None.

MR. PENKA:  Okay.  All right.  I'm all set.

MR. PADOLSKY:  No questions on my end.

MR. PENKA:  Off the record.

(Whereupon, the deposition was concluded at 11:09 a.m.)

Page 48

C E R T I F I C A T E

I, Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing transcript, Volume I, is a true and accurate transcription of my stenographic notes taken on July 26, 2018.

_____

Susan E. DiFraia

Notary Public

My commission expires 10/10/20

* * * * *

DEPOSITION REPORTED BY:_____ ON:_____

# ERRATA/SIGNATURE PAGE

I, the undersigned, _____Charles F. Batta_____ do herby certify, under the pains and penalties of perjury, that I have read the foregoing deposition and that, to the best of my knowledge, said deposition is true and accurate with the exception of the following corrections listed below:

| PAGE | LINE | CORRECTIONS |
|------|------|-------------|
| 10 | 15 | CHANGE __10:15 pm to 6:15 pm AM + 2:15 pm to 10:15 pm__ |
| | | REASON: __Incorrect times__ |
| 22 | 8 | CHANGE __2:15 pm to 10:15 pm__ |
| | | REASON: __Incorrect time__ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |
| | | REASON: _____ |
| ___ | ___ | CHANGE _____ |

DEPONENT'S SIGNATURE _Chas F Batta_

Subscribed and sworn before me this _____ day of _____

NOTARY PUBLIC _____

*Eval*

1234 Boylston Street - 1st Floor
Boston - Chestnut Hill, MA 02467-2104
Tel : 617 723 9432