VOLUME:  I    EXHIBITS:  See Index    PAGES:  1-100

COMMONWEALTH OF MASSACHUSETTS

NORFOLK DIVISION                QUINCY DISTRICT COURT
                               DOCKET NO. 1456CR1473

———————————————————————————

COMMONWEALTH OF MASSACHUSETTS

vs.                                            TRIAL

KAREN CALABRESE-KELLEY

———————————————————————————

*TRANSCRIPTION FROM DIGITAL RECORDING*

**BEFORE:**  The Honorable Elaine M. Moriarty

**LOCATION:**  Quincy District Court
1 Dennis Ryan Parkway
Quincy, Massachusetts 02169

**DATE:**  Thursday, February 25, 2016

**TIME:**  12:35:38 p.m. to 3:58:32 p.m.



Capturing the Official Record
617.786.7783-www.reportersinc.com

**APPEARANCES:**

On Behalf of the Commonwealth:

**JESSICA BROKAW, ESQ.**
**Assistant District Attorney**

Norfolk County District Attorney's Office
45 Shawmut Road
Canton, Massachusetts 02121

On Behalf of the Defendant:

**BRIAN WARD, ESQ.**

333 Victory Road - Suite 3
Marina Bay
Quincy, Massachusetts 02171

## I N D E X

| OPENING STATEMENT | | | | PAGE |
|---|---|---|---|---|
| (Ms. Brokaw) | | | | 13 |
| (Mr. Ward) | | | | 16 |

| COMMONWEALTH'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WILLIAM KELLEY** | | | | |
| (Ms. Brokaw) | 21 | | 82 | |
| (Mr. Ward) | | 39 | | 85 |
| **OFFICER DAVID CLARK** | | | | |
| (Ms. Brokaw) | 86 | | 96 | |
| (Mr. Ward) | | 90 | | 97 |

## E X H I B I T S

| COMMONWEALTH'S NO. | DESCRIPTION | IDEN. | EVID. |
|---|---|---|---|
| 1 | Text message exchange | | 27 |
| 2A,B,C | Photographs | | 38 |

| DEFENSE'S NO. | DESCRIPTION | IDEN. | EVID. |
|---|---|---|---|
| 1 | Two emails | | 42 |

**P R O C E E D I N G S**

(Case commenced at 12:35:38 p.m.)

THE CLERK:  May I, your Honor?

THE COURT:  Yes, please.

THE CLERK:  In the matter of the Commonwealth versus Karen Calabrese-Kelley, Docket No. 14CR1473.

Will the defendant please stand and face the jurors?

You are placed at the bar for trial, and these good jurors whom I shall call are to pass between the Commonwealth and you upon your trial.

If you should object to any of the jurors, you will do so after their numbers are called and before they are sworn.

You have the right to challenge two of the jurors without giving any reason therefor and as many more as you have good cause to challenge.

You may be seated, ma'am.  Thank you.

Will the members of the jury panel stand and raise your right hands?

(JURY VENIRE, SWORN.)

Thank you very much.  Please be seated.

THE COURT:  Ladies and gentlemen, my name is

Judge Diane Moriarty and I will be presiding over this trial.

This is the trial of the Commonwealth versus Karen Calabrese-Kelley. She is charged with assault and battery with a dangerous weapon and has entered a plea of not guilty.

Counsel, will you stand and introduce yourselves to the jurors, please?

MS. BROKAW: Good afternoon, everyone. My name is Jessica Brokaw. I represent the Commonwealth of Massachusetts.

MR. WARD: Good afternoon, ladies and gentlemen. My name is Brian Ward and I represent Karen Calabrese-Kelley.

THE COURT: And we have a list of several witnesses. When I call your name, would you please stand and say what town you're from?

William Kelley.

WILLIAM KELLEY: Reading, Massachusetts.

THE COURT: Thank you.

Officer McNamara.

THE COURT OFFICER: He's not here, your Honor.

THE COURT: He's not here.

Okay. Sergeant Bata?

SERGEANT BATA:  Bata.

THE COURT:  Sorry.  Thank you.

SERGEANT BATA:  That's okay.  Braintree Police.

THE COURT:  And Officer Clark?

OFFICER CLARK:  Braintree Police.

MS. BROKAW:  Your Honor, we may be calling Officer Hurley as well.  I did not add him to the witness list.

THE COURT:  And is Officer Hurley from the Braintree Police?

MS. BROKAW:  Yes.

OFFICER HURLEY:  I am.

THE COURT:  Thank you, sir.  Okay.

THE CLERK:  Members of the panel, please answer "present" as your numbers are called and take your place in the jury box as indicated by the Court Officer.

(Jury Selection not transcribed.)

THE CLERK:  May I, your Honor?

THE COURT:  Yes.

THE CLERK:  Members of the Jury, please stand and raise your right hands.

(JURY VENIRE, SWORN.)

Thank you very much.  Please be seated.

Members of the Jury, harken to the complaint in Braintree on February 21st of the year 2014.  The defendant has been charged with assault and battery with a dangerous weapon.  To this complaint, the defendant has pleaded that she is not guilty, and for trial, places herself upon the country, which country you are.

You are now sworn to try the issue.  If she is guilty, you will say so; if she's not guilty, you will say so and no more.

Members of the jury, harken to the evidence.

Will all the witnesses in this case please stand and raise your right hand?

Thank you.

(ALL WITNESSES, SWORN.)

Thank you very much.  Please be seated.

THE COURT:  May I see the parties, please?

(Inaudible sidebar conference between the Court, Ms. Brokaw and Mr. Ward.)

THE COURT:  Okay.  There has been a motion to sequester all of the witnesses.  So if the witnesses would remain outside of the courtroom.  Please do not discuss the case with each other or with anyone else until the case has been resolved.

You will be called in one at a time to give your testimony.

Thank you.

Ladies and gentlemen of the jury, usually the Court takes a luncheon break between 1:00 and 2:00. And I know that you've all been in that jury room that's about 150 degrees since this morning at 8:30.

So what I'm going to do is give you some preliminary remarks on how I believe that the trial will proceed. And then we'll take a break, I'll send you out to lunch, and when you come back, you will hear opening statements from the lawyers and then we will begin the testimony of the witnesses.

So the first thing I need to do is to order you to please do not discuss this case with each other or with anyone else until you have heard all of the evidence and I have instructed you on the law.

The reason we would like you not to discuss it is because we want you to keep an open mind about what the evidence is. We don't want you to make up your minds about what is happening until you've heard from all of the witnesses and I have instructed you on the law.

I believe that the way it will proceed or at

least I'm hoping that it will go this way, is that the lawyers will give you opening statements.  Opening statements are not evidence.  They're sort of the road maps of what the lawyers think the testimony will be and how they believe that the evidence will come in to your -- for your -- through the testimony of the witnesses.

There will also be some exhibits that will be entered into evidence that I expect that you will hear through a computer, and we will send that back with you also to listen after we have heard all of the evidence.

After the witnesses -- during the testimony of the witnesses, there will be some objections that will be made by the lawyers.  This is their job.  They are required to do this under the caselaw here in Massachusetts.  There is only a certain type of evidence that is allowed in criminal trials.

So when a witness is asked a question, one of the lawyers may object.  If they object and I sustain the objection, I will say that out loud for the record so you will hear it.  That means that you may not consider that answer as evidence.  You must wipe it out of your minds and not even discuss it as part of your deliberations.

If I overrule the objection, that means you may consider that answer as evidence, but give whatever weight of importance you believe it is entitled to receive.

Also during the trial, I will bring the parties sometimes up to the bench to discuss some legal argument that they may have.  These are called bench conferences.  You are not to hold it against either of the parties when this occurs.

Then after you hear all of the evidence, the parties will give you closing arguments.  Again, these are sort of the version of what the lawyers believe that you should consider.  And if your memory about the testimony is different than what the lawyers say, it is your memory collectively about the evidence that was presented to you that holds, not the lawyers.  The closing arguments are similar to opening arguments is not evidence.  It is just their view of how they would like you to consider.

When they have finished with their closing arguments, I will instruct you on the law that you are to apply to the facts as you all decide them to be.  Okay?

So, I'm just going to give you a brief overview

of what the defendant is charged with.

Now, I will give you the full explanation at the end, after you have heard all the evidence, but I just thought you should keep in mind what the Commonwealth is required to prove to you beyond a reasonable doubt.

Now the defendant is charged with having committed an intentional assault and battery by means of a dangerous weapon, specifically, a hockey stick upon Mr. Kelley.

Section 15A of Chapter 265 of our General Laws provides as follows:  "Whoever commits an assault and battery upon another by means of a dangerous weapon shall be punished."

In order to prove the defendant guilty of this offense, the Commonwealth must prove three things beyond a reasonable doubt.

First, that the defendant touched the person of Mr. Kelley, however slightly, without having any right or excuse for doing so.

Second, that the defendant intended to touch Mr. Kelley.

And third, that the touching was done with a dangerous weapon.

Now, those are the three things that you should keep in mind while you're listening to the evidence.

So, we're going to let you go to lunch.  I'm going to ask you when you come back you haven't talked about this case, you haven't called anyone on the phone and told them what the case is that you're on.

I hope you have a nice lunch.  And when you come back at 2:30, we will start right then with the opening statements of the lawyers and then begin with the witnesses.  Okay.

THE COURT OFFICER:  All rise for the jury, please?

Jurors, please follow me.

(Jurors not present.)

THE COURT:  All right.  Am I assuming Officer McNamara is not testifying?

MS. BROKAW:  He's not.  I'm sorry.

THE COURT:  Okay, great.

MS. BROKAW:  He was available on the last date.

THE COURT:  No, that's all right.  I just want to make sure.

Thank you.

All right.  We'll see you back here at 2:30.

MS. BROKAW:  Thank you.

THE COURT OFFICER:  Court, all rise.

(Case recessed at 1:14:37 p.m. for the luncheon recess and resumed at 2:26:30 p.m.)

THE COURT OFFICER:  Jurors, your Honor?

THE COURT:  Yes, please.

THE COURT OFFICER:  Would everyone please rise for the jury?

(Jurors present.)

THE COURT OFFICER:  The jurors are present, your Honor.  Everyone please be seated.

THE COURT:  I have to ask you the all important question, you have not discussed this case with each other or anyone else, correct?

(Jurors answered in the affirmative.)

Thank you.

Commonwealth?

**OPENING STATEMENT**

MS. BROKAW:  Thank you, your Honor.

Divorce is excruciating, particularly when children hang in the balance.  It's common knowledge. We all know this.

Arguments can continue long after the marriage is over.  And when children need to be exchanged when custody arrangements aren't ideal, those arguments can

be very heated.

What happened on February 21st, 2014 went far beyond an argument over exchanging children.  On that date the defendant met her ex-husband at the K-Mart parking lot in Braintree.

The two had agreed to exchange two of the four children that they have together.  And the defendant was waiting.  She was angry.  She was texting her former husband and he was late.  The two had a very angry text message exchange.  She was furious.  He was running late.

He pulled into the parking lot away from her car.  She was even more upset.  She wasn't close enough.  He finally pulled his car closer to the defendant's car and noticed there was a hockey bag with a hockey stick outside the car that belonged to one of their two daughters who had a practice.

You'll hear from William Kelley, and he'll tell you that the defendant was trying to put that bag in his car, and he didn't want that bag in his car.  He told her, "Don't put that bag in my car."  He stood there trying to keep her away with the bag.  And when she tried to load the bag into the car and the hockey stick fell down, she took that hockey stick, held it

like a baseball bat and hit him on the back of the legs repeatedly.  And he sustained serious bruising.  And you'll have an opportunity to see the photographs of that bruising.

My name is Jessica Brokaw, I represent the Commonwealth of Massachusetts, and the Commonwealth has charged the defendant with one count of assault and battery with dangerous weapon, the hockey stick on her former husband, William Kelley.

You'll be hearing testimony today from the people who were there that evening.  You'll first hear from William Kelley, and he'll tell you about what the events leading up to that arranged exchange of their children.  He'll tell you that both of them were very upset, and he'll explain what happened that night as he tried to coax his former wife away from his car, and she got more upset and decided to grab the hockey stick and escalate the situation into violence.

You'll also be hearing from the Braintree Police officers who responded to the scene.  You'll be hearing that both the defendant and William Kelley called police that evening.  And when the police arrived on scene and had an opportunity to speak with everyone, saw the hockey stick and made other

observations.  The defendant was placed under arrest for assault and battery with a dangerous weapon.

And at the end of all the evidence, I'll have an opportunity to speak with you again, and at that point, I'll be asking that you find the defendant guilty.

Thank you.

### OPENING STATEMENT

MR. WARD:  Good afternoon, ladies and gentlemen.  My name is Brian Ward and I represent Karen Calabrese-Kelley.

First and foremost, I want to thank everybody in advance for their time and their attention that they're going to give to this case.  I know there are a lot of things that all seven of you would rather be doing than sitting in this jury box listening to this case.  But it is an important case, and I thank you in advance for the time and the attention you're to give this.

With that said, I want to tell you the story. A few weeks ago I came home from work and I walked into my kitchen.  I greeted my wife, and like many married couples, we heard an argument.  It was my ten-year-old daughter and my eight-year-old son, and they were in

the TV room and we heard them arguing.

And all of a sudden, I hear my son yell "Mom," and we hear my daughter yell "Dad."  And the two of us, we walked into the TV room.  And as we walked into the TV room, my daughter jumps up and said, "He hit me."  And just as she said that, my son jumped up and said, "No, she hit me first."

And me and my wife looked at them and we both looked at each other, and we said, "That's it.  Both of you's up to your room.  Go up to your room.  We're not getting into this."

And that's great for my house, and I tell you that story because I want to tell you about what goes on at my house.  But I tell you that because it's a great parallel to what happened in this case.  I tell you that because you're going to hear evidence that on an evening in February, Ms. Calabrese-Kelley and her ex-husband, met at the K-Mart parking lot.

You're going to hear testimony relative to how they came to meet at that Braintree parking lot, okay? The Braintree K-Mart.

You're going to hear testimony that Ms. Calabrese-Kelley lives in West Roxbury.  You're going to hear testimony that Mr. Kelley lives in

Reading.  Nonetheless you're going to hear testimony that they met in that K-Mart parking lot in Braintree.

You're also going to hear testimony and you're going to hear a 911 tape that Ms. Calabrese-Kelley called 911, and she told the 911 operator that she had been thrown to the ground.

You're going to hear a second 911 call that Mr. Kelley called 911, and he said, "No, no.  My wife hit me with a hockey stick."

Now unlike my wife and I who walked into the room and we looked at our kids, and we said, "You know what?  I'm not getting into this.  We're sending you both to your room."  You can do that.

So you're going to hear testimony that the Braintree Police responded this incident.  They responded as a result of two 911 calls, Ms. Calabrese-Kelley saying "I was thrown to the ground," and Mr. Kelley saying "No, no.  She hit me with a hockey stick."

But what you haven't heard is you're also going to hear testimony that Mr. William Kelley is a Boston Police officer.

You're going to hear testimony that on -- but what you're going to hear on the 911 turret tape that

says that on the way to responding to that call, officers were informed, "By the way, one of the parties is an off-duty police officer."

You're going to hear a tape in which the dispatcher says "Can you call me off the air, so I can fill you in?"

You are going to see a video that shows how the officers investigated this crime, investigated this allegation.

And, finally, you're going to hear testimony that a decision was made.  None of the police officers -- you're going to hear testimony that none of the police officers were there.  They didn't see what happened.  Just like my wife and I who walked into that room.  We didn't see what happened.  We didn't know what happened.  There's only two people in this world that know what happened that night, that's Mr. Kelley and Mrs. Kelley.

But you're going to hear testimony that the Braintree Police show up on that scene having received information that one of the parties was an off-duty police officer, that they responded to that and as a result, they arrested Mrs. Kelley.

I believe that you will hear inconsistencies in

testimony.  I believe that those inconsistencies are important, but I'll leave that to the jury to decide.

I believe that when you hear all the evidence, when you hear from the officers and when you hear from Mr. Kelley and when you hear the tapes, you will come to a conclusion not that something didn't happen, something definitely happened in that parking lot, but you will not be able to tell who hit who, who did what simply because we believe that the testimony will not show that right.  And as a result of that, we believe that you will find Karen Kelley not guilty.

Thank you.

THE COURT:  Thank you.

Commonwealth?

MS. BROKAW:  May I call my first witness, your Honor?

THE COURT:  Yes, please.

MS. BROKAW:  The Commonwealth calls William Kelley.

THE COURT OFFICER:  I'm sorry?

MS. BROKAW:  William Kelley.

THE COURT OFFICER:  You can go right around there.  You can either sit or stand, and keep your voice up.  You've already been sworn in.

THE WITNESS:  Thank you, sir.

THE COURT:  Good afternoon, sir.

THE WITNESS:  Good afternoon, your Honor.

THE COURT:  Sit or stand whichever is more comfortable.

## TESTIMONY OF WILLIAM KELLEY

### DIRECT EXAMINATION

**BY MS. BROKAW:**

Q.  Good afternoon, Mr. Kelley.

A.  Good afternoon.

Q.  Can you state your name and spell it for the record, please?

A.  William Joseph Kelley, K-e-l-l-e-y.

Q.  And, Mr. Kelley, how are you employed?

A.  City of Boston Police detective.

Q.  How long have you been a member of the Boston Police Department?

A.  20 years.

Q.  Now, what town do you live in currently, Mr. Kelley?

A.  Reading, Massachusetts.

Q.  And are you married?

A.  I'm divorced.

Q.  You were married at one point?

A.   I was married.

Q.   Who were you married to?

A.   I was married to Karen Calabrese-Kelley.

Q.   And just for the record, do you see your former wife in court today?

A.   I do.  She's standing -- sitting to your left in a blue shirt, sliver earrings, short hair.

MS. BROKAW:  Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT:  Any objection?

MR. WARD:  No objection, Judge.

THE COURT:  So ID'd.

Q.   How long were the two of you married?

A.   17 years.

Q.   And when did you get divorced?

A.   December -- officially December 7th of 2011.

Q.   Did the two of you have children in common?

A.   Yes.

Q.   How many?

A.   Four.

Q.   And what are their ages?

A.   17, 14, 12 and nine.

Q.   Now, Mr. Kelley, I want to take you back to February 2014, what was the custody arrangement between

the two of you at that time?

A.   I got them every other weekend, Monday and Tuesday of school vacation weeks, two weeks in the summer and then I got them on Wednesday nights from 5:00 p.m. to 8:00 p.m.

Q.   How did you two coordinate exchanges of the kids?

A.   I was to pick the kids up on Wednesday nights, curbside, at five o'clock, and on the weekends I was taking them, I was to pick them up curbside at six o'clock.

Q.   When you say "curbside," was there a location you had agreed upon or...?

A.   Curbside in front of the home in which they live in.

Q.   Okay.  Now, Mr. Kelley, I want to take you to February 21st, 2014.  Do you remember what day of the week that was?

A.   It was a Wednesday.

Q.   And did you communicate with the defendant at all that day?

A.   I did.

Q.   And what was the communication about?

A.   Around, I think it was quarter to six -- I'm

sorry -- quarter of five, I realized I was going to be late, so I texted her saying that I was going to be late.

Q.   When you say "You were going to be late," late to what?

A.   I was not going to make the five o'clock pickup at curbside at the house on that night.

Q.   And why was that?

A.   I had gone home, wasn't feeling well, and then didn't really compensate for traffic, so traffic held me up a little bit coming from Reading to West Roxbury.

Q.   And how did you communicate to the defendant that you were going to be late?

A.   I believe I texted her that I was going to be late.

Q.   And did she respond?

A.   She did.

Q.   What was the tone of her response?

A.   Angry, very angry.

MR. WARD:  Object, your Honor.

THE COURT:  Overruled.

Q.   And how many text messages did the two of you exchange earlier that evening?

A.   Probably 20 plus anyways.

**Q.**    Now, was the plan to meet to pick them up at curbside at their home?

**A.**    (No verbal response.)

**Q.**    Where did you two agree to meet that day?

**A.**    I maintained throughout my text that I wanted to pick them up curbside even if I was going to be late.  She had indicated in her text that that wasn't going to be acceptable, that she wasn't going to let the 15-year-old daughter babysit for the time that it was going to take me to get there and be late.  And she had indicated to me that she would, at some point, tell me a meeting time and place where I could pick them up.

MS. BROKAW:  May I approach the witness, your Honor?

THE COURT:  Yes.

**Q.**    William, I'm going to ask you to take a look at those and just look at me when you had an opportunity to look through that.

**A.**    Okay.  Do you mean look at all the pages?  This is the text chain.

**Q.**    Yes, just to look through and see if you recognize all of them.

Do you recognize all those images, Mr. Kelley?

**A.**    Yes.

**Q.**   What do you recognize those to be?

**A.**    It appears to be the text chain I previously mentioned that we engaged in.

**Q.**    And that's a fair and accurate representation of that exchange, as you remember it on February 21st?

**A.**   Yes.

**Q.**    And is there a phone number at the top of that text message exchange?

**A.**   Yes.

**Q.**    And do you know whose number that is?

**A.**    Are you referring to 680-7015?

**Q.**   Yes.

**A.**    That's a previous phone number of mine.

MS. BROKAW:  Your Honor, I'd move to introduce that as Exhibit 1.

MR. WARD:  Your Honor, I have no objection.  We actually produced those.  The only thing I would ask is that at some point I just want to take a look at the order that they're in to just make sure that they're in the same order as packaged that I have so I can follow along.

THE COURT:  Okay.

MR. WARD:  But there's no objection as to admissibility.

THE COURT:  Okay.  These will all be Commonwealth 1, please.

MS. BROKAW:  And may I just return them to the witness after they're marked, your Honor?

THE COURT:  Yes.

(Text message exchange was marked Commonwealth Exhibit No. 1 and received in evidence.)

THE COURT:  Thank you.

MR. WARD:  Thank you, your Honor.

Q.  Now, Mr. Kelley, on that first page, that first text message bubble we'll call it, do you know who wrote that bubble?  Can you tell by looking at it?

A.  Yes.

Q.  And can you read it for the jury?

A.  "Totally unacceptable.  Now you can get them where I say and when I say.  I will let you know.  I know this is really, really a difficult concept for you to understand, but other people have plans, and oh my God do I dare say it?  You do not always come first.  I know you do not get it and I know you have no idea how to put your kids first, never have and obviously never will, but try making a sacrifice for a change.  Oh, wait, I'm sorry, look it up under "S" in the dictionary."

**Q.** Now, Mr. Kelley, at some point did you two agree on where you'd ultimately exchange the kids that night?

**A.** I reluctantly agreed to meet them at the K-Mart in Braintree.

**Q.** And had you been to that K-Mart before?

**A.** Yes.

**Q.** Under what context?

**A.** I met them there before. I forget if it was 'cuz I was late before, because I had preapproved plans and that was just a meeting place or we met one time there before.

**Q.** And shortly after 8:00 p.m. that evening, what happened?

**A.** I was told they would be available at 8:15. I think I arrived shortly after 8:00. I observed her in the parking lot, so I pulled up a row across from her and about three or four car lengths away from her.

**Q.** Why did you stay three or four car lengths away?

**A.** Because she's been hostile in the past, and I was just trying to avoid any type of problems or anything like that.

MR. WARD: Objection; move to strike.

THE COURT:  Can I see you both, please?

MR. WARD:  Sure.

(Sidebar conference between the Court, Ms. Brokaw and Mr. Ward.)

MR. WARD:  The reference to being "hostile in the past," it was their motion in limine to not introduce any representation of that and I mean, here we go.

MS. BROKAW:  Your Honor, I think the text messages themselves that the jury will see will talk to us.  It's not a specific prior incident.

MR. WARD:  Yeah, they can't make a decision.

THE COURT:  What is the request for this?

MR. WARD:  If I could, an instruction, please, Judge.

MS. BROKAW:  But to avoid confrontation, I would suggest that remain --

THE COURT:  That's fine.

MR. WARD:  No objection to that.

THE COURT:  Okay.

(End of sidebar conference between the Court, Ms. Brokaw and Mr. Ward.)

THE COURT:  The word "hostile" is excluded.

Q.  So when you parked your vehicle, Mr. Kelley,

what happened next?

A.    I waited in my car for them to -- I wanted them to come over to me.  They didn't get out of the car, and then I --

Q.    When you say "them," I'm just going to stop you.  When you say "they," who did you mean?

A.    My two youngest children, ▮▮▮▮▮▮▮ and ▮▮▮▮▮

Q.    And when they didn't get out of the car, what happened?  What did you do?

A.    They didn't get out.  And then I got another text from Ms. Kelley.

Q.    And based on that text message, what happened?

A.    So I -- her text made it clear that she didn't want me to have them come over to me.  She wanted me to move up a little bit.  So, I just moved across into her row, but still four -- three or four cars away from her.

Q.    And once you repositioned your car closer, what happened?

A.    At that point I got out because I observed -- my oldest daughter plays hockey, her name is ▮▮▮▮▮ -- I noticed her equipment on this -- on -- in the parking lot between our cars.

Q.    Did you think that was unusual?

**A.**    A little bit that it was out in the rain, but I was expecting ▇▇▇▇ to have hockey that weekend, so expecting equipment wasn't unusual, but it would've been unusual that it was out in the rain.

**Q.**    And what happened next?

**A.**    So ▇▇▇▇▇▇▇▇ got out of the car, they ran over to my car.  Both got -- ▇▇▇ got in, ▇▇▇▇ got almost all the way in, and ▇▇▇▇ started -- I mean, ▇▇▇ started to get upset because her computer -- she told me her computer was in the hockey bag.  And I told her to get the computer out of the hockey bag because I don't want the computer in the hockey bag, I don't want it to get broken.

She suffers from anxiety.  She got a little bit upset.  She said, "You have to take the hockey bag, you have to take the hockey bag, you have to take the hockey bag."

MR. WARD:  Objection, your Honor; move to strike.

THE COURT:  It's stricken as to what she said.

**Q.**    So after you asked her to take the computer out of the hockey bag, what happened next?

**A.**    So she got -- she began to get upset, and at some point, Karen noticed it.  And as I was telling

█ey to get out to get the computer, "I'll take care of the equipment," Mrs. Kelley picked up -- picked up the equipment and the hockey stick.

Q.   Where were you at this point?

A.   I was on the driver's side rear door helping the kids get in the car.

Q.   Rear door of whose car?

A.   Of my -- my vehicle.

Q.   And when the defendant got out of her car, what happened?

A.   She got out of the car and she picked up the bag and she began to move towards the rear of my car and then towards my open driver's side door on my side of the car.

Q.   What did you do?

A.   I walked over to her and she had the bag and she said, "Take -- take the friggin bag."

And I said, "I will take the bag.  Put it down."

She said, "No.  Take the damn the bag."

And I said -- now at this point we had walked past the rear trunk area where the equipment would typically go or where it always does go.  At this point I didn't know what she was doing.  I didn't know why

she was doing it, but she kept pushing the bag at me, pushing the bag at me.  I kept asking her to put it down.  She wouldn't put it down.

And, eventually, as I went around the car, I stayed up against the car just holding the bag back from her.  She's pushing it at me.  Just trying to ask her to put it down.  She wouldn't put it down.

And, eventually, we got to my driver's side door.

Q.   And what happened next?

A.   The driver's side door is open which essentially would create the "V" that you would get when you open your door.  I was concerned as to why she was adamant about putting my equipment in the front driver's seat of my car and what she may or may not do with the hockey stick.

So, as I said, I stayed up against the back of the car holding the bag back asking her to drop it.

At that point, we got to the door.  I positioned myself inside the "V" not sitting in the car, but blocking her from putting it in the car, and/or for her getting in the car.

And at that point, she fell backwards.  She didn't fall down to the ground, she went back backwards

suddenly and appeared to very, very irate.

MR. WARD:  Objection, your Honor.  We're on a narrative now.

THE COURT:  Sustained.

Q.   After she fell to the ground, what happened?

A.   She didn't fall to the ground.  She hit -- hit the door -- when she got to the door, something happened that made her fall -- fall back like pushed back and she'd -- at that point the hockey bag and the stick fell.  She immediately picked up the stick like a baseball style position swing style and what I thought started to -- was going to start to swing at me.  So I...

Q.   How close were you standing to her at this point, Mr. Kelley?

A.   When she picked up the stick?

Q.   Yes.

A.   Within five feet.

Q.   And where were you facing?

A.   I was still in that -- I was still in the V area and the equipment fell right by the -- right in front of, like, just before my feet in between us and the stick.  And at that point she picked up the stick and took it like baseball style stance and started to

swing it at me.

Q.    And did she make contact with you?

A.    She did.

Q.    Where did she hit you?

A.    I put my hands on my head and turned around to avoid being hit in the head, and the stick hit me in the back of the -- both upper thighs.

Q.    And do you know what part of the stick struck you?

A.    I think it was mostly the shaft.  I don't know if the blade hit me or not.

Q.    Can you describe the stick?  Do you remember it?

A.    I don't remember it.  I just remember it being a standard street hockey stick probably five feet long.  I don't even remember the brand.

Q.    So after you were -- the defendant hit you several times in the back of the leg, what happened next?

A.    Just to be clear, she only -- she did only hit my one time.  She hit me one time.  She dropped the stick.  And then she hurried over to her car yelling to the effect that I was in trouble now that she was calling the police because I had hit her and pushed her

to the ground and to that effect.

Q.   And where are your daughters at this point?

A.   At the point she hit me, I know that ▮▮▮ was still in the car, that ▮▮▮ had seen it.  I don't remember if -- ▮▮▮ was in the car at some point, but ▮▮▮ after -- either sometime after being hit or just after, ▮▮▮ went back to her mom's car and ▮▮▮ remained there until the police arrived.  And I believe in the middle of waiting for the police to arrive, I let ▮▮▮, I think, go back to her mom's car, too.

Q.   So, Mr. Kelley, just taking you back to after the defendant hit you with the stick, you testified she went to her car, what did you do?

A.   I went back to my car and called the police as well.

Q.   And did Braintree Police respond?

A.   They did.

Q.   And how long would you estimate it took them to get to your location at the K-Mart parking lot?

A.   Probably under three minutes.

Q.   And when they arrived, what happened?

A.   When they arrived -- I forget what their names were, but I think two police officers went over and

spoke with Mrs. Kelley and two police officers came over and spoke to me.

Q.   And did you tell them what happened?

A.   Yes.

Q.   And at some point -- so, Mr. Kelley, did you sustain injuries as a result of the hit to the back of your leg?

A.   Yes, I did.

Q.   Can you describe them?

A.   Deep darkish bruises with like a white clear mark going through it consistent with being hit bluntly.

MR. WARD:  Objection.

THE COURT:  Sustained as to consistent.

Q.   Mr. Kelley, at some point did you go to the Braintree Police station after this incident?

A.   I did.

Q.   And when was that?

A.   I think Monday.

Q.   And when you're at the station, what did you do?

A.   An officer met me there and took pictures of my injuries.

MS. BROKAW:  May I approach the witness, your

Honor?

THE COURT:  Yes.

Q.    Again, Mr. Kelley, I'm just going to ask that you take a look at those and just look up when you're finished.

Do you recognize those?

A.    I do.

Q.    And what are they?

A.    Those are the injuries I received from getting hit with the hockey stick.

MS. BROKAW:  Your Honor, I'd move to admit those as my next exhibit.  I suggest as one exhibit, A, B, C.

MR. WARD:  That's fine.  No objection, Judge.

MS. BROKAW:  If I can just have one moment, your Honor?

THE COURT:  Commonwealth's 2.

(Photographs were marked as Commonwealth Exhibit Nos. 2A, B and C and received in evidence.)

Q.    Now, Mr. Kelley, I just have a couple more questions.

You testified that you were in the triangle area near your car door.  Did you push the defendant at

any point when you were in that close proximity with her?

A.   I did not.

Q.   Did you have any contact with the hockey bag?

A.   Yes.

Q.   Was she -- was the defendant also in contact with the hockey bag?

A.   Yes.

Q.   Can you describe that contact?

A.   Yes.  It's like a -- like, if you were tussling for an object, she was trying to push it at me, put it into the car.  And I was just trying to hold her back and asking her to drop it saying "I was going to put it in the trunk."

Q.   And where was the stick at that point?

A.   She had the stick in her hand the whole time until it fell.

        MS. BROKAW:  No further questions, your Honor.

                    **CROSS-EXAMINATION**

**BY MR. WARD:**

Q.   Mr. Kelley, you just testified that on the evening of February 21st, 2014, you were supposed to have visitation with your children, correct?

A.   Say that again?

**Q.**   You just testified that on the evening of February 21st, 2014, you were supposed to have visitation with your children, correct?

**A.**   Correct.

**Q.**   Okay.  And you just told this jury that was a Wednesday, right?

**A.**   You're correct.

**Q.**   In fact, it was a Friday, wasn't it?

**A.**   It was -- it was a Friday.

**Q.**   'Cuz you were going to have the kids overnight, right?

**A.**   Correct.

**Q.**   And in preparation of that, Ms. Kelley had sent you two emails letting you know what the children's activities were for the following -- for that weekend, right?

**A.**   I don't recall the specific emails.

MR. WARD:  Your Honor, if I may approach?

THE COURT:  Yes.

**Q.**   Mr. Kelley, I'm going to show you two emails and ask if you've ever seen these two emails?

Now having a chance to take a look at those emails, do you recognize those emails?

**A.**   I do now, yes.

Q.    You do.

So it's your testimony that you received those emails prior to your visitation on February 21st, right?

A.    I would've, yes.

Q.    And the first email is February 21st at 3:30 p.m., and it talks about some activities that ██████ and Jack have, right?

A.    Well, ██████ has a birthday party with Jack. Jack's not one of my kids.

Q.    Correct.

A.    Yes.  So ██████ has a birthday party, yes.

Q.    Right.  And about how ██████ and ███ have CCD, right?

A.    Yes.

Q.    So Ms. Kelley's sending you this email to let you know what the kids' activities are for the weekend, right?

A.    Yes.

Q.    Okay.  And that's at 3:31 p.m., right?

A.    Yes.

Q.    Okay.  And then the same day, which is Friday, February 21st at 5:45 p.m., Ms. Kelley sends you an email that says "Also ██████ has hockey at

Northeastern tomorrow," right?

A.   Correct.

Q.   And you received those emails, right?

A.   I did.

Q.   Okay.

MR. WARD:  Your Honor, if I can admit those two?

MS. BROKAW:  No objection.

THE COURT:  Okay.  Defense 1.

(Two emails were marked Defense Exhibit No. 1 and received in evidence.)

Q.   Now, you testified that you believed that that visitation was going to begin with you picking the children up curbside, right?

A.   Correct.

Q.   Okay.  But it didn't begin with you picking up the kids curbside, right?

A.   It did not.

Q.   Okay.  And the reason why it didn't begin with you picking the kids up curbside is because you were running late, right?

A.   Correct.

Q.   Okay.  And, in fact, you were supposed to pick the kids up at 6:00 that evening, right?

A.    On a Friday, yes, it was at 6:00.

Q.    Okay.  So it would've been a six o'clock pickup, right?

A.    Correct.

Q.    On Friday, curbside, outside the house, right?

A.    Correct.

Q.    Okay.  But you were running late so alternate plans were made, right?

A.    Eventually, yes.

Q.    Okay.  And, again, you admit that you were running late?  You weren't going to be there at 6:00, right?

A.    Correct.  I was not going to make it at 6:00.

Q.    Okay.  But that's not what you told the Braintree Police, is it?

A.    Excuse me?

Q.    That's not what you told the Braintree Police, is it?

A.    That's exactly what I told the Braintree Police.

Q.    Okay.  So, when the Braintree Police responded to the K-Mart parking lot, you told them that the reason you were in Braintree is because you were running late, right?

**A.**    Yes.

**Q.**    Okay.  You didn't tell them it was because Ms. Kelley was running late, right?

**A.**    I did not.

**Q.**    And you didn't say that Ms. Kelley had said -- Ms. Kelley was running late and she was actually in the South Shore, right?

**A.**    I'm clear I said I was running late.

**Q.**    Okay.  So you're clear about that?

**A.**    Yes.

**Q.**    Okay.  Ms. Kelley never called you that evening, did she?

**A.**    Phone call?

**Q.**    Yep.

**A.**    No.

**Q.**    In fact, all your communication is through either text or email, correct?

**A.**    I believe so, yes.

**Q.**    Okay.  And you and Ms. Kelley had been texting for a period of time that night, right?

**A.**    Yes.

**Q.**    And part of those text messages was Ms. Kelley informing you that the children had activities that Friday evening, right?

A.   Possibly, yes.

Q.   And, in fact, that's why Ms. Kelley informed you that she couldn't leave the kids home in West Roxbury because the children had activities, right?

A.   I don't think she was specific -- that specific.

Q.   Nonetheless, she told you that the children had activities that Friday night, right?

A.   In the text chain?

Q.   Yeah.

A.   I'm not -- I'm not so sure that she did more specific that they had certain events that night.

Q.   Were you aware that the children had activities that Friday night?

A.   Throughout the texting chain and throughout the eventual meeting picking up the kids and bits and pieces, I began to learn of some activities, whether through text from her or through information from other people.

Q.   So you weren't aware before you started texting, but as the text came in, you realized that the kids had some activities that Friday night, right, or you became aware?

A.   Correct.

**Q.**    And you testified that the telephone number, the 617-680-7015, was the telephone number that you had, right?

**A.**    Correct.

**Q.**    And so, when you look at the text messages that's actually text messages that are going to and from you, right?

**A.**    These would be texts coming from me to her phone --

**Q.**    Okay.

**A.**    -- and vice-versa.

**Q.**    Okay.  In all, you and Mrs. Kelley texted each other for about an hour-and-a-half prior to the dropoff, right?

**A.**    That sounds accurate.

**Q.**    Okay.  And the dropoff was arranged at 8:15 at the K-Mart parking lot in Braintree, correct?

**A.**    I wouldn't call that an arrangement.

**Q.**    Ultimately, you went to the K-Mart parking lot in Braintree to pick up your children, correct?

**A.**    That was my only option, yes.

**Q.**    But you went there, right?

**A.**    Yes.

**Q.**    Okay.  Did you ask Ms. Kelley to drive the kids

to Reading that night?

A.    In the text chain I did indicate to her if she wasn't going to make them available curbside, then she'd have to make them available in Reading.

Q.    Right.

Because you didn't want to go to Braintree?

A.    No.  I wanted to pick them up curbside where they're supposed to be picked up.

Q.    So you did not want to go to Braintree, right?

A.    Not if I didn't have to, no.

Q.    Okay.  So you weren't happy about going to Braintree?

A.    I didn't really have a choice.

Q.    The question was:  You were not happy going to Braintree, yes or no?

A.    I guess, yeah.

Q.    "No" you weren't happy going to Braintree, were you?

A.    I didn't like it.

Q.    Sir, can you just answer the question?  Yes or no, you weren't happy going to Braintree?

A.    Okay.  I wasn't happy going to Braintree.

Q.    Okay.  That's because you believed you only had to drive to West Roxbury, right?

A.   No.

Q.   Okay.  You wanted to pick the kids up in West Roxbury?

A.   Correct.

Q.   And if not at West Roxbury, you said, "Bring them up to me at Reading," right?

A.   They weren't gonna -- if they weren't going to be available at West Roxbury, and she wasn't going to tell me where they would be available, then I told her she could make them available at Reading.

Q.   And Ms. Kelley refused to go to Reading, right? She said, "I'm not going to Reading" in the text messages, right?

A.   Correct.

Q.   And she was the one who insisted "If you want to see the kids, meet me in Braintree," right?

A.   Correct.

Q.   And, again, it wasn't your idea, right?

A.   No.  My idea was to pick them up curbside per the settlement agreement.

Q.   Right.  Correct.  But you weren't going to be there at 6:00 per the settlement agreement, right?

A.   Right.

Q.   Okay.  So, it was Ms. Kelley's idea.  She said

to you, "If you want to see them, come to Braintree and get them," right?

A.    Not till an hour-and-a-half after.

Q.    Yeah, sure.  You went back and forth for an hour-and-a-half, "Make them available at curbside," right?  That's what you said?  You said it numerous times in the text, right?

A.    Yeah, after she told me she was going to make them available, she'd let me know by 7:30 or some time.

Q.    Right.  And then you came back and said, "Well, if not West Roxbury, come up to Reading," right?  You said, "Why should I drive all over the place," that's what you were thinking, right?

A.    I was thinking she would either make them available where they were, or they would be available at curbside, and if she wasn't going to do that, I would go back home and she could bring them back to my house.

Q.    Sure.  But that's not what she did, right?

A.    Right.

Q.    Right.  And after an hour-and-a-half of arguing, finally, you said, "You know what?  I'll come to Braintree.  That's it.  I want to see my kids.  I'm going to Braintree," right?

**A.**   The Braintree option didn't come into play until about an hour-and-fifteen minutes after all this.

**Q.**   But after an hour-and-a-half -- please, sir, listen to the question.  After an hour-and-a-half, you said, "Fine, I'll go to Braintree," right?

**A.**   That was my only option, yes.

**Q.**   And, sir, let's be honest.  If it only came up an hour-and-fifteen minutes into it, you wouldn't have been in Braintree by 7:30, right?

**A.**   Say that again?

**Q.**   Strike that.

So after an hour-and-a-half of arguing back and forth, you reluctantly went to Braintree?  Can we agree on that?

MS. BROKAW:  Your Honor, at this point, it's been asked and answered.

THE COURT:  He can answer yes or no to this and then you're going to move on.

**Q.**   Yes or no?

**A.**   Say that again?

**Q.**   After an hour-and-a-half of going back and forth, you reluctantly went to Braintree?

**A.**   Yes.

**Q.**   And you weren't happy about it, right?

A.    No.

Q.    Okay.  Now you finally pulled into the Braintree K-Mart at about 8:15, right?

A.    Correct.

Q.    Okay.  And you saw that Ms. Kelley had placed the hockey bag outside of the car, right?

A.    Correct.

Q.    Okay.  And you just testified that you thought it strange that it was outside, but you didn't think it strange that the hockey bag was there, right?

A.    No.  I thought it was strange that the hockey bag was outside in the rain.

Q.    Right.  But you weren't surprised to see the hockey bag, right?

A.    No, because I knew ▮▮▮▮▮ had hockey.

Q.    Right.  Because she had sent you the email saying "▮▮▮▮ has hockey at Northeastern," right?

A.    And she had hockey on Saturdays.

Q.    Okay.  And she had placed that bag outside prior to you pulling up?

A.    It was there when I pulled up, yes, sir.

Q.    And when you originally pulled up, you were -- Ms. Kelley was in a parking spot and you were in the next row over, right?  You didn't pull into the same

row of parking spaces, right?

A.   She was in a row, and I pulled into the row in front of her, a few cars over to the left.

Q.   Right.  So there was a travel lane between where you two were, right?

A.   Correct.

Q.   And you texted back and forth to each other again, right?

A.   (No verbal response.)

Q.   And she had indicated to you "I want you to get over here," right?

A.   She sent me a final text saying to --

Q.   Pull across?

A.   Well, she said, "Get your fat ass over here and pull across the road."

Q.   Right.  So she said, "Get over here," right? And you did, right?

A.   (No verbal response.)

Q.   Okay.  And at that point you were going to do the exchange, right?

A.   Correct.

Q.   Okay.  And you had indicated that one of your daughters was upset because there was a computer in the hockey bag, right?

A.    Correct.

Q.    And that was ███, right?

A.    Correct.

Q.    And she was upset -- and it was actually her iPad that was in the bag, right?

A.    I believe it was a Googlechrome book.

Q.    Okay.  And she told you that it was in there -- in the bag, right?

A.    Correct.

Q.    Because you wouldn't know, right?  You didn't pack the bag?

A.    Right.

Q.    And at that point, you put the kids in the car, right?

A.    Well, they get themselves in the car.

Q.    Okay.  So the kids are old enough to get themselves in the car, right?

A.    Right.

Q.    And at that point, ███ says to you, "My Google Chromebook is in the hockey bag," right?

A.    She called it a computer.  So she said, "My computer is in the hockey bag."

Q.    And you say, "███, go get it," right?

A.    I said, "Get it out," yeah.

**Q.**   Okay.  So you didn't -- at that point you hadn't gone over to pick up the hockey bag, right?

**A.**   No.  I was going to put the kids in first.

**Q.**   But you just said the kids were old enough to get into the car themselves?

**A.**   I was going to make sure they got in the car first.  It was raining out.  I was by the car.  They get in and I would've gotten the hockey bag.

**Q.**   Okay.  But despite the fact that you were going to get the hockey bag yourself, you sent ███ to go get the Chromebook, right?

**A.**   Right.  Because the hockey bag wasn't going in the compartment with them, it was going in the back, so I wanted to get it for the ride.

**Q.**   Well, you certainly could have got the bag, put it in the car, opened it up and handed her the Chromebook, right?

**A.**   I suppose.

**Q.**   But that's not what happened, right?

**A.**   Right.

**Q.**   You said, "███ go get it," right?

**A.**   Right.

**Q.**   Did you refuse to take the hockey bag?

**A.**   No.

**Q.**   You never refused to take the hockey bag?

**A.**   No.

**Q.**   You never told the Braintree Police that you refused to take the hockey bag?

**A.**   No.

**Q.**   Are you sure about that?

**A.**   I'm pretty sure about that, yes.

**Q.**   So it's your testimony that you were planning on taking that hockey bag?

**A.**   Yes.  And if I left it there, I would be responsible for paying for it if it got left there.

**Q.**   I didn't ask you who was going to be responsible for it.

**A.**   I was going to take the hockey bag.

**Q.**   You were going to take the hockey bag, right?

**A.**   Right.

**Q.**   That's your testimony, right?

**A.**   Right.

**Q.**   And despite the fact that you planned on taking the hockey bag, you sent your daughter to go get the Chromebook out of it, right?

**A.**   Right.

**Q.**   Okay.  Now, at this point, Ms. Kelley gets out of the car, right?

**A.**   Correct.

**Q.**   And she makes it to the hockey bag before you, right?

**A.**   Correct.

**Q.**   And she picks up the hockey bag, right?

**A.**   Correct.

**Q.**   And she goes to put it in your car, right?

**A.**   Eventually, yes.

**Q.**   And she walks towards the driver's or the passenger side of the car, which one?

**A.**   So she picks it up and she starts to walk towards the rear area of the car to go around it -- as if to go around it, not to come to the area where we were, but to go around the car.

**Q.**   Sir, which side did she walk towards, the driver's side with the bag or did she walk towards the passenger side with the bag?

**A.**   She walked to the rear of the car.

**Q.**   Okay.  You testified earlier that Ms. Kelley took the bag and walked towards the front of the car 'cuz she was going to put it in the front seat, did you not?

**A.**   No.  That's not what I said.  I said that she eventually was going to take it to the driver's side

front seat, but in order to get there -- the bag was stationed between the two cars.

Q.   Sir, there's no question before you.

Did you not testify that Ms. Kelley carried the bag towards the V of the door, as you said, and that you stood in the door to block the way?  Did you testify to that, yes or no?

A.   Of the driver's side of the car, yes, I did.

Q.   Okay.  So it was the driver's side, right?

A.   Right.

Q.   Okay.  And so, Ms. Kelley took the bag, walked around the back of the car and tried to put it in the driver's side of the car, right?

A.   Correct.

Q.   And that's -- now at that time, was the driver's side door open or closed?

A.   The driver's side door was open.

Q.   Okay.  And seeing that, you testified that you went and you stood in the V to block her, right?

A.   Correct.

Q.   Okay.  And you said she walked with the bag and started to put it towards you, right?

A.   From the time we -- I met her at the rear of the car till we got around the rear and along the side

of the car to the V, she was pushing it at me and not putting it down, trying, for some reason, to put it in my front seat -- my front driver's seat.

Q.   What were you doing this whole time?

A.   I was just -- I was -- I had my back up against the car and I was just holding it back.  I was just pushing it back like as she's pushing it at me, I just put my arm out and go, "Drop it.  Drop it.  I got it. I got it."

Q.   Didn't you testify that when you -- it was only when you were standing in the V of the car that you touched the bag and Mrs. Kelley touched the bag?

A.   No.

Q.   So you two were struggle -- it's your story that you two were struggling with the bag the whole driver's side -- the whole length of the driver's side of the car?

MS. BROKAW:  Objection, your Honor.

THE COURT:  He can answer yes or no.

A.   Yes.

Q.   You struggled the whole way, right?  And she pushed you into the V of the car, right?

A.   I wouldn't call it a struggle.  She was pushing at me the whole time we were trying -- we were trying

to get to the door.

Q.   And she pushed the bag right into the V, right?

A.   I end up in the V with her pushing the bag at me in the V.

Q.   Okay.  And you were holding the bag, right?

A.   I was holding the bag, yes.

Q.   With one hand or two hands?

A.   One hand.

Q.   Okay.  Where's the stick at this point in time?

A.   In her hand.

Q.   So Ms. Kelley is carrying the bag, and she's got the stick also, right?

A.   Yes.

Q.   Does she have it in her right hand or her left hand?

A.   I don't recall which hand.

Q.   How many hands is she carrying the bag with?

A.   One.

Q.   So she's carrying the bag with one hand and she's carrying the stick in the other hand, that's your testimony?

A.   Yes.  She had the stick.  I don't know if maybe she had the stick in the bag in the same hands, but she had the stick and the bag with her.

Q.    Sir, you were there, weren't you?

A.    I was.

Q.    And you were struggling with her, right?

A.    I was holding her at bay as she was pushing the bag at me.

Q.    One-handed.  She was pushing this bag with one hand pushing you right into the V of the car?

A.    I had one hand -- I had one hand on it, she had one hand on it.  She's pushing at me.

Q.    I mean, how as she -- are there handles on this bag?

A.    There is.

Q.    Okay.  Was she holding it by the handles?

A.    I don't know exactly where she was holding the bag from.

Q.    You don't recall how she was holding the bag?

A.    Exactly how she was holding the bag?  No, I don't.

Q.    Well, you were there, right?

A.    I was.

Q.    And --

MS. BROKAW:  Objection.

THE COURT:  Sustained.

Q.    Okay.  So, this bag, if it's a normal hockey

bag, it has two handles, correct?

**A.**    Correct.

**Q.**    And the handles are located in the middle of the bag, correct?

**A.**    Yes.

**Q.**    Because you often picked these bags up and throw them over your shoulder, right?

**A.**    Yes.

**Q.**    And so they're centered, so that when you put it on your shoulder, it's even on your body, right?

**A.**    That's fair, yes.

**Q.**    You've carried a hockey bag, right?

**A.**    Yes.

**Q.**    Have you ever played hockey?

**A.**    Yes.

**Q.**    Okay.  So you know what a hockey bag looks like?

**A.**    Exactly.

**Q.**    Okay.  So there's two handles on this bag, and you don't know whether or not she was carrying it with one hand?

**A.**    I don't know what hand she was using to carry the bag with.

**Q.**    Was she using the handle, yes or no?

**A.**   I don't know if she was using the handle.

**Q.**   Well, that would make a difference because if she was carrying the handles, her hand would be halfway up the bag, wouldn't it?

MS. BROKAW:  Objection.

THE COURT:  Sustained.

**Q.**   Now, as you say, you were pushed into this V, okay?  It's safe to say that if you -- were you going -- were you pushed back into the V, or were you facing the V as you went in?

**A.**   I was pushed back into the V.

**Q.**   Okay.  So you were facing out, right?

**A.**   Correct.

**Q.**   Okay.  And if it's the driver's side of the car then the car door would come out this way?  If we're going this way, the car door would come out this way, right?

**A.**   We weren't going that way.  The car was facing this way.  When the door opens up, the door comes out this way.

**Q.**   Okay.  So the door opened that way and it made the V, right?

**A.**   Correct.

**Q.**   Okay.  And you say that at some point

Ms. Calabrese-Kelley fell backwards?

A.    She took a few steps backwards, she fell backwards.

Q.    Okay.  And you don't know how that happened?

A.    I didn't.

Q.    You don't know?

A.    I know now.  I didn't know at the time.

Q.    Isn't it true that you told the Braintree Police that you knew how Ms. Kelley fell backwards?

A.    I don't believe I did.

Q.    Isn't it true that you told the Braintree Police that as Ms. Kelley came forward, she banged her knee on the open car door?

A.    Yeah.  She banged her knee on the door.

Q.    Sir, you just said you didn't know how she fell backwards.  When did you learn that?

A.    I concluded that she had hit her knee on the door and that's what got her angry to pick up the stick.

Q.    That's not what you just testified.  You just testified you have no idea how she fell back, right?

A.    At the time -- at the time she fell back, I didn't know.  All I know is she fell back.

Q.    Did you see her hit her knee on the door?

A.   I did not see her hit her knee.

Q.   Okay.  So you don't know if she hit her knee on the door, do you?

A.   I believe that to be true, yes.

Q.   Sir, you didn't see her, right?

A.   Right.

Q.   So you don't know.  I'm asking what you believe.  I'm asking you what you know.

A.   Right.

Q.   Okay.  Isn't it possible that you pushed her and you knocked her down?

A.   Absolutely not.

Q.   Never pushed her, you never laid a hand on her?

A.   I never laid my hands on her.

Q.   Okay.  And you didn't tell the Braintree Police that Ms. Kelley fell because she banged her knee on the door?

A.   I don't remember telling them that, but I had concluded that.  The was the only explanation I could ask for.

Q.   We'll get to -- we'll come back to that, okay?
        All right.  So, at some point Ms. Kelley comes flying back, right?  She falls back.  Does she fall on the ground?

A.   She does not.

Q.   Okay.  So she stumbles back, right?

A.   Correct.

Q.   She gains her balance?

A.   Correct.

Q.   Now, you say she still has the bag, right?  In her hand, right?

A.   No, the bag fell.  I testified that the bag fell to the ground.

Q.   So the bag falls and the stick falls, too?

A.   Correct.

Q.   Okay.  And you said at that point, she grabs the stick, as you claim, like a baseball bat, right?

A.   Correct.

Q.   Okay.  And you say at that point, she winds up and swings it like a baseball bat, right?

A.   Correct.

Q.   And hits you in the legs, right?

A.   Correct.

Q.   I have a hockey stick here.  I'm going to ask you to take this hockey stick and show the jury how she swung it.  Come on up.

A.   So she picked it up to swing.  I was facing her.

Q.   Yep.

A.   I was afraid to get in the face and she --

Q.   I'm just asking you --

A.   -- picked it up and she went...

Q.   Like that?

A.   Like that.

Q.   Okay.  So you went like this, right?

A.   Yes.  And when she got to about here, I was afraid of getting hit, so I turned around pretty much.

Q.   Now you're a lefty, right?

A.   Correct.

Q.   Okay.  So swing it from the left side, right?

A.   Right.

Q.   Now, do you know whether or not Ms. Calabrese-Kelley is a righty or a lefty?

A.   I don't know.

Q.   You don't recall which way it was swung from, right?

A.   I don't.

Q.   I'm a little confused.  Because you tell me you're standing in the V of the car, right?  The V, the car door is open --

A.   Correct.

Q.   -- and you're inside the car door, right?

MS. BROKAW:  Objection, your Honor.  It's been asked and answered many times.

THE COURT:  Overruled.

Q.   So I'm confused about this.  You're standing in the V, right?

A.   Correct.

Q.   Is your back up against the back of the door?

A.   When she falls back and the bag falls, no, because I go to pick up the bag.

Q.   Oh, wait a minute.  So now you're going to pick up the bag?

A.   It's right there.  It's right -- it's in the same -- it's two steps.

Q.   But is that what you testified to just about a half hour ago?  Yes or no?

A.   I don't believe I was asked that question.

Q.   You testified that Ms. Calabrese-Kelley fell back, she dropped the bag and the stick, she then grabbed it and swung and hit you like a baseball bat, you didn't say anything about you leaning forward to pick up the bag?

A.   No, the bag was right there at the V.  It had fell like a foot or two, it fell right there.

Q.   Okay.

**A.**    I went to go grab the bag --

**Q.**    Okay.

**A.**    -- and I'm -- at this point, I'm exposed to her.

**Q.**    Okay.  So you bend over to pick up the bag?  Do you squat or do you bend over like this?

**A.**    No, I started to reach down to pick it up.

**Q.**    So you reached down like this, right?

**A.**    And I saw her pick up the stick.

**Q.**    So you see out of the top of your eyes that she's winding up to swing?

**A.**    No.  As I'm reaching down to get it, I see her picking up the stick and I don't get the bag.

**Q.**    So you go like this?

**A.**    Correct.

**Q.**    But I'm confused.  If you're inside the V, okay, and she's swinging the stick like this, wouldn't she hit the car?

**A.**    No, 'cuz when I turned around, I'm outside -- the V is now to my left.  She hits me in the back.  So I'm kinda blocking -- at this point I'm parallel to the V -- with the V.

**Q.**    So now you came out of the V?

**A.**    It's not -- the V isn't -- it's only a very

small space.

Q.   Right.  And you said the bag fell right in front of your feet, right?

A.   Correct.

Q.   You're in the vehicle, right?  You've got your back in the V, so that's the car door hinge, the other side is the seat and the car coming back this way.  So you're in like this, right?

A.   Right.

Q.   There's a hockey bag at your feet, right?

A.   Right.

Q.   And she somehow grabs a hockey stick, baseball style and who went like this, okay, and hit you in the legs?

A.   Yes.

Q.   She doesn't hit the car?

A.   I don't know if she hit the car.

     MS. BROKAW:  Objection, your Honor.

     THE COURT:  Move on.

Q.   Did you tell a different court that -- strike that.

     Did you ever tell the Braintree Police that you weren't taking the hockey bag?

A.   I did not.

**Q.** Did you ever tell the Braintree Police that you weren't taking the hockey bag because you didn't have your daughter ▮▮▮▮ for that weekend?

**A.** I was concerned that ▮▮▮▮ wasn't there and I was expecting her to be there.

**Q.** The question is: Did you ever tell the Braintree Police that you did not have your daughter ▮▮▮▮ for the weekend?

**A.** I never told them that, no.

**Q.** Okay. And it's your testimony that you were leaning over, you saw her swing and you jumped backwards like that so you wouldn't get hit in the front, right?

**A.** Correct.

**Q.** So you saw the swing coming, but jumped backwards, right?

**A.** I just turned.

**Q.** And you described it as coming like this, right?

**A.** Yes.

**Q.** I'm going to show you these pictures which have been marked as Commonwealth's Exhibit 2. These are the injuries you say you sustained as a result of being hit with the stick one time, right?

A.   As far as pictures, yeah.

Q.   Yes?

A.   (No verbal response.)

Q.   And they all depict the injuries that you say you sustained after being hit with the hockey stick one time, right?

A.   Yes.

Q.   Now, I'm going to show you the first picture, okay?  Your back is turned so the injury on your calf would be on your left leg and the injury on your hamstring would be your right leg, right?

A.   Yes.

Q.   Okay.  And you'll agree that the injury on your hamstring is in a higher location than the injury on your calf, right?

A.   Yes.

Q.   Okay.  And you would agree that in order for that to happen, the stick would have to come down sloped, right?

A.   I'm not sure what you're asking me.

Q.   Sir, look at the injuries --

A.   Yeah.

Q.   -- that you claim happened.

A.   Mm-hmm.

**Q.** One is high on your right thigh, right?

**A.** Right.

**Q.** On your right hamstring, I should say?

**A.** Right.

**Q.** And the other one is low on your left calf?

**A.** Right.

**Q.** Right?

**A.** Right.

**Q.** So for one strike to have caused both of those injuries, the stick would have been long enough to hit both legs, right?

**A.** Yes.

**Q.** And you claim you got hit in both legs simultaneous, though, right?

**A.** Yes.

**Q.** And you would agree that in order for those injuries to have occurred, the stick would've had to either been sloped like this or it would have been sloped like that, right?

**A.** I didn't -- I didn't see the impact, so I wouldn't know how it hit.

**Q.** Sir, you're a detective, are you not?

**A.** I am.

**Q.** Have you ever investigated assault cases?

A.   I have.

Q.   Okay.  Have you ever looked at the location of injuries?

A.   Yes.

Q.   Okay.  So you're telling me that given your experience, you have no opinion as to whether or not a stick would need to be sloped either like this or coming up like that in order to cause those injuries?

A.   It would've came at an angle, yes.

Q.   It would've had to come at an angle.  Thank you.  Okay.

Now, you told me you play hockey, right?

A.   I do.

Q.   Okay.  You're familiar with hockey sticks?

A.   I am.

Q.   You can handle this thing pretty well?

All right.  You would agree with me that the heavier end of the hockey stick is the blade, right?

A.   Yes.

Q.   If you hold it like this, it's heavier down at the blade, right?

A.   Correct.

Q.   And the most dense part of the hockey stick, you would agree, is the heel, right?

**A.**    I never thought about it, but, yeah, yes.

**Q.**    You can hack someone really hard from the heel, right?  You're not going to flick with the tip and you're not going to hit up, right?

**A.**    (No verbal response.)

**Q.**    So, in order -- is it safe to assume that the darker injury, the darker bruise, do you know whether or not that was caused by the shaft because, again, it would've been sloped.  So one part of your leg is going to get with the shaft and the other one's going to get hit with the heel, right?

MS. BROKAW:  Objection, your Honor.  At this point he's asking the witness to speculate.

MR. WARD:  He got hit.  His legs.

THE COURT:  Rephrase the question, please.

**Q.**    You would agree that in order for those injuries to have been caused by one hockey stick, one of your legs would've had to get hit with the shaft, and the other one would've had to get hit with the heel or the blade?

**A.**    Not necessarily.

**Q.**    Not necessarily?

THE COURT:  He can answer.

MR. WARD:  I mean, he's a detective and he's

played hockey.  I don't know --

Q.   Not necessarily?

A.   Like I said earlier, at first, I didn't see the impact, but it could be explained by that it hits here first as it's coming down, it hits down lower there.

Q.   But you said it was swung like a baseball bat, it was one whack?

A.   She started as a baseball, that's -- I don't know how it ended up.

Q.   You just testified that you got hit in both legs simultaneously, one whack, right?

A.   Yeah, it felt like I got hit simultaneously.

Q.   The stick wasn't thrown at you, it didn't come propelling like a boomerang, right?

A.   No.

Q.   You didn't feel it bounce off of one leg and hit the other, right?

A.   Nope.

Q.   Okay.  So, do you know whether or not whether you got hit in the -- in the right hamstring with the heel of the stick or the shaft of the stick?

         MS. BROKAW:  Objection, your Honor.

         THE COURT:  He can answer if he knows.  Yes or no?

THE WITNESS:  I don't know.

Q.   You don't recall which way she swung the stick if she was a righty or a lefty, right?

A.   I don't know which way she swung it.

Q.   And, again, you're inside that V, right?  And you jump and turn around, right?

A.   I turn around which would bring me out of the V, correct, yes.  If I was -- if I was at the V, when I turned around, it now exposes me more away from the car.  And if I had --

Q.   Well, you told me that the hockey bag was in front of your feet, right?

A.   Correct.

Q.   Did you jump over the hockey bag to get out of the V?

A.   No, it fell about a foot away as we are at -- at the door of the V.

Q.   So, you don't know whether or not it came down this way, but it came from high to low, right?

A.   When I -- when I saw her swinging, line up to swing, I turned around.

Q.   And, again, your demonstration was up here, right?

A.   She was coming --

Q.    Right up there like a baseball?

A.    When she started to swing, I --

Q.    Hands choked up, right?

A.    I lost -- I lost sight of what direction up or down she was going.

Q.    Isn't it true that when she got thrown to the ground, the stick went up?

A.    No.

Q.    No?

A.    No.

Q.    So it's your testimony that it was this?

A.    Absolutely.

Q.    Okay.  Now, you just previously testified that you never put your hands on Ms. Kelley, right?

A.    Did not.

Q.    Did you tell the Braintree Police that, in fact, you pushed her after she hit you with the stick?

A.    I did not.

Q.    You didn't tell them that?

A.    I did not.

Q.    Now after the altercation, Mrs. Kelley went back to her car, right?

A.    Correct.

Q.    And, in fact, one of your children actually

went into Ms. Kelley's car, right?

A.    Eventually, they both went back to Mrs. Kelley's car.

Q.    Right, but it -- so both of the kids went to the car with their mother, right?

A.    █████████ did immediately, and I believe at some point Riley went there until the police got there.

Q.    And then eventually the police come, right?

A.    Correct.

Q.    And you stood by the back of the car, right, waiting for the police?

A.    No, I sat in my car.

Q.    When the police came --

A.    When they came, I got out, yes.

Q.    At some point you picked up the hockey stick and put the stick in your car, right?

A.    Correct.

Q.    But you left the bag out, right?

A.    Correct.

Q.    Did you move the bag between the time that the altercation happened and the time the police arrived?

A.    I don't recall.

Q.    You don't recall whether or not you moved the bag?

A.    No, I don't remember if I did.  I don't remember what I did.  I don't -- I don't remember.

Q.    Now when the police arrived, you informed them that you're an off-duty Boston Police officer, didn't you?

A.    No.  They knew that already.

Q.    And at some point, they asked you to go into your car and get your badge, right?

A.    No.

Q.    You never walked into your car, grabbed something, walked over to the police and go like this?

A.    No.

Q.    That never happened?

A.    No.

Q.    Okay.  Now, before you left the parking lot at K-Mart, the Braintree Police instructed you on your rights pursuant to Mass General Law 209A, right?

A.    Correct.

Q.    Okay.  And you didn't seek a restraining order that night, right?

A.    I did not.

Q.    And you know that if you were in fear, you could've picked up the phone and there's a judge on call 24 hours a day, right?

MS. BROKAW:  Objection.

THE COURT:  Move on.

**Q.**   Now, while the police were there, did you ever show them your injuries?

**A.**   No.

**Q.**   Did they ask to see your injuries?

**A.**   They just asked me where I was hit.

**Q.**   And you told them that she wound up like a baseball bat and hit you in the legs, right?

**A.**   Yes.

**Q.**   And you never bothered to show them and they never bothered to ask, right?

**A.**   They didn't.

**Q.**   Okay.  Now these photos, those weren't taken the evening of the incident, were they?

**A.**   Which ones are you referring to, sir?

**Q.**   The photos are in here.

**A.**   Some of these were Braintree PD --

MS. BROKAW:  Objection.

**A.**   -- and some of these were taken by me.

MS. BROKAW:  May we approach?

THE COURT:  Yes.

(Sidebar conference between the Court, Ms. Brokaw and Brian Ward.)

MS. BROKAW:  These are three that I've already introduced of the items that were taken at the Braintree Police Department --

MR. WARD:  Okay.

MS. BROKAW:  -- to avoid that.

MR. WARD:  All right.

MS. BROKAW:  So I don't think you want to redact the --

MR. WARD:  Yep.  Those -- I believe those are the only ones that are --

Okay.  Okay.

(End of sidebar between the Court, Ms. Brokaw and Mr. Ward.)

Q.   So these photographs that are marked as Commonwealth's Exhibit 2, do you recall when those were taken?

A.   I believe the following Monday.  So is that the 24th at Braintree Police?

Q.   Is it possible they were taken the following Tuesday?

A.   It could've been.

Q.   So you waited all weekend to have the photos -- to go to the police station, right?

A.   Excuse me?

**Q.** You waited all weekend -- you waited for the whole weekend to go by before you went to the police station, right?

**A.** No. The police station contacted me on Monday.

**Q.** Okay. And they never drove up to see you in Reading, right?

**A.** No.

**Q.** That whole weekend, right?

**A.** No.

**Q.** So they didn't call you till after the weekend, right?

**A.** My recollection is they called me Monday.

**Q.** Okay.

MR. WARD: That's all I have, Judge.

<u>REDIRECT EXAMINATION</u>

<u>BY MS. BROKAW:</u>

**Q.** Mr. Kelley, you testified that the hockey stick and the hockey bag in question belonged to your daughter. Which daughter is that?

**A.** 

**Q.** And how old is         at this time?

**A.** 15.

**Q.** And how tall is she at that point if you can estimate?

A.    Five-six, maybe, five-seven.

Q.    And how tall would you estimate her hockey stick to be?

A.    Probably a little shorter than that.  A hockey stick is typically about a whisper shorter than that.

Q.    I'm sorry?

A.    I said sticks are typically a little bit shorter than your height.

Q.    It's shorter than that stick that Attorney Ward had?

A.    No.  She would've been taller than that stick.

Q.    Her stick was taller than that stick?

A.    No, that's her stick.  She's taller than that stick.

Q.    I'm asking you how tall her stick would have been, her hockey stick in relation to the height of that hockey stick?

A.    (No verbal response.)

Q.    You testified that it was ▮▮▮▮▮▮▮ hockey stick that the defendant struck you with that evening, right?

A.    Yes.

Q.    How tall would ▮▮▮▮▮▮▮ hockey stick be in comparison to that hockey stick?

A.   That's her hockey stick, I think.

MS. BROKAW:  Is it?  I don't --

A.   I'm assuming that was her hockey stick.  Oh, all right.

Q.   How tall are you, Mr. Kelley?

A.   So if she was -- if she was five-six at the time, her stick would've been four-foot-eight maybe.

Q.   How tall are you?

A.   Five-eleven.

Q.   How tall is your ex-wife?

A.   Five-five, I think.

Q.   So it's safe to say --

A.   Correct.

Q.   So you testified that she held that stick like a baseball bat, correct?

A.   Correct.

Q.   And where would you -- that would come up to you on your torso area if she was to hold it up here?

A.   Below my waist.

Q.   Now, Mr. Kelley, you testified that the Braintree Police Department didn't take any photos of your injury that night.  Can you describe the weather?

A.   It was pouring rain out, cold.

Q.   What time of the year was this?

A.    February, it was winter.  But it wasn't snowing, but it was cold and rainy.

Q.    And what kind of attire were you wearing?

A.    I don't remember.  It would've been blue jeans and a sweatshirt and a hat probably.

MS. BROKAW:  I have nothing further, your Honor.

### RECROSS EXAMINATION

**BY MR. WARD:**

Q.    Mr. Kelley, we talked about the hockey stick and the height of the hockey stick, right?

A.    (No verbal response.)

Q.    Do you know how much the hockey bag weighs?

A.    Hockey bag weighs?

Q.    Yeah.

A.    15 pounds maybe.

Q.    Do you know what's in the hockey bag?

A.    Yeah.

MS. BROKAW:  Objection, your Honor.

THE COURT:  Sustained.

Q.    So 15 pounds?

A.    Yeah, 15, 20 maybe.

MR. WARD:  That's all, Judge.

MS. BROKAW:  Nothing further for this witness,

your Honor.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you, your Honor.

MS. BROKAW:  The Commonwealth calls Officer Clark.

### TESTIMONY OF OFFICER DAVID CLARK

### DIRECT EXAMINATION

BY MS. BROKAW:

Q.    Good afternoon, Officer.  Can you state your name and spell it for the record, please?

A.    David Clark, C-l-a-r-k.

Q.    And, Officer Clark, how are you employed?

A.    Police officer for the Town of Braintree.

Q.    How long have you been a member of the Braintree Police Department?

A.    About 15-and-a-half years.

Q.    Now, Officer Clark, turning your attention to February 1st, 2014, did you work that day?

A.    Yes.

Q.    And what shift did you work?

A.    I worked the 2:30 to 10:30 shift.

Q.    What was your assignment?

A.    815 cruiser.

Q.    Now, at some point around 8:30 p.m. were you

dispatched somewhere?

A.   Yes, I was.

Q.   And where was that?

A.   To the K-Mart parking lot.

Q.   And why were you dispatched there?

A.   Dispatched for a possible domestic disturbance.

Q.   And when you arrived, where did you go?

A.   Just into the K-Mart parking lot.

Q.   And who did you encounter when you got there?

A.   William Kelley and Kelley -- Karen Kelley Calabrese (sic-"Calabrese-Kelley").

Q.   And what did you do?

A.   Sergeant Bata and I spoke to William Kelley.

Q.   What did you ask him?

A.   Basically asked him what happened.

Q.   Can you describe his demeanor?

A.   He was calm talking to us.

Q.   And did you have an opportunity to speak to Mrs. Calabrese-Kelley?

A.   I did not.

Q.   Just for the record, do you see her in court today?

A.   I do.

Q.   Can you identify her by an article of clothing

that she's wearing?

A.   She's wearing a blue shirt.

MS. BROKAW:   Your Honor, may the record reflect that this witness has identified the defendant?

MR. WARD:   No objection.

THE COURT:   So ID'd.

Q.   Did you have an opportunity to observe her demeanor at all?

A.   No, I did not.

Q.   As a result of talking to Mr. Kelley, did you have an opportunity to examine any injuries on him?

A.   No, I did not.

Q.   And why was that?

A.   He was wearing pants.

Q.   And did you locate a hockey stick in the area?

A.   There was a hockey stick in his car.

Q.   Did you have an opportunity to examine it?

A.   Just took a look at it, yes.

Q.   Can you describe it for the jury?

A.   It was some type of wooden hockey stick.

Q.   And after you spoke with Mr. Kelley, did you do anything else in the course of this investigation?

A.   The only other thing I did was take a photo of an injury.

**Q.**    And what injury was that?

**A.**    There was a cut on Karen Calabrese's leg.

**Q.**    And where was that cut located?

**A.**    One of her legs, I believe, near her knee.

**Q.**    Now, did you respond with other officers, Officer Clark?

**A.**    I did.

**Q.**    And who did you respond with, if you remember?

**A.**    Sergeant Bata and Officer McNamara.

**Q.**    And did someone speak with the defendant?

**A.**    Yes.

**Q.**    And did they get her account of what had occurred?

**A.**    Yes.

**Q.**    And at some point was there a decision made to place someone under arrest?

**A.**    Yes.

**Q.**    And who made that decision?

**A.**    Sergeant Bata.

**Q.**    And who was placed under arrest?

**A.**    Karen Calabrese-Kelley.

MS. BROKAW:  I have no further questions, your Honor.

**CROSS-EXAMINATION**

**BY MR. WARD:**

Q.   Officer Clark, you drafted a report in this case, correct?

A.   I did.

Q.   Do you have a copy of your report with you?

A.   No, I do not.

Q.   In part of that report you wrote a narrative, correct?

A.   That is correct.

Q.   All right.

MR. WARD:  If I may approach, your Honor?

THE COURT:  Yes.

Q.   Officer Clark, if you could take a look at this narrative very briefly and look up to me when you're done looking at that narrative.

Is that the narrative you wrote?

A.   Yes, sir.

Q.   Okay.  Now, you indicated that as you arrived at the K-Mart parking lot, you went and you spoke with Mr. Kelley, correct?

A.   Correct.

Q.   Okay.  And there were other officers that responded, correct?

A.   Correct.

Q.   There was an Officer McNamara, correct?

A.   Correct.

Q.   And there was Sergeant Bata, correct?

A.   (No verbal response.)

Q.   And Officer McNamara went and spoke with Ms. Kelley, correct?

A.   Correct.

Q.   And Sergeant Bata kinda bounced back and forth between you, right?

A.   Correct.

Q.   So he's -- he's the one who went back and forth, right?

A.   Correct.

Q.   And it was his decision --

A.   That is correct.

Q.   -- to make the arrest, right?

A.   That's correct.

Q.   Okay.  Now, you indicated that you were assigned to the car, 815, that evening, correct?

A.   That's correct.

Q.   Okay.  Do you know what car Sergeant Bata was assigned to?

A.   It would be 817.

Q.   He would be 817, correct?

A.   (No verbal response.)

Q.   Okay.  Now, I'm going to direct you -- well, let me ask you a couple of questions.  You spoke with Mr. Kelley when you got to the scene, right?

A.   That's correct.

Q.   Okay.  And Mr. Kelley told you that --

MR. WARD:  If I could have one second, Judge.

Q.   -- Ms. Karen Kelley had called him and stated that she was running late and that she was in the South Shore area, correct?

A.   I believe that's what was told to me.

Q.   Okay.  I'm going to direct you to the first, second, third paragraph of your narrative and it's going to be the last two full sentences.  I'm going to ask you to take a look at those two full sentences, okay?

A.   Mm-hmm.

Q.   And those sentences say "Karen had called him and stated that she was running late and was in the South Shore area," correct?

A.   That's correct.

Q.   And it also says "They arranged to meet at K-Mart parking lot to exchange the kids," right?

A.   That's correct.

MS. BROKAW:  Objection, your Honor.  He can testify as to memory --

THE COURT:  What?

MS. BROKAW:  The defendant's -- Mr. Kelley said to him, but the report speaks for itself and it's not admissible.

THE COURT:  Okay.

Q.   So you wrote that, right?

A.   That's correct.

Q.   Okay.  And you had no conversations with Ms. Kelley prior to arriving on the scene, right?

A.   No, I did not.

Q.   And you had no conversations with Mr. Kelley prior to arriving on the scene, right?

A.   That's correct.

Q.   So based upon that, it's safe to say that Mr. Kelley told you that Mrs. Kelley was running late, right?

A.   That's correct.

Q.   I'm going to move down.  And Mr. Kelley also tells you that "Mrs. Kelley had gotten out of her car and tried to give him a hockey bag and stick that belonged to his other daughter that he did not have

this weekend," correct?

A.   That's correct.

Q.   You recall him telling you that Mrs. Kelley tried to give him a hockey bag and a stick, but that he didn't have his other daughter that weekend, right?

A.   That's correct.

Q.   And, again, you would have had no other source for that information other than Mr. Kelley, right?

A.   That's correct.

Q.   So the fact that it's in your report is indicative that Mr. Kelley told you that she tried to give him the bag for a daughter that he didn't have that weekend, right?

MS. BROKAW:   Objection.

THE COURT:   Overruled.

Q.   Right?

A.   That's correct.

Q.   So you would have got that information from him, right?

A.   That would be correct.

Q.   Okay.  And the next short part it says that "Mr. Kelley would not take it," right?

A.   That's correct.

Q.   That's what you wrote, right?

**A.**   That's correct.

**Q.**   And, again, you would have got that information from Mr. Kelley 'cuz Mr. Kelley told you that he wasn't taking that hockey bag, right?

**A.**   That is correct.

**Q.**   Because he didn't have his daughter that weekend, right?

**A.**   That's correct.

**Q.**   You also indicate that Karen -- that Mr. Kelley told you that Karen came over to his car with the bag and was trying to put it in, right?

**A.**   That's correct.

**Q.**   You also indicate that he stated that "She grabbed the hockey stick with two hands and slashed the stick on the back of his legs," right?

**A.**   That's correct.

**Q.**   And, again, you got that information from Mr. Kelley, right?

**A.**   That's correct.

**Q.**   And then finally he states:  "He then stated that he pushed her away," right?

**A.**   That's correct.

**Q.**   So he told you that he did push her, right?

**A.**   That's correct.

**Q.**   But he says "She hit me with the stick, then I pushed her away," right?

**A.**   (No verbal response.)

**Q.**   That's what he told you, right?

**A.**   My memory's exhausted.

**Q.**   Well, if your memory's exhausted, please take a look at your police report.  I'll direct you down to the first, second, third, fourth full paragraph.

Looking at your police report, is your recollection refreshed?

**A.**   It is.

**Q.**   Okay.  Now, having looked at your police report, is it safe to say that Mr. Kelley told you that he pushed Mrs. Kelley after she hit him with a hockey stick?

**A.**   Correct.

MR. WARD:  That's all I have.

#### REDIRECT EXAMINATION

**BY MS. BROKAW:**

**Q.**   Officer Clark, when you spoke with Mr. Kelley that evening, he told you he had parked far away from the defendant at first, is that your memory?

**A.**   That's correct.

**Q.**   And you indicated that he -- your memory is

that he told you that he pushed the defendant?

A.   That's correct.

Q.   Did he specify how he pushed her, with her hands or with -- it is possible -- with the bag, did he specify what contact --

MR. WARD:  Objection.

THE COURT:  Sustained.  Rephrase that question.

Q.   Did he specify at all how he made contact with the defendant?

A.   Not that I recall.

Q.   When you spoke with Mr. Kelley, he told you that the defendant slashed the stick on the back of his legs, is that correct?

A.   That's correct.

Q.   Now you didn't have an opportunity to speak with the defendant at all, correct?

A.   That's correct.

MS. BROKAW:  No further questions.

**RECROSS EXAMINATION**

**BY MR. WARD:**

Q.   You don't recall Mr. Kelley saying that he pushed Mrs. Kelley with a hockey bag, do you?

A.   I do not recall.

Q.   And that's -- if he had told you that he

didn't, in fact, push her, but that he pushed a bag into her, that's something that you would put in your report, isn't it?

A.    Yes.

Q.    Because that's a pretty specific difference between pushing someone and pushing a bag into someone, right?

A.    Yes.

MR. WARD:  Thank you.

MS. BROKAW:  Nothing further, your Honor. Thank you.

THE COURT:  Thank you, Officer.

MS. BROKAW:  You can send Sergeant Bata in, please.  Thank you.

THE WITNESS:  No problem.

THE COURT:  Can I see you both for a minute before you do that?

(Inaudible sidebar conference between the Court, Ms. Brokaw and Mr. Ward.)

THE COURT:  We're having some issues with scheduling.  So before I send you out, I'm just going to try to confirm the scheduling.

Because you have been here all day and usually we go to 4:30, I suspect that Sergeant Bata's testimony

will take more than an hour which will make you here till at least quarter past five.  So I'm going to release you for today.  I'm going to ask you if you would all come back tomorrow morning at nine o'clock. I usually check to see what the schedule is for myself. I sometimes have to call the jury list before we impanel a jury.  So I'm not sure what it is for tomorrow, so that's what we were trying to find out.

So I'm just going to ask you to come back at nine.  We'll start right at nine and we'll hear the testimony and you'll hear the 911 tapes and finish up with the evidence.

So if you could all be back at nine.  The Court Officer will tell you where to report.  And, please, I must remind you again, do not discuss this case with anyone else.  Usually when you go home, people will say "Oh, what kind of jury are you on?  What is the case about?"  You cannot discuss it, okay?

So we'll see you all tomorrow morning at nine.

THE COURT OFFICER:  All rise, please.

(Case adjourned at 3:58:32 p.m.)

## C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
PLYMOUTH, SS.

I, **Linda E. Williams**, Approved Court Transcriber and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript, prepared to the best of my ability, of the designated portions of the digital recording provided to me by the appellant or appellee of a trial or hearing of the Norfolk of the Quincy District Court Department in the proceedings of the Commonwealth of Massachusetts versus Karen Calabrese-Kelley, Docket No. 1456CR1473, before Justice Diane Moriarty on February 25, 2016.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of February 2018.

_____
**Linda E. Williams**
**Notary Public**

My Commission expires: November 28, 2019

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                              101

**'**

**'cuz** [5] - 28:10, 40:10, 56:21, 68:19, 95:3

**0**

**02121** [1] - 2:6
**02169** [1] - 1:15
**02171** [1] - 2:11

**1**

**1** [8] - 1:15, 3:14, 3:17, 26:15, 27:2, 27:7, 42:9, 42:11
**1-100** [1] - 1:1
**10:30** [1] - 86:21
**11/28/2019** [1] - 100:22
**12** [1] - 22:22
**12:35:38** [2] - 1:17, 4:3
**13** [1] - 3:3
**14** [1] - 22:22
**1456CR1473** [2] - 1:6, 100:13
**14CR1473** [1] - 4:7
**15** [4] - 82:22, 85:16, 85:21, 85:22
**15-and-a-half** [1] - 86:16
**15-year-old** [1] - 25:9
**150** [1] - 8:7
**15A** [1] - 11:11
**16** [1] - 3:4
**17** [2] - 22:14, 22:22
**1:00** [1] - 8:5
**1:14:37** [1] - 13:2
**1st** [2] - 86:18, 100:17

**2**

**2** [3] - 38:17, 70:22, 81:15
**20** [3] - 21:18, 24:24, 85:22
**2011** [1] - 22:16
**2014** [7] - 7:2, 14:2, 22:24, 23:17, 39:22, 40:2, 86:18
**2016** [2] - 1:16, 100:15
**2018** [1] - 100:17

**209A** [1] - 79:17
**21** [1] - 3:7
**21st** [9] - 7:2, 14:2, 23:17, 26:5, 39:22, 40:2, 41:3, 41:6, 41:23
**24** [1] - 79:24
**24th** [1] - 81:18
**25** [2] - 1:16, 100:14
**265** [1] - 11:11
**27** [1] - 3:14
**2:00** [1] - 8:5
**2:26:30** [1] - 13:3
**2:30** [3] - 12:8, 12:23, 86:21
**2A** [1] - 38:19
**2A,B,C** [1] - 3:15

**3**

**3** [1] - 2:10
**333** [1] - 2:10
**38** [1] - 3:15
**39** [1] - 3:7
**3:30** [1] - 41:6
**3:31** [1] - 41:20
**3:58:32** [2] - 1:17, 99:21

**4**

**42** [1] - 3:17
**45** [1] - 2:5
**4:30** [1] - 98:24

**5**

**5:00** [1] - 23:5
**5:45** [1] - 41:23

**6**

**617-680-7015** [1] - 46:2
**680-7015** [1] - 26:11
**6:00** [5] - 42:24, 43:1, 43:11, 43:13, 48:22

**7**

**7:30** [2] - 49:9, 50:9
**7th** [1] - 22:16

**8**

**815** [2] - 86:23, 91:20
**817** [2] - 91:24, 92:1
**82** [1] - 3:7
**85** [1] - 3:7
**86** [1] - 3:9
**8:00** [3] - 23:5, 28:13, 28:16
**8:15** [3] - 28:15, 46:16, 51:3
**8:30** [2] - 8:7, 86:24

**9**

**90** [1] - 3:9
**911** [8] - 18:4, 18:5, 18:7, 18:8, 18:16, 18:24, 99:11
**96** [1] - 3:9
**97** [1] - 3:9

**A**

**ability** [1] - 100:9
**able** [1] - 20:8
**absolutely** [2] - 64:12, 77:12
**acceptable** [1] - 25:8
**account** [1] - 89:12
**accurate** [3] - 26:4, 46:15, 100:8
**activities** [9] - 40:15, 41:7, 41:17, 44:23, 45:4, 45:8, 45:13, 45:17, 45:22
**adamant** [1] - 33:14
**add** [1] - 6:7
**adjourned** [1] - 99:21
**admissibility** [1] - 26:24
**admissible** [1] - 93:7
**admit** [3] - 38:11, 42:6, 43:10
**advance** [2] - 16:13, 16:18
**afraid** [2] - 66:2, 66:9
**afternoon** [8] - 5:9, 5:12, 16:9, 21:2, 21:3, 21:9, 21:10, 86:9
**ages** [1] - 22:21
**ago** [2] - 16:21, 67:15

**agree** [9] - 25:4, 28:2, 50:13, 71:13, 71:17, 72:16, 73:17, 73:24, 74:16
**agreed** [3] - 14:6, 23:13, 28:4
**agreement** [2] - 48:20, 48:22
**air** [1] - 19:5
**ALL** [1] - 7:15
**allegation** [1] - 19:9
**allowed** [1] - 9:17
**almost** [1] - 31:8
**altercation** [2] - 77:21, 78:21
**alternate** [1] - 43:7
**angle** [2] - 73:9, 73:10
**angry** [5] - 14:8, 14:10, 24:19, 63:18
**answer** [8] - 6:14, 9:22, 10:2, 47:20, 50:17, 58:19, 74:23, 75:23
**answered** [3] - 13:14, 50:16, 67:2
**anxiety** [1] - 31:14
**anyways** [1] - 24:24
**APPEARANCES** [1] - 2:1
**appeared** [1] - 34:1
**appellant** [1] - 100:10
**apply** [1] - 10:22
**approach** [5] - 25:13, 37:24, 40:18, 80:21, 90:12
**Approved** [1] - 100:5
**area** [9] - 32:22, 34:21, 38:24, 56:12, 56:13, 84:18, 88:15, 92:11, 92:21
**arguing** [3] - 17:1, 49:22, 50:12
**argument** [3] - 10:7, 14:3, 16:23
**arguments** [6] - 10:11, 10:17, 10:21, 13:22, 13:24
**arm** [1] - 58:8
**arranged** [3] - 15:13, 46:16, 92:23

**arrangement** [2] - 22:24, 46:18
**arrangements** [1] - 13:24
**arrest** [4] - 16:1, 89:16, 89:20, 91:17
**arrested** [1] - 19:23
**arrive** [1] - 36:10
**arrived** [9] - 15:23, 28:16, 36:8, 36:22, 36:23, 78:21, 79:3, 87:7, 90:19
**arriving** [2] - 93:12, 93:15
**article** [1] - 87:24
**ass** [1] - 52:14
**assault** [7] - 5:4, 7:3, 11:8, 11:12, 15:7, 16:2, 72:24
**assigned** [2] - 91:20, 91:23
**assignment** [1] - 86:22
**Assistant** [1] - 2:4
**assume** [1] - 74:6
**assuming** [2] - 12:15, 84:3
**attention** [3] - 16:13, 16:18, 86:17
**attire** [1] - 85:3
**Attorney** [2] - 2:4, 83:9
**Attorney's** [1] - 2:5
**available** [11] - 12:19, 28:15, 47:3, 47:4, 48:8, 48:9, 48:10, 49:5, 49:9, 49:15
**avoid** [4] - 28:22, 29:16, 35:6, 81:5
**aware** [3] - 45:13, 45:20, 45:23

## B

**babysit** [1] - 25:9
**backwards** [9] - 33:23, 33:24, 63:1, 63:2, 63:3, 63:9, 63:16, 70:12, 70:16
**badge** [1] - 79:8
**bag** [118] - 14:15, 14:19, 14:20, 14:21,

14:22, 14:23, 31:11, 31:12, 31:13, 31:15, 31:16, 31:17, 31:22, 32:12, 32:16, 32:17, 32:18, 32:20, 33:1, 33:2, 33:5, 33:18, 34:9, 39:4, 39:7, 51:6, 51:10, 51:12, 51:14, 51:19, 52:24, 53:5, 53:8, 53:11, 53:20, 53:22, 54:2, 54:8, 54:10, 54:12, 54:15, 54:23, 55:1, 55:4, 55:9, 55:14, 55:15, 55:20, 56:2, 56:5, 56:16, 56:17, 56:20, 57:1, 57:5, 57:11, 57:21, 58:12, 58:15, 59:2, 59:3, 59:5, 59:6, 59:11, 59:17, 59:19, 59:23, 59:24, 60:5, 60:6, 60:11, 60:15, 60:16, 60:17, 60:24, 61:1, 61:4, 61:12, 61:16, 61:19, 61:23, 62:4, 65:6, 65:8, 65:10, 67:8, 67:9, 67:11, 67:18, 67:21, 67:22, 68:1, 68:5, 68:13, 69:2, 69:10, 69:23, 70:2, 76:11, 76:14, 78:18, 78:20, 78:24, 82:18, 85:13, 85:14, 85:17, 93:23, 94:4, 94:12, 95:4, 95:10, 97:4, 97:22, 98:1, 98:6
**bags** [1] - 61:6
**balance** [2] - 13:20, 65:4
**banged** [3] - 63:12, 63:14, 64:16
**bar** [1] - 4:10
**baseball** [12] - 15:1, 34:11, 34:24, 65:13, 65:16, 67:19, 69:12, 75:6, 75:8, 77:1, 80:9, 84:15
**based** [2] - 30:12, 93:17
**bat** [7] - 15:1, 65:13, 65:16, 67:19, 75:6, 80:9, 84:15

**Bata** [9] - 5:24, 6:1, 87:13, 89:9, 89:19, 91:4, 91:9, 91:22, 98:13
**BATA** [2] - 6:1, 6:3
**Bata's** [1] - 98:24
**battery** [6] - 5:5, 7:3, 11:8, 11:13, 15:8, 16:2
**bay** [1] - 60:4
**Bay** [1] - 2:11
**became** [1] - 45:23
**BEFORE** [1] - 1:13
**began** [3] - 31:23, 32:12, 45:17
**begin** [5] - 8:13, 12:9, 42:13, 42:16, 42:19
**Behalf** [2] - 2:2, 2:8
**belonged** [3] - 14:16, 82:18, 93:24
**below** [1] - 84:19
**bench** [2] - 10:6, 10:7
**bend** [2] - 68:5, 68:6
**best** [1] - 100:8
**between** [16] - 4:11, 7:18, 8:5, 22:24, 29:3, 29:21, 30:23, 34:22, 52:4, 57:2, 78:20, 80:23, 81:12, 91:10, 98:6, 98:18
**beyond** [3] - 11:5, 11:17, 14:3
**birthday** [2] - 41:9, 41:12
**bit** [5] - 24:11, 30:15, 31:1, 31:14, 83:7
**bits** [1] - 45:16
**blade** [4] - 35:11, 73:18, 73:21, 74:20
**block** [2] - 57:6, 57:19
**blocking** [2] - 33:21, 68:21
**blue** [3] - 22:7, 85:4, 88:2
**bluntly** [1] - 37:12
**body** [1] - 61:10
**book** [1] - 53:6
**boomerang** [1] - 75:14
**Boston** [4] - 18:21, 21:15, 21:16, 79:4

**bothered** [2] - 80:11, 80:12
**bounce** [1] - 75:16
**bounced** [1] - 91:9
**box** [2] - 6:16, 16:16
**Braintree** [53] - 6:3, 6:5, 6:10, 7:2, 14:5, 15:19, 17:20, 17:21, 18:2, 18:15, 19:20, 28:5, 36:17, 37:16, 43:15, 43:17, 43:19, 43:21, 43:23, 46:17, 46:20, 47:6, 47:9, 47:12, 47:15, 47:17, 47:21, 47:22, 48:16, 49:1, 49:23, 49:24, 50:1, 50:5, 50:9, 50:13, 50:22, 51:3, 55:3, 63:8, 63:11, 64:15, 69:22, 70:1, 70:7, 77:16, 79:16, 80:18, 81:3, 81:18, 84:21, 86:13, 86:15
**brand** [1] - 35:16
**break** [2] - 8:5, 8:10
**Brian** [3] - 5:13, 16:10, 80:24
**BRIAN** [1] - 2:9
████████ [13] - 30:7, 31:6, 31:8, 36:5, 36:6, 36:7, 36:8, 41:7, 41:9, 41:12, 41:13, 78:6
**brief** [1] - 10:24
**briefly** [1] - 90:15
**bring** [3] - 10:5, 49:17, 76:7
**Bring** [1] - 48:5
**Brokaw** [10] - 3:3, 3:7, 3:9, 5:10, 7:19, 15:5, 29:3, 29:22, 80:23, 98:19
**brokaw** [1] - 81:12
**BROKAW** [53] - 2:3, 5:9, 6:6, 6:11, 12:17, 12:19, 12:24, 13:18, 20:15, 20:18, 20:21, 21:8, 22:8, 25:13, 26:14, 27:3, 29:9, 29:16, 37:24, 38:11, 38:15, 39:18, 42:8, 50:15, 58:18, 60:22, 62:5, 67:1, 69:18,

74:12, 75:22, 80:1, 80:19, 80:21, 81:1, 81:5, 81:7, 82:16, 84:2, 85:6, 85:19, 85:24, 86:4, 86:8, 88:3, 89:22, 93:2, 93:5, 94:14, 96:19, 97:18, 98:10, 98:13

**broken** [1] - 31:13
**bruise** [1] - 74:7
**bruises** [1] - 37:10
**bruising** [2] - 15:2, 15:4
**bubble** [2] - 27:11, 27:12
**BY** [8] - 21:8, 39:20, 82:16, 85:9, 86:8, 90:2, 96:19, 97:20

# C

**C-l-a-r-k** [1] - 86:11
**Calabrese** [16] - 4:7, 5:4, 5:14, 16:11, 17:17, 17:23, 18:4, 18:17, 22:3, 63:1, 66:15, 67:17, 87:11, 87:19, 89:21, 100:13
**CALABRESE** [1] - 1:10
**Calabrese's** [1] - 89:2
**CALABRESE-KELLEY** [1] - 1:10
**Calabrese-Kelley** [15] - 4:7, 5:4, 5:14, 16:11, 17:17, 17:23, 18:4, 18:17, 22:3, 63:1, 66:15, 67:17, 87:19, 89:21, 100:13
**calf** [3] - 71:9, 71:15, 72:5
**calm** [1] - 87:17
**cannot** [1] - 99:18
**Canton** [1] - 2:6
**car** [92] - 14:13, 14:14, 14:15, 14:16, 14:20, 14:21, 14:23, 15:16, 28:18, 28:19, 30:2, 30:3, 30:8, 30:18, 31:6, 31:7, 32:6, 32:7, 32:9, 32:11, 32:12, 32:14, 33:4, 33:5, 33:15, 33:18, 33:21, 33:22, 35:22, 36:4, 36:5, 36:7, 36:10, 36:14, 36:15, 38:24, 39:12, 51:6, 53:13, 53:15, 53:17, 54:5, 54:6, 54:7, 54:16, 55:24, 56:7, 56:10, 56:12, 56:14, 56:18, 56:20, 57:8, 57:12, 57:13, 57:24, 58:1, 58:6, 58:11, 58:17, 58:22, 60:7, 62:14, 62:15, 62:16, 62:18, 63:13, 66:21, 66:22, 66:24, 68:18, 69:6, 69:7, 69:16, 69:17, 76:10, 77:22, 78:1, 78:3, 78:5, 78:10, 78:12, 78:16, 79:8, 79:10, 88:16, 91:20, 91:22, 93:22, 95:10
**care** [1] - 32:1
**carried** [2] - 57:4, 61:12
**carry** [1] - 61:22
**carrying** [6] - 59:11, 59:17, 59:19, 59:20, 61:20, 62:3
**cars** [4] - 30:16, 30:23, 52:3, 57:2
**Case** [3] - 4:3, 13:2, 99:21
**case** [14] - 7:12, 7:23, 7:24, 8:15, 12:5, 12:6, 13:12, 16:14, 16:17, 17:15, 90:4, 99:15, 99:17
**caselaw** [1] - 9:15
**cases** [1] - 72:24
**caused** [3] - 72:9, 74:8, 74:17
**CCD** [1] - 41:14
**centered** [1] - 61:9
**certain** [2] - 9:16, 45:12
**certainly** [1] - 54:15
**certify** [1] - 100:7
**chain** [5] - 25:20, 26:2, 45:9, 45:15, 47:2
**challenge** [2] - 4:16, 4:18

**chance** [1] - 40:22
**change** [1] - 27:22
**Chapter** [1] - 11:11
**charged** [5] - 5:4, 7:3, 11:1, 11:7, 15:7
**check** [1] - 99:5
**children** [16] - 13:20, 13:23, 14:3, 14:7, 15:14, 22:17, 30:7, 39:23, 40:3, 42:14, 44:23, 45:4, 45:7, 45:13, 46:20, 77:24
**children's** [1] - 40:14
**choice** [1] - 47:13
**choked** [1] - 77:3
**Chromebook** [4] - 53:20, 54:11, 54:17, 55:21
**City** [1] - 21:15
**claim** [3] - 65:13, 71:23, 72:13
**Clark** [9] - 6:4, 86:5, 86:11, 86:12, 86:17, 89:6, 90:3, 90:14, 96:20
**CLARK** [3] - 3:8, 6:5, 86:6
**clear** [5] - 30:13, 35:20, 37:10, 44:8, 44:9
**CLERK** [5] - 4:4, 4:6, 6:14, 6:19, 6:21
**close** [3] - 14:13, 34:14, 39:1
**closed** [1] - 57:16
**closer** [2] - 14:14, 30:18
**closing** [3] - 10:11, 10:17, 10:20
**clothing** [1] - 87:24
**coax** [1] - 15:16
**cold** [2] - 84:23, 85:2
**collectively** [1] - 10:15
**comfortable** [1] - 21:5
**coming** [8] - 24:11, 46:8, 69:7, 70:15, 70:18, 73:8, 75:5, 76:24
**commenced** [1] - 4:3

**Commission** [1] - 100:22
**commits** [1] - 11:12
**committed** [1] - 11:8
**common** [2] - 13:20, 22:17
**commonwealth** [1] - 20:14
**COMMONWEALTH** [3] - 1:4, 1:8, 100:2
**Commonwealth** [17] - 2:2, 4:6, 4:12, 5:3, 5:10, 11:5, 11:16, 13:16, 15:6, 20:18, 27:2, 27:6, 38:18, 86:4, 100:6, 100:12
**COMMONWEALTH'S** [2] - 3:5, 3:12
**Commonwealth's** [3] - 38:17, 70:22, 81:15
**communicate** [2] - 23:20, 24:12
**communication** [2] - 23:23, 44:16
**comparison** [1] - 83:24
**compartment** [1] - 54:13
**compensate** [1] - 24:10
**complaint** [2] - 7:1, 7:4
**computer** [10] - 9:10, 31:10, 31:11, 31:12, 31:21, 32:1, 52:23, 53:21, 53:22
**concept** [1] - 27:17
**concerned** [2] - 33:13, 70:4
**concluded** [2] - 63:17, 64:19
**conclusion** [1] - 20:6
**conference** [5] - 7:18, 29:3, 29:21, 80:23, 98:18
**conferences** [1] - 10:8
**confirm** [1] - 98:22
**confrontation** [1] - 29:16

confused [3] - 66:20, 67:4, 68:16
consider [4] - 9:22, 10:2, 10:13, 10:19
consistent [2] - 37:11, 37:14
contact [6] - 35:2, 39:4, 39:6, 39:9, 97:5, 97:8
contacted [1] - 82:4
context [1] - 28:8
continue [1] - 13:22
conversations [2] - 93:11, 93:14
coordinate [1] - 23:6
copy [1] - 90:6
correct [111] - 13:13, 39:23, 40:3, 40:4, 40:7, 40:12, 41:11, 42:2, 42:15, 42:22, 43:4, 43:6, 43:13, 44:17, 45:24, 46:4, 46:17, 46:20, 48:4, 48:14, 48:17, 48:21, 51:4, 51:7, 52:6, 52:21, 53:1, 53:3, 53:9, 56:1, 56:4, 56:6, 57:14, 57:20, 61:1, 61:2, 61:4, 62:13, 62:23, 65:3, 65:5, 65:11, 65:14, 65:17, 65:19, 66:11, 66:23, 67:6, 68:15, 69:4, 70:14, 73:22, 76:8, 76:13, 77:23, 78:9, 78:17, 78:19, 79:18, 84:13, 84:15, 84:16, 90:4, 90:9, 90:10, 90:21, 90:22, 90:24, 91:1, 91:2, 91:3, 91:4, 91:7, 91:8, 91:11, 91:14, 91:16, 91:18, 91:20, 91:21, 92:1, 92:6, 92:11, 92:21, 92:22, 93:1, 93:10, 93:16, 93:20, 94:1, 94:2, 94:6, 94:9, 94:17, 94:20, 94:23, 95:1, 95:5, 95:8, 95:12, 95:16, 95:19, 95:22, 95:24, 96:16, 96:23, 97:2, 97:13,

97:14, 97:16, 97:17
could've [2] - 79:23, 81:21
counsel [1] - 5:7
count [1] - 15:7
country [2] - 7:6
County [2] - 2:5, 100:11
couple [2] - 38:21, 92:4
couples [1] - 16:23
course [1] - 88:22
court [4] - 13:1, 22:5, 69:20, 87:21
COURT [73] - 1:5, 4:5, 4:24, 5:15, 5:20, 5:22, 5:23, 6:2, 6:4, 6:9, 6:13, 6:20, 7:17, 7:20, 12:11, 12:15, 12:18, 12:20, 13:1, 13:4, 13:5, 13:6, 13:9, 13:11, 20:13, 20:17, 20:20, 20:22, 21:2, 21:4, 22:10, 22:12, 24:21, 25:15, 26:22, 27:1, 27:5, 27:8, 29:1, 29:13, 29:18, 29:20, 29:23, 31:20, 34:4, 37:14, 38:2, 38:17, 40:19, 42:9, 50:17, 58:19, 60:23, 62:6, 67:3, 69:19, 74:15, 74:23, 75:23, 80:2, 80:22, 85:20, 86:2, 88:6, 90:13, 93:4, 93:8, 94:15, 97:7, 98:12, 98:16, 98:20, 99:20
Court [12] - 1:14, 6:16, 7:18, 8:5, 29:3, 29:21, 80:23, 81:12, 98:18, 99:13, 100:5, 100:11
courtroom [1] - 7:22
create [1] - 33:12
crime [1] - 19:8
criminal [1] - 9:17
CROSS [3] - 3:5, 39:19, 90:1
CROSS-EXAMINATION [2] - 39:19, 90:1

cruiser [1] - 86:23
curbside [16] - 23:9, 23:10, 23:12, 23:14, 24:7, 25:2, 25:6, 42:14, 42:17, 42:20, 43:5, 47:3, 47:7, 48:19, 49:5, 49:16
custody [2] - 13:24, 22:24
cut [2] - 89:2, 89:3

## D

Dad [1] - 17:3
damn [1] - 32:20
dangerous [7] - 5:5, 7:4, 11:9, 11:13, 11:24, 15:8, 16:2
dare [1] - 27:19
darker [2] - 74:7
darkish [1] - 37:10
DATE [1] - 1:16
date [2] - 12:19, 14:4
daughter [14] - 16:24, 17:3, 17:5, 25:9, 30:21, 55:20, 70:3, 70:7, 82:19, 93:24, 94:5, 94:12, 95:6
daughters [3] - 14:17, 36:2, 52:23
David [1] - 86:11
DAVID [2] - 3:8, 86:6
December [2] - 22:16
decide [2] - 10:22, 20:2
decided [1] - 15:17
decision [5] - 19:11, 29:12, 89:15, 89:18, 91:15
deep [1] - 37:10
defendant [31] - 4:8, 7:3, 7:5, 11:1, 11:7, 11:15, 11:18, 11:21, 14:4, 14:7, 14:19, 15:7, 15:21, 16:1, 16:5, 22:9, 23:20, 24:12, 32:9, 35:17, 36:13, 38:24, 39:6, 83:20, 88:4, 89:10, 96:22, 97:1, 97:9, 97:12, 97:16

Defendant [1] - 2:8
defendant's [2] - 14:15, 93:5
Defense [2] - 42:9, 42:10
DEFENSE'S [1] - 3:16
definitely [1] - 20:7
degrees [1] - 8:7
deliberations [1] - 9:24
demeanor [2] - 87:16, 88:8
demonstration [1] - 76:22
Dennis [1] - 1:15
dense [1] - 73:23
Department [4] - 21:17, 81:3, 84:21, 86:15
depict [1] - 71:4
describe [6] - 35:12, 37:9, 39:9, 84:22, 87:16, 88:19
described [1] - 70:18
DESCRIPTION [2] - 3:13, 3:16
designated [1] - 100:9
despite [2] - 54:9, 55:19
detective [3] - 21:15, 72:22, 74:24
Diane [1] - 5:1
dictionary [1] - 27:24
difference [2] - 62:2, 98:5
different [2] - 10:14, 69:20
difficult [1] - 27:17
DIGITAL [1] - 1:12
digital [1] - 100:9
direct [3] - 92:3, 92:13, 96:7
DIRECT [3] - 3:5, 21:7, 86:7
direction [1] - 77:4
discuss [7] - 7:23, 8:15, 8:18, 9:23, 10:6, 99:15, 99:18
discussed [1] - 13:12
dispatched [3] - 87:1,

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                                     105

87:5, 87:6
**dispatcher** [1] - 19:5
**DISTRICT** [1] - 1:5
**District** [4] - 1:14, 2:4, 2:5, 100:11
**disturbance** [1] - 87:6
**DIVISION** [1] - 1:5
**divorce** [1] - 13:19
**divorced** [2] - 21:23, 22:15
**Docket** [2] - 4:7, 100:13
**DOCKET** [1] - 1:6
**domestic** [1] - 87:6
**done** [2] - 11:23, 90:16
**door** [31] - 32:5, 32:7, 32:13, 33:9, 33:11, 33:13, 33:19, 34:7, 38:24, 57:5, 57:6, 57:16, 57:17, 59:1, 62:15, 62:16, 62:19, 62:21, 63:13, 63:14, 63:18, 63:24, 64:3, 64:17, 66:22, 66:24, 67:7, 69:6, 76:17
**doubt** [2] - 11:6, 11:17
**down** [21] - 14:24, 32:19, 33:3, 33:7, 33:24, 58:2, 64:11, 68:7, 68:8, 68:12, 71:18, 73:20, 75:5, 76:18, 77:5, 86:2, 93:21, 96:7
**drafted** [1] - 90:3
**drive** [3] - 46:24, 47:24, 49:12
**driver's** [17] - 32:5, 32:13, 33:8, 33:11, 33:15, 56:9, 56:16, 56:24, 57:8, 57:9, 57:13, 57:16, 57:17, 58:3, 58:16, 62:14
**Drop** [1] - 58:8
**drop** [3] - 33:18, 39:13, 58:8
**dropoff** [2] - 46:14, 46:16
**dropped** [2] - 35:21, 67:18
**drove** [1] - 82:5
**during** [2] - 9:12, 10:5

**duty** [3] - 19:3, 19:21, 79:4

## E

**earrings** [1] - 22:7
**effect** [2] - 35:23, 36:1
**eight** [2] - 16:24, 84:7
**eight-year-old** [1] - 16:24
**either** [7] - 10:8, 20:23, 36:6, 44:17, 49:14, 72:18, 73:7
**Elaine** [2] - 1:13, 100:14
**eleven** [1] - 84:9
**email** [5] - 41:6, 41:16, 41:24, 44:17, 51:16
**emails** [10] - 3:17, 40:14, 40:17, 40:20, 40:21, 40:23, 41:3, 42:3, 42:10
**employed** [2] - 21:14, 86:12
**encounter** [1] - 87:9
**end** [4] - 11:3, 16:3, 59:3, 73:18
**End** [2] - 29:21, 81:12
**ended** [1] - 75:9
**engaged** [1] - 26:3
**entered** [2] - 5:5, 9:9
**entitled** [1] - 10:3
**equipment** [7] - 30:22, 31:3, 32:2, 32:3, 32:22, 33:14, 34:21
**escalate** [1] - 15:18
**ESQ** [2] - 2:3, 2:9
**essentially** [1] - 33:12
**estimate** [3] - 36:19, 82:24, 83:2
**evening** [14] - 15:11, 15:22, 17:17, 24:23, 28:13, 39:22, 40:1, 42:24, 44:12, 44:24, 80:15, 83:20, 91:20, 96:21
**events** [2] - 15:13, 45:12
**eventual** [1] - 45:16
**eventually** [7] - 33:4, 33:8, 43:9, 56:8,

56:24, 78:2, 78:8
**EVID** [2] - 3:13, 3:16
**evidence** [22] - 7:11, 8:17, 8:20, 9:3, 9:5, 9:9, 9:11, 9:17, 9:22, 10:2, 10:10, 10:15, 10:18, 11:3, 12:2, 16:3, 17:16, 20:3, 27:7, 38:20, 42:11, 99:12
**ex** [3] - 14:4, 17:18, 84:10
**ex-husband** [2] - 14:4, 17:18
**ex-wife** [1] - 84:10
**exactly** [4] - 43:19, 60:14, 60:17, 61:18
**EXAMINATION** [8] - 21:7, 39:19, 82:15, 85:8, 86:7, 90:1, 96:18, 97:19
**examine** [2] - 88:11, 88:17
**exchange** [11] - 3:14, 14:6, 14:10, 15:13, 24:23, 26:5, 26:8, 27:6, 28:2, 52:20, 92:24
**exchanged** [1] - 13:23
**exchanges** [1] - 23:6
**exchanging** [1] - 14:3
**excluded** [1] - 29:23
**excruciating** [1] - 13:19
**excuse** [3] - 11:20, 43:16, 81:24
**exhausted** [2] - 96:5, 96:6
**exhibit** [2] - 38:12
**Exhibit** [6] - 26:15, 27:7, 38:19, 42:10, 70:22, 81:15
**exhibits** [1] - 9:8
**EXHIBITS** [1] - 1:1
**expect** [1] - 9:9
**expecting** [3] - 31:2, 31:3, 70:5
**experience** [1] - 73:6
**expires** [1] - 100:22
**explain** [1] - 15:15

**explained** [1] - 75:4
**explanation** [2] - 11:2, 64:19
**exposed** [1] - 68:3
**exposes** [1] - 76:9
**eyes** [1] - 68:10

## F

**face** [2] - 4:8, 66:2
**facing** [5] - 34:19, 62:9, 62:12, 62:18, 65:23
**fact** [10] - 40:8, 42:23, 44:16, 45:2, 54:9, 55:19, 77:17, 77:24, 94:10, 98:1
**facts** [1] - 10:22
**fair** [2] - 26:4, 61:11
**fall** [5] - 33:24, 34:6, 34:8, 64:23
**falls** [5] - 64:23, 65:10, 67:8
**familiar** [1] - 73:14
**far** [3] - 14:2, 71:1, 96:21
**fat** [1] - 52:14
**fear** [1] - 79:22
**February** [16] - 1:16, 7:2, 14:2, 17:17, 22:24, 23:17, 26:5, 39:22, 40:2, 41:3, 41:6, 41:23, 85:1, 86:18, 100:14, 100:17
**feet** [6] - 34:18, 34:22, 35:15, 69:3, 69:10, 76:12
**fell** [21] - 14:24, 33:23, 34:5, 34:10, 34:21, 39:17, 63:1, 63:2, 63:9, 63:15, 63:21, 63:22, 63:23, 64:16, 65:8, 65:9, 67:17, 67:23, 69:2, 76:16
**felt** [1] - 75:12
**few** [3] - 16:21, 52:3, 63:2
**fifteen** [2] - 50:2, 50:8
**fill** [1] - 19:6
**final** [1] - 52:12
**finally** [5] - 14:14,

19:10, 49:22, 51:2, 95:20

**fine** [2] - 29:18, 38:14

**Fine** [1] - 50:5

**finish** [1] - 99:11

**finished** [2] - 10:20, 38:5

**first** [19] - 8:14, 11:18, 15:11, 16:12, 17:7, 20:15, 27:10, 27:19, 27:21, 41:6, 54:3, 54:7, 71:8, 75:3, 75:5, 92:13, 96:8, 96:22

**five** [12] - 23:9, 24:1, 24:6, 34:18, 35:15, 83:1, 84:6, 84:9, 84:11, 99:2

**five-eleven** [1] - 84:9

**five-five** [1] - 84:11

**five-seven** [1] - 83:1

**five-six** [2] - 83:1, 84:6

**flick** [1] - 74:3

**flying** [1] - 64:23

**follow** [2] - 12:13, 26:20

**following** [3] - 40:15, 81:17, 81:19

**follows** [1] - 11:12

**foot** [3] - 67:23, 76:16, 84:7

**foregoing** [1] - 100:7

**foremost** [1] - 16:12

**forget** [2] - 28:9, 36:23

**former** [4] - 14:9, 15:9, 15:16, 22:4

**forth** [6] - 49:4, 50:13, 50:22, 52:7, 91:9, 91:13

**forward** [2] - 63:12, 67:20

**four** [7] - 14:6, 22:20, 28:18, 28:19, 30:16, 84:7

**four-foot-eight** [1] - 84:7

**fourth** [1] - 96:8

**Friday** [9] - 40:8, 40:9, 41:22, 43:1, 43:5, 44:24, 45:8, 45:14, 45:22

**friggin** [1] - 32:17

**FROM** [1] - 1:12

**front** [12] - 23:14, 33:14, 34:22, 52:3, 56:20, 56:21, 57:1, 58:3, 69:3, 70:13, 76:12

**full** [4] - 11:2, 92:15, 92:16, 96:8

**furious** [1] - 14:10

## G

**gains** [1] - 65:4

**General** [2] - 11:11, 79:17

**gentlemen** [4] - 4:24, 5:13, 8:4, 16:10

**given** [1] - 73:5

**God** [1] - 27:19

**gonna** [1] - 48:7

**Google** [1] - 53:20

**Googlechrome** [1] - 53:6

**grab** [2] - 15:17, 68:1

**grabbed** [3] - 67:19, 79:10, 95:14

**grabs** [2] - 65:12, 69:12

**great** [3] - 12:18, 17:12, 17:15

**greeted** [1] - 16:22

**ground** [9] - 18:6, 18:18, 33:24, 34:5, 34:6, 36:1, 64:24, 65:9, 77:7

**guess** [1] - 47:16

**guilty** [7] - 5:6, 7:5, 7:9, 11:15, 16:6, 20:11

## H

**hack** [1] - 74:2

**hair** [1] - 22:7

**half** [9] - 46:13, 49:3, 49:5, 49:21, 50:3, 50:4, 50:12, 50:21, 67:15

**halfway** [1] - 62:3

**hamstring** [4] - 71:11, 71:14, 72:3, 75:20

**hand** [20] - 7:13,

39:16, 59:7, 59:8, 59:10, 59:14, 59:15, 59:16, 59:19, 59:20, 60:7, 60:8, 60:9, 61:21, 61:22, 62:3, 64:13, 65:7, 100:17

**handed** [2] - 54:16, 60:6

**handle** [3] - 61:24, 62:1, 73:16

**handles** [6] - 60:10, 60:13, 61:1, 61:3, 61:19, 62:3

**hands** [11] - 4:21, 6:22, 35:5, 59:7, 59:17, 59:23, 64:14, 77:3, 77:14, 95:14, 97:4

**hang** [1] - 13:20

**happy** [6] - 47:11, 47:14, 47:17, 47:21, 47:22, 50:24

**hard** [1] - 74:2

**harken** [2] - 7:1, 7:11

**hat** [1] - 85:5

**head** [2] - 35:5, 35:6

**hear** [31] - 8:11, 9:9, 9:21, 10:10, 14:18, 15:11, 17:2, 17:3, 17:16, 17:19, 17:22, 17:24, 18:1, 18:3, 18:4, 18:7, 18:14, 18:21, 18:23, 18:24, 19:4, 19:10, 19:12, 19:19, 19:24, 20:3, 20:4, 20:5, 99:10, 99:11

**heard** [7] - 8:16, 8:21, 9:11, 11:3, 16:23, 17:1, 18:20

**hearing** [4] - 15:10, 15:19, 15:21, 100:10

**heated** [1] - 14:1

**heavier** [2] - 73:18, 73:20

**heel** [5] - 73:24, 74:2, 74:11, 74:19, 75:21

**height** [3] - 83:8, 83:16, 85:11

**held** [3] - 14:24, 24:10, 84:14

**helping** [1] - 32:5

**hereby** [1] - 100:7

**hereunto** [1] - 100:16

**herself** [1] - 7:6

**high** [2] - 72:1, 76:19

**higher** [1] - 71:14

**hinge** [1] - 69:6

**hit** [52] - 15:1, 17:5, 17:7, 18:9, 18:18, 20:8, 34:6, 35:4, 35:6, 35:11, 35:17, 35:20, 35:21, 35:24, 36:3, 36:6, 36:13, 37:6, 37:11, 38:10, 63:17, 63:24, 64:1, 64:2, 66:9, 67:19, 68:18, 69:13, 69:16, 69:17, 70:12, 70:23, 71:5, 72:10, 72:13, 72:21, 74:4, 74:11, 74:14, 74:18, 74:19, 75:10, 75:12, 75:17, 75:20, 77:17, 80:7, 80:9, 96:1, 96:14

**hits** [4] - 65:18, 68:20, 75:4, 75:5

**hmm** [2] - 71:24, 92:18

**hockey** [95] - 11:9, 14:15, 14:16, 14:23, 14:24, 15:8, 15:17, 15:24, 18:9, 18:19, 30:21, 31:2, 31:11, 31:12, 31:13, 31:15, 31:16, 31:17, 31:22, 32:3, 33:16, 34:9, 35:15, 38:10, 39:4, 39:7, 41:24, 51:6, 51:10, 51:11, 51:14, 51:15, 51:17, 51:18, 52:24, 53:20, 53:22, 54:2, 54:8, 54:10, 54:12, 54:23, 55:1, 55:4, 55:9, 55:14, 55:15, 55:20, 56:2, 56:5, 60:24, 61:12, 61:14, 61:16, 65:20, 65:21, 69:10, 69:12, 69:23, 70:2, 71:5, 73:12, 73:14, 73:18, 73:23, 74:17, 75:1, 76:11, 76:14, 78:15, 82:17, 82:18, 83:2,

83:4, 83:16, 83:17, 83:19, 83:23, 83:24, 84:1, 84:3, 85:10, 85:11, 85:13, 85:14, 85:17, 88:15, 88:16, 88:20, 93:23, 94:4, 95:4, 95:14, 96:14, 97:22

**hold** [4] - 10:8, 39:12, 73:20, 84:18

**holding** [10] - 33:5, 33:18, 58:6, 59:5, 59:6, 60:4, 60:13, 60:14, 60:16, 60:17

**holds** [1] - 10:16

**home** [7] - 16:21, 23:14, 24:9, 25:2, 45:3, 49:17, 99:16

**honest** [1] - 50:7

**Honor** [40] - 4:4, 5:22, 6:6, 6:19, 13:4, 13:10, 13:18, 20:16, 21:3, 22:8, 24:20, 25:14, 26:14, 26:16, 27:4, 27:9, 29:9, 31:18, 34:2, 38:1, 38:11, 38:16, 39:18, 40:18, 42:6, 50:15, 58:18, 67:1, 69:18, 74:12, 75:22, 85:7, 85:19, 86:1, 86:3, 88:3, 89:23, 90:12, 93:2, 98:10

**Honorable** [1] - 1:13

**hope** [1] - 12:7

**hoping** [1] - 9:1

**hostile** [3] - 28:21, 29:5, 29:23

**hour** [12] - 46:13, 49:3, 49:5, 49:21, 50:2, 50:3, 50:4, 50:8, 50:12, 50:21, 67:15, 99:1

**hour-and-a-half** [8] - 46:13, 49:3, 49:5, 49:21, 50:3, 50:4, 50:12, 50:21

**hour-and-fifteen** [2] - 50:2, 50:8

**hours** [1] - 79:24

**house** [5] - 17:12, 17:14, 24:7, 43:5,

49:18

**Hurley** [2] - 6:7, 6:9

**HURLEY** [1] - 6:12

**hurried** [1] - 35:22

**husband** [4] - 14:4, 14:9, 15:9, 17:18

## I

**I..** [1] - 34:13

**ID'd** [2] - 22:12, 88:6

**idea** [5] - 27:20, 48:18, 48:19, 48:24, 63:21

**ideal** [1] - 13:24

**IDEN** [2] - 3:13, 3:16

**identified** [2] - 22:9, 88:4

**identify** [1] - 87:24

**images** [1] - 25:23

**immediately** [2] - 34:10, 78:6

**impact** [2] - 72:20, 75:4

**impanel** [1] - 99:7

**importance** [1] - 10:3

**important** [3] - 13:11, 16:17, 20:2

**IN** [1] - 100:16

**Inaudible** [2] - 7:18, 98:18

**incident** [4] - 18:15, 29:11, 37:16, 80:15

**inconsistencies** [2] - 19:24, 20:1

**Index** [1] - 1:1

**indicate** [3] - 47:2, 95:9, 95:13

**indicated** [8] - 6:16, 25:7, 25:11, 52:10, 52:22, 90:19, 91:19, 96:24

**indicative** [1] - 94:11

**information** [6] - 19:21, 45:18, 94:8, 94:18, 95:2, 95:17

**informed** [3] - 19:2, 45:2, 79:3

**informing** [1] - 44:23

**injuries** [14] - 37:6, 37:23, 38:9, 70:23, 71:4, 71:21, 72:10,

72:17, 73:3, 73:8, 74:17, 80:4, 80:6, 88:11

**injury** [8] - 71:9, 71:10, 71:13, 71:14, 74:7, 84:22, 88:24, 89:1

**inside** [4] - 33:20, 66:24, 68:16, 76:5

**insisted** [1] - 48:15

**instruct** [1] - 10:21

**instructed** [3] - 8:17, 8:22, 79:16

**instruction** [1] - 29:14

**intended** [1] - 11:21

**intentional** [1] - 11:8

**introduce** [3] - 5:7, 26:14, 29:7

**introduced** [1] - 81:2

**investigated** [3] - 19:8, 72:24

**investigation** [1] - 88:22

**iPad** [1] - 53:5

**irate** [1] - 34:1

**issue** [1] - 7:8

**issues** [1] - 98:20

**items** [1] - 81:2

**itself** [1] - 93:6

## J

**Jack** [2] - 41:8, 41:9

**Jack's** [1] - 41:10

**jeans** [1] - 85:4

**Jessica** [2] - 5:10, 15:5

**JESSICA** [1] - 2:3

**████** [10] - 30:21, 31:2, 41:24, 51:15, 51:17, 70:3, 70:4, 70:8, 82:20, 82:21

**████** [2] - 83:19, 83:23

**job** [1] - 9:14

**Joseph** [1] - 21:13

**Judge** [7] - 5:1, 22:11, 29:15, 38:14, 82:14, 85:23, 92:8

**judge** [1] - 79:23

**jump** [2] - 76:6, 76:14

**jumped** [3] - 17:6, 70:11, 70:15

**jumps** [1] - 17:5

**Jurors** [5] - 12:13, 12:14, 13:4, 13:8, 13:14

**jurors** [6] - 4:9, 4:11, 4:13, 4:17, 5:8, 13:9

**Jury** [3] - 6:18, 6:21, 7:1

**jury** [17] - 4:20, 6:16, 7:11, 8:4, 8:6, 12:11, 13:7, 16:16, 20:2, 27:14, 29:10, 40:5, 65:21, 88:19, 99:6, 99:7, 99:17

**JURY** [2] - 4:22, 6:23

**Justice** [1] - 100:14

## K

**K-e-l-l-e-y** [1] - 21:13

**K-Mart** [16] - 14:4, 17:18, 17:21, 18:2, 28:4, 28:6, 36:20, 43:22, 46:17, 46:19, 51:3, 79:16, 87:4, 87:8, 90:20, 92:24

**Karen** [15] - 4:7, 5:4, 5:13, 16:10, 20:11, 22:3, 31:24, 87:10, 89:2, 89:21, 92:9, 92:19, 95:9, 95:10, 100:13

**KAREN** [1] - 1:10

**keep** [5] - 8:19, 11:4, 12:2, 14:22, 20:23

**KELLEY** [4] - 1:10, 3:6, 5:19, 21:6

**Kelley** [117] - 4:7, 5:4, 5:14, 5:18, 11:10, 11:19, 11:22, 14:18, 15:9, 15:12, 15:21, 16:11, 17:17, 17:23, 17:24, 18:4, 18:8, 18:17, 18:18, 18:21, 19:17, 19:18, 19:23, 20:5, 20:11, 20:19, 20:21, 21:9, 21:13, 21:14, 21:20, 22:3, 22:23, 23:16, 25:23, 27:10, 28:1, 29:24, 30:11, 32:2, 34:15,

36:12, 37:1, 37:5, 37:15, 38:3, 38:21, 39:21, 40:13, 40:20, 41:23, 44:3, 44:5, 44:6, 44:11, 44:19, 44:22, 45:2, 46:12, 46:24, 48:11, 51:5, 51:23, 55:23, 56:19, 57:4, 57:11, 58:12, 59:11, 63:1, 63:9, 63:12, 64:16, 64:22, 66:15, 67:17, 77:14, 77:21, 82:17, 84:5, 84:20, 85:10, 87:10, 87:13, 87:19, 88:10, 88:21, 89:21, 90:21, 91:7, 92:5, 92:7, 92:9, 93:5, 93:12, 93:14, 93:18, 93:21, 93:22, 94:3, 94:8, 94:11, 94:22, 95:3, 95:9, 95:18, 96:13, 96:14, 96:20, 97:11, 97:21, 97:22, 100:13

**Kelley's** [4] - 41:16, 48:24, 78:1, 78:3

**kept** [2] - 33:1, 33:2

**kids** [24] - 18:11, 23:7, 23:8, 27:21, 28:2, 32:6, 40:10, 41:10, 42:17, 42:20, 42:24, 45:3, 45:16, 45:22, 46:24, 48:2, 48:16, 49:23, 53:13, 53:16, 54:3, 54:4, 78:4, 92:24

**kids'** [1] - 41:17

**kind** [2] - 85:3, 99:17

**kinda** [2] - 68:21, 91:9

**kitchen** [1] - 16:22

**knee** [8] - 63:13, 63:14, 63:17, 63:24, 64:1, 64:2, 64:16, 89:4

**knocked** [1] - 64:11

**knowledge** [1] - 13:20

**knows** [1] - 75:23

## L

**ladies** [4] - 4:24, 5:12, 8:4, 16:9

**laid** [2] - 64:13, 64:14

**lane** [1] - 52:4

**last** [2] - 12:19, 92:15

**late** [21] - 14:9, 14:11, 24:2, 24:3, 24:4, 24:13, 24:15, 25:7, 25:10, 28:10, 42:21, 43:7, 43:11, 43:24, 44:3, 44:6, 44:8, 92:10, 92:20, 93:18

**law** [3] - 8:17, 8:23, 10:21

**Law** [1] - 79:17

**Laws** [1] - 11:11

**lawyers** [9] - 8:12, 9:2, 9:4, 9:14, 9:19, 10:12, 10:14, 10:16, 12:9

**leading** [1] - 15:13

**leaning** [2] - 67:20, 70:11

**learn** [2] - 45:17, 63:16

**least** [2] - 9:1, 99:2

**leave** [2] - 20:2, 45:3

**left** [11] - 22:6, 52:3, 55:10, 55:11, 59:14, 66:12, 68:20, 71:10, 72:5, 78:18, 79:15

**lefty** [3] - 66:10, 66:15, 76:3

**leg** [7] - 35:18, 37:7, 71:10, 71:11, 74:9, 75:16, 89:2

**legal** [1] - 10:6

**legs** [12] - 15:1, 65:18, 69:14, 72:11, 72:13, 74:14, 74:18, 75:11, 80:9, 89:4, 95:15, 97:13

**length** [1] - 58:16

**lengths** [2] - 28:18, 28:19

**letting** [1] - 40:14

**limine** [1] - 29:6

**Linda** [2] - 100:5, 100:20

**line** [1] - 76:20

**list** [3] - 5:15, 6:8, 99:6

**listen** [2] - 9:11, 50:4

**listening** [2] - 12:2, 16:16

**live** [2] - 21:19, 23:15

**lives** [2] - 17:23, 17:24

**load** [1] - 14:23

**locate** [1] - 88:15

**located** [2] - 61:3, 89:3

**location** [4] - 23:12, 36:20, 71:14, 73:2

**LOCATION** [1] - 1:14

**look** [17] - 25:16, 25:17, 25:18, 25:19, 25:21, 26:18, 27:23, 38:4, 40:22, 46:5, 71:21, 88:18, 90:14, 90:15, 92:16, 96:7

**looked** [5] - 17:8, 17:9, 18:11, 73:2, 96:12

**looking** [3] - 27:12, 90:16, 96:9

**looks** [1] - 61:16

**lost** [2] - 77:4

**loud** [1] - 9:20

**low** [2] - 72:5, 76:19

**lower** [1] - 75:5

**lunch** [3] - 8:11, 12:3, 12:7

**luncheon** [2] - 8:5, 13:2

## M

**ma'am** [1] - 4:19

**maintained** [1] - 25:5

**maps** [1] - 9:4

**Marina** [1] - 2:11

**mark** [1] - 37:11

**marked** [6] - 27:4, 27:6, 38:18, 42:10, 70:22, 81:14

**marriage** [1] - 13:22

**married** [7] - 16:22, 21:22, 21:24, 22:1, 22:2, 22:3, 22:13

**Mart** [16] - 14:4, 17:18, 17:21, 18:2, 28:4, 28:6, 36:20, 43:22, 46:17, 46:19, 51:3, 79:16, 87:4, 87:8, 90:20, 92:24

**Mass** [1] - 79:17

**MASSACHUSETTS** [3] - 1:4, 1:8, 100:2

**Massachusetts** [10] - 1:15, 2:6, 2:11, 5:11, 5:19, 9:16, 15:6,

21:21, 100:7, 100:12

**matter** [1] - 4:6

**McNamara** [5] - 5:21, 12:16, 89:9, 91:2, 91:6

**mean** [6] - 25:19, 29:7, 30:6, 31:9, 60:10, 74:24

**means** [4] - 9:21, 10:1, 11:8, 11:13

**meet** [6] - 17:20, 25:1, 25:4, 28:4, 48:16, 92:23

**meeting** [3] - 25:12, 28:11, 45:16

**member** [2] - 21:16, 86:14

**members** [5] - 4:20, 6:14, 6:21, 7:1, 7:11

**memory** [5] - 10:13, 10:15, 93:3, 96:22, 96:24

**memory's** [2] - 96:5, 96:6

**mentioned** [1] - 26:3

**message** [6] - 3:14, 14:10, 26:8, 27:6, 27:11, 30:12

**messages** [6] - 24:22, 29:10, 44:22, 46:5, 46:6, 48:13

**met** [7] - 14:4, 17:18, 18:2, 28:9, 28:11, 37:22, 57:23

**middle** [2] - 36:9, 61:3

**mind** [3] - 8:19, 11:4, 12:2

**minds** [2] - 8:21, 9:23

**mine** [1] - 26:13

**minute** [2] - 67:10, 98:16

**minutes** [3] - 36:21, 50:2, 50:8

**Mom** [1] - 17:2

**mom's** [2] - 36:7, 36:10

**moment** [1] - 38:15

**Monday** [5] - 23:2, 37:19, 81:17, 82:4, 82:12

**Moriarty** [3] - 1:13, 5:1, 100:14

**morning** [3] - 8:7, 99:4, 99:19
**most** [1] - 73:23
**mostly** [1] - 35:10
**mother** [1] - 78:5
**motion** [2] - 7:20, 29:6
**move** [11] - 26:14, 28:24, 30:15, 31:18, 32:12, 38:11, 50:18, 69:19, 78:20, 80:2, 93:21
**moved** [2] - 30:15, 78:23
**MR** [36] - 5:12, 16:9, 22:11, 24:20, 26:16, 26:23, 27:9, 28:24, 29:2, 29:5, 29:12, 29:14, 29:19, 31:18, 34:2, 37:13, 38:14, 39:20, 40:18, 42:6, 74:14, 74:24, 81:4, 81:6, 81:9, 82:14, 85:9, 85:23, 88:5, 90:2, 90:12, 92:8, 96:17, 97:6, 97:20, 98:9
**MS** [52] - 5:9, 6:6, 6:11, 12:17, 12:19, 12:24, 13:18, 20:15, 20:18, 20:21, 21:8, 22:8, 25:13, 26:14, 27:3, 29:9, 29:16, 37:24, 38:11, 38:15, 39:18, 42:8, 50:15, 58:18, 60:22, 62:5, 67:1, 69:18, 74:12, 75:22, 80:1, 80:19, 80:21, 81:1, 81:5, 81:7, 82:16, 84:2, 85:6, 85:19, 85:24, 86:4, 86:8, 88:3, 89:22, 93:2, 93:5, 94:14, 96:19, 97:18, 98:10, 98:13
**must** [3] - 9:22, 11:16, 99:15

# N

**name** [9] - 4:24, 5:9, 5:13, 5:16, 15:5, 16:10, 21:11, 30:21, 86:10

**names** [1] - 36:23
**narrative** [6] - 34:3, 90:8, 90:15, 90:16, 90:17, 92:14
**near** [2] - 38:24, 89:4
**necessarily** [3] - 74:21, 74:22, 75:2
**need** [3] - 8:14, 13:23, 73:7
**never** [16] - 27:21, 44:11, 55:1, 55:3, 64:13, 64:14, 70:9, 74:1, 77:14, 79:10, 79:13, 80:11, 80:12, 82:5
**next** [8] - 30:1, 31:5, 31:22, 33:10, 35:19, 38:12, 51:24, 94:21
**nice** [1] - 12:7
**night** [12] - 15:15, 19:17, 24:7, 28:3, 44:20, 45:8, 45:12, 45:14, 45:22, 47:1, 79:20, 84:22
**nights** [2] - 23:4, 23:8
**nine** [6] - 22:22, 99:4, 99:10, 99:13, 99:19
**NO** [3] - 1:6, 3:13, 3:16
**none** [2] - 19:11, 19:12
**nonetheless** [2] - 18:1, 45:7
**NORFOLK** [1] - 1:5
**Norfolk** [2] - 2:5, 100:11
**normal** [1] - 60:24
**Northeastern** [2] - 42:1, 51:17
**Nos** [1] - 38:19
**Notary** [2] - 100:6, 100:21
**nothing** [3] - 85:6, 85:24, 98:10
**noticed** [3] - 14:15, 30:22, 31:24
**number** [5] - 26:7, 26:10, 26:13, 46:1, 46:2
**numbers** [2] - 4:14, 6:15
**numerous** [1] - 49:6

# O

**o'clock** [5] - 23:9, 23:11, 24:6, 43:2, 99:4
**object** [5] - 4:13, 9:19, 24:20, 39:11
**objection** [27] - 9:20, 10:1, 22:10, 22:11, 26:16, 26:23, 28:24, 29:19, 31:18, 34:2, 37:13, 38:14, 42:8, 58:18, 60:22, 62:5, 67:1, 69:18, 74:12, 75:22, 80:1, 80:19, 85:19, 88:5, 93:2, 94:14, 97:6
**objections** [1] - 9:13
**observations** [1] - 16:1
**observe** [1] - 88:7
**observed** [2] - 28:16, 30:20
**obviously** [1] - 27:21
**occurred** [2] - 72:17, 89:13
**occurs** [1] - 10:9
**OF** [5] - 1:4, 1:8, 21:6, 86:6, 100:2
**off-duty** [3] - 19:3, 19:21, 79:4
**offense** [1] - 11:16
**Office** [1] - 2:5
**Officer** [19] - 5:21, 6:4, 6:7, 6:9, 6:17, 12:15, 86:4, 86:9, 86:12, 86:17, 89:6, 89:9, 90:3, 90:14, 91:2, 91:6, 96:20, 98:12, 99:14
**officer** [6] - 18:22, 19:3, 19:22, 37:22, 79:4, 86:13
**OFFICER** [13] - 3:8, 5:22, 6:5, 6:12, 12:11, 13:1, 13:4, 13:6, 13:9, 20:20, 20:22, 86:6, 99:20
**officers** [10] - 15:20, 19:2, 19:8, 19:11, 19:13, 20:4, 36:24, 37:1, 89:5, 90:23
**officially** [1] - 22:16

**often** [1] - 61:6
**old** [5] - 16:23, 16:24, 53:16, 54:4, 82:21
**oldest** [1] - 30:21
**once** [1] - 30:18
**one** [42] - 8:1, 9:18, 14:16, 15:7, 19:2, 19:21, 21:24, 28:11, 35:21, 38:12, 38:15, 41:10, 48:15, 52:22, 56:10, 59:7, 59:8, 59:18, 59:19, 60:6, 60:8, 60:9, 61:21, 70:24, 71:5, 72:1, 72:5, 72:9, 74:9, 74:17, 74:19, 75:7, 75:11, 75:16, 77:24, 89:4, 91:12, 92:8
**one's** [1] - 74:10
**one-handed** [1] - 60:6
**ones** [2] - 80:16, 81:10
**open** [8] - 8:19, 32:13, 33:11, 33:13, 57:16, 57:17, 63:13, 66:22
**opened** [2] - 54:16, 62:21
**OPENING** [3] - 3:2, 13:17, 16:8
**opening** [5] - 8:12, 9:2, 10:17, 12:9
**opens** [1] - 62:19
**operator** [1] - 18:5
**opinion** [1] - 73:6
**opportunity** [9] - 15:3, 15:23, 16:4, 25:17, 87:18, 88:7, 88:11, 88:17, 97:15
**option** [3] - 46:21, 50:1, 50:6
**or..** [1] - 23:13
**order** [11] - 8:14, 11:15, 26:19, 26:20, 57:1, 71:17, 72:16, 73:8, 74:6, 74:16, 79:19
**originally** [1] - 51:22
**outside** [8] - 7:22, 14:16, 43:5, 51:6, 51:9, 51:12, 51:19, 68:19
**overnight** [1] - 40:10

**overrule** [1] - 10:1
**overruled** [3] - 24:21, 67:3, 94:15
**overview** [1] - 10:24

**P**

**p.m** [13] - 1:17, 4:3, 13:2, 13:3, 23:5, 28:13, 41:7, 41:20, 41:23, 86:24, 99:21
**pack** [1] - 53:11
**packaged** [1] - 26:20
**PAGE** [1] - 3:2
**page** [1] - 27:10
**PAGES** [1] - 1:1
**pages** [1] - 25:19
**panel** [2] - 4:20, 6:14
**pants** [1] - 88:14
**paragraph** [2] - 92:14, 96:8
**parallel** [2] - 17:15, 68:21
**parked** [2] - 29:24, 96:21
**parking** [19] - 14:5, 14:12, 17:18, 17:20, 18:2, 20:7, 28:17, 30:22, 36:20, 43:22, 46:17, 46:19, 51:23, 52:1, 79:15, 87:4, 87:8, 90:20, 92:24
**Parkway** [1] - 1:15
**part** [7] - 9:23, 35:8, 44:22, 73:23, 74:9, 90:8, 94:21
**particularly** [1] - 13:19
**parties** [6] - 7:17, 10:5, 10:9, 10:11, 19:2, 19:21
**party** [2] - 41:9, 41:12
**pass** [1] - 4:11
**passenger** [2] - 56:10, 56:17
**past** [4] - 28:21, 29:6, 32:22, 99:2
**paying** [1] - 55:11
**PD** [1] - 80:18
**people** [5] - 15:11, 19:16, 27:18, 45:19,

99:16
**per** [2] - 48:19, 48:22
**period** [1] - 44:20
**person** [1] - 11:18
**phone** [6] - 12:5, 26:7, 26:13, 44:13, 46:9, 79:23
**photo** [1] - 88:23
**Photographs** [2] - 3:15, 38:18
**photographs** [2] - 15:3, 81:14
**photos** [4] - 80:14, 80:17, 81:22, 84:21
**pick** [18] - 23:8, 23:10, 25:1, 25:6, 25:12, 42:23, 46:20, 47:7, 48:2, 48:19, 54:2, 63:18, 67:9, 67:10, 67:21, 68:5, 68:7, 68:9
**picked** [12] - 32:2, 32:11, 34:10, 34:16, 34:23, 47:8, 61:6, 65:23, 66:4, 78:15, 79:23
**picking** [5] - 42:13, 42:16, 42:20, 45:16, 68:13
**picks** [2] - 56:5, 56:11
**pickup** [2] - 24:6, 43:3
**picture** [1] - 71:8
**pictures** [3] - 37:22, 70:21, 71:1
**pieces** [1] - 45:17
**place** [5] - 6:16, 25:12, 28:11, 49:12, 89:16
**placed** [5] - 4:10, 16:1, 51:5, 51:19, 89:20
**places** [1] - 7:6
**plan** [1] - 25:1
**planned** [1] - 55:19
**planning** [1] - 55:8
**plans** [3] - 27:18, 28:10, 43:8
**play** [2] - 50:1, 73:12
**played** [2] - 61:14, 75:1
**plays** [1] - 30:21
**plea** [1] - 5:6
**pleaded** [1] - 7:5

**plus** [1] - 24:24
**PLYMOUTH** [1] - 100:3
**point** [42] - 16:5, 21:24, 25:11, 26:18, 28:1, 30:20, 31:24, 32:4, 32:21, 32:23, 33:19, 33:23, 34:9, 34:15, 34:23, 36:2, 36:3, 36:5, 37:5, 37:15, 39:1, 39:15, 50:15, 52:19, 53:13, 53:19, 54:1, 55:23, 59:9, 62:24, 64:22, 65:12, 65:15, 68:3, 68:21, 74:13, 78:7, 78:15, 79:7, 82:23, 86:24, 89:15
**Police** [29] - 6:3, 6:5, 6:10, 15:20, 18:15, 18:22, 19:20, 21:15, 21:17, 36:17, 37:16, 43:15, 43:17, 43:20, 43:21, 55:3, 63:9, 63:12, 64:15, 69:22, 70:1, 70:7, 77:16, 79:4, 79:16, 81:3, 81:18, 84:21, 86:15
**police** [27] - 15:22, 19:3, 19:11, 19:13, 19:22, 35:24, 36:8, 36:9, 36:15, 36:24, 37:1, 78:7, 78:8, 78:11, 78:13, 78:21, 79:3, 79:11, 80:3, 81:23, 82:2, 82:4, 86:13, 96:7, 96:9, 96:12
**portions** [1] - 100:9
**position** [1] - 34:11
**positioned** [1] - 33:20
**possible** [4] - 64:10, 81:19, 87:6, 97:4
**possibly** [1] - 45:1
**pounds** [2] - 85:16, 85:21
**pouring** [1] - 84:23
**practice** [1] - 14:17
**preapproved** [1] - 28:10
**preliminary** [1] - 8:9
**preparation** [1] -

40:13
**prepared** [1] - 100:8
**present** [4] - 6:15, 12:14, 13:8, 13:9
**presented** [1] - 10:16
**presiding** [1] - 5:1
**pretty** [4] - 55:7, 66:9, 73:16, 98:5
**previous** [1] - 26:13
**previously** [2] - 26:2, 77:13
**problem** [1] - 98:15
**problems** [1] - 28:22
**proceed** [2] - 8:10, 8:24
**proceedings** [1] - 100:12
**produced** [1] - 26:17
**propelling** [1] - 75:14
**prove** [3] - 11:5, 11:15, 11:16
**provided** [1] - 100:10
**provides** [1] - 11:12
**proximity** [1] - 39:1
**Public** [2] - 100:6, 100:21
**pull** [3] - 51:24, 52:13, 52:15
**pulled** [7] - 14:12, 14:14, 28:17, 51:2, 51:21, 51:22, 52:2
**pulling** [1] - 51:20
**punished** [1] - 11:14
**pursuant** [1] - 79:17
**push** [4] - 38:24, 39:11, 95:23, 98:1
**pushed** [17] - 34:8, 35:24, 58:22, 59:2, 62:7, 62:9, 62:11, 64:10, 64:13, 77:17, 95:21, 96:2, 96:14, 97:1, 97:3, 97:22, 98:1
**pushing** [14] - 33:1, 33:2, 33:6, 58:1, 58:7, 58:23, 59:3, 60:4, 60:6, 60:7, 60:9, 98:6
**put** [25] - 14:19, 14:21, 27:21, 32:18, 33:2, 33:3, 33:7, 35:5, 39:11, 39:13, 53:13,

54:3, 54:15, 56:7, 56:21, 57:12, 57:22, 58:2, 58:8, 61:9, 77:14, 78:16, 95:11, 98:2
**putting** [3] - 33:14, 33:21, 58:2

## Q

**quarter** [3] - 23:24, 24:1, 99:2
**questions** [5] - 38:22, 39:18, 89:22, 92:4, 97:18
**QUINCY** [1] - 1:5
**Quincy** [4] - 1:14, 1:15, 2:11, 100:11

## R

**rain** [4] - 31:1, 31:4, 51:12, 84:23
**raining** [1] - 54:7
**rainy** [1] - 85:2
**raise** [3] - 4:21, 6:22, 7:13
**ran** [1] - 31:7
**rather** [1] - 16:15
**reach** [1] - 68:7
**reached** [1] - 68:8
**reaching** [1] - 68:12
**read** [1] - 27:14
**Reading** [12] - 5:19, 18:1, 21:21, 24:11, 47:1, 47:4, 48:6, 48:10, 48:11, 48:12, 49:11, 82:6
**realized** [2] - 24:1, 45:21
**really** [5] - 24:10, 27:17, 47:13, 74:2
**rear** [8] - 32:5, 32:7, 32:12, 32:22, 56:12, 56:18, 57:23, 57:24
**reason** [5] - 4:17, 8:18, 42:19, 43:23, 58:2
**reasonable** [2] - 11:6, 11:17
**receive** [1] - 10:4
**received** [7] - 19:20, 27:7, 38:9, 38:19,

41:2, 42:3, 42:11
**recess** [1] - 13:2
**recessed** [1] - 13:2
**recognize** [5] - 25:22, 25:23, 26:1, 38:6, 40:23
**recollection** [2] - 82:12, 96:10
**record** [7] - 9:20, 21:12, 22:4, 22:8, 86:10, 87:21, 88:3
**RECORDING** [1] - 1:12
**recording** [1] - 100:10
**RECROSS** [3] - 3:5, 85:8, 97:19
**redact** [1] - 81:8
**REDIRECT** [3] - 3:5, 82:15, 96:18
**reference** [1] - 29:5
**referring** [2] - 26:11, 80:16
**reflect** [2] - 22:8, 88:3
**refreshed** [1] - 96:10
**refuse** [1] - 54:23
**refused** [3] - 48:11, 55:1, 55:4
**relation** [1] - 83:16
**relative** [1] - 17:19
**release** [1] - 99:3
**reluctantly** [3] - 28:4, 50:13, 50:22
**remain** [2] - 7:22, 29:17
**remained** [1] - 36:8
**remarks** [1] - 8:9
**remember** [13] - 23:17, 26:5, 35:12, 35:14, 35:16, 36:5, 64:18, 79:1, 79:2, 85:4, 89:8
**remind** [1] - 99:15
**repeatedly** [1] - 15:2
**rephrase** [2] - 74:15, 97:7
**report** [10] - 90:3, 90:6, 90:8, 93:6, 94:10, 96:7, 96:9, 96:13, 98:3, 99:14
**repositioned** [1] -

30:18
**represent** [4] - 5:10, 5:13, 15:5, 16:10
**representation** [2] - 26:4, 29:7
**request** [1] - 29:13
**required** [2] - 9:15, 11:5
**resolved** [1] - 7:24
**respond** [4] - 24:16, 36:17, 89:5, 89:8
**responded** [6] - 15:20, 18:15, 18:16, 19:22, 43:21, 90:24
**responding** [1] - 19:1
**response** [11] - 24:18, 25:3, 52:9, 52:18, 71:3, 74:5, 83:18, 85:12, 91:5, 92:2, 96:3
**responsible** [2] - 55:11, 55:13
**restraining** [1] - 79:19
**result** [6] - 18:16, 19:23, 20:10, 37:6, 70:23, 88:10
**resumed** [1] - 13:3
**return** [1] - 27:3
**ride** [1] - 54:14
**rights** [1] - 79:17
**righty** [2] - 66:15, 76:3
**▇▇▇▇** [15] - 30:7, 31:6, 31:7, 31:9, 32:1, 36:3, 36:4, 36:10, 41:13, 53:2, 53:19, 53:23, 54:10, 54:21, 78:7
**rise** [4] - 12:11, 13:1, 13:6, 99:20
**Road** [2] - 2:5, 2:10
**road** [2] - 9:3, 52:15
**room** [9] - 8:6, 17:1, 17:4, 17:5, 17:10, 18:11, 18:13, 19:15
**row** [6] - 28:17, 30:16, 51:24, 52:1, 52:2
**Roxbury** [8] - 17:23, 24:11, 45:4, 47:24, 48:3, 48:5, 48:8, 49:11
**running** [11] - 14:11, 42:21, 43:7, 43:11, 43:24, 44:3, 44:6, 44:8, 92:10, 92:20,

93:18
**Ryan** [1] - 1:15

## S

**sacrifice** [1] - 27:22
**safe** [5] - 62:8, 74:6, 84:12, 93:17, 96:13
**sat** [1] - 78:12
**Saturdays** [1] - 51:18
**saw** [6] - 15:24, 51:5, 68:9, 70:11, 70:15, 76:20
**scene** [6] - 15:20, 15:23, 19:20, 92:5, 93:12, 93:15
**schedule** [1] - 99:5
**scheduling** [2] - 98:21, 98:22
**school** [1] - 23:3
**seal** [1] - 100:17
**seat** [6] - 33:15, 56:21, 57:1, 58:3, 69:7
**seated** [5] - 4:19, 4:23, 6:24, 7:16, 13:10
**second** [5] - 11:21, 18:7, 92:8, 92:14, 96:8
**Section** [1] - 11:11
**see** [27] - 7:17, 12:23, 15:3, 19:7, 19:13, 19:15, 22:4, 25:21, 29:1, 29:10, 48:16, 49:1, 49:23, 51:13, 63:24, 64:1, 64:5, 68:10, 68:12, 72:20, 75:3, 80:6, 82:5, 87:21, 98:16, 99:5, 99:19
**See** [1] - 1:1
**seeing** [1] - 57:18
**seek** [1] - 79:19
**Selection** [1] - 6:18
**send** [4] - 8:10, 9:10, 98:13, 98:21
**sending** [2] - 18:12, 41:16
**sends** [1] - 41:23
**sent** [5] - 40:13, 51:16, 52:12, 54:10, 55:20
**sentences** [3] - 92:15, 92:16, 92:19

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                                                    112

**sequester** [1] - 7:21
**Sergeant** [9] - 5:24,
  87:13, 89:9, 89:19,
  91:4, 91:9, 91:22,
  98:13, 98:24
**SERGEANT** [2] - 6:1,
  6:3
**serious** [1] - 15:2
**set** [1] - 100:16
**settlement** [2] - 48:20,
  48:22
**seven** [2] - 16:15, 83:1
**several** [2] - 5:15,
  35:18
**shaft** [5] - 35:10, 74:8,
  74:10, 74:18, 75:21
**shall** [2] - 4:11, 11:14
**Shawmut** [1] - 2:5
**shift** [2] - 86:20, 86:21
**shirt** [2] - 22:7, 88:2
**Shore** [3] - 44:7,
  92:11, 92:21
**short** [2] - 22:7, 94:21
**shorter** [4] - 83:4,
  83:5, 83:8, 83:9
**shortly** [2] - 28:13,
  28:16
**shoulder** [2] - 61:7,
  61:10
**show** [8] - 19:20,
  20:10, 40:20, 65:21,
  70:21, 71:8, 80:4,
  80:11
**shows** [1] - 19:7
**sic-"Calabrese-
  Kelley")** [1] - 87:11
**side** [21] - 32:5, 32:13,
  33:8, 33:11, 56:10,
  56:15, 56:16, 56:17,
  56:24, 57:8, 57:9,
  57:13, 57:16, 57:17,
  57:24, 58:16, 62:14,
  66:12, 69:7
**sidebar** [4] - 7:18,
  29:21, 81:12, 98:18
**Sidebar** [2] - 29:3,
  80:23
**sight** [1] - 77:4
**similar** [1] - 10:17
**simply** [1] - 20:9

**simultaneous** [1] -
  72:14
**simultaneously** [2] -
  75:11, 75:12
**sit** [2] - 20:23, 21:4
**sitting** [3] - 16:16,
  22:6, 33:20
**situation** [1] - 15:18
**six** [5] - 23:10, 23:24,
  43:2, 83:1, 84:6
**slashed** [2] - 95:14,
  97:12
**slightly** [1] - 11:19
**sliver** [1] - 22:7
**sloped** [5] - 71:19,
  72:18, 72:19, 73:7,
  74:9
**small** [1] - 69:1
**snowing** [1] - 85:2
**someone** [5] - 74:2,
  89:10, 89:16, 98:6
**sometime** [1] - 36:6
**sometimes** [2] - 10:6,
  99:6
**somewhere** [1] - 87:1
**son** [3] - 16:24, 17:2,
  17:6
**sorry** [6] - 6:2, 12:17,
  20:20, 24:1, 27:23,
  83:6
**sort** [2] - 9:3, 10:12
**sounds** [1] - 46:15
**source** [1] - 94:7
**South** [3] - 44:7,
  92:10, 92:21
**space** [1] - 69:1
**spaces** [1] - 52:1
**speaks** [1] - 93:6
**specific** [6] - 29:11,
  40:17, 45:5, 45:6,
  45:12, 98:5
**specifically** [1] - 11:9
**specify** [3] - 97:3,
  97:5, 97:8
**speculate** [1] - 74:13
**spell** [2] - 21:11, 86:10
**spot** [1] - 51:23
**squat** [1] - 68:6
**SS** [1] - 100:3

**stance** [1] - 34:24
**stand** [8] - 4:8, 4:20,
  5:7, 5:17, 6:21, 7:13,
  20:23, 21:4
**standard** [1] - 35:15
**standing** [5] - 22:6,
  34:14, 58:11, 66:21,
  67:4
**start** [3] - 12:8, 34:12,
  99:10
**started** [9] - 31:9,
  34:12, 34:24, 45:20,
  57:22, 68:7, 75:8, 77:2
**starts** [1] - 56:11
**state** [2] - 21:11, 86:9
**STATEMENT** [3] - 3:2,
  13:17, 16:8
**statements** [4] - 8:12,
  9:2, 9:3, 12:9
**states** [1] - 95:20
**station** [5] - 37:16,
  37:20, 81:23, 82:3,
  82:4
**stationed** [1] - 57:2
**stay** [1] - 28:19
**stayed** [2] - 33:5,
  33:17
**step** [1] - 86:2
**steps** [2] - 63:2, 67:13
**stick** [89] - 11:9, 14:16,
  14:24, 15:8, 15:17,
  15:24, 18:9, 18:19,
  32:3, 33:16, 34:10,
  34:16, 34:23, 35:6,
  35:8, 35:12, 35:15,
  35:22, 36:13, 38:10,
  39:15, 39:16, 59:9,
  59:12, 59:20, 59:22,
  59:23, 59:24, 63:19,
  65:10, 65:13, 65:20,
  65:21, 67:18, 68:9,
  68:13, 68:17, 69:12,
  70:24, 71:5, 71:18,
  72:10, 72:17, 73:7,
  73:18, 73:23, 74:17,
  75:13, 75:21, 76:2,
  77:7, 77:17, 78:15,
  78:16, 82:17, 83:3,
  83:5, 83:9, 83:11,
  83:12, 83:13, 83:14,
  83:15, 83:16, 83:17,

  83:20, 83:23, 83:24,
  84:1, 84:3, 84:7,
  84:14, 85:10, 85:11,
  88:15, 88:16, 88:20,
  93:23, 94:4, 95:14,
  95:15, 96:1, 96:15,
  97:12
**sticks** [2] - 73:14, 83:7
**still** [5] - 30:16, 34:20,
  36:4, 65:6
**stood** [4] - 14:21, 57:6,
  57:19, 78:10
**stop** [1] - 30:5
**story** [3] - 16:20,
  17:13, 58:14
**strange** [3] - 51:9,
  51:10, 51:11
**street** [1] - 35:15
**stricken** [1] - 31:20
**strike** [5] - 28:24,
  31:19, 50:11, 69:20,
  72:9
**struck** [2] - 35:8, 83:20
**struggle** [2] - 58:14,
  58:23
**struggled** [1] - 58:21
**struggling** [2] - 58:15,
  60:3
**stumbles** [1] - 65:2
**style** [4] - 34:11, 34:24,
  69:13
**sudden** [1] - 17:2
**suddenly** [1] - 34:1
**suffers** [1] - 31:14
**suggest** [2] - 29:17,
  38:12
**Suite** [1] - 2:10
**summer** [1] - 23:4
**suppose** [1] - 54:18
**supposed** [4] - 39:22,
  40:2, 42:23, 47:8
**surprised** [1] - 51:13
**suspect** [1] - 98:24
**sustain** [2] - 9:19, 37:6
**sustained** [9] - 15:2,
  34:4, 37:14, 60:23,
  62:6, 70:23, 71:5,
  85:20, 97:7
**sweatshirt** [1] - 85:5
**swing** [10] - 34:11,

34:12, 35:1, 65:23, 66:12, 68:11, 70:11, 70:15, 76:21, 77:2
**swinging** [2] - 68:17, 76:20
**swings** [1] - 65:16
**sworn** [3] - 4:15, 7:8, 20:24
**SWORN** [3] - 4:22, 6:23, 7:15
**swung** [6] - 65:22, 66:17, 67:19, 75:6, 76:2, 76:4

## T

**talks** [1] - 41:7
**tall** [7] - 82:23, 83:2, 83:15, 83:23, 84:5, 84:8, 84:10
**taller** [3] - 83:11, 83:12, 83:13
**tape** [3] - 18:4, 18:24, 19:4
**tapes** [2] - 20:5, 99:11
**telephone** [2] - 46:1, 46:2
**ten** [1] - 16:23
**ten-year-old** [1] - 16:23
**testified** [20] - 36:13, 38:23, 39:21, 40:1, 42:12, 46:1, 51:8, 56:19, 57:18, 63:20, 63:21, 65:8, 67:14, 67:17, 75:10, 77:13, 82:17, 83:19, 84:14, 84:20
**testify** [4] - 57:4, 57:7, 58:10, 93:3
**testifying** [1] - 12:16
**testimony** [28] - 8:2, 8:13, 9:4, 9:6, 9:12, 10:14, 15:10, 17:19, 17:22, 17:24, 18:1, 18:3, 18:14, 18:21, 18:23, 19:10, 19:12, 19:19, 20:1, 20:9, 41:2, 55:8, 55:17, 59:21, 70:10, 77:11, 98:24, 99:11
**TESTIMONY** [2] -

21:6, 86:6
**text** [23] - 14:10, 24:22, 25:5, 25:7, 25:20, 26:2, 26:8, 27:11, 29:9, 30:11, 30:12, 30:13, 44:17, 44:22, 45:9, 45:18, 45:21, 46:5, 46:6, 47:2, 48:12, 49:7, 52:12
**Text** [2] - 3:14, 27:6
**texted** [4] - 24:2, 24:14, 46:12, 52:7
**texting** [4] - 14:8, 44:19, 45:15, 45:21
**texts** [1] - 46:8
**THE** [82] - 4:4, 4:5, 4:6, 4:24, 5:15, 5:20, 5:22, 5:23, 6:2, 6:4, 6:9, 6:13, 6:14, 6:19, 6:20, 6:21, 7:17, 7:20, 12:11, 12:15, 12:18, 12:20, 13:1, 13:4, 13:5, 13:6, 13:9, 13:11, 20:13, 20:17, 20:20, 20:22, 21:1, 21:2, 21:3, 21:4, 22:10, 22:12, 24:21, 25:15, 26:22, 27:1, 27:5, 27:8, 29:1, 29:13, 29:18, 29:20, 29:23, 31:20, 34:4, 37:14, 38:2, 38:17, 40:19, 42:9, 50:17, 58:19, 60:23, 62:6, 67:3, 69:19, 74:15, 74:23, 75:23, 76:1, 80:2, 80:22, 85:20, 86:2, 86:3, 88:6, 90:13, 93:4, 93:8, 94:15, 97:7, 98:12, 98:15, 98:16, 98:20, 99:20
**themselves** [4] - 29:10, 53:15, 53:17, 54:5
**therefor** [1] - 4:17
**thigh** [1] - 72:1
**thighs** [1] - 35:7
**thinking** [2] - 49:13, 49:14
**third** [3] - 11:23, 92:14, 96:8

**three** [7] - 11:16, 12:1, 28:18, 28:19, 30:16, 36:21, 81:1
**throughout** [3] - 25:5, 45:15
**throw** [1] - 61:7
**thrown** [4] - 18:6, 18:17, 75:13, 77:6
**Thursday** [1] - 1:16
**TIME** [1] - 1:17
**tip** [1] - 74:3
**today** [4] - 15:10, 22:5, 87:22, 99:3
**together** [1] - 14:7
**tomorrow** [4] - 42:1, 99:4, 99:8, 99:19
**tone** [1] - 24:18
**took** [8] - 14:24, 34:24, 36:19, 37:22, 56:20, 57:11, 63:2, 88:18
**top** [2] - 26:7, 68:10
**torso** [1] - 84:18
**totally** [1] - 27:15
**touch** [1] - 11:21
**touched** [3] - 11:18, 58:12
**touching** [1] - 11:23
**towards** [9] - 32:12, 32:13, 56:9, 56:12, 56:15, 56:16, 56:20, 57:5, 57:22
**town** [2] - 5:17, 21:19
**Town** [1] - 86:13
**traffic** [2] - 24:10
**transcribed** [1] - 6:18
**Transcriber** [1] - 100:5
**transcript** [1] - 100:8
**TRANSCRIPTION** [1] - 1:12
**travel** [1] - 52:4
**TRIAL** [1] - 1:9
**trial** [7] - 4:10, 4:12, 5:2, 5:3, 7:6, 8:9, 10:5
**trials** [1] - 9:17
**triangle** [1] - 38:23
**tried** [6] - 14:23, 15:16, 57:12, 93:23, 94:4, 94:11

**trouble** [1] - 35:23
**true** [5] - 63:8, 63:11, 64:4, 77:6, 100:8
**trunk** [2] - 32:22, 39:14
**try** [3] - 7:8, 27:22, 98:22
**trying** [11] - 14:19, 14:22, 28:22, 33:6, 39:11, 39:12, 58:2, 58:24, 95:11, 99:8
**Tuesday** [3] - 23:3, 81:20, 100:14
**turn** [2] - 76:6, 76:7
**turned** [7] - 35:5, 66:9, 68:19, 70:17, 71:9, 76:9, 76:21
**turning** [1] - 86:17
**turret** [1] - 18:24
**tussling** [1] - 39:10
**TV** [3] - 17:1, 17:4, 17:5
**Two** [2] - 3:17, 42:10
**two** [35] - 4:16, 14:6, 14:9, 14:17, 17:3, 18:16, 19:16, 22:13, 22:17, 23:1, 23:3, 23:6, 24:22, 25:4, 28:1, 30:7, 36:24, 37:1, 40:14, 40:20, 40:21, 42:7, 52:5, 57:2, 58:14, 58:15, 59:7, 61:1, 61:19, 67:13, 67:23, 92:15, 92:16, 95:14
**type** [3] - 9:16, 28:22, 88:20
**typically** [3] - 32:23, 83:5, 83:7

## U

**ultimately** [2] - 28:2, 46:19
**unacceptable** [1] - 27:15
**under** [7] - 9:15, 16:1, 27:23, 28:8, 36:21, 89:16, 89:20
**unlike** [1] - 18:10
**unusual** [3] - 30:24, 31:3, 31:4
**up** [83] - 8:20, 10:6, 15:13, 17:5, 17:6,

17:10, 19:20, 20:24, 23:8, 23:10, 24:11, 25:1, 25:6, 25:12, 27:23, 28:17, 30:15, 32:2, 32:11, 33:5, 33:17, 34:10, 34:16, 34:23, 38:4, 42:14, 42:16, 42:20, 42:24, 45:16, 46:20, 47:7, 47:8, 48:2, 48:6, 48:19, 49:11, 50:7, 51:20, 51:21, 51:22, 54:2, 54:16, 56:5, 56:11, 58:5, 59:3, 61:6, 62:4, 62:19, 63:18, 65:15, 65:22, 65:23, 66:4, 67:7, 67:9, 67:11, 67:21, 68:5, 68:7, 68:9, 68:11, 68:13, 73:8, 74:4, 75:9, 76:20, 76:22, 77:1, 77:3, 77:4, 77:7, 78:15, 79:23, 80:8, 82:5, 84:17, 84:18, 90:15, 99:11

**upper** [1] - 35:7

**upset** [8] - 14:13, 15:15, 15:17, 31:9, 31:15, 31:23, 52:23, 53:4

## V

**vacation** [1] - 23:3

**vehicle** [3] - 29:24, 32:8, 69:5

**VENIRE** [2] - 4:22, 6:23

**verbal** [10] - 25:3, 52:9, 52:18, 71:3, 74:5, 83:18, 85:12, 91:5, 92:2, 96:3

**versa** [1] - 46:11

**version** [1] - 10:12

**versus** [3] - 4:7, 5:3, 100:12

**vice** [1] - 46:11

**vice-versa** [1] - 46:11

**Victory** [1] - 2:10

**video** [1] - 19:7

**view** [1] - 10:18

**violence** [1] - 15:18

**visitation** [4] - 39:23, 40:3, 41:3, 42:13

**voice** [1] - 20:24

**vOLUME** [1] - 1:1

**vs** [1] - 1:9

## W

**waist** [1] - 84:19

**wait** [2] - 27:23, 67:10

**waited** [4] - 30:2, 81:22, 82:1

**waiting** [3] - 14:8, 36:9, 78:11

**walk** [3] - 56:11, 56:15, 56:16

**walked** [13] - 16:21, 17:4, 18:10, 19:14, 32:16, 32:21, 56:18, 56:20, 57:11, 57:21, 79:10, 79:11

**walks** [1] - 56:9

**WARD** [37] - 2:9, 5:12, 16:9, 22:11, 24:20, 26:16, 26:23, 27:9, 28:24, 29:2, 29:5, 29:12, 29:14, 29:19, 31:18, 34:2, 37:13, 38:14, 39:20, 40:18, 42:6, 74:14, 74:24, 81:4, 81:6, 81:9, 82:14, 85:9, 85:23, 88:5, 90:2, 90:12, 92:8, 96:17, 97:6, 97:20, 98:9

**Ward** [12] - 3:4, 3:7, 3:9, 5:13, 7:19, 16:10, 29:4, 29:22, 80:24, 81:13, 83:9, 98:19

**weapon** [7] - 5:5, 7:4, 11:9, 11:13, 11:24, 15:8, 16:2

**wearing** [4] - 85:3, 88:1, 88:2, 88:14

**weather** [1] - 84:22

**Wednesday** [4] - 23:4, 23:8, 23:19, 40:6

**week** [1] - 23:18

**weekend** [15] - 23:2, 31:2, 40:15, 41:17, 70:3, 70:8, 81:22, 82:1, 82:2, 82:8,

82:10, 94:1, 94:5, 94:13, 95:7

**weekends** [1] - 23:9

**weeks** [3] - 16:21, 23:3

**weighs** [2] - 85:13, 85:14

**weight** [1] - 10:3

**went..** [1] - 66:4

**West** [8] - 17:23, 24:11, 45:3, 47:24, 48:2, 48:5, 48:8, 49:11

**whack** [2] - 75:7, 75:11

**WHEREOF** [1] - 100:16

**whichever** [1] - 21:4

**whisper** [1] - 83:5

**white** [1] - 37:10

**whole** [8] - 39:16, 58:4, 58:15, 58:16, 58:21, 58:24, 82:2, 82:8

**wife** [8] - 15:16, 16:22, 17:8, 18:8, 18:10, 19:14, 22:5, 84:10

**William** [12] - 5:18, 14:18, 15:9, 15:12, 15:21, 18:21, 20:18, 20:21, 21:13, 25:16, 87:10, 87:13

**WILLIAM** [3] - 3:6, 5:19, 21:6

**Williams** [2] - 100:5, 100:20

**winding** [1] - 68:11

**winds** [1] - 65:15

**winter** [1] - 85:1

**wipe** [1] - 9:22

**WITNESS** [6] - 21:1, 21:3, 76:1, 86:3, 98:15, 100:16

**witness** [10] - 6:8, 9:18, 20:15, 22:9, 25:13, 27:4, 37:24, 74:13, 85:24, 88:4

**witnesses** [10] - 5:16, 7:12, 7:21, 8:13, 8:22, 9:7, 9:12, 9:13, 12:10

**WITNESSES** [2] - 3:5, 7:15

**wooden** [1] - 88:20

**word** [1] - 29:23

**world** [1] - 19:16

**would've** [13] - 31:3, 41:5, 43:2, 54:8, 72:17, 73:9, 73:10, 74:9, 74:18, 74:19, 83:11, 84:7, 85:4

**wound** [1] - 80:8

**wrote** [5] - 27:12, 90:8, 90:17, 93:9, 94:24

## Y

**year** [4] - 7:2, 16:23, 16:24, 84:24

**years** [3] - 21:18, 22:14, 86:16

**yell** [2] - 17:2, 17:3

**yelling** [1] - 35:22

**you's** [1] - 17:10

**youngest** [1] - 30:7

**yourself** [1] - 54:10

**yourselves** [1] - 5:8