VOLUME:  II    EXHIBITS:  See Index    PAGES:  1-120

COMMONWEALTH OF MASSACHUSETTS

NORFOLK DIVISION                QUINCY DISTRICT COURT
                               DOCKET NO. 1456CR1473

———————————————————————

COMMONWEALTH OF MASSACHUSETTS

vs.                                       TRIAL

KAREN CALABRESE-KELLEY

———————————————————————

*TRANSCRIPTION FROM DIGITAL RECORDING*

**BEFORE:**  The Honorable Elaine M. Moriarty

**LOCATION:**  Quincy District Court
             1 Dennis Ryan Parkway
             Quincy, Massachusetts 02169

**DATE:**  Friday, February 26, 2016

**TIME:**  8:58:32 a.m. to 12:07:07 p.m.



Capturing the Official Record
617.786.7783-www.reportersinc.com

**APPEARANCES:**

On Behalf of the Commonwealth:

**JESSICA BROKAW, ESQ.**
**Assistant District Attorney**

Norfolk County District Attorney's Office
45 Shawmut Road
Canton, Massachusetts 02121

On Behalf of the Defendant:

**BRIAN WARD, ESQ.**

333 Victory Road - Suite 3
Marina Bay
Quincy, Massachusetts 02171

## I N D E X

**COMMONWEALTH'S**
**WITNESS**                    **DIRECT CROSS REDIRECT RECROSS**

**SERGEANT CHARLES BATA**
(Ms. Brokaw)                    2-5
(Mr. Ward)                              2-13


**DEFENSE'S**
**WITNESS**                    **DIRECT CROSS REDIRECT RECROSS**

**KAREN CALABRESE-KELLEY**
(Mr. Ward)                      2-33              2-81
(Ms. Brokaw)                          2-58

## E X H I B I T S

**DEFENSE'S**

| NO. | DESCRIPTION | IDEN. | EVID. |
|-----|-------------|-------|-------|
| 2 | Two 911 calls and a turret tape | | 31 |
| 3 | Surveillance video | | 32 |

| **CLOSING ARGUMENT** | **PAGE** |
|----------------------|----------|
| (Mr. Ward) | 2-93 |
| (Ms. Brokaw) | 2-103 |

JURY CHARGE                                              2-107

**P R O C E E D I N G S**

(Case commenced at 8:58:59 a.m.)

THE COURT:  Ready?

THE COURT OFFICER:  Jurors, your Honor?

THE COURT:  Yes.

All rise for the jury.

Jurors are present, your Honor.  Everyone be seated, please.

THE CLERK:  This is the resumption of the trial of Karen Calabrese-Kelley, 14CR1473.

THE COURT:  Good morning, everyone.  I hope you had a nice night.  You did not discuss the case with anyone, correct?

(All jurors replied in the affirmative.)

Thank you.

Commonwealth?

MS. BROKAW:  Thank you, your Honor.

Commonwealth calls Sergeant Bata.

THE WITNESS:  Morning.

THE COURT:  Good morning, Sergeant.  You can either sit or stand whichever is more comfortable.

THE WITNESS:  Thank you.

**TESTIMONY OF SERGEANT CHARLES BATA**

<u>**DIRECT EXAMINATION**</u>

<u>**BY MS. BROKAW:**</u>

Q.   Good morning, Sergeant.

A.   Good morning.

Q.   Can you state your name and spell it for the record, please?

A.   It's Charles Bata, B-a-t-a.

Q.   And, Sergeant Bata, how are you employed?

A.   I'm a sergeant with the Braintree Police Department.

Q.   And how long have you been a member of the Braintree Police Department?

A.   I'm in my 23rd year.

Q.   Sergeant Bata, I'm going to ask you about February 21st, 2014.  Did you work that day?

A.   I did.

Q.   And what shift did you work?

A.   I worked the evening shift that day.

Q.   And now, around 8:30 p.m., were you dispatched to a particular location?

A.   I was.

Q.   And where was that?

A.   It was 35 Grossman Drive which is the K-Mart --

K-Mart shopping mall area.

Q.   And why were you dispatched there?

A.   A report of a disturbance, possibly a domestic disturbance.

Q.   Now, when you arrived on scene, were you the first member of the Braintree Police Department to respond?

A.   I was not.

Q.   Who responded before you?

A.   Officer McNamara and Officer Clark.

Q.   And when you arrived on scene, where did you go?

A.   I went and spoke with -- I believe I spoke with Officer McNamara first.

Q.   And based on your conversation with Officer McNamara, what did you do next?

A.   I went and spoke with the male party that was involved, Mr. Kelley.

Q.   And after speaking with -- I'm sorry -- when you were speaking with Mr. Kelley, can you describe his demeanor?

A.   He was calm.  He was -- he was talking at a normal pace, a normal tone, not too excited, just explained what was -- a little upset, but -- I'm just

trying -- you know, was able to converse in a normal manner.

Q.    And did he describe to you what had happened?

A.    He did.

Q.    And after you had an opportunity to speak with him, what did you do?

A.    After I spoke with him, I went over and spoke with Mrs. Kelley.

Q.    And just for the record, do you see Ms. Kelley in the courtroom today?

A.    I do.

Q.    Can you identify her by an article of clothing that she's wearing?

A.    The grayish-brownish sweater.

MS. BROKAW:  Your Honor, may the record reflect that this witness has also identified the defendant?

MR. WARD:  No objection, Judge.

THE COURT:  So ID'd.

Q.    Can you describe Ms. Kelley's demeanor when you first approached her?

A.    She was upset, a little bit more agitated than Mr. Kelley had been, but she was, you know, clearly emotional.

Q.    And how close was she to Mr. Kelley when you

encountered her?

A.    They were two to three parking spots away, but on opposite sides of their vehicles.

Q.    And when you spoke to her, what did she tell you?

A.    She -- she told me that she -- that Mr. Kelley had assaulted her.  He had pushed her.

Q.    And when she said he had pushed her, did she describe that in any more detail?

A.    Not that I recall in a sense -- not -- not -- I'm sorry.  Not that I recall.

Q.    Did she indicate where he had pushed her?

A.    They were by his vehicle when it happened.

Q.    Did she describe what happened when he pushed her?

A.    She stated that she had fallen to the ground.

Q.    Did she specify what, if any, area of her body hit the ground when she fell?

A.    She complained about her knee.  She said she had a cut on her knee.

Q.    Did you have an opportunity to observe her knee?

A.    I did not.

Q.    Did she -- besides telling you that Mr. Kelley

had pushed her, did she tell you anything else?

A.    That they had met -- they initially had met for a custody exchange between their children, and when they got there, they -- she was trying to put a hockey bag into his vehicle and basically the disagreement resulted because of his reluctance to take the bag.

Q.    And did she describe what she did during this altercation?

A.    Yeah.  After I spoke to -- after I spoke to her, she explained to me that she had taken the hockey stick -- she didn't know if she had one hand or two hands -- but she had swung it at him.

Q.    Did she indicate that she had made contact with Mr. Kelley?

A.    She said she did hit him.

Q.    Did she tell you where she had hit him?

A.    No.

Q.    Did she describe how she held the hockey stick when she hit Mr. Kelley?

A.    No, 'cuz she was uncertain when I had asked her about her -- Mr. Kelley initially told me about it, but she -- when I had asked her, she stated that she did swing the stick, but she didn't know if she had one hand or two, so she really wasn't sure about which way

she hit him or...

Q.   Did you ask her how Mr. Kelley was standing when she swung the hockey stick at him -- what direction he was facing, rather?

A.   I don't remember.

Q.   And did you have an opportunity to observe any injuries on Mr. Kelley?

A.   I was not at that time.  It was winter.  He had pants on.  He stated that he hit her (sic-"she hit him") in the legs, but I wasn't able to see anything.

Q.   Now, at some point was a decision made to place one of the parties under arrest?

A.   Yes.

Q.   And which party was ultimately placed under arrest?

A.   Mrs. Kelley.

Q.   And who made that decision?

A.   I did.

Q.   And when the decision was made to place her under arrest, who communicated that to her?

A.   I probably did -- either myself or -- actually, I'm trying -- I'm sure I was standing there when it happened, so myself -- I think we were all probably standing there at the time because usually when we

arrest somebody, we have more than one person there just in case it doesn't go agreeable.

Q.   And what was that decision based on?

A.   That she was the aggressor in this incident. The whole incident is that she had come over to his vehicle with the intent of making him take the hockey bag.  He did not want her to be anywhere near his car or his vehicle, and she was very insistent.  And because of that, the assault took place.  And then I believe that she was the aggressor and assaulted him in frustration.

Q.   And did the decision to place her under arrest have anything to do with what she told you about the incident?

A.   I'm sorry?

Q.   Did the decision have anything to do with the fact that she told you she had hit the defendant (sic)?

A.   Yes.

Q.   Now, once the decision was made to place her under arrest and you testified someone, either you or Officer McNamara, told her she was placed under arrest, did she say anything to you?

A.   She told me that we're only arresting her because her husband's a police officer.

**Q.** Can you describe her demeanor at that point when she's being placed under arrest?

**A.** She was very emotional. She was -- she -- upset, combative. She really, you know, she just did not cooperate all that well.

**Q.** Once she was placed under arrest, where was she taken?

**A.** She was taken to the Braintree Police Station.

**Q.** And who was responsible for transporting her there?

**A.** Officer McNamara.

**Q.** And were you present when she arrived at the Braintree Police Station?

**A.** I was not.

**Q.** So besides placing her under arrest and taking those statements, did you have any other involvement in the course of this investigation?

**A.** Just whatever I did on scene, speaking to both parties and, you know, making the determination, but after that, no.

**Q.** Did you have an opportunity to view a hockey stick while you were on scene?

**A.** I did.

**Q.** Can you describe that hockey stick to the best

of your memory?

A.   To the best of my memory it's a wooden hockey stick for youth hockey, all wood, wood blade.

Q.   Do you remember where it was when you saw it?

A.   It was -- it was in the back of the vehicle -- Mr. Kelley's vehicle.

MS. BROKAW:  Just one moment, your Honor?

THE COURT:  Yes.

Q.   Sergeant Bata, you testified that the defendant indicated she wasn't sure whether she was holding the stick with one hand or two when she struck the defendant (sic).  Did she tell you whether she was right-handed or left-handed?

A.   I don't recall.

MS. BROKAW:  I have no further questions, your Honor.

THE COURT:  Thank you.  Counsel?

**CROSS-EXAMINATION**

**BY MR. WARD:**

Q.   Morning -- morning, Sergeant.

A.   Good morning.

Q.   Sergeant, the night of February 21st, which cruiser were you assigned?

A.   817.

Q.    You were the 817 --

A.    I was.

Q.    -- vehicle, correct?

A.    Correct.

Q.    Okay.  And when you arrived on the scene, did you observe the hockey bag?

A.    It wasn't my initial -- I saw it at some point along the way, but not initially, I don't think I saw it.

Q.    And when you observed the hockey bag, the hockey bag was located behind Mr. Kelley's vehicle, isn't that correct?

A.    I do not recall.

Q.    Do you have any recollection as to where the hockey bag was located?

A.    At the initial time?

Q.    When you arrived on the scene.  When you first --

A.    I do not, no.

Q.    Okay.  Now, when you arrived on the scene, you indicated that there was Officer Clark and Officer McNamara who were both on scene, correct?

A.    Correct.

Q.    Okay.  And when you arrived on scene, one

officer was with Mrs. Kelley and one officer was with Mr. Kelley, correct?

A.    Correct.

Q.    Okay.  And it was Officer McNamara who was with Mr. Kelley, correct?

A.    I believe so.

Q.    And it was Officer Clark who was with Mrs. Kelley, correct?

A.    Correct.

Q.    And when you arrived on scene, Officer Clark stayed with Mrs. Kelley, correct?

A.    Correct.

Q.    And Officer McNamara stayed with Mr. Kelley, correct?

A.    Correct.

Q.    And it was you who went back and forth and talked to both parties, correct?

A.    Well, they both came to me, so we're a little bit away from both parties.  We can confer, kinda tell me what they -- what they had learned, and then we went back to both parties and spoke to them together.

Q.    But you went from one party and then walked back over to the other?  You kept the parties separated the whole time, right?

A.   Yes.

Q.   And you were the one who walked over and talked with Mr. Kelley first, right?

A.   Yes.

Q.   And then you walked over and you spoke with Mrs. Kelley afterwards, right?

A.   Correct.

Q.   And you were the superior officer at the scene, right?

A.   Yes, sir.

Q.   And that's why you were the one -- and so you took control of the scene at that point in time, right?

A.   I do, yes.

Q.   And that's why you're the one who went from one party to the other party, right?

A.   Correct.

Q.   Because ultimately you were the one who made the decision who to place, if anybody, under arrest, right?

A.   Correct.

Q.   Okay.  So you didn't write a report with regard to this incident, right?

A.   I did not.

Q.   You know Officer Clark wrote a report, right?

A.    I do.

Q.    Okay.  And you know Officer McNamara did not write a report, right?

A.    Yes, I'm aware of that.  He did not, yes.

Q.    But it's not necessary that because three officers were on the scene that all three write a report, right?

A.    It's pretty standard that we don't.

Q.    That you don't, right?

A.    Right.

Q.    So basically what you do is one officer will write the report based upon information that is given by all three officers on the scene, right?

A.    Yes.

Q.    And you have an opportunity to take a look at that report, right?

A.    Yes.

Q.    And do you look at it and approve it before it's actually filed?

A.    I do not.

Q.    You do not?

A.    No.

Q.    Do you look at it -- when is the first time that you looked at that report that's filed to a scene

that you're the -- you're the superior officer at?

A.    It varies by incident.

Q.    Okay.  Do you recall in this case when you first saw the report filed in this case?

A.    I do not.

Q.    Okay.  Now given the fact that you were the superior officer and you were the one who took control of the scene at the time, you would, though, at some point look at the report, right?

A.    There is -- not necessarily because there is a watch commander who's in charge -- the inside supervisor is responsible for a report with you.  So I'm the road supervisor, I wouldn't necessarily see it unless I was on the desk.

Q.    Well, you would -- but as the officer who was in charge of the scene, you would certainly want to make sure that what was reported was accurate, right?

A.    I would, yes.

Q.    And if after reviewing the report you saw something in the report that was authored by Officer Clark that was inaccurate, you have the opportunity to file your own report, right?

A.    I would.

Q.    You can file a supplemental report, right?

A.    That's correct.

Q.    And you can file that supplemental report at any time you want, right?

A.    In theory, yes.

Q.    Right.  All the way up to the date of trial, right?

A.    Yes.

Q.    Okay.  At some point in time you saw Officer Clark's report on this case, right?

A.    At some point I did, yes.

Q.    Okay.  You read it, correct?

A.    I did.

Q.    And you never filed a supplemental report, right?

A.    I did not.

Q.    Okay.  So, when you first arrived on the scene, the first person you spoke to was Officer McNamara -- was -- strike that.

The first person you spoke to was Mr. Kelley, right?

A.    Yes.

Q.    And he was with Officer McNamara, right?

A.    Well, I spoke to Officer McNamara first and then we walked back over to Mr. Kelley in a matter of

feet, probably the back of the car or so.  I wouldn't like walk right up on somebody and say, "What's going on?"

Q.   Okay.

A.   I'll ask the officer to come to me, give me -- confer with me a little bit, give me a little head's up as to what's going on and then we'll go back and --

Q.   All right.

A.   -- usually what I do is I'll ask for the story again.

Q.   So that makes sense.  So you said Officer McNamara, he came over, conversed with you, and then, the two of you went and spoke to Mr. Kelley, correct?

A.   Yes, mm-hmm.

Q.   And that was the first party that you spoke to, correct?

A.   Yes.

Q.   Okay.  And when you spoke to Mr. Kelley, Mr. Kelley told you that he was supposed to have parenting time or visitation with his children that weekend, right?

A.   That's correct.

Q.   Okay.  And he also told you that Mrs. Kelley had called him on the telephone and told him that she

was running late because she was down the South Shore, right?

A.    I know they were -- yeah.  Yes, I know that they were supposed to meet up, not necessarily in Braintree originally, but they were running late so they agreed to meet at the K-Mart.

Q.    Okay.  Do you recall whether or not Mr. Kelley said he was running late or Mrs. Kelley was running late?

A.    I do not.

Q.    Okay.  Do you know that Officer Clark's report indicates that Mr. Kelley stated that Mrs. Kelley was running late and that she was in the South Shore?

A.    I'm aware of it.

Q.    Okay.  Now, Officer Clark never spoke with Mrs. Kelley, right?

A.    I do not know.

Q.    Well, you were on scene, right?

A.    I was, but I don't know if he spoke to her or not.

Q.    Okay.  When you arrived on scene, the parties were separated, right?

A.    Yes.

Q.    And Officer McNamara was with Mr. Kelley,

right?

A.    Correct.

Q.    And Officer Clark, who was the author of this report, was with Mrs. Kelley, right?

A.    Yes.

Q.    Okay.  So, at that point someone must've told Officer Clark, he put it in his report, that Mr. Kelley reported that Mrs. Kelley was running late, right?

MS. BROKAW:  Objection.

THE COURT:  Sustained.

Q.    Okay.  Do you recall Mr. Kelley indicating that Mrs. Kelley had gotten out of her car and tried to give him a hockey bag?

A.    I do.

Q.    Okay.  And do you recall Mr. Kelley telling you that he refused to take the hockey bag?

A.    I do.

Q.    And do you recall Mr. Kelley telling you that he refused to take the bag because it was his oldest daughter's bag and that he didn't have her that weekend?

A.    I do.

Q.    And he told you that, right?

A.    He did.

**Q.**    Okay.  And that was his reason for not taking the bag?

**A.**    Yes.

**Q.**    He never told you that he intended to take the bag, right?

**A.**    No.

**Q.**    In fact, he told you the opposite, he wasn't taking the bag, right?

**A.**    Right.

**Q.**    And that's why Mrs. Kelley got out and said, "No, you have to take this bag," right?  And that's what initiated this conflict, right?

**A.**    What he stated to me was that she tried to put the bag in his car, she had been -- she had damaged his car in the past, and he did not want her anywhere near the car.

**Q.**    Okay.

**A.**    So that was really what --

**Q.**    But, again, he wasn't taking the bag, right?

**A.**    That's what he told me.

**Q.**    Because he didn't have his daughter for visitation that weekend?

**A.**    That's what he told me.

**Q.**    Okay.  And he stated that he got in front of

Mrs. Kelley and blocked her from putting the car -- the bag in the car, right?

A.   That's correct.

Q.   And did he tell you where he stood in front of her?

A.   He was in the opening of the driver's door.

Q.   So he was --

A.   The door's open, he's standing facing her.

Q.   So he was standing in the V, right?

A.   Correct.

Q.   Okay.  And he said at that point in time, Mrs. Kelley dropped the bag, right, took the stick and whacked him, right?

A.   No.  She was pushing the bag at him and he was stopping her from doing it.  I don't -- I'm not sure if the bag got dropped and she grabbed the stick at that point, or -- but he said that she was trying to push her way into the car and put the bag in the car and he was just trying to stop her.

Q.   He stated that she grabbed the stick with two hands and hit him, right?

A.   I don't remember what he said with regards to how he was hit.

Q.   Okay.  Did he show you how she hit him with the

stick?  Did he demonstrate that for you?

A.   I don't recall.

Q.   Okay.  Did -- but he told you that he was standing in the V of the car door when she hit him, right?

A.   That's where it initially took place.  Whether they moved forward or back, I don't know.

Q.   Okay.

A.   But that's where it initially stopped it.

Q.   Okay.  And then he also told you that after he got hit with the stick, that he pushed Mrs. Kelley, right?

A.   He pushed her away, yes, he stated.

Q.   Okay.  And put the stick in the back of Mr. Kelley's car?

A.   Yes.

Q.   Did you ask him how it got there?

A.   I did not.

Q.   Did you ask Mr. Kelley where he got hit with the stick?

A.   Yes.

Q.   And he told you he got hit in the legs, right?

A.   The back of the legs.

Q.   Okay.  Did you ask to view the back of his

legs?

A.   I did not.

Q.   You say it was because it was cold out?

A.   Two reasons:  It's cold out, it's February, and the other thing is we, through experience, most of the time bruising and marks do not show up until at least the next day.  So we're not necessarily going to see anything even if he pulled his pant legs up.

Q.   But he could've been cut, right?

A.   He could've been.

Q.   Right?

A.   Mm-hmm.

Q.   But nonetheless you didn't ask to see it, right?

A.   I did not.

Q.   Okay.  Now, there were two children at the scene, correct?

A.   Correct.

Q.   Okay.  And did you talk to either of the children?

A.   I believe one of the officers did.  I think maybe Officer McNamara spoke to one of the -- the oldest child, but I do not know for sure.

Q.   Okay.  But you were the officer in charge of

the scene, right?

**A.** Mm-hmm.

**Q.** And you're the officer who made the decision whether or not to arrest, right?

**A.** Correct.

**Q.** And you didn't talk to either one of the children?

**A.** Myself personally?

**Q.** Yes.

**A.** I don't believe so.

**Q.** Okay. Now, you indicate to -- you testified that Mrs. Kelley told you that she swung the stick and that she hit Mr. Kelley with it, correct?

**A.** Correct.

**Q.** And that she didn't know if she used one hand or two, right?

**A.** Correct.

**Q.** In fact, she told -- isn't it true that, in fact, she told you when she fell to the ground, she swung the stick, correct?

**A.** No.

**Q.** She didn't tell you that?

**A.** I don't remember that, no.

**Q.** And Mrs. Kelley actually told you that

Mr. Kelley had pushed her and assaulted her, correct?

A.   She did.

Q.   Now, you indicated that the reason for placing Ms. Kelley under arrest was because you believed Mrs. Kelley was the aggressor, correct?

A.   That's correct.

Q.   Okay.  And that was based upon the fact, you said, that Mrs. Kelley got out of the car, correct?

A.   That she made her way over to his car to --

Q.   With the hockey bag, correct?

A.   Correct.

Q.   So she got out of the car and she brought the bag over to him, to Mr. Kelley, right?

A.   (No verbal response.)

Q.   And that Mr. Kelley was refusing the bag, right?

A.   Yes.

Q.   Okay.  So that -- the fact that he said that he was refusing the bag and she was pushing it on him, leads you to believe that she was the aggressor?

A.   Well, she was at his car and she was -- she was forcibly pushing the bag.  It was not a situation where she's like "Here, take the bag."

Q.   Right.  A bag that he told you that he didn't

want --

A.   Correct.

Q.   Right?

A.   Yeah.

Q.   Because he didn't have his daughter?

A.   Correct.

Q.   And there's no reason why he would take the bag if he didn't have his daughter, right?

A.   That's what he told me.

Q.   Okay.  And you stated that your decision to effectuate the arrest and arrest Mrs. Kelley had nothing to do with the fact that Mr. Kelley was an off-duty police officer?

A.   It did not.

Q.   You knew he was an off-duty police officer when you got to the scene, though, right?

A.   I was notified on the radio that it was possibly involving an off-duty police officer.

Q.   It was possibly involving?

A.   That's what -- or it was an off-duty -- I can't remember exactly what they said, but it's an off-duty police officer or something to the effect, but that has no bearing as to what actions I'm going to take when I'm there.  I don't have any tolerance for that.

MR. WARD:  No further questions, Judge.

MS. BROKAW:  Nothing further, your Honor.

THE COURT:  Thank you, Sergeant, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Can we release the sergeant?

MR. WARD:  I have no further questions of the sergeant.

THE WITNESS:  Thank you.

MS. BROKAW:  The Commonwealth rests, your Honor.

THE COURT:  Okay.  Can I see you both, please? (Inaudible sidebar conference between the Court, Ms. Brokaw and Mr. Ward.)

THE COURT:  So, ladies and gentlemen, you have now heard all of the testimony that you're going to hear from the Commonwealth.  So the defense is going to start their case, and at the beginning of the case, they're going to play for you two 911 calls that have gone into the Braintree Police Station and a dispatch call which is a call from the Braintree Police Station to the officers that are out on the road.  They then are going to play a surveillance tape from the parking lot area of K-Mart.  The parties have agreed that the

first 12 or 13 minutes of the surveillance taping area is the relevant part of it, but the tape itself is 45 minutes long.  So these are going to be sent back with you to deliberate.  So you can look at the first 13 minutes or you can continue to look at the 45, but for now, we're just going to show you the first 12 or 13 minutes which the parties have agreed to is the relevant time that this incident occurred on the surveillance tape.  Okay.

(The following tape recordings are being played for the jury:  911 call placed by the defendant; 911 called placed by William Kelly and a turret tape.)

        MR. WARD:  Your Honor, if I could admit the 911 tape?

        MS. BROKAW:  There's no objection.

        THE COURT:  Stipulated to this is Defense 2.

        (Two 911 calls and a turret tape were marked

        Defense Exhibit No. 2 and received in

        evidence.)

        MR. WARD:  Your Honor, if I may --

        THE COURT:  Yes.

        MR. WARD:  -- the surveillance.  Your Honor, I'm going to play, if it's okay with the Court, 14 minutes?

THE COURT:  Okay.

MR. WARD:  I don't believe the Court has another device to play it on?

THE COURT:  We don't.

MR. WARD:  I'll do my best.

(Surveillance tape is now being played for the jury.)

THE COURT:  Can everyone see it?

THE JUROR:  Can you tilt the screen up?

THE COURT:  Okay.  Does everyone see it now?

(All Jurors stated in the affirmative.)

THE COURT:  Is that the whole tape?

MR. WARD:  Excuse me?

THE COURT:  Is that just 14 minutes?

MR. WARD:  It was about -- I timed it, it was about 15.

THE COURT:  Okay.  Thank you.

MR. WARD:  Your Honor, move to admit the surveillance video.

MS. BROKAW:  No objection.

THE COURT:  Thank you.  Defense 3.

(Surveillance video was marked Defense Exhibit No. 3 and received in evidence.)

MR. WARD:  Your Honor, at this time, I'd call Karen Kelley.

THE COURT:  You can stand or sit whichever is more comfortable.

### TESTIMONY OF KAREN CALABRESE-KELLEY

### DIRECT EXAMINATION

**BY MR. WARD:**

Q.  Please state your name for the record.

A.  Karen Calabrese-Kelley.

Q.  And, Ms. Kelley, where do you live?

A.  West Roxbury, Mass.  My address or just the town?  43 Bellaire Road, West Roxbury, Mass.

Q.  And who do you live there with?

A.  My four children.

Q.  And you're divorced, is that correct?

A.  Yes.

Q.  And you're divorced to Mr. Kelley, correct?

A.  Yes.

Q.  And that's the same Mr. Kelley who came and testified previously in this case, correct?

A.  Yes.

Q.  Do you know when you were divorced?

A.  It was finalized around December 7th, 2011, I believe.

Q.  So you've been divorced for about five, five-and-a-half years?

**A.**    Yeah, four or five years.

**Q.**    And have your children lived with you since that time?

**A.**    Yes.

**Q.**    Fair to say that your relationship with Mr. Kelley is rocky?

**A.**    Yes.

**Q.**    And fair to say that you both have been back to the Probate and Family Court numerous times?

**A.**    Yes.

**Q.**    Turning your attention to February of 2014, specifically February 20th of 2014, do you recall where you were?

**A.**    I was at court that day.

**Q.**    And can you specify which court you were at?

**A.**    The Boston Suffolk County Probate and Family Court.

**Q.**    Just to be clear that's February 20th of 2014, the day before this alleged incident, correct?

**A.**    Yes.

**Q.**    Okay.  And can you tell the jury why you were in Probate and Family Court on February 29th, the day before this incident?

**A.**    There was a modification going on on my divorce

agreement.  I was trying to modify something on my divorce agreement.

Q.    Okay.  And what do you recall happened on February 20th, 2014 at that court?

A.    They scheduled it as being uncontested and it was clearly contested, and so, we had to schedule another date and it was not -- Mr. Kelley was very angry.  It was annoying for the both of us.

Q.    Okay.  And the next day was February 21st, correct?

A.    Yes.

Q.    In the year 2014, correct?

A.    Yes.

Q.    And do you recall what day of the week that was?

A.    It was a Friday.

Q.    Okay.  And what, if any -- what, if anything, was the schedule between the children and Mr. Kelley that day?

A.    It was the end of school vacation and he was supposed to get them at six o'clock as he normally would on his --

Q.    When you say "he," you mean Mr. Kelley, correct?

**A.**   Yes, Mr. Kelley.

**Q.**   So just to be clear, Mr. Kelley was supposed to have visitation with the children at six o'clock that Friday evening, correct?

**A.**   To six o'clock on that Sunday, yes.

**Q.**   So it was a weekend visit, correct?

**A.**   Yes.

**Q.**   And was he supposed to have two of the kids or was he supposed to have all of the children?

**A.**   All four children.

**Q.**   Okay.  And do you know where he was supposed to pick those children up?

**A.**   Initially at 43 Bellaire Road, West Roxbury, Mass., my home.

**Q.**   Okay.  Do you recall whether or not there was a court order in place at that time specifying where Mr. Kelley was to pick those children up?

**A.**   Yes.  He's supposed to pick them up and he's supposed to give two hours' notice if he's not going to get them.

**Q.**   Okay.  And where was he supposed to pick them up?

**A.**   West -- 43 Bellaire Road -- my home at 43 Bellaire Road.

Q.   And you heard Mr. Kelley's prior testimony that it was curbside, correct?

A.   Yes.

Q.   And you would agree with that, right?

A.   Yes.

Q.   Okay.  Now, you just said something about two hours' notice.  Can you explain what you mean by "two hours' notice" to the jury?

A.   Mr. Kelley -- one of the many times we're in court was for violations of the divorce agreement.  And Mr. Kelley was habitually late, and I used to have a part-time job where I'd work nights and I had to leave it because of that.  So the court ordered him to give a two-hour notice if he was going to be late from (inaudible @ 12:44:27-away from microphone).

Q.   Okay.  On the evening of February 21st, 2014, do you recall if Mr. Kelley was on time?

A.   No, he was not.

Q.   Okay.  And as a result of that, did you have any communication with Mr. Kelley?

A.   My daughter had called him at six o'clock to ask if he could drive her friend back from her activity, and that was the time that we found out that he was going to be late.  And we waited till about

6:40, and then I had to leave because my kids were getting all upset that they were going to miss their party and their other activity.  And at that point or maybe a few texts prior to that --

MS. BROKAW:  Objection.

THE COURT:  Sustained.

Q.  Okay.

A.  -- texting --

THE COURT:  Hold on a second.

THE WITNESS:  I'm sorry.

Q.  There's no question.

MR. WARD:  Your Honor, if I could have Exhibit 1 the text messages?

Thank you.

Q.  Mrs. Kelley, I'm going to show you a document that's been marked as Exhibit 1 in this case.  Please take a look at it and look up at me when you're done.

A.  You want me to look at all this?

Q.  Just flip through the exhibit.

A.  Okay.

Q.  Look up at me when you're done.

Do you recognize those documents?

A.  Yes.

Q.  And do you, in fact, recognize them to be a

documentation of the text correspondence that you had with Mr. Kelley?

A.    Yes.

Q.    Do you know who produced this text correspondence?

A.    I did.

Q.    Okay.  Now, previously you heard the Commonwealth had described you as being upset and irate at the time you were at -- you arrived in Braintree at the K-Mart, correct?

A.    Yes, I heard that.

Q.    And Mr. Kelley read the first text verbatim to the jury in which it indicates that you texted "Totally unacceptable" and it goes on, correct?

A.    Yes.

Q.    Okay.  I'm going to ask you to turn to the -- it's one, two, three, fourth page in, but it actually has a "2" on it.  Do you see that?

A.    Yes.

Q.    Okay.  And there's a text, it's in white, can you take a look at that text?

A.    Okay.

Q.    And that text says "There is no reason Jill could not watch them for less than an hour.  I am not

playing games with you.  They better be at the house by 7:00," right?

A.   Yes.

Q.   Did you send that text or did Mr. Kelley send that text to you?

A.   Mr. Kelley sent that text to me.

Q.   And then right below it, there's the same exact text, right?

A.   Yes.

Q.   Ending in "They better be at the house at seven," right?

A.   Yes.

Q.   Now did you send that or did Mr. Kelley send that?

A.   No, Mr. Kelley sent that.

Q.   Let me ask you to turn to Page 3, and there's a text that's dark colored -- what's marked as Page 3, it's, I believe the fifth page in.  And the first line of it says "Huh, you are kidding, right?"

Did you send that text or did Mr. Kelley send that text?

A.   I sent that text.

Q.   Okay.  So you responded "Huh, you're kidding," that was your response, right?

A.   "You're kidding, right, ha-ha."

Q.   And it goes on, right?

A.   Yes.

Q.   Now, could you turn to Page 4 -- what's marked as Page 4.  There's a text in white.

Do you see that text at the top?

A.   Yes.

Q.   And it says "I'm here.  They are not here by 7:30 -- if they are not here by 7:30, you can drop them off at my house."

Do you see that?

A.   Yes.

Q.   Did you send that or did Mr. Kelley send that?

A.   Mr. Kelley sent that.

Q.   And then right below it, there's a dark text that says "Ha-ha-ha.  Did you send that or did Mr. Kelley send that?

A.   I sent that.

Q.   Okay.  Now, below there's a series of texts in white again.  Do you see those?

A.   Yes.

Q.   Okay.  And it says "I'm not playing games with you.  I didn't have two hours' notice, the reason is irrelevant as you would accept no excuses.  The fact is

the court uses a reasonable or standard" -- it goes on to Page 5, where it says "You're reaction to me is being less than an hour late is nowhere near reasonable," and it goes on.  Did you send that text?

A.   No, I did not.

Q.   Did Mr. Kelley the send that text?

A.   Yes, he did.

Q.   And he sent it to you?

A.   (No verbal response.)

Q.   At the bottom of Page -- what's marked as Page 5, the text in white, it says "I am too sick right now to play your games and will not" and it goes on to Page 6 -- "You're driving in our rearview like -- like I did last time," right?  It's in white?

A.   Yes.

Q.   Did you send that text or did Mr. Kelley send that text?

A.   Mr. Kelley sent that text.

MS. BROKAW:  Your Honor, I'd stipulate that everything in white is Mr. Kelley and everything in the dark is the defendant's correspondence.  They all speak for themselves at this point.

Q.   During this text correspondence, did Mr. Kelley threaten to take you back to court?

A.    Yes.

Q.    During that text correspondence, did Mr. Kelley indicate to you that he was sick of your bullshit?

A.    Yes.

Q.    Now, how long do you -- do you recall the text correspondence you had with Mr. Kelley?

A.    I recall it, yes.

Q.    And do you recall how long the texting between you and Mr. Kelley went on?

A.    Approximately an hour and a half, an hour-and-a-half possibly.

Q.    And at some point in time, during that text correspondence, it was decided that you would meet at K-Mart, correct?

A.    Yes.

Q.    And at first Mr. Kelley objected to it, right?

A.    Yes.

Q.    But you insisted, right?

A.    Yes.

Q.    Okay.  You had indicated previously that there was a reason why you left the house, right, at around 6:00, 6:30, right?

A.    Actually 6:45.

Q.    6:45.  Tell the jury why you left the house at

6:45.

A.   Because my older three children had to be at activities.  My son had to be at a birthday party, and my daughter was meeting her friends at Free Skate.

Q.   Okay.  Now -- and that's the reason why you left the house, right?

A.   They were getting nervous and upset, yes, that they could be late.

Q.   Okay.  Now prior to this text correspondence, did you send any emails to Mr. Kelley?

A.   Early in that day I sent -- I almost always send an email when they're going the weekend with their schedules or what their activities are.

MR. WARD:  Your Honor, if I may see Exhibit 3?

It's Defense Exhibit 1.

Q.   I'm going to show you two emails which are marked as Defense Exhibit 1, and ask you to take a look at those and let me know when you're done.

Do you recognize those two documents?

A.   Yes, I do.

Q.   What do you recognize them to be?

A.   They're two emails that I sent Mr. Kelley with the kids -- their schedules for the weekend, their activities that they had.

Q.   Okay.  And, in fact, you had sent them -- does the email indicate the time you had sent them?

A.   At 3:31 and at 5:45.

Q.   Again, Mr. Kelley was supposed to pick the kids up at 6:00, right?

A.   Yes.

Q.   Okay.  And if I could ask you to take a look at the email of approximately 5:45, please explain to the jury the purpose of your sending that email.

A.   I wanted him to know that my daughter, ███████ , had hockey that next morning at 8:45, and that to please make sure she gets there on time and that he brings her, and please confirm that you received it and just basically telling him that she has hockey the next morning.

Q.   Okay.  And as a result of that, did you bring ████████ hockey bag with you?

A.   Yes, I did.

Q.   So the hockey bag that we're talking about belonged to ██████ , correct?

A.   Yes, it did.

Q.   How old was ██████ at the time?

A.   15.

Q.   And when you met Mr. Kelley at the K-Mart

parking lot, you had that hockey bag with you?

A.   I did.

Q.   Okay.  Now, when you got to the K-Mart parking lot, who arrived first?  Did you arrive first or did Mr. Kelley arrive first?

A.   I arrived first.

Q.   And what, if anything, did you do when you arrived at the K-Mart parking lot?

A.   We sat in the car and waited for Mr. Kelley to arrive.

Q.   Okay.  Did you do anything with the hockey bag?

A.   No.

Q.   At any point did you take the hockey bag out of your car?

A.   When he got there and pulled across from us, I got the girls out and the hockey bag out, and I put it on the ground and we stood and waited for him to get out of his car, and he didn't, and the girl -- it was cold and the girls started to whine, so we got back in the car, but I left the bag outside the car.

Q.   Okay.  So it's safe to say that you arrived at K-Mart before Mr. Kelley?

A.   Yes.

Q.   Okay.  And you didn't take the bag out and

leave it outside until he arrived, correct?

A.   Yes.

Q.   Okay.  And it was only when he pulled in that you took the bag out and you put it outside, correct?

A.   Yes.

Q.   Now was there a hockey stick with the bag?

A.   Yes.

Q.   Okay.  And when Mr. Kelley arrived, did he arrive right next to you or where, if anywhere, did he park?

A.   He parked like diagonally across in a couple of spaces, but like cars can drive through between where he was and where I was.

Q.   So he was in a separate aisle?

A.   Yes.

Q.   Is that fair to say?

A.   Yes.

Q.   Okay.  And at that point you didn't send the children over to him, correct?

A.   He just sat in his car and didn't get out.

Q.   Okay.  Now, when you do an exchange of the children, we've already established through Mr. Kelley's testimony and your testimony that the pickups in West Roxbury are curbside, is that correct?

**A.** Correct.

**Q.** Now, when you do a normal pickup, would you walk the children to the car, or would you just open the first door and let them go to the car?

**A.** I just opened the door. It's not very far.

**Q.** Okay. And is there any particular reason why you would open the door and have the kids walk to the car, or Mr. Kelley would not come to the door and pick the kids up?

**A.** I don't understand what you mean.

**Q.** Well, why would you open the door and let the kids walk out and why would Mr. Kelley not come to the door and knock on the door and get him?

**A.** 'Cuz they're just walking up my walkway to the sidewalk.

**Q.** And, again, it's safe to say that you two have a very rocky and volatile relationship?

**A.** Yes.

**Q.** So, when Mr. Kelley pulled across in a sperate row of parking spaces, is there any reason why you just didn't open the door and tell the kids to go see Mr. Kelley?

**A.** We were standing outside. I was standing with them, waiting for him to stand outside his car so I

could send them over, but he didn't get out.  And I didn't want to just send them across the parking lot by themselves.

Q.   And, again, at that time you had taken the hockey bag out, right?

A.   Yes.

Q.   So, what, if anything, did Mr. Kelley then do in his car?

A.   He just sat there, and then my daughters were -- started to complain they were cold, so we got back in the car and I had started to text him to move forward, and he moved forward at that point.

Q.   Okay.  And when he moved forward, what, if anything, did you do?

A.   He pulled down a few spaces and that time he got out of the car, and then I got out on the far side, and I let the girls out, and I walked to the back of the car and I sent them over 'cuz he was out of the car at that point and they were just walking across parking spaces at that point.

Q.   Okay.  So they weren't walking across the --

A.   No.

Q.   -- area of traffic, correct?

A.   Yes.

Q.   Okay.  And the kids walked to Mr. Kelley?

A.   Yes.

Q.   Okay.  And what, if anything, happened that you observed happened next?

A.   I got back in my car.  He was trying to put them in the car, I think.  I got back in my car and I could hear this huge commotion, and I -- mainly my daughter ███████  And as Mr. Kelley said, she has anxiety, but she also is -- has -- she's autistic as well, and she was very, very upset at --

Q.   Let's take this in pieces.

A.   Okay.

Q.   You're in your car and you hear a commotion and you notice that it's your daughter ███████ correct?

A.   Yes.

Q.   Okay.  And at some point did you come to an understanding as to what that commotion was?

A.   I rolled down my passenger window and I said, "What's wrong?"

She was -- "The bag, the computer.  My computer.  I left the computer in the bag."

Q.   Okay.  So at that point what, if anything, did Mr. Kelley do?

A.   He was trying to like push her into the car so

she'd get in.  And I could not leave with her being that upset.  So I just got out of the car.  I walked around.  I picked up the bag.  There was a bookbag there as well with the computer in it.  I just picked up -- first picked up the hockey bag and I picked up the stick, and I did not try to give it to him, I did not speak to him.  I started to walk around...

Q.   Now, let's take this in pieces.

A.   Okay.

Q.   So you got out of your car and you walked around and you picked up the hockey bag, right?

A.   Yes.

Q.   Okay.  And you claim that there was no conversation between you or Mr. Kelley, right?

A.   None.

Q.   Okay.  And Mr. Kelley didn't say anything to you about not taking the bag, right?

A.   I did not hear if he did.

Q.   Okay.  But you just picked it up and started to bring it around to his car, right?

A.   I didn't bring it anywhere near him.  I wanted to bring it around to the other side.

Q.   To his car?

A.   Yes, to his car.

Q.   Okay.  Now, you had previously testified that you had parked here in a location, and Mr. Kelley had parked several spaces away, right?

A.   Yes.

Q.   And when you took the hockey bag out, was the hockey bag closer to your car or was it closer to Mr. Kelley's car?

A.   Initially?

Q.   Initially.

A.   It was closer to my car because he was across the way.

Q.   Okay.  So then you hear your daughter ▮ saying something at that point about the computer, right?

A.   Yeah.  I got that much between the screams, yes.

Q.   And you then took the bag from what was right next to your car over to Mr. Kelley's car?

A.   I didn't want to have any confrontation with him, so that's why I went around --

MS. BROKAW:  Objection.

THE COURT:  Sustained.

Just answer "yes" or "no," please.

Q.   Okay.  So the question was:  You then take the

bag from what's right next to your car and bring it over to where Mr. Kelley's car is, 'cuz he's a couple spaces away, right?

A.    Next to his car.

Q.    Again, your daughter ███ is upset because of the computer that's in one of the bags, right?

A.    Yes.

Q.    Please tell the jury what, if anything, happened as you're carrying that bag.

A.    I carried the bag and I wanted no contact with him to --

Q.    Ma'am, if you could just focus and tell us what you did when you carried the bag.

A.    I carried the bag and I walked around the back of his car.  He was facing this way, I was facing that way.  I went around the back of his car, and as I rounded probably --

Q.    Okay.  Let's -- so you carried the bag around his car.  When you say "you carried it around his car," did you carry it around the front of his car or did you carry it around the back of his car?

A.    The back of his car.

Q.    Okay.  What, if anything, happened as you carried the bag around the back of his car?

**A.**   As I was rounding the driver's rear side, out of the corner of my eye, I could see him -- someone or him coming at me, and I had turned, half turned, and he said, "Get the" -- can I say the word?

**Q.**   You can say it.

**A.**   "Get the fuck away from my car."  And then he --

**Q.**   Okay.  We'll take it in pieces.  So you're walking, you go around the back of the car, you have the bag in one or two hands?  Tell the jury.

**A.**   I believe it was one hand and the stick, I had them both.

**Q.**   Okay.  And you hear "Get the fuck away from my car," right?

**A.**   Out the corner of my eye, yeah, I turned -- half turned as I heard it.

**Q.**   But the question --

**A.**   Yes, I heard that, yes.

**Q.**   -- is:  You heard that?

**A.**   Yes.

**Q.**   Okay.  And at that point, tell the jury where you are.

**A.**   Probably like just rounding, like out a ways, a little ways out from the car just rounding the back of

it, his driver's side rear part of the car.

Q. Okay. So if I said, "The rear taillight," is that accurate, or would it be further up towards the front of the car?

A. Right around the taillight. Right around the taillight.

Q. Okay. And as you're in that area and you hear this "Get the fuck away from my car," what, if anything happens next?

A. As I said, I half turned, and he pushed me. And as he pushed me, he then went past me, and when he pushed me, he pushed me down to the ground.

Q. Okay. Now, when you say he pushed you down to the ground, did you fall forwards or did you fall backwards?

A. I fell forward down and right directly on my left knee.

Q. Okay. And as that happened, do you know where Mr. Kelley was?

A. Out the corner of my eye, he kept going past me.

Q. So he ended up in front of you as he pushed by you?

A. Somehow, yeah, he went between me and the car.

Q.   And what, if anything, happened to you when that happened?  Explain it to the jury.

A.   When I fell, I fell straight down and I had the bag and -- I don't know if the bag was on the ground at that point, but I had -- this is what I told the police -- the stick, when I fell, it went out and I don't know if I was able to put my hand on it 'cuz I came straight down on my kneecap, and the stick went forward, and if it hit Mr. Kelley as he went by, I don't know.

Q.   Okay.

A.   That's the only explanation.

Q.   Now you heard Officer Bata testify that you told him that you swung the stick at Mr. Kelley, correct?

A.   I heard that, yes.

Q.   Okay.  Do you recall what you told Officer Bata?

A.   All I told the police was that when I fell, the stick went out towards -- just went out.  I don't know if it went towards him or whatever.  I don't know if it was one hand or two.  And I like almost -- I think I showed them even how when I fell, how it went, and that's all I told them.

Q.   Okay.  Now, do you know whether or not the

stick hit Mr. Kelley?

A.   I don't.

Q.   Okay.  Now, after you fell, as you say you fell forward, like that, what, if anything, did you do next?

A.   I tossed the stick and I ran around the front of the car -- I ran, I think, around the front of the car and I yelled that I was going to call the police, and I ran back to my car.

Q.   And you did call the police, correct?

A.   I did.

Q.   Did you -- how did you do that?  Did you dial 911 or did you --

A.   I dialed 911.

Q.   Okay.  Now you heard that 911 recording, correct?

A.   Yes.

Q.   Was that you on that recording?

A.   Yes, it was.

Q.   Now, at any time did you intend to hit Mr. Kelley with that hockey stick?

A.   No.

MR. WARD:  That's all I have, Judge.

THE COURT:  Thank you.

Counsel?

Case 1:17-cv-10876-LTS   Document 26-6   Filed 09/17/18   Page 58 of 138

MS. BROKAW:  Thank you, your Honor.

Your Honor, may I approach with Commonwealth's Exhibit 1?  Oh, that's right here.

THE COURT:  Yes.

### CROSS-EXAMINATION

**BY MS. BROKAW:**

Q.   Now, Ms. Kelley, you testified that Mr. Kelley was habitually late to your house when you expected him at 6:00 p.m. for these curbside pickups, isn't that right?

A.   That the court agreed to, yes.

Q.   So it's pretty commonplace for him to be late on a Friday evening?

A.   After the court agreement, he had been pretty good about coming at that time.

Q.   Is it safe to say that was a frustrating situation given that the kids have activities on Friday night, isn't that right?

A.   They were upset, yes.

Q.   But I'm asking:  You were upset with that, too, is that right?

A.   I was more -- more upset because they were annoyed because the kids were getting upset.

Q.   And you testified that you sent William an

*www.reportersinc.com*

email specifically describing the activities of your older children that Friday evening on the 21st, is that right?

A.    I actually sent an email -- two emails describing all of my children's activities for the whole weekend.

Q.    Okay.  But those included those Friday activities, right?

A.    No.

Q.    It had nothing to do with Friday activities?

A.    The kids had already told him earlier that they had activities.  I don't believe --

Q.    But you testified that they did have activities that Friday night?

A.    Yes, they did.  The older two had activities Friday night.

Q.    Okay.  And it's safe to say that given the fact that at some point you learned William was late, they were going to miss some of those activities or at least it would be inconvenient to get them there, isn't that right?

A.    Repeat that?  I'm sorry?

Q.    Based on the fact that William was going to be late to pick them up, there would be some inconvenience

in those evening activities, isn't that right, getting them there?

    **A.**   I basically take them to everything.  This would be no different.

    **Q.**   That's not the question, Ms. Kelley.

        Based on the fact that he was late, did that inconvenience them at all in getting to their activities or you helping them get to those activities that night?

    **A.**   I kinda don't understand.  I didn't -- I drove them so it wasn't an inconvenience for them.  Was it an inconvenience for me, is that what you're asking?

    **Q.**   Yes.

    **A.**   It's par for the course.  I drive -- yes, yes.

    **Q.**   Were you upset that night?

    **A.**   No, I wasn't.

    **Q.**   You weren't upset that night?

    **A.**   I was more upset that the kids were getting upset.

    **Q.**   You weren't upset that night, yes or no?

    **A.**   I was annoyed.

        MS. BROKAW:  May I approach, your Honor?

        THE COURT:  Yes.

    **Q.**   I want you to take a look at the dark bubbles.

Those are from you, Ms. Kelley, isn't that right?

A.    Yes.

Q.    And the second one down you're telling him he's an embarrassment, isn't that right?

A.    Yes.

Q.    And that's shortly before --

MR. WARD:  Can you just let me know --

MS. BROKAW:  I'm sorry.  It's labeled "PH9" at the top.

MR. WARD:  Okay.  Thank you.

Q.    And that's shortly before the two of you saw each other in Braintree in the parking lot, isn't that right?

A.    No, I don't think -- I think this was towards the beginning.  I'm not sure where this was.

Q.    Well, it's safe to say all these text messages were from this afternoon prior to you two meeting up in Braintree, isn't that right?

A.    They were from after 6:00, yes.

Q.    Okay.  And when you're telling the defendant that he's an -- Mr. Kelley that he's an embarrassment, at that point you already knew he was going to be late, isn't that right?

A.    Yes.

**Q.**   Now, you testified that you arrived first in the K-Mart parking lot, isn't that right?

**A.**   Yes.

**Q.**   So on top of Mr. Kelley being late, you're in a position where you're getting to the parking lot before him, isn't that right?

**A.**   Yes.

**Q.**   And you were upset by that, isn't that right?

**A.**   No.

**Q.**   You weren't upset by that?

**A.**   That I got there early?

**Q.**   That you were the first one there and that you're waiting for someone who is already late by almost two hours and, you know, over 15 minutes to pick up the children, you weren't upset by that?

**A.**   No, I was not.  I got there maybe ten minutes before him.

**Q.**   So you would describe yourself as calm when Mr. Kelley arrived, isn't that right?

**A.**   Yes.  I was relieved.

**Q.**   And when you saw his car pulling up, you were calm, is that right?

**A.**   Yes.

**Q.**   Now, at some point you asked Mr. Kelley to get

closer because you were frustrated that he was far away, isn't that right?

A.   No, that's not why I asked him to get closer.

Q.   So you calmly asked him to get closer, is that right?

A.   I had started to text him to move closer, but he moved before I could finish sending the text as I hit "send."

Q.   And you complied with that request?

A.   He had already started to move before I even hit "send."

Q.   Okay.  And then at some point he gets closer, and the decision is made that that's where the exchange of the kids is going to take place, they're going to get out of the car.   █████ gets out of the car.  The hockey bag's out of the car and the exchange is about to take place, isn't that right?

A.   The hockey bag had been out because we got back in.  I had gotten them out and I was sending them over, yes.

Q.   And at that point you hadn't seen Mr. Kelley touch the hockey bag, isn't that right?

A.   No.

Q.   And you wanted him to take the hockey bag,

right?

    **A.**   It made sense.

    **Q.**   So at some point you described your daughter ██████ getting upset presumably because there was a computer in the car, is that right?

    **A.**   No.

    **Q.**   In the back?

    **A.**   Yeah, in the back, yes.

    **Q.**   For whatever reason she seems to be upset, right?

    **A.**   I was getting ready to leave, yes.

    **Q.**   Okay.  So you made the decision to get out of the car and get closer to the -- to Mr. Kelley's car, isn't that right?

    **A.**   I got out of the car to bring the bag over to the other side of the car so ██████ would calm down.

    **Q.**   And you were upset when you got out of your car to get a bag that you thought he should be putting in the car himself, right?

    **A.**   It was common sense.  I wasn't upset, I just wanted ██████ to calm down.

    **Q.**   Well, fair to say, you were frustrated by that, right?  You're sitting in the car, he hasn't done anything to get that bag, so you're getting out of the

car to get a hockey bag that he should be putting in his own car, right?

A.    I wasn't thinking of Mr. Kelley, I was thinking of my daughter ████.

Q.    You weren't thinking of Mr. Kelley at all, is that your testimony?

A.    Not at all.

Q.    Okay.  So you get out of the car, you pick up the hockey bag and you get closer to Mr. Kelley's car, right?

A.    Towards the back part of it, yes.

Q.    Okay.  When you first pick up that hockey bag, are you in a position to make eye contact with him?

A.    Nope.  I didn't look.

Q.    Okay.  And you testified that you picked up the bag and walked around his car, right?

A.    Around the back.

Q.    Now, is the trunk of the car open or closed?

A.    I think it was closed.

Q.    So, it's safe to say you walked past the area where a hockey bag would probably be loaded into a car, right?

A.    I wasn't thinking of where he was going to put the bag.

Q.   Okay.  So you're just thinking that it was a good idea to pick up the bag and walk closer around to the driver's side area where you presumed him to be, right?

A.   Well, he was right where he was putting the kids in the car on the passenger side.  That's why I went around to the other side 'cuz I didn't want to have any contact with him, and I figured his door -- I went around, his door was open, I could see it.  I figured if I got there, I'd just put it down, I'd leave and my daughter would relax 'cuz she knew he would have to take the bag before they could leave.

Q.   Okay.  So your testimony is that you calmly took the bag, you weren't upset with him, you walked over closer to where he was standing, but you didn't want to make any contact with him, is that right?

A.   I did not walk closer to where he was standing.  I calmly did pick up the bag and I walked around the back of the car.

Q.   So you walked farther away from him where he was standing, is that your testimony?

A.   He was parallel to me, my car.  The bag was there.  I went diagonally around.  I went nowhere near him.

Q.   Nowhere near him at any point, is that your testimony?

A.   As far as I -- if the distance makes me look like -- I went -- my goal was to go to the back of the car.

Q.   Okay.  And you testified at this point, you had both the hockey bag and your daughter ████████ hockey stick, is that right?

A.   I did.  I had the bag and the stick.

Q.   And do you recall what shoulder you had that bag on over?

A.   I think I had the bag -- I don't think it was over her shoulder, I think I was carrying it in my left hand, I believe, and I think I just picked them up and walked like that.  So the stick would be in my right, I guess, and the bag or maybe both in both hands.  I don't recall.

Q.   So your testimony is that you were holding the bag with your left hand and the stick was in your right hand, is that right?

MR. WARD:  Objection, your Honor.  I believe the testimony was "I don't recall."

THE COURT:  Rephrase.

Q.   What hand were you holding the bag with,

Ms. Kelley?

A.    Definitely my left hand.  It could've been two.

Q.    And if it could've been two, how would you have been holding the hockey stick?

A.    When I carried it initially when I picked it up, I know it was in my left hand.  I'm not sure if at one point it was a little heavier, I might've grabbed two and had the stick and them both this way.  It was in my left hand, the stick was in my right.  And I don't know if at some point they kinda went together, I'm not sure.

Q.    So where was the hockey bag, the weight of the hockey bag, where would you describe that in relationship to your body?  Were you carrying it sort've in front of your legs or to the right or to the left side of your body?

A.    I don't know.  More probably it would've been towards the left side, I'm not sure.

Q.    Okay.  And you testified you got closer to the defendant -- to Mr. Kelley.  He says "Get the fuck away from me."

A.    I did not get closer to him.  He came running at me.

Q.    He came charging at you, that's your testimony?

A.    That is my testimony.

Q.    Okay.  He comes charging at you and he says "Get the fuck away from me," is that your testimony?

A.    "Get the fuck away from my car."

Q.    "Get the fuck away from my car."

And he pushes you?

A.    He pushed me, yes.

Q.    Okay.  And he pushes you, but you fall forward on your left knee, is that your testimony?

A.    Mm-hmm.

Q.    And your testimony is that the bag is right in front of your left knee, is that your testimony?

A.    The bag's in front of me.  I fell to the ground.  I don't know how, but I hit the ground.

Q.    Okay.  But, Ms. Kelley, you testified that you were carrying the bag and it was on your left side, the weight of the bag?

Ms. Kelley, how much would you estimate a hockey bag to weigh?

A.    I think we established this yesterday, 15, 20 pounds.

Q.    Well, I didn't ask you that.

Okay.  So you agree that it's 15 or --

A.    I'm not quite sure.  It was heavy.  It was

fairly heavy.

Q.   Safe to say that you carry a hockey bag, you usually hold the weight of the hockey bag on some area of your body, is that right?

A.   I suppose.  I don't carry a hockey bag very often.

Q.   Well, describe to the best -- you don't carry a hockey bag very often?

A.   No, I don't.

Q.   Okay.  To the best of your memory, you testified that you were carrying it towards the left of your body, isn't that right?

A.   All I can tell you is it was like in my left hand.  I don't know if I had to use my right hand to hold it.  I know I had the hockey stick in my right hand for sure and the bag was in my left hand for sure. I don't know if at some point I needed two hands to carry it or not.  That's all I can tell you.

Q.   Okay.  I'm not asking you about your hands, though.  I'm asking you about where the bag was in relation to your legs, to the best of your memory.  Was it right in front of your legs, was it to the right of your legs, to the left of your legs?

A.   I don't recall.

Q.   Okay.  Your testimony is that the defendant --
Mr. Kelley comes towards you, he says "Get the fuck
away from my car," you fall and you hit your left knee,
is that right?

A.   That's correct.

Q.   Okay.  And where's the stick at this point?

A.   In my right hand.

Q.   Okay.  And you only hit your left knee, that's
the only thing that makes contact?

A.   I fell straight down on my left knee and my
right leg was, I believe, still almost up.

Q.   And you didn't fall on the bag, is that right?

A.   No, I did not.

Q.   And you only hit your left knee, that's the
only thing that made contact?

A.   I fell straight down on my left knee, and my
right leg, I believe, still almost up.

Q.   And you didn't fall on the bag, is that right?

A.   No, I did not.

Q.   Where was the bag at this point?

A.   I don't know, but it wasn't under my knee.

Q.   You have no recollection where the bag is?

A.   Somewhere in front of me on the ground or to
the left.  I --

Q.   Okay.

A.   -- didn't stop to think or look where it was.

Q.   Okay.  So you hit only your left knee and you scraped your knee, is that right?

A.   I cut my knee, yes.

Q.   Okay.  Okay.  And so you're down.  And how are you touching the stick, if you're touching the stick at all at that point?

A.   The stick was in my hand.  Mr. Kelley pushed me.  I went down.  And when I went down, I went forward, straight down on my left knee.  I'm assuming my right leg was still up, went forward and I went forward.  The stick was out and it went forward.

Mr. Kelley, as he pushed me, went by me.  So he would've -- the stick would've went along with him.

Q.   So when he went by you, is he facing you or was he standing away from you?  Was he facing you or was he turning --

A.   I half turned when I saw him coming.  He hit into -- pushed me to the ground and then he pushed passed -- as I was on the ground, he went between me and the car and kept going.  I went forward, so his back would've been to me.

Q.   So he pushed you, but you fell forward, is that

your testimony, he pushed you and you fell this way?

A.    Pushed me on my shoulder and I fell to my left and the stick went forward when I went forward.

Q.    He pushed you on your shoulder, is that your testimony?

A.    I said I half turned 'cuz I heard -- I saw out from the corner of my eye that he was coming and he screamed -- as I half turned, he screamed "Get the fuck away from my car," and as he was pretty much almost saying that, that's when he pushed me.  I went forward, the stick was in my hand, he kept going past as I was going down, and the stick went with me forward.

Q.    So he's pushing you on your right shoulder, is that right?

A.    Well, he pushed me, yes.

Q.    And the hockey bag's in front of you, yet, you fall forward, is that your testimony?

A.    I don't know where the hockey bag was, but it was probably under my feet.

Q.    So you didn't touch the hockey bag when you fell?

A.    I did not touch the hockey bag after that point.  The hockey bag remained on the ground.  I don't know what happened to the hockey bag.

Q.    And you testified that when you fell, the stick came up, is that right?

A.    It went forward.

Q.    It went forward.

A.    When I went forward.

Q.    Okay.  And as it went forward, do you recall how you were holding the stick?

A.    That's what I told the police.  I don't know if it was one hand or two.

Q.    Okay.  But you didn't swing it --

A.    I never swing it.

Q.    -- at Mr. Kelley, did you?

Did you tell the police that you hit Mr. Kelley with the stick?

A.    All I told the police was that when I went forward, the stick swing forward when I went forward. I don't know if it was one hand or two.  I did not swing it at him.  I did not hit him and I never stated I hit him.

Q.    You never stated you hit him with the stick, is that right?

A.    I never stated I hit Mr. Kelley with the stick.

Q.    Ms. Kelley, do you recall talking to Officer McNamara and Sergeant Bata on scene that night?

**A.**    Yes, I did.

**Q.**    You saw Sergeant Bata in the courtroom earlier today, is that right?

**A.**    Yes, I did.

**Q.**    So your testimony is that you never told him that you swung the stick and hit Mr. Kelley, is that right?

**A.**    I'm telling you that I never -- I never --

**Q.**    It's a yes or no.  You're telling me that you never told Sergeant Bata that you swung the stick and you hit Mr. Kelley, is that your testimony?

**A.**    I never said that, not intentionally.  If I did -- if it went --

**Q.**    It's a yes or --

**A.**    No, the answer's no.

**Q.**    Okay.  Now, you fall forward after being pushed, okay, you hit one knee, nothing hits the hockey bag, your hand comes up, the stick swings.  You had no idea whether you made contact with anything, is that right?

**A.**    I don't know.

**Q.**    So you're still holding onto the stick, but your testimony today is that you have no idea whether the stick made contact with anything?

A.   I was falling.  I was concentrating on trying to like not fall on my face.  The stick was still in my hand.  It was a reflex.  When it went forward, as I went forward, I don't know if it hit Mr. Kelley.

Q.   And your reflex, you testified that your reflex was to go forward with the stick, not to drop the stick and attempt to brace your fall, is that right?

A.   That's why I said I don't know if it was in one hand or two.  It was still in my hand.  It happened so quickly, my knee, I went directly down on my knee and then I don't -- and then the stick went forward and at some point I probably went all the way over, but my right leg was still up a ways so it stopped me from falling on my face.

Q.   And you only made contact with concrete, is that your testimony?

A.   My knee only hit the ground.

Q.   Okay.  Now, you fall, this all happens, you testified that you got up and run away, is that right, to your car?

A.   I dropped the stick and tossed the stick and I ran, yes.

Q.   And did you say anything to Mr. Kelley when you were walking away?

**A.**    When I ran, I -- as I got far enough away, I yelled that I was calling the police.

**Q.**    And you did call the police, isn't that right?

**A.**    Yes, I did.

**Q.**    And the police arrived on scene, is that right?

**A.**    Yes.

**Q.**    And you told the police that nothing was going to happen because Mr. Kelley's a Boston Police detective, is that right?

**A.**    Yes.

**Q.**    And you were very, very upset, and you thought it was unfair because he was a police detective, is that right?

**A.**    At that point I wasn't upset that he was a police detective.  I was upset on the call, I was upset that he had pushed me and did it in front of my kids.

**Q.**    And when you were placed under arrest, you told Sergeant Bata and Officer McNamara that you were upset and you thought it was unfair because Mr. Kelley was a police detective, is that right?

**A.**    No, I didn't say that until I was back at the station.

**Q.**    You never voiced those sentiments to any members of the Braintree Police Department that night,

is that right?

A.   No.  At the police station I told the officer that was booking me that it was unfair because they only arrested me because my ex-husband's a Boston Police officer.

MS. BROKAW:  Your Honor, may I approach and take Commonwealth's Exhibit 2?

Q.   Now, Ms. Kelley, have you had an opportunity to see these photographs?

A.   I've seen them.

Q.   Okay.  Can you just take a look at them?

A.   Sure.

Q.   You can just look up when you've had an opportunity -- I think there are three total.

Do those look familiar to you?

A.   I'm kinda confused because he has two different pants on in the pictures.

Q.   Okay.  But have you seen those before?

A.   Yes.

Q.   And do you know where they were taken?

A.   There are two different pants on, I don't know. I know one was -- I know he did have them taken at the Braintree Police Station.

Q.   Okay.  So your testimony today is that these

injuries were sustained on his leg when you fell and the stick came up, but you're not sure whether you made contact with anyone, is that right?

A.   All I know is those were taken at the Braintree Police Station on Tuesday after the Friday incident.  I don't know if it hit him or not.

Q.   Okay.  And you still -- your testimony is that you have no idea whether this stick made contact with anything?

A.   Obviously if he has bruises on the back of his leg, the stick might've hit him, but I never swung it at him, I never hit him intentionally.

Q.   You never swung at him, is that your testimony?

A.   That is my testimony.

Q.   And you never told the Braintree Police that you swung it at him, is that right?

A.   No, not like you're trying to imply, no.

Q.   Did you tell them that you swung it at him at all?

A.   I said the stick might've swung forward.

Q.   You say the stick might've swung forward, is that what you told the Braintree Police?

A.   When I fell forward, the stick went forward, my reflex.

Q.   But you weren't sure, is that right?  You weren't sure whether the stick was swung forward?

A.   No, I know the stick went forward.  I didn't know if it was in one hand or two is what I told them that I wasn't sure of.

MS. BROKAW:  Just one moment, your Honor.

Q.   And so, your testimony today, Ms. Kelley, is that when you arrived at that Braintree parking lot, you walked over to the car and you never intentionally hit Mr. Kelley with that hockey stick, is that right?

A.   Walked over to his car...  I don't understand if you're trying to --

Q.   You didn't walk over to his --

A.   No.  To him, or to like -- I walked far away from him.

Q.   You never intentionally hit him with that hockey stick, is that right?

A.   No.  Most definitely not.

Q.   You're not even sure if you made contact with him, is that right?

A.   Well, if he's claiming he has bruises from a hockey stick, obviously --

Q.   I'm just asking you whether -- just listen to the question:  You testified that you never

intentionally hit him, and your testimony today is that you're not sure whether the stick ever made contact with him, is that right?

A.   Yes, I'm not sure.

Q.   Okay.

MS. BROKAW:  No further questions, your Honor.

### REDIRECT EXAMINATION

**BY MR. WARD:**

Q.   Ms. Kelley, just to clarify, as you came around the back of the car and you heard Mr. Kelley yell "Get the fuck away from my car," was he approaching you from the front or was he approaching you from behind you?

A.   He was coming from behind me.

MR. WARD:  That's all I have.

MS. BROKAW:  Nothing further, your Honor.

THE COURT:  Thank you.  You may step down.

THE DEFENDANT:  Thank you.

MR. WARD:  Nothing further, Judge.

THE COURT:  The defense rests?

MR. WARD:  The defense rests.

THE COURT:  Okay.  I'm going to give you a five-minute break.  The lawyers are going to get their thoughts together and give you their closing arguments, and then I'm going to instruct you on the law and we'll

send you out to deliberate.

THE COURT OFFICER:  Court, all rise, please, jurors exiting.

(Jurors not present.)

THE COURT:  Do you have an argument on your motion for required finding?

MR. WARD:  Yes, your Honor.  Again, similar to the initial motion at this point.  I'd move for a required finding of not guilty.  We believe that the Commonwealth has not met the three elements they must prove specifically the intent evidence.

MS. BROKAW:  Your Honor, I respectfully request that you deny my Brother's motion.  I suggest that intent -- evidence of intent was clearly elicited through the text messages, through the testimony of the complaining witness in this case and through Sergeant Bata and Officer Clark who responded to the scene as well as the photographs.

THE COURT:  Motion's denied.

MR. WARD:  Thank you.

THE COURT:  Any special instructions that you're requesting?

MR. WARD:  I would be asking for the accident instruction.

MS. BROKAW:  I'd object to that, your Honor.  I would be seeking a lesser included instruction for assault and battery.

MR. WARD:  Object.

MS. BROKAW:  Your Honor, I'd respectfully request that the jury be permitted to hear that lesser included instruction if they do not determine that a hockey stick, for whatever reason, and the instrumentality and the nature of -- if they don't credit the evidence that was used in a manner that could've caused serious bodily harm, I think they still should hear instructions on assault and battery. There's certainly evidence of that and it is just a lesser included offense.

MR. WARD:  Your Honor, that's not what she's charged with.  The whole allegation is that she intentionally swung the hockey stick with the intent of hitting him in the legs or hitting him.  Mr. Kelley testified that he took the stick -- she took the stick and swung it like a baseball bat.  He also testified as to injuries that he sustained and described them.  So I would suggest that I'm not looking for the lesser included.

MS. BROKAW:  And, your Honor, just briefly, if

the jury was to credit that testimony and find that -- that will still be the nature of assault and battery would still be contact by the hockey stick.  I'm merely saying that the Commonwealth's entitled to that instruction if they don't find that the instrumentality meets the element of dangerous weapon.  The Commonwealth could still have proven that there was intentional touching likely to cause bodily harm.

THE COURT:  No.  I won't give the lesser included.  I don't think it's on an assault and battery case.

I will read under the assault and battery dangerous weapon, I will -- "An item that is normally used for innocent purposes, such as a hockey stick can become a dangerous weapon," and then I'll read that whole thing including, for example, a lighted cigarette can become a dangerous weapon if used to burn to someone or, you know, poke somebody's eye out.

So I will explain and I will also -- that it wasn't necessary for the Commonwealth to prove that the defendant actually caused the injury with the dangerous weapon.  Any slight touching is sufficient if it was done with a dangerous weapon.  So that's part of the assault and battery dangerous weapon.

MR. WARD:  Your Honor --

THE COURT:  And I don't know about the accident.  See the issue with the accident is based on her testimony.

MR. WARD:  Your Honor --

THE COURT:  Not sure if the stick ever made contact, don't know if I hit him with the stick.

MR. WARD:  Well, I think there was also testimony in there that there's bruising so obviously there could have been contact.  There's an acknowledgement that there could have been contact.

The other thing is this, Judge:  The allegation that's contained in the testimony that has been put forth, if there's -- this isn't a situation where it's alleged to -- and, again, I'd object to the just mere contact because that's not what's alleged here.  What's alleged here is a violent baseball bat like swing.

THE COURT:  I important, but she's saying it was mere contact.  I'm taking into --

MR. WARD:  But in his --

THE COURT:  I'm taking into account her testimony.

MR. WARD:  Correct.  But, again, she's indicating that she never intended -- if there was mere

contact and it wasn't intentional -- and that's why the accident instruction is extremely important, your Honor, simply because I would suggest that the complaining witness acknowledged that the location of the bruises on the legs indicate that the stick would have had to come down at an angle.  It would have had to come down in a position where -- and he also acknowledges that the heavier end of the stick is the blade, and that the deeper bruising was on the hamstring which indicates that the blade would have had to be coming up which indicates that if the blade is coming up and it's carried like this, the stick is coming in an upward manner which is consistent with being on the ground.

THE COURT:  Can I ask you this:  I didn't see the video.  What's on the video?

MS. BROKAW:  The police.  Basically seeing police cars coming in and each -- the complaining witness was being kind've interviewed.  And the hockey bag --

THE COURT:  Did you see anything with the stick?

MS. BROKAW:  No.

MR. WARD:  Well, I -- the stick, what I would

suggest is relevant is that when Sergeant Bata arrives at the scene, he goes -- immediately goes to Mr. Kelley's vehicle.

THE COURT:  No, I understand that part --

MR. WARD:  But what I'm saying about it goes to the stick, your Honor, he immediately takes the stick out of the car, puts it in his cruiser and that's before he even talks to Mrs. Kelley.  He does this before he even talks to Mrs. Kelley.  And I think he does it even before he talks to Mr. Kelley.

He goes in, takes the stick out and puts it in his vehicle.  So, again, you important, there's testimony --

THE COURT:  What do you see on the video before the police get there?

MR. WARD:  Excuse me?

THE COURT:  What do you see --

MR. WARD:  Nothing.  Nothing.  It's too -- it's too --

THE COURT:  You can't see anything?

MS. BROKAW:  No.

MR. WARD:  It gets zoomed in about six minutes into the video.  It's a far shot and that at about six minutes, it zooms in at that point in time.

THE COURT:  What do you see?

MR. WARD:  It zooms in as the police pull in. And what we have been able to ascertain through an investigator is that the loss prevention officers at K-Mart had a scanner.  They heard it on the scanner. And when they heard it on the scanner, they then focused --

THE COURT:  I see.

MR. WARD:  -- and zoomed it in because as opposed to -- so the actual incident doesn't -- it's only after they hear it on the scanner that they zoom in.  And, again, I would suggest that, you know0, was relevant, ready relative to the location of the hockey bag relative to when the hockey stick is taken, and there are a couple of the minor nuisances that I plan on referring to, but, again, I think the accident is crucial, Judge.

THE COURT:  I know you do.

MR. WARD:  The location, again, it has to do with the lo -- simply stated, it's my position that there is absolutely no way that those bruises could have occurred from if -- if Mr. Kelley was hit in the manner he describes at the location he describes.

Again, he testifies that she swung the stick

when she was about five feet away from him.

THE COURT:  I know.

MR. WARD:  I mean --

THE COURT:  So everything comes down to credibility, and it's up to the jury to make that decision.  But the intentional assault and battery dangerous weapon charge does have the whole part on the Commonwealth must prove reasonable doubt that the defendant intended to touch --

MS. BROKAW:  Right.

THE COURT:  -- which I will read.  And...

MS. BROKAW:  And I'd just argue that that's sufficient on any lack of intent.

Your Honor, the Commonwealth would additionally request a negligent assault and battery with a dangerous weapon instruction.

MR. WARD:  I'd object.

THE COURT:  You mean reckless assault and battery?

MS. BROKAW:  Yes.

MR. WARD:  Judge, every single test that -- Mr. Kelley's testimony is clear, she wound up and swinging it like baseball bat.

THE COURT:  And that she told the police that

she hit him with a stick.

According to the police testimony at least what I heard and my notes, there was no issue that she told them she was falling down when she might've accidentally hit him.  That was never told to the police according -- according to Sergeant Bata's testimony which is what the jury heard.

So I believe that the issue is intentional assault and battery.  Your witness testified that she swung it at him.

So I will give the -- I will note your objection and give the accident in addition to the intentional language and then the jury will decide whether it was or whether it wasn't.

Anything else?

MS. BROKAW:  Nothing.

MR. WARD:  Nope.

MS. BROKAW:  Your Honor, any chance I can quickly run to the bathroom?

THE COURT:  Oh, absolutely, yes.

MS. BROKAW:  Thank you.

THE COURT:  Yes, absolutely.

MR. WARD:  Thank you.

THE COURT OFFICER:  Court, all rise, please.

Okay.  So since we're going to send in the 911 and the surveillance tape --

MR. WARD:  Yes.

THE COURT:  -- we're going to use your computer?

MR. WARD:  Yes.

THE COURT:  Okay.  I was going to ask the jury if there's someone that's computer savvy that could put it on --

MR. WARD:  Sure.

THE COURT:  -- while they're in there.  If there's an issue that somebody can't put it on, I'll ask Mr. Leigh to go in and get it, we'll set it up here, and then I'll send it back in.

MR. WARD:  Sure.  Judge, I would even be open to if they have their own computer -- if one of them has their own computer, they can play it on their own computer.  I'm open to that.  That way we don't have any issues of them opening up my --

THE COURT:  Yeah, I know.

MR. WARD:  -- my -- my documents file and go into her case or whatever.

THE COURT:  Yeah, I know that.

THE COURT OFFICER:  I think one of them did

have one.

THE COURT:  Okay.

MR. WARD:  'Cuz I know that --

THE COURT:  Let's find out.

MR. WARD:  -- I know that there's -- I know that I did see a couple of jurors walking with bags, so if they have them, I have no objection to them playing with that.

THE COURT:  All right.

THE COURT OFFICER:  One of the jurors does have a laptop with them, your Honor, and he seems quite knowledgeable about it and said that he would be able to show it --

THE COURT:  Great.

THE COURT OFFICER:  -- and display it.

THE COURT:  Okay.  That takes care of the prominence of that.

MR. WARD:  And, obviously, if there's any issue with formatting or anything...

THE COURT:  Okay.  Thank you.

Okay.  You can bring them up, please.

THE COURT OFFICER:  Everyone please be seated.

(Jurors are present.)

THE COURT:  Counsel?

## CLOSING ARGUMENT

MR. WARD:  Thank you, your Honor.

Ladies and gentlemen of the jury, again, I would thank you for your attention and your time to this matter.  I know it's not easy to sit through roughly four or five hours of testimony, you know, listening to a 911 as well as viewing a videotape. It's not an easy thing to do, but I can tell everyone paid attention, that everyone gave their attention and I thank everybody from the outset.

At the beginning of this trial I told this jury that this is a situation where there are only two people in this world that know exactly what happened that night, that's Mr. Kelley and Mrs. Kelley.

And you heard two completely different stories of what happened that night.  And as a result, you, as the jury are going to need to go back and evaluate the testimony in this case.

During my opening, I also told you that you are going to hear conflicting testimony.  And when I said "You're going to hear conflicting testimony," I didn't mean that Mrs. Kelley was going to have different testimony than Mr. Kelley because that happens all the time.

What I meant is that you would hear conflicts in testimony from the police officer -- police officers who responded to the scene and Mr. Kelley.

Specifically, you heard from Officer Clark. Officer Clark testified he drafted a report and his report was drafted based upon information that he received from Sergeant Bata and Officer McNamara.  He testified that Ms. Kelley informed the officers that on the night of February 21st, 2014, Mrs. Kelley called him on the telephone and told him, "You need to go down to Braintree because I'm running late and I'm down the South Shore."

Now that's a pretty specific statement.  Not only is it "I'm running late," but Mrs. Kelley's running late because she's down the South Shore.  That testimony by Officer Clark was reiterated by Officer Bata.  Officer Bata said, "Yeah, that's what Mr. Kelley told me."

Mr. Kelley got before you and said, "Nah, nah, nah."  I never told the police that.  I told the police officers I was running late.

Ladies and gentlemen of the jury, I'm suggesting Mr. Kelley changed his testimony.  He changed his testimony because Mrs. Kelley produced text

messages and emails indicating that it wasn't her that was running late, that it was him that was running late.

Mr. Kelley further testified that he had every intention of taking the hockey bag, that he knew that he had his daughter ████████ for the weekend and that he knew she had hockey.

Officer Clark and Sergeant Bata both testified unequivocally that Mr. Kelley told him -- told them at the scene Mr. Kelley said, "He did not know why the hockey bag was there, that he refused to take the hockey bag, that the hockey bag belonged to his older daughter ████████ and that he didn't have visits with ████████ over the weekend. He specifically said that.

Officer Bata and -- Sergeant Bata and Officer Clark indicated that Mrs. Kelley told them that he refused to take the bag. Mr. Kelley told you the exact opposite.

Again, we would suggest that Mr. Kelley changed his testimony. Why did he change his testimony because we produced emails that showed Mrs. Kelley told him, "You have ████████ this weekend and ████████ has hockey."

You have those emails. Take a look at them. Mr. Kelley testified that he never put his hands on

Mrs. Kelley.  He made that clear.  I asked him a number of times, "Mr. Kelley, did you ever push her?"

"No.  I never put my hands on Mrs. Kelley."

Officer Clark testified that he pushed her after she hit him with the hockey stick.

Sergeant Bata, again, reiterated he pushed her.

Why did we change the story?  Why?  Because it doesn't make sense.  It doesn't make sense at all.

Mr. Kelley told you that Mrs. Kelley grabbed the hockey bag and tried to jam it into the car.  The bag that he said he was going to take despite the fact that he previously told the officers that he refused the bag.  But for some reason she took that bag and tried to bring it around his car and that they struggled with the bag, that she pushed him into the V of the car and that somehow she fell down.  Didn't know how.  But somehow she fell down.  When she got back up, she grabbed the stick -- he said like a baseball bat -- and he demonstrated this -- like this and swung.

I asked Mr. Kelley, "Where were you?  Were you in the V of the car?"  Because if he wasn't in the V of the car at the time, there's no way Mrs. Kelley would be able to swing a hockey stick like a baseball bat and hit him.  He'd be inside the V.  There's no way that

stick would be able to hit him.

Moreover, we talked about the stick.  We talked about the fact that the heel is heavier than the shaft and Mr. Kelley's bruises.  He had a lighter bruise on his bottom left calf and a darker bruise on his top right calf.  And we talked about it.  The heavy part of the stick making a darker bruise.

I would suggest if Ms. Kelley took the stick and swung it, the darker bruise would be on the calf, and if she swung it from straight up, the darker bruise would be on the calf.

Mr. Kelley said she swung the stick from five feet away -- five feet -- and somehow managed to inflict two bruises, one down here, one up here.

He testified that the hockey stick was a little smaller than this stick.

Ladies and gentlemen, there's no way that stick was swung from five feet away.  There's no way that bruise would have ended up on the calf and that Ms. Kelley could do it from five feet away.  You would have to be right on top of somebody and swing down to make those bruises.  It made no sense.  It makes no sense that she pushed the bag and pushed him into a corner.  And it makes no sense that she would swing the

stick the way he said she swung the stick. It makes no sense that she would be able to hit him and not hit the car. And this makes no sense that if she swung the way he said she did, that those bruises put himself in that pathway.

You heard from Mrs. Kelley. Mrs. Kelley told you that the hockey bag was next to her car, that her daughter was making a commotion about the bag, that she wanted to calm her daughter, so she took the bag and walked it around the car to put it in Mr. Kelley's car. The daughter was crying about the computer that's in the bag, she's going to bring the bag over to the car in hopes to calm the child who's crying about the bag.

She states that Mr. Kelley came from behind, yelled a profanity and knocked her down. As he knocked her down, she claims the bag falls, the stick comes forward and it swings forward like this. She says Mr. Kelley, at that time, walked in front of him (sic-"her"). If that had happened, Ms. Kelley would have fallen forward, the blade of the stick would have been up, there would be a light bruise here and a dark bruise up here. That makes sense, ladies and gentlemen of the jury.

Now, at the beginning of this case, I told you

that you'd also hear a 911 tape.  And during that 911 tape, you heard that it was actually Ms. Kelley who first called 911.  And it was Ms. Kelley who had her children with her, and it was Ms. Kelley who said, "He threw me to the ground.  He's a Boston Police officer. Nothing ever happens.  He'll talk his way out of it again."

Then you heard a turret tape and the turret tape is, as the Judge explained, is the dispatcher calling the police to respond.

You heard Sergeant Bata replied -- testified he was Officer 817.  He was the officer in charge.  He was the superior officer.  He's the one who made the decision who to arrest.

What does that turret tape say?  The dispatcher says "817.  Call me on 8602 and I'll fill you in."

His response:  "You can't say it online."

She says "It's an off-duty."

He says "One of ours?"

She says "No."

He says "Okay.  Call me offline."

Why would they need to talk offline?  Why would she ask that he pick up the phone and call her offline? Why?

I showed you a videotape.  Now, at first that videotape, I'll be honest, is boring, okay?  You looked at it and probably said, "What the hell am I looking for on this tape?"  I'll tell you.  The tape zooms in at about six minutes.  When it zooms in, the first thing you see is the hockey bag.  The hockey bag is not in the V of the front door -- of the front driver's side door.  The hockey bag is set diagonally by the rear taillight of the driver's side of the car.  It's in front of the V.

I asked Mr. Kelley, "Did you move that bag?"

"I don't know."

You'd know if you moved that bag.  You'd know.

We would suggest that bag never moved.  That's where the incident happened.  That's where Mr. Kelley yelled "Get the fuck away from my car."  That's where Mr. Kelley pushed Ms. Kelley down causing her to fall forward.  The bag never moved.  It's right where it was when she got knocked to the ground.  And that's where it stayed.

You're also going to notice that Sergeant Bata, the third officer, arrives on scene.  He testified -- and you'll look at the tape -- at that time two officers are already on scene, one's with Mr. Kelley

and one's with Mrs. Kelley.  Watch the tape.  Where did Sergeant Bata go?  He was at Mr. Kelley's car.  He goes to Mr. Kelley's car and he takes out an item that looks like a hockey stick, and then goes and he puts it in his cruiser and secures that item.  And he does that prior to talking to Mrs. Kelley, and I believe it was prior to talking to Mr. Kelley.  And why is that significant?  It's significant because he had his mind made up when he got there.  He didn't even talk to people and he's securing that hockey stick.  He's the one who made the arrest.  He's the one who made the decision, the one who they said, "Call me offline. I'll fill you in."

And what's the first thing he does?  He goes in, grabs the hockey stick and puts it in his car.

I'm also going to ask you to take a look at the video.  There's a tracker on the bottom of the video. And right between 12 minutes and ten seconds and 12 minutes and 40 seconds on that track, I asked Mr. Kelley, "Did you ever go to your car and grab something?  Show those officers your badge?"

"Nope."

I was clear.  "Okay.  Did you ever go in and take something out of your car, then walk over and do

this?"

"Nope."

Look at the video between 12:10 and 12:40, you'll see it.

Ladies and gentlemen, make no mistake. Mrs. Kelley was arrested because her ex-husband is an off-duty police officer.

Now, in my opening I told you a story about my wife and I walked into the TV room and my ten-year-old daughter and my eight-year-old son. When we walked in, one said, "He hit me."

"No, she hit me."

"He hit me first.

"No, she hit me first."

Me and my wife said, "That's it. The two of you go up to your room." And, again, that works great in my house. And that's fine.

But that's not why we're here. You can't just send somebody to your (sic-"their") room in a case like this. And you have a situation where one person says one thing, another person says another thing.

I would ask that you look at all the evidence that surrounds, that you evaluate what makes sense in this case, and I'm confident that if you do that and

you look at all the evidence, and you ask yourself how would these bruises have occurred?  Could he actually have been hit in that manner?  Could she actually have swung the stick from five feet away and make those injuries?  You'd have to be again right on top of somebody.  You'd have to swing down.  No sense.

But ask yourself these questions.  If you ask yourself these questions and you evaluate the evidence like I know you will, I have no doubt that you will find Ms. Kelley not guilty.

Thank you.

THE COURT:  Thank you.

**CLOSING ARGUMENT**

MS. BROKAW:  Ladies and gentlemen of the jury, I want to join defense counsel in thanking you all for coming back yet a second day to listen to this case.

I told you yesterday when I first had an opportunity to speak with you that divorce was hard and that you will probably hear a lot of testimony about rivaling ex-spouses who are still very upset with one another.  And that testimony was clear.

You'll take the lengthy text messages into the jury room with you.  I implore you, take a look at them.  It is clear the context of how upset Mrs. Kelley

was when she arrived at the K-Mart parking lot.  And you heard from her she was there first.  She was there first.  And he wasn't there.  And you'll read through those text messages.  Take a look at those emails.  I mean, it's clear, it tells the story of ex-spouses who are furious.  Custody exchanges, exchanges of their four children not smooth.  That's clear.

That's not what this case is about.  This case is about what happened during that exchange on February 21st, 2014.  And you heard from Mr. Kelley. He was clear.  They were both upset.  And you'll see that.  His text messages, he was short with her.  Her text messages are much longer.  But he was short and he was angry as well.  He gets in, she wants him to pull closer.  He doesn't want to get any closer.  Finally he pulls closer.

And there's no dispute there was a fight over that hockey bag.  It's clear.  I think the testimony from everyone is clear.  There was a fight that erupted over that hockey bag.  Again, not what this case is about.

The testimony from Mr. Kelley was clear.  She was trying to bring the hockey bag into the car.  He was pushing her away, she took that stick, he turned

away from her and she struck him, baseball-style, on the back of the legs.

And you'll have an opportunity to take the photos into the deliberation room with you that were taken by the Braintree Police Department.  They're consistent with that.  Their consistent with an individual who was turned away when he was hit in the back of the legs.

And it will be for you to determine what makes sense.  Mr. Kelley's testimony is consistent with the bruising.  It's consistent with what Mrs. Kelley (sic-"Mr. Kelley") told the Braintree Police that night when they arrived.

You'll hear -- you heard from Sergeant Bata. He was clear.  First of all, he said he had no tolerance for the suggestion that he would treat an off-duty police officer differently.  And he was clear. And you've seen that video.  They spoke with both parties for a long time.  You watched ten, 11 minutes, both parties being clear -- interviewed at length.  And you heard from Sergeant Bata.  Mrs. Kelley told him "I assaulted Mr. Kelley with the hockey stick."  The only thing she wasn't clear about was whether she had one hand or two hands on the stick when she hit him.  That

is what you'll have to determine whether that makes sense that what she told the officers which is consistent with what Mr. Kelley told you is what happened, or does it make sense what you heard today that she was pushed by Mr. Kelley, that she fell, despite having a heavy hockey bag in front of her, not backwards, but forwards and that in that one moment, he somehow had an opportunity to turn and the stick accidentally may or may not have hit him.  Does that make sense, ladies and gentlemen of jury?  That will be for you to determine.

Take a look at those photographs.  You'll have to determine whether those photographs are consistent with someone falling to the ground forward and accidentally perhaps making contact with the back of someone's legs.

And I'd suggest to you that that does not make sense.

So, again, ladies and gentlemen of the jury, this case is not about spouses who are upset with one another.

You can take a look at all the text messages. You can consider that evidence.  The case is about whether the defendant assaulted and battered Mr. Kelley

with a hockey stick on the night of February 24th -- 21st -- excuse me -- 2014.

And I'd suggest that the testimony and the evidence and the photos and even the context of their read up, they get clear as day, and I'd ask that you find the defendant guilty.

Thank you.

**JURY CHARGE**

THE COURT:  Thank you.

Members of the jury, you're about to begin your final duty which is to decide the fact issues in this case, and before you do that, I'm going to instruct you on the law.

It is your duty as jurors to accept the law as I state it to you.  You should consider all my instructions as a whole.  You may not ignore any instruction or give special attention to any instruction.

You must follow the law as I give it to you whether you agree with the law or not.

Your function as the jury is to determine the facts of this case.  You alone determine what evidence to accept, how important any evidence is that you do accept and what conclusions to draw from all of the

evidence.  You must apply the law as I give it to you, the facts as you determine them to be in order to decide whether the Commonwealth has proven that the defendant is guilty of this charge.  You should determine the facts based solely on a fair consideration of the evidence.  You are to be completely fair and impartial, and you are not to be swayed by prejudice or by sympathies, by personal likes or dislikes towards either side.  And you are not to allow yourselves to be influenced because the offense charged is unpopular with the public.

You are not to decide this case based on what you may have read or heard outside of the courtroom. You are not to engage in any guesswork about any unanswered questions that remain in your mind, or to speculate about what the real facts might or might not have been.

You should not consider anything that I have done in ruling on the motions or objections or commenting to the lawyers that I -- as to the defendant's guilt or innocence.

I have no opinion.  That is your sole and exclusive duty and responsibility to decide if the Commonwealth has proven the charge against the

defendant beyond a reasonable doubt.

In short, you are to confine your deliberations to the evidence and nothing but the evidence.

Now the complaint against the defendant is only an accusation.  It is not evidence.  The defendant has denied that she is guilty of the charge in the complaint.

The law presumes that the defendant to be innocent of the charge against her.  This presumption of innocence is a rule of law that compels you to find the defendant not guilty unless and until the Commonwealth produces evidence from whatever source that proves that the defendant is guilty beyond a reasonable doubt.

This burden of proof never shifts.  The defendant is not required to call any witnesses or produce any evidence since she is presumed to be innocent.

The presumption of innocence stays with the defendant unless and until the evidence convinces you unanimously as a jury that the defendant is guilty beyond a reasonable doubt.

It requires you to find the defendant not guilty unless her guilt has been proven beyond a

reasonable doubt.

Your verdict whether guilty or not guilty must be unanimous.

Now there are two types of evidence which you may use to determine the facts of a case. There is direct evidence and circumstantial evidence. You have direct evidence where a witness testifies directly about that fact that is to be proven to you based on what he claims to have seen or felt or heard with his own senses.

And the only question to you as jurors is whether you believe the witness.

You have circumstantial evidence where a witness cannot testify directly about the fact that is to be proven to you, but you are presented with evidence of other facts and then asked to draw reasonable inferences from them.

Now, what does all that mean? Let me give you an example. Your daughter might tell you one morning that she sees the mailman at the mailbox. That is direct evidence that the mailman has been there.

On the other hand, she might tell you that she sees mail in the mailbox. That is circumstantial evidence that the mail carrier has been there even

though no one has seen he or she, but you can reasonably infer that the male carrier was there since there is mail in the mailbox.

Now the law allows either type of proof in a criminal trial.  But there are two things to keep in mind about circumstantial evidence.  The first one is that you may draw inferences and conclusions only from the facts that have been proven to you.

The second rule is that any inference or conclusions which you do draw must be reasonable and natural based on your own common sense and experience of life.

In a chain of circumstantial evidence, it is not required that every one of your inferences and conclusions be inevitable, but it is required that each of them be reasonable, and that they all be consistent with one another and, that together they establish the defendant's guilt beyond a reasonable doubt.

If you find that the Commonwealth's case is based solely on circumstantial evidence, you may find the defendant guilty only if those circumstances are conclusive enough to leave you with a moral certainty, a clear and settled belief that the defendant is guilty and there is no other reasonable explanation of the

facts that have been proven to you.

The evidence must not only be consistent with the defendant's guilt, it must be inconsistent with her innocence.  Whether the evidence is direct or circumstantial, the Commonwealth must prove the defendant's guilt beyond a reasonable doubt from all of the evidence in this case.

Now, it will be your duty to decide any disputed questions of fact.  You will have to determine which witnesses to believe and how much weight to give to their testimony.  You should give the testimony of each of the witnesses whatever degree of belief and importance that you judge it is fairly entitled to receive.

You are the sole judges of the credibility of the witnesses, and if there are any conflicts in the testimony, it is your function to resolve those conflicts and to determine where the truth lies.

You may believe everything a witness says or part of it or none of it.  If you do not believe a witness's testimony that something has happened, your disbelief is not evidence that it didn't happen.

When you disbelieve a witness, it just means that you have to look elsewhere for credible evidence

about the fact that is to be proven to you.

In deciding whether to believe a witness and how much importance to give to a witness's testimony, you must look at all of the evidence, drawing on your own common sense and experience of life.

Often it might not be what a witness says, but how he says it that might give you a clue on whether or not to accept his version or her version of the events as believable.

You may consider a witness's appearance and demeanor on the witness stand, the frankness or lack of frankness in testifying and whether the testimony is reasonable or unreasonable, probable or improbable.

You may take into account the degree of intelligence he or she shows and whether their memory seems accurate.

You may also consider the motive for testifying whether there is any display of bias in testifying and whether or not the witness has any interest in the outcome of the case.

Now, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge against her.

What is proof beyond a reasonable doubt?  The

term is probably pretty well understood although it is not easily defined.

Proof beyond a reasonable doubt does not mean proof beyond all possible doubt.  For everything in the lives of human beings is open to some possible or imaginary doubt.

A charge is proved beyond a reasonable doubt if after you have compared and considered all of the evidence.  You have in your minds an abiding conviction to a moral certainty that the charge is true.  When we refer to a moral certainty, we mean the highest degree of certainty possible in matters relating to human affairs based solely on the evidence that has been put before you in this case.

I have told you that every person is presumed to be innocent until he or she is proven guilty, and the burden of proof is on the prosecutor.

If you evaluate all of the evidence and you still have a reasonable doubt remaining that the defendant is entitled to the benefit of that doubt and must be acquitted.  It is not enough for the Commonwealth to establish a probability even a strong probability that the defendant is more likely to be guilty or not guilty that is not enough.  Instead the

evidence must convince you of the defendant to a reasonable and moral certainty, a certainty that convinces you your understanding and satisfies your reason and judgment as jurors who are sworn to act conscientiously on the evidence.  This is what we mean by proof beyond a reasonable doubt.

Now the defendant is charged with having committed an assault and battery by means of a dangerous weapon, specifically a hockey stick upon Mr. Kelley.

Section 15A of Chapter 265 of our General Laws provides as follows:  Whoever commits an assault and battery upon another by means of a dangerous weapon shall be punished.  In order to prove the defendant guilty of this offense, the Commonwealth must prove three things beyond a reasonable doubt.

First:  That the defendant touched the person of Mr. Kelley however slightly without having any right or excuse for doing so.

Second:  That the defendant intended to touch Mr. Kelly.

And third:  That the touching was done with a dangerous weapon.

The Commonwealth must prove beyond a reasonable

doubt that the defendant intended to touch Mr. Kelley with the dangerous weapon in the sense that the defendant consciously and deliberately intended the touching to occur, and that touching was not merely accidental or negligent.

The Commonwealth is not required to prove that the defendant specifically intended to cause injury to Mr. Kelley.

An item that is normally used for innocent purposes, such as a hockey stick, can become a dangerous weapon if it is intentionally used as a weapon in a dangerous or potentially dangerous fashion. The law considers any item to be a dangerous weapon if it is intentionally used in a way that it reasonably appears to be capable of causing serious injury or death to another person.

For example, a lighted cigarette can be a dangerous weapon if it's used to burn someone or a pencil if it is aimed at someone's eyes.

In deciding whether an item was intentionally used as a dangerous weapon, you may consider the circumstances surrounding the alleged crime, the nature, size and shape of the item, and the manner in which it was handled or controlled.

Now, there has been evidence introduced in this case which you may consider in determining whether the defendant intentionally committed an act that was a criminal offense or whether what occurred was a pure and simple accident.

In considering such evidence, please keep in mind that the Commonwealth must prove beyond a reasonable doubt that what occurred was not an accident.

If the Commonwealth has failed to prove to you beyond a reasonable doubt that what occurred was not an accident, then you must find the defendant not guilty.

An accident is defined as an unexpected happening that occurs without intention or design on the defendant's part.  It means a sudden unexpected event that takes place without the defendant's intending it to happen.

May I see the parties, please?

Ladies and gentlemen, we're going to reduce your number to six.  At the beginning of a trial, I always have an extra juror because we never knew during the trial if there will be some emergency that a juror would need to be excused.  By law only six are allowed to make the decision whether the Commonwealth has

proven the charge against the defendant beyond a reasonable doubt.

So the Clerk is going to reduce your number to six.  If you become the alternate juror, please don't take it personally because you're here and still willing to serve while the jury is deliberating.  Again if something comes up and a juror needs to be excused that prevents us from having to start the trial all over again.

So the Clerk is going to go through the cards and pull out someone's number.

THE CLERK:  Juror in Seat 2, Matthew Burke.

THE COURT:  Okay.

THE CLERK:  And juror in Seat 3, Timothy Schrim (phonetic) you're appointed as the foreperson of the jury.

THE COURT:  Mr. Foreman, there's going to be one verdict slip.  When all the jurors have agreed unanimously upon the verdict, you shall record it on the verdict slip, date it and sign it and then inform the Court Officer and you all will be brought back into the courtroom together.

If there's any questions during the deliberations, please write it out on a piece of paper,

send it to the court officer, he'll bring it to the parties and myself, we'll discuss it and then we'll bring you all back into the courtroom together to answer or whatever the question happens to be.

Now, we're going to send in these CDs and my understanding is that someone knows how to run the whatever it is.  If there becomes a problem, if you would just let the court officer know, he'll bring it back out and we'll set it up here and then we'll send it back into you, okay?

So, the Clerk is going to now swear in the court officers who are going to escort you back to your deliberations.

(All jurors, sworn.)

You may now retire to consider your verdict.

THE COURT OFFICER:  Court, all rise, please.

Jurors exiting.

(Case recessed at 12:07:07 p.m. and jurors commence with their deliberations.)

(Verdict not transcribed.)

# C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS
PLYMOUTH, SS.

I, **Linda E. Williams**, Approved Court Transcriber and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript, prepared to the best of my ability, of the designated portions of the digital recording provided to me by the appellant or appellee of a trial or hearing of the Norfolk of the Quincy District Court Department in the proceedings of the Commonwealth of Massachusetts versus Karen Calabrese-Kelley, Docket No. 1456CR1473, before Justice Diane Moriarty on February 26, 2016.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 7th day of February 2018.

_____
**Linda E. Williams**
**Notary Public**

My Commission expires:  November 28, 2019

**'**

**'cuz** [9] - 9:20, 48:14, 49:18, 53:2, 56:7, 66:7, 66:11, 73:6, 92:3

**0**

**02121** [1] - 2:6
**02169** [1] - 1:15
**02171** [1] - 2:11

**1**

**1** [6] - 1:15, 38:13, 38:16, 44:15, 44:17, 58:3
**1-120** [1] - 1:1
**11** [1] - 105:19
**12** [4] - 31:1, 31:6, 101:18
**12:07:07** [2] - 1:17, 119:18
**12:10** [1] - 102:3
**12:40** [1] - 102:3
**12:44:27-away** [1] - 37:15
**13** [3] - 31:1, 31:4, 31:6
**14** [2] - 31:23, 32:13
**1456CR1473** [2] - 1:6, 120:14
**14CR1473** [1] - 4:11
**15** [5] - 32:15, 45:23, 62:14, 69:20, 69:23
**15A** [1] - 115:11

**2**

**2** [6] - 3:15, 31:16, 31:18, 39:18, 78:7, 118:12
**2-103** [1] - 3:19
**2-107** [1] - 3:20
**2-13** [1] - 3:5
**2-33** [1] - 3:9
**2-5** [1] - 3:5
**2-58** [1] - 3:9
**2-81** [1] - 3:9
**2-93** [1] - 3:18
**20** [1] - 69:20
**2011** [1] - 33:21
**2014** [10] - 5:16, 34:11, 34:12, 34:18, 35:4, 35:12, 37:16, 94:9, 104:10, 107:2
**2016** [2] - 1:16, 120:15
**2018** [1] - 120:17
**2019** [1] - 120:23
**20th** [3] - 34:12, 34:18, 35:4
**21st** [8] - 5:16, 13:22, 35:9, 37:16, 59:2, 94:9, 104:10, 107:2
**23rd** [1] - 5:14
**24th** [1] - 107:1
**26** [2] - 1:16, 120:15
**265** [1] - 115:11
**28** [1] - 120:23
**29th** [1] - 34:22

**3**

**3** [8] - 2:10, 3:16, 32:20, 32:22, 40:16, 40:17, 44:14, 118:14
**31** [1] - 3:15
**32** [1] - 3:16
**333** [1] - 2:10
**35** [1] - 5:24
**3:31** [1] - 45:3

**4**

**4** [2] - 41:4, 41:5
**40** [1] - 101:19
**43** [4] - 33:10, 36:13, 36:23
**45** [3] - 2:5, 31:2, 31:5

**5**

**5** [2] - 42:2, 42:11
**5:45** [2] - 45:3, 45:8

**6**

**6** [1] - 42:13
**6:00** [4] - 43:22, 45:5, 58:9, 61:19
**6:30** [1] - 43:22
**6:40** [1] - 38:1
**6:45** [3] - 43:23, 43:24, 44:1

**7**

**7:00** [1] - 40:2
**7:30** [2] - 41:9
**7th** [2] - 33:21, 120:17

**8**

**817** [4] - 13:24, 14:1, 99:12, 99:16
**8602** [1] - 99:16
**8:30** [1] - 5:20
**8:45** [1] - 45:11
**8:58:32** [1] - 1:17
**8:58:59** [1] - 4:3

**9**

**911** [14] - 3:15, 30:19, 31:11, 31:13, 31:17, 57:12, 57:13, 57:14, 91:1, 93:7, 99:1, 99:3

**A**

**a.m** [2] - 1:17, 4:3
**abiding** [1] - 114:9
**ability** [1] - 120:9
**able** [8] - 7:1, 10:10, 56:7, 88:3, 92:12, 96:23, 97:1, 98:2
**absolutely** [3] - 88:21, 90:20, 90:22
**accept** [5] - 41:24, 107:14, 107:23, 107:24, 113:8
**accident** [10] - 82:23, 85:3, 86:2, 88:16, 90:12, 117:5, 117:9, 117:12, 117:13
**accidental** [1] - 116:5
**accidentally** [3] - 90:5, 106:9, 106:15
**according** [3] - 90:2, 90:6
**account** [2] - 85:21, 113:14
**accurate** [4] - 18:17, 55:3, 113:16, 120:8
**accusation** [1] - 109:5
**acknowledged** [1] - 86:4
**acknowledgement** [1] - 85:11
**acknowledges** [1] - 86:8
**acquitted** [1] - 114:21
**act** [2] - 115:4, 117:3
**actions** [1] - 29:23
**activities** [15] - 44:3, 44:13, 44:24, 58:17, 59:1, 59:5, 59:8, 59:10, 59:12, 59:13, 59:15, 59:19, 60:1, 60:8
**activity** [2] - 37:23, 38:3
**actual** [1] - 88:10
**addition** [1] - 90:12
**additionally** [1] - 89:14
**address** [1] - 33:9
**admit** [2] - 31:13, 32:17
**affairs** [1] - 114:13
**afternoon** [1] - 61:17
**afterwards** [1] - 16:6
**aggressor** [4] - 11:4, 11:10, 28:5, 28:20
**agitated** [1] - 7:21
**agree** [3] - 37:4, 69:23, 107:20
**agreeable** [1] - 11:2
**agreed** [5] - 21:6, 30:24, 31:7, 58:11, 118:18
**agreement** [4] - 35:1, 35:2, 37:10, 58:14
**aimed** [1] - 116:19
**aisle** [1] - 47:14
**allegation** [2] - 83:16, 85:12
**alleged** [5] - 34:19, 85:15, 85:16, 85:17, 116:22
**allow** [1] - 108:10
**allowed** [1] - 117:23
**allows** [1] - 111:4
**almost** [6] - 44:11, 56:21, 62:14, 71:11, 71:17, 73:9
**alone** [1] - 107:22
**altercation** [1] - 9:8

**alternate** [1] - 118:4

**and..** [1] - 89:11

**angle** [1] - 86:6

**angry** [2] - 35:8, 104:14

**annoyed** [2] - 58:23, 60:21

**annoying** [1] - 35:8

**answer** [2] - 52:23, 119:4

**answer's** [1] - 75:15

**anxiety** [1] - 50:9

**anything..** [1] - 92:19

**appearance** [1] - 113:10

**APPEARANCES** [1] - 2:1

**appellant** [1] - 120:10

**appellee** [1] - 120:10

**apply** [1] - 108:1

**appointed** [1] - 118:15

**approach** [3] - 58:2, 60:22, 78:6

**approached** [1] - 7:20

**approaching** [2] - 81:11, 81:12

**approve** [1] - 17:18

**Approved** [1] - 120:5

**area** [9] - 6:1, 8:17, 30:24, 31:1, 49:23, 55:7, 65:20, 66:3, 70:3

**argue** [1] - 89:12

**argument** [1] - 82:5

**ARGUMENT** [3] - 3:17, 93:1, 103:13

**arguments** [1] - 81:23

**around..** [1] - 51:7

**arrest** [18] - 10:12, 10:15, 10:20, 11:1, 11:12, 11:20, 11:21, 12:2, 12:6, 12:15, 16:18, 27:4, 28:4, 29:11, 77:17, 99:14, 101:11

**arrested** [2] - 78:4, 102:6

**arresting** [1] - 11:23

**arrive** [4] - 46:4, 46:5, 46:10, 47:9

**arrived** [23] - 6:5, 6:11,

12:12, 14:5, 14:17, 14:20, 14:24, 15:10, 19:16, 21:21, 39:9, 46:4, 46:6, 46:8, 46:21, 47:1, 47:8, 62:1, 62:19, 77:5, 80:8, 104:1, 105:13

**arrives** [2] - 87:1, 100:22

**article** [1] - 7:12

**ascertain** [1] - 88:3

**assault** [13] - 11:9, 83:3, 83:12, 84:2, 84:10, 84:12, 84:24, 89:6, 89:15, 89:18, 90:9, 115:8, 115:12

**assaulted** [5] - 8:7, 11:10, 28:1, 105:22, 106:24

**assigned** [1] - 13:23

**Assistant** [1] - 2:4

**assuming** [1] - 72:11

**attempt** [1] - 76:7

**attention** [5] - 34:11, 93:4, 93:9, 107:17

**Attorney** [1] - 2:4

**Attorney's** [1] - 2:5

**author** [1] - 22:3

**authored** [1] - 18:20

**autistic** [1] - 50:9

**aware** [2] - 17:4, 21:14

## B

**B-a-t-a** [1] - 5:8

**backwards** [2] - 55:15, 106:7

**badge** [1] - 101:21

**bag** [137] - 9:5, 9:6, 11:7, 14:6, 14:10, 14:11, 14:15, 22:13, 22:16, 22:19, 22:20, 23:2, 23:5, 23:8, 23:11, 23:14, 23:19, 24:2, 24:12, 24:14, 24:16, 24:18, 28:10, 28:13, 28:15, 28:19, 28:22, 28:23, 28:24, 29:7, 45:17, 45:19, 46:1, 46:11, 46:13, 46:16, 46:20, 46:24, 47:4, 47:6, 49:5,

50:20, 50:21, 51:3, 51:5, 51:11, 51:17, 52:5, 52:6, 52:17, 53:1, 53:9, 53:10, 53:13, 53:14, 53:18, 53:24, 54:10, 56:4, 63:18, 63:22, 63:24, 64:15, 64:18, 64:24, 65:1, 65:9, 65:12, 65:16, 65:21, 65:24, 66:2, 66:12, 66:14, 66:18, 66:22, 67:7, 67:9, 67:11, 67:12, 67:16, 67:19, 67:24, 68:12, 68:13, 69:11, 69:16, 69:17, 69:19, 70:2, 70:3, 70:5, 70:8, 70:16, 70:20, 71:12, 71:18, 71:20, 71:22, 73:18, 73:20, 73:22, 73:23, 73:24, 75:18, 86:20, 88:14, 95:5, 95:11, 95:12, 95:17, 96:10, 96:11, 96:13, 96:15, 97:23, 98:7, 98:8, 98:9, 98:12, 98:13, 98:16, 100:6, 100:8, 100:11, 100:13, 100:14, 100:18, 104:18, 104:20, 104:23, 106:6

**bag's** [3] - 63:16, 69:13, 73:16

**bags** [2] - 53:6, 92:6

**baseball** [6] - 83:20, 85:17, 89:23, 96:18, 96:23, 105:1

**baseball-style** [1] - 105:1

**based** [14] - 6:15, 11:3, 17:12, 28:7, 59:23, 60:6, 85:3, 94:6, 108:5, 108:12, 110:8, 111:11, 111:20, 114:13

**bat** [5] - 83:20, 85:17, 89:23, 96:18, 96:23

**BATA** [2] - 3:4, 5:1

**Bata** [25] - 4:19, 5:8, 5:9, 5:15, 13:9, 56:12, 56:17, 74:24, 75:2, 75:10, 77:18, 82:17, 87:1, 94:7, 94:17,

95:8, 95:15, 96:6, 99:11, 100:21, 101:2, 105:14, 105:21

**Bata's** [1] - 90:6

**bathroom** [1] - 90:19

**battered** [1] - 106:24

**battery** [12] - 83:3, 83:12, 84:2, 84:10, 84:12, 84:24, 89:6, 89:15, 89:19, 90:9, 115:8, 115:13

**Bay** [1] - 2:11

**bearing** [1] - 29:23

**become** [4] - 84:15, 84:17, 116:10, 118:4

**becomes** [1] - 119:7

**BEFORE** [1] - 1:13

**begin** [1] - 107:10

**beginning** [5] - 30:18, 61:15, 93:11, 98:24, 117:20

**Behalf** [2] - 2:2, 2:8

**behind** [4] - 14:11, 81:12, 81:13, 98:14

**beings** [1] - 114:5

**belief** [2] - 111:23, 112:12

**believable** [1] - 113:9

**Bellaire** [4] - 33:10, 36:13, 36:23, 36:24

**belonged** [2] - 45:20, 95:12

**below** [3] - 40:7, 41:15, 41:19

**benefit** [1] - 114:20

**best** [7] - 12:24, 13:2, 32:5, 70:7, 70:10, 70:21, 120:8

**better** [2] - 40:1, 40:10

**between** [11] - 9:3, 30:13, 35:18, 43:8, 47:12, 51:14, 52:15, 55:24, 72:21, 101:18, 102:3

**beyond** [17] - 109:1, 109:13, 109:22, 109:24, 111:18, 112:6, 113:22, 113:24, 114:3, 114:4, 114:7, 115:6, 115:16, 115:24, 117:7, 117:11, 118:1

**bias** [1] - 113:18
**birthday** [1] - 44:3
**bit** [3] - 7:21, 15:19, 20:6
**blade** [5] - 13:3, 86:9, 86:10, 86:11, 98:20
**blocked** [1] - 24:1
**bodily** [2] - 83:11, 84:8
**body** [5] - 8:17, 68:14, 68:16, 70:4, 70:12
**bookbag** [1] - 51:3
**booking** [1] - 78:3
**boring** [1] - 100:2
**Boston** [4] - 34:16, 77:8, 78:4, 99:5
**bottom** [3] - 42:10, 97:5, 101:17
**brace** [1] - 76:7
**Braintree** [20] - 5:10, 5:13, 6:6, 12:8, 12:13, 21:5, 30:20, 30:21, 39:9, 61:12, 61:18, 77:24, 78:23, 79:4, 79:15, 79:22, 80:8, 94:11, 105:5, 105:12
**break** [1] - 81:22
**BRIAN** [1] - 2:9
**briefly** [1] - 83:24
**bring** [13] - 45:16, 51:20, 51:21, 51:22, 53:1, 64:15, 92:21, 96:14, 98:12, 104:23, 119:1, 119:3, 119:8
**brings** [1] - 45:13
**BROKAW** [36] - 2:3, 4:18, 5:3, 7:15, 13:7, 13:15, 22:9, 30:2, 30:10, 31:15, 32:19, 38:5, 42:19, 52:21, 58:1, 58:6, 60:22, 61:8, 78:6, 80:6, 81:6, 81:15, 82:12, 83:1, 83:5, 83:24, 86:17, 86:23, 87:21, 89:10, 89:12, 89:20, 90:16, 90:18, 90:21, 103:14
**Brokaw** [4] - 3:5, 3:9, 3:19, 30:14
**Brother's** [1] - 82:13
**brought** [2] - 28:12, 118:21

**brownish** [1] - 7:14
**bruise** [8] - 97:4, 97:5, 97:7, 97:9, 97:10, 97:19, 98:21, 98:22
**bruises** [9] - 79:10, 80:21, 86:5, 88:21, 97:4, 97:14, 97:22, 98:4, 103:2
**bruising** [4] - 26:6, 85:9, 86:9, 105:11
**bubbles** [1] - 60:24
**bullshit** [1] - 43:3
**burden** [3] - 109:15, 113:21, 114:17
**Burke** [1] - 118:12
**burn** [2] - 84:17, 116:18
**BY** [5] - 5:3, 13:19, 33:5, 58:6, 81:8

## C

**CALABRESE** [3] - 1:10, 3:8, 33:3
**Calabrese** [3] - 4:11, 33:7, 120:13
**CALABRESE-KELLEY** [3] - 1:10, 3:8, 33:3
**Calabrese-Kelley** [3] - 4:11, 33:7, 120:13
**calf** [5] - 97:5, 97:6, 97:9, 97:11, 97:19
**calm** [7] - 6:22, 62:18, 62:22, 64:16, 64:21, 98:9, 98:13
**calmly** [3] - 63:4, 66:13, 66:18
**cannot** [1] - 110:14
**Canton** [1] - 2:6
**capable** [1] - 116:15
**car** [119] - 11:7, 20:1, 22:12, 23:14, 23:15, 23:16, 24:1, 24:2, 24:18, 25:4, 25:15, 28:8, 28:9, 28:12, 28:21, 46:9, 46:14, 46:18, 46:20, 47:20, 48:3, 48:4, 48:8, 48:24, 49:8, 49:11, 49:16, 49:18, 50:5, 50:6, 50:13, 50:24, 51:2, 51:10, 51:20, 51:23, 51:24, 52:6, 52:7, 52:10, 52:18, 53:1, 53:2, 53:4, 53:15, 53:16, 53:19, 53:20, 53:21, 53:22, 53:24, 54:6, 54:9, 54:14, 54:24, 55:1, 55:4, 55:8, 55:24, 57:6, 57:7, 57:8, 62:21, 63:15, 63:16, 64:5, 64:13, 64:15, 64:16, 64:17, 64:19, 64:23, 65:1, 65:2, 65:8, 65:9, 65:16, 65:18, 65:21, 66:6, 66:19, 66:22, 67:5, 69:4, 69:5, 71:3, 72:22, 73:9, 76:20, 80:9, 81:10, 81:11, 87:7, 96:10, 96:14, 96:16, 96:21, 96:22, 98:3, 98:7, 98:10, 98:12, 100:9, 100:16, 101:2, 101:3, 101:15, 101:20, 101:24, 104:23
**car..** [1] - 80:11
**cards** [1] - 118:10
**care** [1] - 92:16
**carried** [8] - 53:10, 53:13, 53:14, 53:18, 53:19, 53:24, 68:5, 86:12
**carrier** [2] - 110:24, 111:2
**carry** [6] - 53:20, 53:21, 70:2, 70:5, 70:7, 70:18
**carrying** [5] - 53:9, 67:13, 68:14, 69:16, 70:11
**cars** [2] - 47:12, 86:18
**Case** [2] - 4:3, 119:18
**case** [31] - 4:13, 11:2, 18:3, 18:4, 19:9, 30:18, 33:18, 38:16, 82:16, 84:11, 91:22, 93:18, 98:24, 102:19, 102:24, 103:16, 104:8, 104:20, 106:20, 106:23, 107:12, 107:22, 108:12, 110:5,

111:19, 112:7, 113:20, 114:14, 117:2
**caused** [2] - 83:11, 84:21
**causing** [2] - 100:17, 116:15
**CDs** [1] - 119:5
**certainly** [2] - 18:16, 83:13
**certainty** [6] - 111:22, 114:10, 114:11, 114:12, 115:2
**certify** [1] - 120:7
**chain** [1] - 111:13
**chance** [1] - 90:18
**change** [2] - 95:20, 96:7
**changed** [3] - 94:23, 94:24, 95:19
**Chapter** [1] - 115:11
**CHARGE** [2] - 3:20, 107:8
**charge** [13] - 18:11, 18:16, 26:24, 89:7, 99:12, 108:4, 108:24, 109:6, 109:9, 113:23, 114:7, 114:10, 118:1
**charged** [3] - 83:16, 108:11, 115:7
**charging** [2] - 68:24, 69:2
**CHARLES** [2] - 3:4, 5:1
**Charles** [1] - 5:8
**child** [2] - 26:23, 98:13
**children** [21] - 9:3, 20:20, 26:16, 26:20, 27:7, 33:12, 34:2, 35:18, 36:3, 36:9, 36:10, 36:12, 36:17, 44:2, 47:19, 47:22, 48:3, 59:2, 62:15, 99:4, 104:7
**children's** [1] - 59:5
**cigarette** [2] - 84:16, 116:17
**circumstances** [2] - 111:21, 116:22
**circumstantial** [7] - 110:6, 110:13, 110:23, 111:6, 111:13, 111:20,

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                    2 - 124

112:5

**claim** [1] - 51:13

**claiming** [1] - 80:21

**claims** [2] - 98:16, 110:9

**clarify** [1] - 81:9

**Clark** [16] - 6:10, 14:21, 15:7, 15:10, 16:24, 18:21, 21:15, 22:3, 22:7, 82:17, 94:4, 94:5, 94:16, 95:8, 95:16, 96:4

**Clark's** [2] - 19:9, 21:11

**clear** [19] - 34:18, 36:2, 89:22, 96:1, 101:23, 103:21, 103:24, 104:5, 104:7, 104:11, 104:18, 104:19, 104:22, 105:15, 105:17, 105:20, 105:23, 107:5, 111:23

**clearly** [3] - 7:22, 35:6, 82:14

**Clerk** [3] - 118:3, 118:10, 119:11

**CLERK** [3] - 4:10, 118:12, 118:14

**close** [1] - 7:24

**closed** [2] - 65:18, 65:19

**closer** [18] - 52:6, 52:10, 63:1, 63:3, 63:4, 63:6, 63:12, 64:13, 65:9, 66:2, 66:15, 66:17, 68:19, 68:22, 104:15, 104:16

**closing** [1] - 81:23

**CLOSING** [3] - 3:17, 93:1, 103:13

**clothing** [1] - 7:12

**clue** [1] - 113:7

**cold** [4] - 26:3, 26:4, 46:19, 49:10

**colored** [1] - 40:17

**combative** [1] - 12:4

**comfortable** [2] - 4:22, 33:2

**coming** [10] - 54:3, 58:15, 72:19, 73:7,

81:13, 86:11, 86:12, 86:13, 86:18, 103:16

**commander** [1] - 18:11

**commence** [1] - 119:18

**commenced** [1] - 4:3

**commenting** [1] - 108:20

**Commission** [1] - 120:23

**commits** [1] - 115:12

**committed** [2] - 115:8, 117:3

**common** [3] - 64:20, 111:11, 113:5

**commonplace** [1] - 58:12

**COMMONWEALTH** [3] - 1:4, 1:8, 120:3

**Commonwealth** [25] - 2:2, 4:17, 4:19, 30:10, 30:17, 39:8, 82:10, 84:7, 84:20, 89:8, 89:14, 108:3, 108:24, 109:12, 112:5, 113:21, 114:22, 115:15, 115:24, 116:6, 117:7, 117:10, 117:24, 120:6, 120:12

**COMMONWEALTH' S** [1] - 3:3

**Commonwealth's** [4] - 58:2, 78:7, 84:4, 111:19

**commotion** [4] - 50:7, 50:13, 50:17, 98:8

**communicated** [1] - 10:20

**communication** [1] - 37:20

**compared** [1] - 114:8

**compels** [1] - 109:10

**complain** [1] - 49:10

**complained** [1] - 8:19

**complaining** [3] - 82:16, 86:4, 86:18

**complaint** [2] - 109:4, 109:7

**completely** [2] - 93:15, 108:7

**complied** [1] - 63:9

**computer** [13] - 50:20, 50:21, 51:4, 52:13, 53:6, 64:5, 91:5, 91:8, 91:16, 91:17, 91:18, 98:11

**concentrating** [1] - 76:1

**conclusions** [4] - 107:24, 111:7, 111:10, 111:15

**conclusive** [1] - 111:22

**concrete** [1] - 76:15

**confer** [2] - 15:19, 20:6

**conference** [1] - 30:13

**confident** [1] - 102:24

**confine** [1] - 109:2

**confirm** [1] - 45:13

**conflict** [1] - 23:12

**conflicting** [2] - 93:20, 93:21

**conflicts** [3] - 94:1, 112:16, 112:18

**confrontation** [1] - 52:19

**confused** [1] - 78:16

**conscientiously** [1] - 115:5

**consciously** [1] - 116:3

**consider** [8] - 106:23, 107:15, 108:18, 113:10, 113:17, 116:21, 117:2, 119:15

**consideration** [1] - 108:6

**considered** [1] - 114:8

**considering** [1] - 117:6

**considers** [1] - 116:13

**consistent** [9] - 86:13, 105:6, 105:10, 105:11, 106:3, 106:13, 111:16, 112:2

**contact** [22] - 9:13, 53:10, 65:13, 66:8, 66:16, 71:9, 71:15, 75:19, 75:24, 76:15,

79:3, 79:8, 80:19, 81:2, 84:3, 85:7, 85:10, 85:11, 85:16, 85:19, 86:1, 106:15

**contained** [1] - 85:13

**contested** [1] - 35:6

**context** [2] - 103:24, 107:4

**continue** [1] - 31:5

**control** [2] - 16:12, 18:7

**controlled** [1] - 116:24

**conversation** [2] - 6:15, 51:14

**converse** [1] - 7:1

**conversed** [1] - 20:12

**conviction** [1] - 114:9

**convince** [1] - 115:1

**convinces** [2] - 109:20, 115:3

**cooperate** [1] - 12:5

**corner** [5] - 54:2, 54:15, 55:20, 73:7, 97:24

**correct** [68] - 4:14, 14:3, 14:4, 14:12, 14:22, 14:23, 15:2, 15:3, 15:5, 15:8, 15:9, 15:11, 15:12, 15:14, 15:15, 15:17, 16:7, 16:16, 16:20, 19:1, 19:11, 20:13, 20:16, 20:22, 22:2, 24:3, 24:10, 26:17, 26:18, 27:5, 27:13, 27:14, 27:17, 27:20, 28:1, 28:5, 28:6, 28:8, 28:10, 28:11, 29:2, 29:6, 33:13, 33:15, 33:18, 34:19, 35:10, 35:12, 35:24, 36:4, 36:6, 37:2, 39:10, 39:14, 43:14, 45:20, 47:1, 47:4, 47:19, 47:24, 48:1, 49:23, 50:14, 56:14, 57:9, 57:15, 71:5, 85:23

**correspondence** [8] - 39:1, 39:5, 42:21, 42:23, 43:2, 43:6, 43:13, 44:9

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                              2 - 125

**could've** [5] - 26:9, 26:10, 68:2, 68:3, 83:11
**counsel** [4] - 13:17, 57:24, 92:24, 103:15
**County** [2] - 2:5, 34:16
**couple** [4] - 47:11, 53:2, 88:15, 92:6
**course** [2] - 12:17, 60:14
**court** [15] - 34:14, 34:15, 35:4, 36:16, 37:10, 37:13, 42:1, 42:24, 58:11, 58:14, 82:2, 90:24, 119:1, 119:8, 119:12
**COURT** [82] - 1:5, 4:4, 4:5, 4:6, 4:12, 4:21, 7:18, 13:8, 13:17, 22:10, 30:3, 30:6, 30:12, 30:15, 31:16, 31:21, 32:1, 32:4, 32:7, 32:9, 32:11, 32:13, 32:16, 32:20, 33:1, 38:6, 38:9, 52:22, 57:23, 58:4, 60:23, 67:23, 81:16, 81:19, 81:21, 82:2, 82:5, 82:19, 82:21, 84:9, 85:2, 85:6, 85:18, 85:21, 86:15, 86:21, 87:4, 87:14, 87:17, 87:20, 88:1, 88:8, 88:18, 89:2, 89:4, 89:11, 89:18, 89:24, 90:20, 90:22, 90:24, 91:4, 91:7, 91:11, 91:20, 91:23, 91:24, 92:2, 92:4, 92:9, 92:10, 92:14, 92:15, 92:16, 92:20, 92:22, 92:24, 103:12, 107:9, 118:13, 118:17, 119:16
**Court** [11] - 1:14, 30:13, 31:23, 32:2, 34:9, 34:17, 34:22, 118:21, 119:16, 120:5, 120:12
**courtroom** [5] - 7:10, 75:2, 108:13, 118:22, 119:3
**credibility** [2] - 89:5,

112:15
**credible** [1] - 112:24
**credit** [2] - 83:10, 84:1
**crime** [1] - 116:22
**criminal** [2] - 111:5, 117:4
**CROSS** [4] - 3:3, 3:7, 13:18, 58:5
**CROSS-EXAMINATION** [2] - 13:18, 58:5
**crucial** [1] - 88:17
**cruiser** [3] - 13:23, 87:7, 101:5
**crying** [2] - 98:11, 98:13
**curbside** [3] - 37:2, 47:24, 58:9
**custody** [2] - 9:3, 104:6
**cut** [3] - 8:20, 26:9, 72:5

## D

**damaged** [1] - 23:14
**dangerous** [19] - 84:6, 84:13, 84:15, 84:17, 84:21, 84:23, 84:24, 89:7, 89:16, 115:9, 115:13, 115:23, 116:2, 116:11, 116:12, 116:13, 116:18, 116:21
**dark** [5] - 40:17, 41:15, 42:21, 60:24, 98:21
**darker** [4] - 97:5, 97:7, 97:9, 97:10
**date** [3] - 19:5, 35:7, 118:20
**DATE** [1] - 1:16
**daughter** [21] - 23:21, 29:5, 29:8, 37:21, 44:4, 45:10, 50:8, 50:14, 52:12, 53:5, 64:3, 65:4, 66:11, 67:7, 95:6, 95:13, 98:8, 98:9, 98:11, 102:10, 110:19
**daughter's** [1] - 22:20
**daughters** [1] - 49:9

**death** [1] - 116:16
**December** [1] - 33:21
**decide** [6] - 90:13, 107:11, 108:3, 108:12, 108:23, 112:8
**decided** [1] - 43:13
**deciding** [2] - 113:2, 116:20
**decision** [16] - 10:11, 10:17, 10:19, 11:3, 11:12, 11:16, 11:19, 16:18, 27:3, 29:10, 63:13, 64:12, 89:6, 99:14, 101:12, 117:24
**deeper** [1] - 86:9
**DEFENDANT** [1] - 81:17
**defendant** [39] - 7:16, 11:17, 13:9, 13:12, 31:11, 61:20, 68:20, 71:1, 84:21, 89:9, 106:24, 107:6, 108:4, 109:1, 109:4, 109:5, 109:8, 109:11, 109:13, 109:16, 109:20, 109:21, 109:23, 111:21, 111:23, 113:22, 114:20, 114:23, 115:1, 115:7, 115:14, 115:17, 115:20, 116:1, 116:3, 116:7, 117:3, 117:12, 118:1
**Defendant** [1] - 2:8
**defendant's** [7] - 42:21, 108:21, 111:18, 112:3, 112:6, 117:15, 117:16
**defense** [4] - 30:17, 81:19, 81:20, 103:15
**Defense** [6] - 31:16, 31:18, 32:20, 32:21, 44:15, 44:17
**DEFENSE'S** [2] - 3:7, 3:13
**defined** [2] - 114:2, 117:13
**definitely** [2] - 68:2, 80:18
**degree** [3] - 112:12, 113:14, 114:11

**deliberate** [2] - 31:4, 82:1
**deliberately** [1] - 116:3
**deliberating** [1] - 118:6
**deliberation** [1] - 105:4
**deliberations** [4] - 109:2, 118:24, 119:13, 119:19
**demeanor** [4] - 6:21, 7:19, 12:1, 113:11
**demonstrate** [1] - 25:1
**demonstrated** [1] - 96:19
**denied** [2] - 82:19, 109:6
**Dennis** [1] - 1:15
**deny** [1] - 82:13
**Department** [6] - 5:11, 5:13, 6:6, 77:24, 105:5, 120:12
**describe** [12] - 6:20, 7:3, 7:19, 8:9, 8:14, 9:7, 9:18, 12:1, 12:24, 62:18, 68:13, 70:7
**described** [3] - 39:8, 64:3, 83:21
**describes** [2] - 88:23
**describing** [2] - 59:1, 59:5
**DESCRIPTION** [1] - 3:14
**design** [1] - 117:14
**designated** [1] - 120:9
**desk** [1] - 18:14
**despite** [2] - 96:11, 106:6
**detail** [1] - 8:9
**detective** [4] - 77:9, 77:12, 77:15, 77:20
**determination** [1] - 12:19
**determine** [12] - 83:7, 105:9, 106:1, 106:11, 106:13, 107:21, 107:22, 108:2, 108:5, 110:5, 112:9, 112:18

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*                    2-126

**determining** [1] - 117:2
**device** [1] - 32:3
**diagonally** [3] - 47:11, 66:23, 100:8
**dial** [1] - 57:11
**dialed** [1] - 57:13
**Diane** [1] - 120:14
**different** [5] - 60:4, 78:16, 78:21, 93:15, 93:22
**differently** [1] - 105:17
**digital** [1] - 120:9
**DIGITAL** [1] - 1:12
**DIRECT** [4] - 3:3, 3:7, 5:2, 33:4
**direct** [4] - 110:6, 110:7, 110:21, 112:4
**direction** [1] - 10:4
**directly** [4] - 55:16, 76:10, 110:7, 110:14
**disagreement** [1] - 9:5
**disbelief** [1] - 112:22
**disbelieve** [1] - 112:23
**discuss** [2] - 4:13, 119:2
**dislikes** [1] - 108:9
**dispatch** [1] - 30:20
**dispatched** [2] - 5:20, 6:2
**dispatcher** [2] - 99:9, 99:15
**display** [2] - 92:15, 113:18
**dispute** [1] - 104:17
**disputed** [1] - 112:9
**distance** [1] - 67:3
**DISTRICT** [1] - 1:5
**District** [4] - 1:14, 2:4, 2:5, 120:11
**disturbance** [2] - 6:3, 6:4
**DIVISION** [1] - 1:5
**divorce** [4] - 34:24, 35:2, 37:10, 103:18
**divorced** [4] - 33:13, 33:15, 33:20, 33:23

**DOCKET** [1] - 1:6
**Docket** [1] - 120:13
**document** [1] - 38:15
**documentation** [1] - 39:1
**documents** [3] - 38:22, 44:19, 91:21
**domestic** [1] - 6:3
**done** [7] - 38:17, 38:21, 44:18, 64:23, 84:23, 108:19, 115:22
**door** [14] - 24:6, 25:4, 48:4, 48:5, 48:7, 48:8, 48:11, 48:13, 48:21, 66:8, 66:9, 100:7, 100:8
**door's** [1] - 24:8
**doubt** [22] - 89:8, 103:9, 109:1, 109:14, 109:22, 110:1, 111:18, 112:6, 113:22, 113:24, 114:3, 114:4, 114:6, 114:7, 114:19, 114:20, 115:6, 115:16, 116:1, 117:8, 117:11, 118:2
**down** [37] - 21:1, 30:4, 49:15, 50:18, 55:12, 55:13, 55:16, 56:3, 56:8, 61:3, 64:16, 64:21, 66:10, 71:10, 71:16, 72:6, 72:10, 72:11, 73:12, 76:10, 81:16, 86:6, 86:7, 89:4, 90:4, 94:10, 94:11, 94:15, 96:16, 96:17, 97:14, 97:21, 98:15, 98:16, 100:17, 103:6
**drafted** [2] - 94:5, 94:6
**draw** [4] - 107:24, 110:16, 111:7, 111:10
**drawing** [1] - 113:4
**Drive** [1] - 5:24
**drive** [3] - 37:22, 47:12, 60:14
**driver's** [6] - 24:6, 54:1, 55:1, 66:3, 100:7, 100:9
**driving** [1] - 42:13
**drop** [2] - 41:9, 76:6
**dropped** [3] - 24:12,

24:16, 76:21
**drove** [1] - 60:10
**during** [9] - 9:7, 42:23, 43:2, 43:12, 93:19, 99:1, 104:9, 117:21, 118:23
**duty** [12] - 29:13, 29:15, 29:18, 29:20, 29:21, 99:18, 102:7, 105:17, 107:11, 107:14, 108:23, 112:8

# E

**early** [2] - 44:11, 62:11
**easily** [1] - 114:2
**easy** [2] - 93:5, 93:8
**effect** [1] - 29:22
**effectuate** [1] - 29:11
**eight** [1] - 102:10
**eight-year-old** [1] - 102:10
**either** [7] - 4:22, 10:21, 11:20, 26:19, 27:6, 108:9, 111:4
**Elaine** [1] - 1:13
**element** [1] - 84:6
**elements** [1] - 82:10
**elicited** [1] - 82:14
**elsewhere** [1] - 112:24
**email** [6] - 44:12, 45:2, 45:8, 45:9, 59:1, 59:4
**emails** [8] - 44:10, 44:16, 44:22, 59:4, 95:1, 95:21, 95:23, 104:4
**embarrassment** [2] - 61:4, 61:21
**emergency** [1] - 117:22
**emotional** [2] - 7:23, 12:3
**employed** [1] - 5:9
**encountered** [1] - 8:1
**end** [2] - 35:20, 86:8
**ended** [2] - 55:22, 97:19
**ending** [1] - 40:10
**engage** [1] - 108:14
**entitled** [3] - 84:4,

112:13, 114:20
**erupted** [1] - 104:19
**escort** [1] - 119:12
**ESQ** [2] - 2:3, 2:9
**establish** [2] - 111:17, 114:22
**established** [2] - 47:22, 69:20
**estimate** [1] - 69:18
**evaluate** [4] - 93:17, 102:23, 103:8, 114:18
**evening** [6] - 5:19, 36:4, 37:16, 58:13, 59:2, 60:1
**event** [1] - 117:16
**events** [1] - 113:8
**EVID** [1] - 3:14
**evidence** [45] - 31:19, 32:22, 82:11, 82:14, 83:10, 83:13, 102:22, 103:1, 103:8, 106:23, 107:4, 107:22, 107:23, 108:1, 108:6, 109:3, 109:5, 109:12, 109:17, 109:20, 110:4, 110:6, 110:7, 110:13, 110:16, 110:21, 110:24, 111:6, 111:13, 111:20, 112:2, 112:4, 112:7, 112:22, 112:24, 113:4, 114:9, 114:13, 114:18, 115:1, 115:5, 117:1, 117:6
**ex** [4] - 78:4, 102:6, 103:20, 104:5
**ex-husband** [1] - 102:6
**ex-husband's** [1] - 78:4
**ex-spouses** [2] - 103:20, 104:5
**exact** [2] - 40:7, 95:17
**exactly** [2] - 29:21, 93:13
**EXAMINATION** [5] - 5:2, 13:18, 33:4, 58:5, 81:7
**example** [3] - 84:16, 110:19, 116:17
**exchange** [5] - 9:3, 47:21, 63:13, 63:16, 104:9

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*    2 - 127

**exchanges** [2] - 104:6
**excited** [1] - 6:23
**exclusive** [1] - 108:23
**excuse** [4] - 32:12, 87:16, 107:2, 115:19
**excused** [2] - 117:23, 118:7
**excuses** [1] - 41:24
**Exhibit** [9] - 31:18, 32:22, 38:12, 38:16, 44:14, 44:15, 44:17, 58:3, 78:7
**exhibit** [1] - 38:19
**EXHIBITS** [1] - 1:1
**exiting** [2] - 82:3, 119:17
**expected** [1] - 58:8
**experience** [3] - 26:5, 111:11, 113:5
**expires** [1] - 120:23
**explain** [4] - 37:7, 45:8, 56:2, 84:19
**explained** [3] - 6:24, 9:10, 99:9
**explanation** [2] - 56:11, 111:24
**extra** [1] - 117:21
**extremely** [1] - 86:2
**eye** [6] - 54:2, 54:15, 55:20, 65:13, 73:7, 84:18
**eyes** [1] - 116:19

## F

**face** [2] - 76:2, 76:14
**facing** [6] - 10:4, 24:8, 53:15, 72:16, 72:17
**fact** [21] - 11:17, 18:6, 23:7, 27:18, 27:19, 28:7, 28:18, 29:12, 38:24, 41:24, 45:1, 59:17, 59:23, 60:6, 96:11, 97:3, 107:11, 110:8, 110:14, 112:9, 113:1
**facts** [8] - 107:22, 108:2, 108:5, 108:16, 110:5, 110:16, 111:8, 112:1
**failed** [1] - 117:10

**fair** [6] - 34:5, 34:8, 47:16, 64:22, 108:5, 108:7
**fairly** [2] - 70:1, 112:13
**fall** [12] - 55:14, 69:8, 71:3, 71:12, 71:18, 73:17, 75:16, 76:2, 76:7, 76:18, 100:17
**fallen** [2] - 8:16, 98:20
**falling** [4] - 76:1, 76:14, 90:4, 106:14
**falls** [1] - 98:16
**familiar** [1] - 78:15
**Family** [3] - 34:9, 34:16, 34:22
**far** [7] - 48:5, 49:16, 63:1, 67:3, 77:1, 80:14, 87:23
**fashion** [1] - 116:12
**February** [16] - 1:16, 5:16, 13:22, 26:4, 34:11, 34:12, 34:18, 34:22, 35:4, 35:9, 37:16, 94:9, 104:10, 107:1, 120:15, 120:17
**feet** [8] - 20:1, 73:19, 89:1, 97:13, 97:18, 97:20, 103:4
**fell** [23] - 8:18, 27:19, 55:16, 56:3, 56:6, 56:18, 56:22, 57:3, 69:13, 71:10, 71:16, 72:24, 73:1, 73:2, 73:21, 74:1, 79:1, 79:23, 96:16, 96:17, 106:5
**felt** [1] - 110:9
**few** [2] - 38:4, 49:15
**fifth** [1] - 40:18
**fight** [2] - 104:17, 104:19
**figured** [2] - 66:8, 66:10
**file** [4] - 18:22, 18:24, 19:2, 91:21
**filed** [4] - 17:19, 17:24, 18:4, 19:13
**fill** [2] - 99:16, 101:13
**final** [1] - 107:11
**finalized** [1] - 33:21
**finally** [1] - 104:15

**fine** [1] - 102:17
**finish** [1] - 63:7
**first** [39] - 6:6, 6:14, 7:20, 14:18, 16:3, 17:23, 18:4, 19:16, 19:17, 19:19, 19:23, 20:15, 31:1, 31:4, 31:6, 39:12, 40:18, 43:16, 46:4, 46:5, 46:6, 48:4, 51:5, 62:1, 62:12, 65:12, 99:3, 100:1, 100:5, 101:14, 102:13, 102:14, 103:17, 104:2, 104:3, 105:15, 111:6, 115:17
**five** [11] - 33:23, 33:24, 34:1, 81:22, 89:1, 93:6, 97:12, 97:13, 97:18, 97:20, 103:4
**five-and-a-half** [1] - 33:24
**five-minute** [1] - 81:22
**flip** [1] - 38:19
**focus** [1] - 53:12
**focused** [1] - 88:7
**follow** [1] - 107:19
**following** [1] - 31:10
**follows** [1] - 115:12
**forcibly** [1] - 28:22
**foregoing** [1] - 120:7
**Foreman** [1] - 118:17
**foreperson** [1] - 118:15
**formatting** [1] - 92:19
**forth** [2] - 15:16, 85:14
**forward** [42] - 25:7, 49:12, 49:13, 55:16, 56:8, 57:4, 69:8, 72:11, 72:12, 72:13, 72:22, 72:24, 73:3, 73:10, 73:12, 73:17, 74:3, 74:4, 74:5, 74:6, 74:16, 75:16, 76:3, 76:4, 76:6, 76:11, 79:20, 79:21, 79:23, 80:2, 80:3, 98:17, 98:20, 100:18, 106:14
**forwards** [2] - 55:14, 106:7
**four** [5] - 33:12, 34:1,

36:10, 93:6, 104:7
**fourth** [1] - 39:17
**frankness** [2] - 113:11, 113:12
**Free** [1] - 44:4
**Friday** [11] - 1:16, 35:16, 36:4, 58:13, 58:17, 59:2, 59:7, 59:10, 59:14, 59:16, 79:5
**friend** [1] - 37:22
**friends** [1] - 44:4
**FROM** [1] - 1:12
**front** [20] - 23:24, 24:4, 53:20, 55:4, 55:22, 57:5, 57:6, 68:15, 69:12, 69:13, 70:22, 71:23, 73:16, 77:16, 81:12, 98:18, 100:7, 100:10, 106:6
**frustrated** [2] - 63:1, 64:22
**frustrating** [1] - 58:16
**frustration** [1] - 11:11
**fuck** [11] - 54:6, 54:13, 55:8, 68:20, 69:3, 69:4, 69:5, 71:2, 73:8, 81:11, 100:16
**function** [2] - 107:21, 112:17
**furious** [1] - 104:6

## G

**games** [3] - 40:1, 41:22, 42:12
**General** [1] - 115:11
**gentlemen** [10] - 30:15, 93:3, 94:22, 97:17, 98:22, 102:5, 103:14, 106:10, 106:19, 117:19
**girl** [1] - 46:18
**girls** [3] - 46:16, 46:19, 49:17
**given** [4] - 17:12, 18:6, 58:17, 59:17
**goal** [1] - 67:4
**grab** [1] - 101:20
**grabbed** [5] - 24:16, 24:20, 68:7, 96:9,

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*

96:18

**grabs** [1] - 101:15

**grayish** [1] - 7:14

**grayish-brownish** [1] - 7:14

**great** [2] - 92:14, 102:16

**Grossman** [1] - 5:24

**ground** [18] - 8:16, 8:18, 27:19, 46:17, 55:12, 55:14, 56:4, 69:14, 71:23, 72:20, 72:21, 73:23, 76:17, 86:14, 99:5, 100:19, 106:14

**guess** [1] - 67:16

**guesswork** [1] - 108:14

**guilt** [5] - 108:21, 109:24, 111:18, 112:3, 112:6

**guilty** [19] - 82:9, 103:10, 107:6, 108:4, 109:6, 109:11, 109:13, 109:21, 109:24, 110:2, 111:21, 111:23, 113:22, 114:16, 114:24, 115:15, 117:12

## H

**ha-ha** [1] - 41:1

**Ha-ha-ha** [1] - 41:16

**habitually** [2] - 37:11, 58:8

**half** [9] - 33:24, 43:10, 43:11, 54:3, 54:16, 55:10, 72:19, 73:6, 73:8

**hamstring** [1] - 86:10

**hand** [31] - 9:11, 9:24, 13:11, 27:15, 54:11, 56:7, 56:21, 67:14, 67:19, 67:20, 67:24, 68:2, 68:6, 68:9, 70:14, 70:16, 71:7, 72:9, 73:11, 74:9, 74:17, 75:18, 76:3, 76:9, 80:4, 105:24, 110:22, 120:16

**handed** [2] - 13:13

**handled** [1] - 116:24

**hands** [9] - 9:12, 24:21, 54:10, 67:16, 70:17, 70:19, 95:24, 96:3, 105:24

**hard** [1] - 103:18

**harm** [2] - 83:11, 84:8

**head's** [1] - 20:6

**hear** [16] - 30:17, 50:7, 50:13, 51:18, 52:12, 54:13, 55:7, 83:6, 83:12, 88:11, 93:20, 93:21, 94:1, 99:1, 103:19, 105:14

**heard** [29] - 30:16, 37:1, 39:7, 39:11, 54:16, 54:18, 54:19, 56:12, 56:15, 57:14, 73:6, 81:10, 88:5, 88:6, 90:3, 90:7, 93:15, 94:4, 98:6, 99:2, 99:8, 99:11, 104:2, 104:10, 105:14, 105:21, 106:4, 108:13, 110:9

**hearing** [1] - 120:11

**heavier** [3] - 68:7, 86:8, 97:3

**heavy** [4] - 69:24, 70:1, 97:6, 106:6

**heel** [1] - 97:3

**held** [1] - 9:18

**hell** [1] - 100:3

**helping** [1] - 60:8

**hereby** [1] - 120:7

**hereunto** [1] - 120:16

**highest** [1] - 114:11

**himself** [2] - 64:19, 98:4

**hit** [60] - 8:18, 9:15, 9:16, 9:19, 10:1, 10:9, 11:17, 24:21, 24:23, 24:24, 25:4, 25:11, 25:19, 25:22, 27:13, 56:9, 57:1, 57:19, 63:8, 63:11, 69:14, 71:3, 71:8, 71:14, 72:3, 72:19, 74:13, 74:18, 74:19, 74:20, 74:22, 75:6, 75:11, 75:17, 76:4, 76:17,

79:6, 79:11, 79:12, 80:10, 80:16, 81:1, 85:7, 88:22, 90:1, 90:5, 96:5, 96:24, 97:1, 98:2, 102:11, 102:12, 102:13, 102:14, 103:3, 105:7, 105:24, 106:9

**hits** [1] - 75:17

**hitting** [2] - 83:18

**hmm** [4] - 20:14, 26:12, 27:2, 69:10

**hockey** [92] - 9:4, 9:10, 9:18, 10:3, 11:6, 12:21, 12:24, 13:2, 13:3, 14:6, 14:10, 14:11, 14:15, 22:13, 22:16, 28:10, 45:11, 45:14, 45:17, 45:19, 46:1, 46:11, 46:13, 46:16, 47:6, 49:5, 51:5, 51:11, 52:5, 52:6, 57:20, 63:16, 63:18, 63:22, 63:24, 65:1, 65:9, 65:12, 65:21, 67:7, 68:4, 68:12, 68:13, 69:19, 70:2, 70:3, 70:5, 70:8, 70:15, 73:16, 73:18, 73:20, 73:22, 73:23, 73:24, 75:17, 80:10, 80:17, 80:22, 83:8, 83:17, 84:3, 84:14, 86:19, 88:13, 88:14, 95:5, 95:7, 95:11, 95:12, 95:22, 96:5, 96:10, 96:23, 97:15, 98:7, 100:6, 100:8, 101:4, 101:10, 101:15, 104:18, 104:20, 104:23, 105:22, 106:6, 107:1, 115:9, 116:10

**hold** [3] - 38:9, 70:3, 70:15

**holding** [6] - 13:10, 67:18, 67:24, 68:4, 74:7, 75:22

**home** [2] - 36:14, 36:23

**honest** [1] - 100:2

**Honor** [38] - 4:5, 4:8, 4:18, 7:15, 13:7, 13:16, 30:2, 30:11,

31:13, 31:20, 31:22, 32:17, 32:23, 38:12, 42:19, 44:14, 58:1, 58:2, 60:22, 67:21, 78:6, 80:6, 81:6, 81:15, 82:7, 82:12, 83:1, 83:5, 83:15, 83:24, 85:1, 85:5, 86:3, 87:6, 89:14, 90:18, 92:11, 93:2

**Honorable** [1] - 1:13

**hope** [1] - 4:12

**hopes** [1] - 98:13

**hour** [5] - 37:14, 39:24, 42:3, 43:10, 43:11

**hour-and-a-half** [1] - 43:11

**hours** [2] - 62:14, 93:6

**hours'** [4] - 36:19, 37:7, 37:8, 41:23

**house** [8] - 40:1, 40:10, 41:10, 43:21, 43:24, 44:6, 58:8, 102:17

**huge** [1] - 50:7

**human** [2] - 114:5, 114:12

**husband** [1] - 102:6

**husband's** [2] - 11:24, 78:4

## I

**ID'd** [1] - 7:18

**idea** [4] - 66:2, 75:19, 75:23, 79:8

**IDEN** [1] - 3:14

**identified** [1] - 7:16

**identify** [1] - 7:12

**ignore** [1] - 107:16

**II** [1] - 1:1

**imaginary** [1] - 114:6

**immediately** [2] - 87:2, 87:6

**impartial** [1] - 108:7

**implore** [1] - 103:23

**imply** [1] - 79:17

**importance** [2] - 112:13, 113:3

**important** [4] - 85:18, 86:2, 87:12, 107:23

**improbable** [1] - 113:13

**IN** [1] - 120:16

**inaccurate** [1] - 18:21

**Inaudible** [1] - 30:13

**inaudible** [1] - 37:15

**incident** [11] - 11:4, 11:5, 11:14, 16:22, 18:2, 31:8, 34:19, 34:23, 79:5, 88:10, 100:15

**included** [6] - 59:7, 83:2, 83:7, 83:14, 83:23, 84:10

**including** [1] - 84:16

**inconsistent** [1] - 112:3

**inconvenience** [4] - 59:24, 60:7, 60:11, 60:12

**inconvenient** [1] - 59:20

**Index** [1] - 1:1

**indicate** [6] - 8:12, 9:13, 27:11, 43:3, 45:2, 86:5

**indicated** [5] - 13:10, 14:21, 28:3, 43:20, 95:16

**indicates** [4] - 21:12, 39:13, 86:10, 86:11

**indicating** [3] - 22:11, 85:24, 95:1

**individual** [1] - 105:7

**inevitable** [1] - 111:15

**infer** [1] - 111:2

**inference** [1] - 111:9

**inferences** [3] - 110:17, 111:7, 111:14

**inflict** [1] - 97:14

**influenced** [1] - 108:10

**inform** [1] - 118:20

**information** [2] - 17:12, 94:6

**informed** [1] - 94:8

**initial** [3] - 14:7, 14:16, 82:8

**initiated** [1] - 23:12

**injuries** [4] - 10:7,

79:1, 83:21, 103:5

**injury** [3] - 84:21, 116:7, 116:15

**innocence** [4] - 108:21, 109:10, 109:19, 112:4

**innocent** [5] - 84:14, 109:9, 109:18, 114:16, 116:9

**inside** [2] - 18:11, 96:24

**insisted** [1] - 43:18

**insistent** [1] - 11:8

**instead** [1] - 114:24

**instruct** [2] - 81:24, 107:12

**instruction** [8] - 82:24, 83:2, 83:7, 84:5, 86:2, 89:16, 107:17, 107:18

**instructions** [3] - 82:21, 83:12, 107:16

**instrumentality** [2] - 83:9, 84:5

**intelligence** [1] - 113:15

**intend** [1] - 57:19

**intended** [7] - 23:4, 85:24, 89:9, 115:20, 116:1, 116:3, 116:7

**intending** [1] - 117:17

**intent** [6] - 11:6, 82:11, 82:14, 83:17, 89:13

**intention** [2] - 95:5, 117:14

**intentional** [5] - 84:8, 86:1, 89:6, 90:8, 90:13

**intentionally** [10] - 75:12, 79:12, 80:9, 80:16, 81:1, 83:17, 116:11, 116:14, 116:20, 117:3

**interest** [1] - 113:19

**interviewed** [2] - 86:19, 105:20

**introduced** [1] - 117:1

**investigation** [1] - 12:17

**investigator** [1] - 88:4

**involved** [1] - 6:18

**involvement** [1] - 12:16

**involving** [2] - 29:18, 29:19

**irate** [1] - 39:8

**irrelevant** [1] - 41:24

**issue** [5] - 85:3, 90:3, 90:8, 91:12, 92:18

**issues** [2] - 91:19, 107:11

**item** [7] - 84:13, 101:3, 101:5, 116:9, 116:13, 116:20, 116:23

**itself** [1] - 31:2

## J

**jam** [1] - 96:10

**JESSICA** [1] - 2:3

**Jill** [1] - 39:23

▮▮▮▮ [8] - 45:10, 45:20, 45:22, 95:6, 95:13, 95:14, 95:22

▮▮▮▮ [2] - 45:17, 67:7

**job** [1] - 37:12

**join** [1] - 103:15

**judge** [1] - 112:13

**Judge** [9] - 7:17, 30:1, 57:22, 81:18, 85:12, 88:17, 89:21, 91:15, 99:9

**judges** [1] - 112:15

**judgment** [1] - 115:4

**JUROR** [1] - 32:8

**juror** [5] - 117:21, 117:22, 118:4, 118:7, 118:14

**Juror** [1] - 118:12

**Jurors** [4] - 32:10, 82:4, 92:23, 119:17

**jurors** [12] - 4:5, 4:8, 4:15, 82:3, 92:6, 92:10, 107:14, 110:11, 115:4, 118:18, 119:14, 119:18

**JURY** [2] - 3:20, 107:8

**jury** [32] - 4:7, 31:11, 32:6, 34:21, 37:8, 39:13, 43:24, 45:9, 53:8, 54:10, 54:21,

56:2, 83:6, 84:1, 89:5, 90:7, 90:13, 91:7, 93:3, 93:11, 93:17, 94:22, 98:23, 103:14, 103:23, 106:10, 106:19, 107:10, 107:21, 109:21, 118:6, 118:16

**Justice** [1] - 120:14

## K

**K-Mart** [13] - 5:24, 6:1, 21:6, 30:24, 39:10, 43:14, 45:24, 46:3, 46:8, 46:22, 62:2, 88:5, 104:1

**KAREN** [3] - 1:10, 3:8, 33:3

**Karen** [4] - 4:11, 32:24, 33:7, 120:13

**keep** [2] - 111:5, 117:6

**Kelley** [218] - 4:11, 6:18, 6:20, 7:8, 7:9, 7:22, 7:24, 8:6, 8:24, 9:14, 9:19, 9:21, 10:2, 10:7, 10:16, 15:1, 15:2, 15:5, 15:8, 15:11, 15:13, 16:3, 16:6, 19:19, 19:24, 20:13, 20:18, 20:19, 20:23, 21:7, 21:8, 21:12, 21:16, 21:24, 22:4, 22:7, 22:8, 22:11, 22:12, 22:15, 22:18, 23:10, 24:1, 24:12, 25:11, 25:19, 27:12, 27:13, 27:24, 28:1, 28:4, 28:5, 28:8, 28:13, 28:15, 29:11, 29:12, 32:24, 33:7, 33:8, 33:15, 33:17, 34:6, 35:7, 35:18, 35:23, 36:1, 36:2, 36:17, 37:9, 37:11, 37:17, 37:20, 38:15, 39:2, 39:12, 40:4, 40:6, 40:13, 40:15, 40:20, 41:13, 41:14, 41:17, 42:6, 42:16, 42:18, 42:20, 42:23, 43:2, 43:6, 43:9, 43:16, 44:10, 44:22, 45:4, 45:24, 46:5,

46:9, 46:22, 47:8, 48:8, 48:12, 48:19, 48:22, 49:7, 50:1, 50:8, 50:23, 51:14, 51:16, 52:2, 55:19, 56:9, 56:13, 57:1, 57:20, 58:7, 60:5, 61:1, 61:21, 62:4, 62:19, 62:24, 63:21, 65:3, 65:5, 68:1, 68:20, 69:15, 69:18, 71:2, 72:9, 72:14, 74:12, 74:13, 74:22, 74:23, 75:6, 75:11, 76:4, 76:23, 77:19, 78:8, 80:7, 80:10, 81:9, 81:10, 83:18, 87:8, 87:9, 87:10, 88:22, 93:14, 93:22, 93:23, 94:3, 94:8, 94:9, 94:17, 94:19, 94:23, 94:24, 95:4, 95:9, 95:10, 95:16, 95:17, 95:19, 95:21, 95:24, 96:1, 96:2, 96:3, 96:9, 96:20, 96:22, 97:8, 97:12, 97:20, 98:6, 98:14, 98:18, 98:19, 99:2, 99:3, 99:4, 100:11, 100:15, 100:17, 100:24, 101:1, 101:6, 101:7, 101:20, 102:6, 103:10, 103:24, 104:10, 104:22, 105:11, 105:12, 105:21, 105:22, 106:3, 106:5, 106:24, 115:10, 115:18, 116:1, 116:8, 120:13

**KELLEY** [3] - 1:10, 3:8, 33:3

**Kelley's** [20] - 7:19, 13:6, 14:11, 25:15, 37:1, 47:23, 52:7, 52:18, 53:2, 64:13, 65:9, 77:8, 87:3, 89:22, 94:14, 97:4, 98:10, 101:2, 101:3, 105:10

**Kelly** [2] - 31:12, 115:21

**kept** [4] - 15:23, 55:20,

72:22, 73:11

**kidding** [3] - 40:19, 40:23, 41:1

**kids** [16] - 36:8, 38:1, 44:23, 45:4, 48:7, 48:9, 48:12, 48:21, 50:1, 58:17, 58:23, 59:11, 60:18, 63:14, 66:6, 77:16

**kind've** [1] - 86:19

**kinda** [4] - 15:19, 60:10, 68:10, 78:16

**knee** [20] - 8:19, 8:20, 8:22, 55:17, 69:9, 69:12, 71:3, 71:8, 71:10, 71:14, 71:16, 71:21, 72:3, 72:4, 72:5, 72:11, 75:17, 76:10, 76:17

**kneecap** [1] - 56:8

**knock** [1] - 48:13

**knocked** [3] - 98:15, 100:19

**know0** [1] - 88:12

**knowledgeable** [1] - 92:12

**knows** [1] - 119:6

## L

**labeled** [1] - 61:8

**lack** [2] - 89:13, 113:11

**ladies** [10] - 30:15, 93:3, 94:22, 97:17, 98:22, 102:5, 103:14, 106:10, 106:19, 117:19

**language** [1] - 90:13

**laptop** [1] - 92:11

**last** [1] - 42:14

**late** [25] - 21:1, 21:5, 21:8, 21:9, 21:13, 22:8, 37:11, 37:14, 37:24, 42:3, 44:8, 58:8, 58:12, 59:18, 59:24, 60:6, 61:22, 62:4, 62:13, 94:11, 94:14, 94:15, 94:21, 95:2, 95:3

**law** [11] - 81:24, 107:13, 107:14, 107:19, 107:20, 108:1,

109:8, 109:10, 111:4, 116:13, 117:23

**Laws** [1] - 115:11

**lawyers** [2] - 81:22, 108:20

**leads** [1] - 28:20

**learned** [2] - 15:20, 59:18

**least** [3] - 26:6, 59:19, 90:2

**leave** [8] - 37:12, 38:1, 47:1, 51:1, 64:11, 66:10, 66:12, 111:22

**left** [31] - 13:13, 43:21, 43:24, 44:6, 46:20, 50:21, 55:17, 67:13, 67:19, 68:2, 68:6, 68:9, 68:16, 68:18, 69:9, 69:12, 69:16, 70:11, 70:13, 70:16, 70:23, 71:3, 71:8, 71:10, 71:14, 71:16, 71:24, 72:3, 72:11, 73:2, 97:5

**left-handed** [1] - 13:13

**leg** [6] - 71:11, 71:17, 72:12, 76:13, 79:1, 79:11

**legs** [15] - 10:10, 25:22, 25:23, 26:1, 26:8, 68:15, 70:21, 70:22, 70:23, 83:18, 86:5, 105:2, 105:8, 106:16

**Leigh** [1] - 91:13

**length** [1] - 105:20

**lengthy** [1] - 103:22

**less** [2] - 39:24, 42:3

**lesser** [5] - 83:2, 83:6, 83:14, 83:22, 84:9

**lies** [1] - 112:18

**life** [2] - 111:12, 113:5

**light** [1] - 98:21

**lighted** [2] - 84:16, 116:17

**lighter** [1] - 97:4

**likely** [2] - 84:8, 114:23

**Linda** [2] - 120:5, 120:20

**line** [1] - 40:18

**listen** [2] - 80:23, 103:16

**listening** [1] - 93:7

**live** [2] - 33:8, 33:11

**lived** [1] - 34:2

**lives** [1] - 114:5

**lo** [1] - 88:20

**loaded** [1] - 65:21

**located** [2] - 14:11, 14:15

**LOCATION** [1] - 1:14

**location** [6] - 5:21, 52:2, 86:4, 88:13, 88:19, 88:23

**look** [32] - 17:15, 17:18, 17:23, 18:9, 31:4, 31:5, 38:17, 38:18, 38:21, 39:21, 44:17, 45:7, 60:24, 65:14, 67:3, 72:2, 78:11, 78:13, 78:15, 95:23, 100:23, 101:16, 102:3, 102:22, 103:1, 103:23, 104:4, 106:12, 106:22, 112:24, 113:4

**looked** [2] - 17:24, 100:2

**looking** [2] - 83:22, 100:3

**looks** [1] - 101:3

**loss** [1] - 88:4

## M

**ma'am** [1] - 53:12

**mail** [3] - 110:23, 110:24, 111:3

**mailbox** [3] - 110:20, 110:23, 111:3

**mailman** [2] - 110:20, 110:21

**male** [2] - 6:17, 111:2

**mall** [1] - 6:1

**managed** [1] - 97:13

**manner** [6] - 7:2, 83:10, 86:13, 88:23, 103:3, 116:23

**Marina** [1] - 2:11

**marked** [7] - 31:17, 32:21, 38:16, 40:17, 41:4, 42:10, 44:17

**marks** [1] - 26:6
**Mart** [13] - 5:24, 6:1, 21:6, 30:24, 39:10, 43:14, 45:24, 46:3, 46:8, 46:22, 62:2, 88:5, 104:1
**Mass** [3] - 33:9, 33:10, 36:14
**MASSACHUSETTS** [3] - 1:4, 1:8, 120:3
**Massachusetts** [5] - 1:15, 2:6, 2:11, 120:7, 120:13
**matter** [2] - 19:24, 93:5
**matters** [1] - 114:12
**Matthew** [1] - 118:12
**McNamara** [18] - 6:10, 6:14, 6:16, 11:21, 12:11, 14:22, 15:4, 15:13, 17:2, 19:17, 19:22, 19:23, 20:12, 21:24, 26:22, 74:24, 77:18, 94:7
**mean** [11] - 35:23, 37:7, 48:10, 89:3, 89:18, 93:22, 104:5, 110:18, 114:3, 114:11, 115:5
**means** [4] - 112:23, 115:8, 115:13, 117:15
**meant** [1] - 94:1
**meet** [3] - 21:4, 21:6, 43:13
**meeting** [2] - 44:4, 61:17
**meets** [1] - 84:6
**member** [2] - 5:12, 6:6
**members** [2] - 77:24, 107:10
**memory** [5] - 13:1, 13:2, 70:10, 70:21, 113:15
**mere** [3] - 85:15, 85:19, 85:24
**merely** [2] - 84:3, 116:4
**messages** [9] - 38:13, 61:16, 82:15, 95:1, 103:22, 104:4, 104:12, 104:13, 106:22
**met** [4] - 9:2, 45:24,

82:10
**microphone)** [1] - 37:15
**might** [6] - 108:16, 110:19, 110:22, 113:6, 113:7
**might've** [5] - 68:7, 79:11, 79:20, 79:21, 90:4
**mind** [4] - 101:8, 108:15, 111:6, 117:7
**minds** [1] - 114:9
**minor** [1] - 88:15
**minute** [1] - 81:22
**minutes** [14] - 31:1, 31:3, 31:5, 31:7, 31:24, 32:13, 62:14, 62:16, 87:22, 87:24, 100:5, 101:18, 101:19, 105:19
**miss** [2] - 38:2, 59:19
**mistake** [1] - 102:5
**modification** [1] - 34:24
**modify** [1] - 35:1
**moment** [3] - 13:7, 80:6, 106:7
**moral** [4] - 111:22, 114:10, 114:11, 115:2
**moreover** [1] - 97:2
**Moriarty** [2] - 1:13, 120:14
**morning** [11] - 4:12, 4:20, 4:21, 5:4, 5:5, 13:20, 13:21, 45:11, 45:15, 110:19
**most** [2] - 26:5, 80:18
**motion** [3] - 82:6, 82:8, 82:13
**motion's** [1] - 82:19
**motions** [1] - 108:19
**motive** [1] - 113:17
**move** [6] - 32:17, 49:11, 63:6, 63:10, 82:8, 100:11
**moved** [7] - 25:7, 49:12, 49:13, 63:7, 100:13, 100:14, 100:18
**MR** [56] - 7:17, 13:19, 30:1, 30:7, 31:13,

31:20, 31:22, 32:2, 32:5, 32:12, 32:14, 32:17, 32:23, 33:5, 38:12, 44:14, 57:22, 61:7, 61:10, 67:21, 81:8, 81:14, 81:18, 81:20, 82:7, 82:20, 82:23, 83:4, 83:15, 85:1, 85:5, 85:8, 85:20, 85:23, 86:24, 87:5, 87:16, 87:18, 87:22, 88:2, 88:9, 88:19, 89:3, 89:17, 89:21, 90:17, 90:23, 91:3, 91:6, 91:10, 91:15, 91:21, 92:3, 92:5, 92:18, 93:2
**MS** [35] - 4:18, 5:3, 7:15, 13:7, 13:15, 22:9, 30:2, 30:10, 31:15, 32:19, 38:5, 42:19, 52:21, 58:1, 58:6, 60:22, 61:8, 78:6, 80:6, 81:6, 81:15, 82:12, 83:1, 83:5, 83:24, 86:17, 86:23, 87:21, 89:10, 89:12, 89:20, 90:16, 90:18, 90:21, 103:14
**must** [16] - 82:10, 89:8, 107:19, 108:1, 110:2, 111:10, 112:2, 112:3, 112:5, 113:4, 114:21, 115:1, 115:15, 115:24, 117:7, 117:12
**must've** [1] - 22:6

# N

**Nah** [1] - 94:19
**nah** [2] - 94:19, 94:20
**name** [2] - 5:6, 33:6
**natural** [1] - 111:11
**nature** [3] - 83:9, 84:2, 116:23
**near** [6] - 11:7, 23:15, 42:3, 51:21, 66:23, 67:1
**necessarily** [4] - 18:10, 18:13, 21:4, 26:7
**necessary** [2] - 17:5, 84:20

**need** [4] - 93:17, 94:10, 99:22, 117:23
**needed** [1] - 70:17
**needs** [1] - 118:7
**negligent** [2] - 89:15, 116:5
**nervous** [1] - 44:7
**never** [29] - 19:13, 21:15, 23:4, 74:11, 74:18, 74:20, 74:22, 75:5, 75:8, 75:10, 75:12, 77:23, 79:11, 79:12, 79:13, 79:15, 80:9, 80:16, 80:24, 85:24, 90:5, 94:20, 95:24, 96:3, 100:14, 100:18, 109:15, 117:21
**next** [13] - 6:16, 26:7, 35:9, 45:11, 45:14, 47:9, 50:4, 52:18, 53:1, 53:4, 55:9, 57:4, 98:7
**nice** [1] - 4:13
**night** [16] - 4:13, 13:22, 58:18, 59:14, 59:16, 60:9, 60:15, 60:17, 60:20, 74:24, 77:24, 93:14, 93:16, 94:9, 105:12, 107:1
**nights** [1] - 37:12
**NO** [2] - 1:6, 3:14
**none** [2] - 51:15, 112:20
**nonetheless** [1] - 26:13
**NORFOLK** [1] - 1:5
**Norfolk** [2] - 2:5, 120:11
**normal** [4] - 6:23, 7:1, 48:2
**normally** [3] - 35:21, 84:13, 116:9
**Notary** [2] - 120:6, 120:21
**note** [1] - 90:11
**notes** [1] - 90:3
**nothing** [12] - 29:12, 30:2, 59:10, 75:17, 77:7, 81:15, 81:18, 87:18, 90:16, 99:6,

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*    2 - 132

109:3

**notice** [7] - 36:19, 37:7, 37:8, 37:14, 41:23, 50:14, 100:21
**notified** [1] - 29:17
**November** [1] - 120:23
**nowhere** [3] - 42:3, 66:23, 67:1
**nuisances** [1] - 88:15
**number** [4] - 96:1, 117:20, 118:3, 118:11
**numerous** [1] - 34:9

## O

**o'clock** [4] - 35:21, 36:3, 36:5, 37:21
**object** [4] - 83:1, 83:4, 85:15, 89:17
**objected** [1] - 43:16
**objection** [9] - 7:17, 22:9, 31:15, 32:19, 38:5, 52:21, 67:21, 90:12, 92:7
**objections** [1] - 108:19
**observe** [3] - 8:21, 10:6, 14:6
**observed** [2] - 14:10, 50:4
**obviously** [4] - 79:10, 80:22, 85:9, 92:18
**occur** [1] - 116:4
**occurred** [6] - 31:8, 88:22, 103:2, 117:4, 117:8, 117:11
**occurs** [1] - 117:14
**OF** [5] - 1:4, 1:8, 5:1, 33:3, 120:3
**off-duty** [8] - 29:13, 29:15, 29:18, 29:20, 29:21, 99:18, 102:7, 105:17
**offense** [4] - 83:14, 108:10, 115:15, 117:4
**Office** [1] - 2:5
**officer** [27] - 11:24, 15:1, 16:8, 17:11, 18:1, 18:7, 18:15, 20:5, 26:24, 27:3,

29:13, 29:15, 29:18, 29:22, 78:2, 78:5, 94:2, 96:4, 99:5, 99:12, 99:13, 100:22, 102:7, 105:17, 119:1, 119:8
**Officer** [42] - 6:10, 6:14, 6:15, 11:21, 12:11, 14:21, 15:4, 15:7, 15:10, 15:13, 16:24, 17:2, 18:20, 19:8, 19:17, 19:22, 19:23, 20:11, 21:11, 21:15, 21:24, 22:3, 22:7, 26:22, 56:12, 56:16, 74:23, 77:18, 82:17, 94:4, 94:5, 94:7, 94:16, 94:17, 95:8, 95:15, 99:12, 118:21
**OFFICER** [8] - 4:5, 82:2, 90:24, 91:24, 92:10, 92:15, 92:22, 119:16
**officers** [13] - 17:6, 17:13, 26:21, 30:22, 88:4, 94:2, 94:8, 94:21, 96:12, 100:24, 101:21, 106:2, 119:12
**offline** [4] - 99:21, 99:22, 99:23, 101:12
**often** [3] - 70:6, 70:8, 113:6
**old** [3] - 45:22, 102:9, 102:10
**older** [4] - 44:2, 59:2, 59:15, 95:12
**oldest** [2] - 22:19, 26:23
**once** [2] - 11:19, 12:6
**one** [59] - 9:11, 9:23, 10:12, 11:1, 13:7, 13:11, 14:24, 15:1, 15:22, 16:2, 16:11, 16:14, 16:17, 17:11, 18:7, 26:21, 26:22, 27:6, 27:15, 37:9, 39:17, 53:6, 54:10, 54:11, 56:21, 61:3, 62:12, 68:7, 74:9, 74:17, 75:17, 76:8, 78:22, 80:4, 80:6, 91:16, 91:24, 92:1,

92:10, 97:14, 99:13, 101:11, 101:12, 102:11, 102:20, 102:21, 103:20, 105:23, 106:7, 106:20, 110:19, 111:1, 111:6, 111:14, 111:17, 118:18
**One** [1] - 99:19
**one's** [2] - 100:24, 101:1
**online** [1] - 99:17
**open** [10] - 24:8, 48:3, 48:7, 48:11, 48:21, 65:18, 66:9, 91:15, 91:18, 114:5
**opened** [1] - 48:5
**opening** [4] - 24:6, 91:19, 93:19, 102:8
**opinion** [1] - 108:22
**opportunity** [11] - 7:5, 8:21, 10:6, 12:21, 17:15, 18:21, 78:8, 78:14, 103:18, 105:3, 106:8
**opposed** [1] - 88:10
**opposite** [3] - 8:3, 23:7, 95:18
**or..** [1] - 10:1
**order** [3] - 36:16, 108:2, 115:14
**ordered** [1] - 37:13
**originally** [1] - 21:5
**outcome** [1] - 113:20
**outset** [1] - 93:10
**outside** [6] - 46:20, 47:1, 47:4, 48:23, 48:24, 108:13
**own** [8] - 18:22, 65:2, 91:16, 91:17, 110:10, 111:11, 113:5

## P

**p.m** [4] - 1:17, 5:20, 58:9, 119:18
**pace** [1] - 6:23
**page** [2] - 39:17, 40:18
**PAGE** [1] - 3:17
**Page** [8] - 40:16, 40:17, 41:4, 41:5,

42:2, 42:10, 42:12
**PAGES** [1] - 1:1
**paid** [1] - 93:9
**pant** [1] - 26:8
**pants** [3] - 10:9, 78:17, 78:21
**paper** [1] - 118:24
**par** [1] - 60:14
**parallel** [1] - 66:22
**parenting** [1] - 20:20
**park** [1] - 47:10
**parked** [3] - 47:11, 52:2, 52:3
**parking** [13] - 8:2, 30:23, 46:1, 46:3, 46:8, 48:20, 49:2, 49:19, 61:12, 62:2, 62:5, 80:8, 104:1
**Parkway** [1] - 1:15
**part** [10] - 31:2, 37:12, 55:1, 65:11, 84:23, 87:4, 89:7, 97:6, 112:20, 117:15
**part-time** [1] - 37:12
**particular** [2] - 5:21, 48:6
**parties** [13] - 10:12, 12:19, 15:17, 15:19, 15:21, 15:23, 21:21, 30:24, 31:7, 105:19, 105:20, 117:18, 119:2
**party** [8] - 6:17, 10:14, 15:22, 16:15, 20:15, 38:3, 44:3
**passed** [1] - 72:21
**passenger** [2] - 50:18, 66:6
**past** [5] - 23:15, 55:11, 55:20, 65:20, 73:11
**pathway** [1] - 98:5
**pencil** [1] - 116:19
**people** [2] - 93:13, 101:10
**perhaps** [1] - 106:15
**permitted** [1] - 83:6
**person** [8] - 11:1, 19:17, 19:19, 102:20, 102:21, 114:15, 115:17, 116:16
**personal** [1] - 108:8

91:16, 91:24, 92:1, *Reporters, Inc.*
*www.reportersinc.com*

**personally** [2] - 27:8, 118:5
**PH9** [1] - 61:8
**phone** [1] - 99:23
**phonetic** [1] - 118:15
**photographs** [4] - 78:9, 82:18, 106:12, 106:13
**photos** [2] - 105:4, 107:4
**pick** [13] - 36:12, 36:17, 36:18, 36:21, 45:4, 48:8, 59:24, 62:14, 65:8, 65:12, 66:2, 66:18, 99:23
**picked** [9] - 51:3, 51:4, 51:5, 51:11, 51:19, 65:15, 67:14, 68:5
**pickup** [1] - 48:2
**pickups** [2] - 47:24, 58:9
**pictures** [1] - 78:17
**piece** [1] - 118:24
**pieces** [3] - 50:11, 51:8, 54:8
**place** [11] - 10:11, 10:19, 11:9, 11:12, 11:19, 16:18, 25:6, 36:16, 63:14, 63:17, 117:16
**placed** [7] - 10:14, 11:21, 12:2, 12:6, 31:11, 31:12, 77:17
**placing** [2] - 12:15, 28:3
**plan** [1] - 88:15
**play** [6] - 30:19, 30:23, 31:23, 32:3, 42:12, 91:17
**played** [2] - 31:10, 32:6
**playing** [3] - 40:1, 41:22, 92:7
**PLYMOUTH** [1] - 120:3
**point** [42] - 10:11, 12:1, 14:7, 16:12, 18:9, 19:8, 19:10, 22:6, 24:11, 24:17, 38:3, 42:22, 43:12, 46:13, 47:18, 49:12,

49:19, 49:20, 50:16, 50:22, 52:13, 54:21, 56:5, 59:18, 61:22, 62:24, 63:12, 63:21, 64:3, 67:1, 67:6, 68:7, 68:10, 70:17, 71:6, 71:20, 72:8, 73:23, 76:12, 77:14, 82:8, 87:24
**poke** [1] - 84:18
**Police** [17] - 5:10, 5:13, 6:6, 12:8, 12:13, 30:20, 30:21, 77:8, 77:24, 78:5, 78:23, 79:5, 79:15, 79:22, 99:5, 105:5, 105:12
**police** [34] - 11:24, 29:13, 29:15, 29:18, 29:22, 56:5, 56:18, 57:7, 57:9, 74:8, 74:13, 74:15, 77:2, 77:3, 77:5, 77:7, 77:12, 77:15, 77:20, 78:2, 86:17, 86:18, 87:15, 88:2, 89:24, 90:2, 90:6, 94:2, 94:20, 99:10, 102:7, 105:17
**portions** [1] - 120:9
**position** [4] - 62:5, 65:13, 86:7, 88:20
**possible** [3] - 114:4, 114:5, 114:12
**possibly** [4] - 6:3, 29:18, 29:19, 43:11
**potentially** [1] - 116:12
**pounds** [1] - 69:21
**prejudice** [1] - 108:8
**prepared** [1] - 120:8
**present** [4] - 4:8, 12:12, 82:4, 92:23
**presented** [1] - 110:15
**presumably** [1] - 64:4
**presumed** [3] - 66:3, 109:17, 114:15
**presumes** [1] - 109:8
**presumption** [2] - 109:9, 109:19
**pretty** [6] - 17:8, 58:12, 58:14, 73:9, 94:13,

114:1
**prevention** [1] - 88:4
**prevents** [1] - 118:8
**previously** [5] - 33:18, 39:7, 43:20, 52:1, 96:12
**probability** [2] - 114:22, 114:23
**probable** [1] - 113:13
**Probate** [3] - 34:9, 34:16, 34:22
**problem** [1] - 119:7
**proceedings** [1] - 120:12
**produce** [1] - 109:17
**produced** [3] - 39:4, 94:24, 95:21
**produces** [1] - 109:12
**profanity** [1] - 98:15
**prominence** [1] - 92:17
**proof** [7] - 109:15, 111:4, 113:24, 114:3, 114:4, 114:17, 115:6
**prosecutor** [1] - 114:17
**prove** [11] - 82:11, 84:20, 89:8, 112:5, 113:21, 115:14, 115:15, 115:24, 116:6, 117:7, 117:10
**proved** [1] - 114:7
**proven** [11] - 84:7, 108:3, 108:24, 109:24, 110:8, 110:15, 111:8, 112:1, 113:1, 114:16, 118:1
**proves** [1] - 109:13
**provided** [1] - 120:10
**provides** [1] - 115:12
**Public** [2] - 120:6, 120:21
**public** [1] - 108:11
**pull** [3] - 88:2, 104:14, 118:11
**pulled** [5] - 26:8, 46:15, 47:3, 48:19, 49:15
**pulling** [1] - 62:21
**pulls** [1] - 104:16

**punished** [1] - 115:14
**pure** [1] - 117:4
**purpose** [1] - 45:9
**purposes** [2] - 84:14, 116:10
**push** [3] - 24:17, 50:24, 96:2
**pushed** [34] - 8:7, 8:8, 8:12, 8:14, 9:1, 25:11, 25:13, 28:1, 55:10, 55:11, 55:12, 55:13, 55:22, 69:7, 72:9, 72:14, 72:20, 72:24, 73:1, 73:2, 73:4, 73:10, 73:15, 75:17, 77:16, 96:4, 96:6, 96:15, 97:23, 100:17, 106:5
**pushes** [2] - 69:6, 69:8
**pushing** [5] - 24:14, 28:19, 28:22, 73:13, 104:24
**put** [19] - 9:4, 22:7, 23:13, 24:18, 25:14, 46:16, 47:4, 50:5, 56:7, 65:23, 66:10, 85:13, 91:8, 91:12, 95:24, 96:3, 98:4, 98:10, 114:13
**puts** [4] - 87:7, 87:11, 101:4, 101:15
**putting** [4] - 24:1, 64:18, 65:1, 66:5

## Q

**questions** [9] - 13:15, 30:1, 30:7, 81:6, 103:7, 103:8, 108:15, 112:9, 118:23
**quickly** [2] - 76:10, 90:19
**QUINCY** [1] - 1:5
**Quincy** [4] - 1:14, 1:15, 2:11, 120:11
**quite** [2] - 69:24, 92:11

## R

**radio** [1] - 29:17
**ran** [5] - 57:5, 57:6, 57:8, 76:22, 77:1
**rather** [1] - 10:4

*Commonwealth v. Karen Calabrese-Kelley (2-25-16)*    2-134

**reaction** [1] - 42:2
**read** [8] - 19:11, 39:12, 84:12, 84:15, 89:11, 104:3, 107:5, 108:13
**ready** [3] - 4:4, 64:11, 88:13
**real** [1] - 108:16
**really** [3] - 9:24, 12:4, 23:18
**rear** [4] - 54:1, 55:1, 55:2, 100:9
**rearview** [1] - 42:13
**reason** [13] - 23:1, 28:3, 29:7, 39:23, 41:23, 43:21, 44:5, 48:6, 48:20, 64:9, 83:8, 96:13, 115:4
**reasonable** [26] - 42:1, 42:4, 89:8, 109:1, 109:14, 109:22, 110:1, 110:17, 111:10, 111:16, 111:18, 111:24, 112:6, 113:13, 113:22, 113:24, 114:3, 114:7, 114:19, 115:2, 115:6, 115:16, 115:24, 117:8, 117:11, 118:2
**reasonably** [2] - 111:2, 116:14
**reasons** [1] - 26:4
**receive** [1] - 112:14
**received** [4] - 31:18, 32:22, 45:13, 94:7
**recessed** [1] - 119:18
**reckless** [1] - 89:18
**recognize** [4] - 38:22, 38:24, 44:19, 44:21
**recollection** [2] - 14:14, 71:22
**record** [5] - 5:7, 7:9, 7:15, 33:6, 118:19
**recording** [3] - 57:14, 57:17, 120:10
**RECORDING** [1] - 1:12
**recordings** [1] - 31:10
**RECROSS** [2] - 3:3, 3:7
**REDIRECT** [3] - 3:3, 3:7, 81:7
**reduce** [2] - 117:19,

118:3
**refer** [1] - 114:11
**referring** [1] - 88:16
**reflect** [1] - 7:15
**reflex** [4] - 76:3, 76:5, 79:24
**refused** [5] - 22:16, 22:19, 95:11, 95:17, 96:12
**refusing** [2] - 28:15, 28:19
**regard** [1] - 16:21
**regards** [1] - 24:22
**reiterated** [2] - 94:16, 96:6
**relating** [1] - 114:12
**relation** [1] - 70:21
**relationship** [3] - 34:5, 48:17, 68:14
**relative** [2] - 88:13, 88:14
**relax** [1] - 66:11
**release** [1] - 30:6
**relevant** [4] - 31:2, 31:8, 87:1, 88:13
**relieved** [1] - 62:20
**reluctance** [1] - 9:6
**remain** [1] - 108:15
**remained** [1] - 73:23
**remaining** [1] - 114:19
**remember** [5] - 10:5, 13:4, 24:22, 27:23, 29:21
**repeat** [1] - 59:22
**rephrase** [1] - 67:23
**replied** [2] - 4:15, 99:11
**report** [23] - 6:3, 16:21, 16:24, 17:3, 17:7, 17:12, 17:16, 17:24, 18:4, 18:9, 18:12, 18:19, 18:20, 18:22, 18:24, 19:2, 19:9, 19:13, 21:11, 22:4, 22:7, 94:5, 94:6
**reported** [2] - 18:17, 22:8
**request** [4] - 63:9, 82:12, 83:6, 89:15
**requesting** [1] - 82:22

**required** [6] - 82:6, 82:9, 109:16, 111:14, 111:15, 116:6
**requires** [1] - 109:23
**resolve** [1] - 112:17
**respectfully** [2] - 82:12, 83:5
**respond** [2] - 6:7, 99:10
**responded** [4] - 6:9, 40:23, 82:17, 94:3
**response** [4] - 28:14, 40:24, 42:9, 99:17
**responsibility** [1] - 108:23
**responsible** [2] - 12:9, 18:12
**rests** [3] - 30:10, 81:19, 81:20
**result** [3] - 37:19, 45:16, 93:16
**resulted** [1] - 9:6
**resumption** [1] - 4:10
**retire** [1] - 119:15
**reviewing** [1] - 18:19
**right-handed** [1] - 13:13
**▮** [9] - 50:8, 50:14, 52:12, 53:5, 63:15, 64:4, 64:16, 64:21, 65:4
**rise** [4] - 4:7, 82:2, 90:24, 119:16
**rivaling** [1] - 103:20
**road** [2] - 18:13, 30:22
**Road** [6] - 2:5, 2:10, 33:10, 36:13, 36:23, 36:24
**rocky** [2] - 34:6, 48:17
**rolled** [1] - 50:18
**room** [5] - 102:9, 102:16, 102:19, 103:23, 105:4
**roughly** [1] - 93:6
**rounded** [1] - 53:17
**rounding** [3] - 54:1, 54:23, 54:24
**row** [1] - 48:20
**Roxbury** [4] - 33:9, 33:10, 36:13, 47:24

**rule** [2] - 109:10, 111:9
**ruling** [1] - 108:19
**run** [3] - 76:19, 90:19, 119:6
**running** [13] - 21:1, 21:5, 21:8, 21:13, 22:8, 68:22, 94:11, 94:14, 94:15, 94:21, 95:2
**Ryan** [1] - 1:15

## S

**safe** [7] - 46:21, 48:16, 58:16, 59:17, 61:16, 65:20, 70:2
**sat** [3] - 46:9, 47:20, 49:9
**satisfies** [1] - 115:3
**savvy** [1] - 91:8
**saw** [11] - 13:4, 14:7, 14:8, 18:4, 18:19, 19:8, 61:11, 62:21, 72:19, 73:6, 75:2
**scanner** [4] - 88:5, 88:6, 88:11
**scene** [31] - 6:5, 6:11, 12:18, 12:22, 14:5, 14:17, 14:20, 14:22, 14:24, 15:10, 16:8, 16:12, 17:6, 17:13, 17:24, 18:8, 18:16, 19:16, 21:18, 21:21, 26:17, 27:1, 29:16, 74:24, 77:5, 82:17, 87:2, 94:3, 95:10, 100:22, 100:24
**schedule** [2] - 35:6, 35:18
**scheduled** [1] - 35:5
**schedules** [2] - 44:13, 44:23
**school** [1] - 35:20
**Schrim** [1] - 118:14
**scraped** [1] - 72:4
**screamed** [2] - 73:8
**screams** [1] - 52:15
**screen** [1] - 32:8
**seal** [1] - 120:17
**Seat** [2] - 118:12, 118:14

*Reporters, Inc.*
*www.reportersinc.com*

**seated** [2] - 4:9, 92:22
**second** [5] - 38:9, 61:3, 103:16, 111:9, 115:20
**seconds** [2] - 101:18, 101:19
**Section** [1] - 115:11
**secures** [1] - 101:5
**securing** [1] - 101:10
**see** [30] - 7:9, 10:10, 18:13, 26:7, 26:13, 30:12, 32:7, 32:9, 39:18, 41:6, 41:11, 41:20, 44:14, 48:21, 54:2, 66:9, 78:9, 85:3, 86:15, 86:21, 87:14, 87:17, 87:20, 88:1, 88:8, 92:6, 100:6, 102:4, 104:11, 117:18
**See** [1] - 1:1
**seeing** [1] - 86:17
**seeking** [1] - 83:2
**sees** [2] - 110:20, 110:23
**send** [28] - 40:4, 40:13, 40:20, 41:13, 41:16, 41:17, 42:4, 42:6, 42:16, 44:10, 44:12, 47:18, 49:1, 49:2, 63:8, 63:11, 82:1, 91:1, 91:14, 102:19, 119:1, 119:5, 119:9
**sending** [3] - 45:9, 63:7, 63:19
**sense** [22] - 8:10, 20:11, 64:2, 64:20, 96:8, 97:22, 97:23, 97:24, 98:2, 98:3, 98:22, 102:23, 103:6, 105:10, 106:2, 106:4, 106:10, 106:18, 111:11, 113:5, 116:2
**senses** [1] - 110:10
**sent** [15] - 31:3, 40:6, 40:15, 40:22, 41:14, 41:18, 42:8, 42:18, 44:11, 44:22, 45:1, 45:2, 49:18, 58:24, 59:4
**sentiments** [1] - 77:23

**separate** [1] - 47:14
**separated** [2] - 15:23, 21:22
**Sergeant** [25] - 4:19, 4:21, 5:4, 5:9, 5:15, 13:9, 13:20, 13:22, 30:3, 74:24, 75:2, 75:10, 77:18, 82:16, 87:1, 90:6, 94:7, 95:8, 95:15, 96:6, 99:11, 100:21, 101:2, 105:14, 105:21
**SERGEANT** [2] - 3:4, 5:1
**sergeant** [3] - 5:10, 30:6, 30:8
**series** [1] - 41:19
**serious** [2] - 83:11, 116:15
**serve** [1] - 118:6
**set** [4] - 91:13, 100:8, 119:9, 120:16
**settled** [1] - 111:23
**seven** [1] - 40:11
**several** [1] - 52:3
**shaft** [1] - 97:3
**shall** [2] - 115:14, 118:19
**shape** [1] - 116:23
**Shawmut** [1] - 2:5
**shift** [2] - 5:18, 5:19
**shifts** [1] - 109:15
**shopping** [1] - 6:1
**Shore** [4] - 21:1, 21:13, 94:12, 94:15
**short** [3] - 104:12, 104:13, 109:2
**shortly** [2] - 61:6, 61:11
**shot** [1] - 87:23
**shoulder** [5] - 67:10, 67:13, 73:2, 73:4, 73:13
**show** [7] - 24:24, 26:6, 31:6, 38:15, 44:16, 92:13, 101:21
**showed** [3] - 56:22, 95:21, 100:1
**shows** [1] - 113:15
**sic** [1] - 11:17

**sic)** [1] - 13:12
**sic-"her")** [1] - 98:19
**sic-"Mr** [1] - 105:12
**sic-"she** [1] - 10:9
**sic-"their** [1] - 102:19
**sick** [2] - 42:11, 43:3
**side** [14] - 49:16, 51:22, 54:1, 55:1, 64:16, 66:3, 66:6, 66:7, 68:16, 68:18, 69:16, 100:8, 100:9, 108:9
**sidebar** [1] - 30:13
**sides** [1] - 8:3
**sidewalk** [1] - 48:15
**sign** [1] - 118:20
**significant** [2] - 101:8
**similar** [1] - 82:7
**simple** [1] - 117:5
**simply** [2] - 86:3, 88:20
**single** [1] - 89:21
**sit** [3] - 4:22, 33:1, 93:5
**sitting** [1] - 64:23
**situation** [5] - 28:22, 58:17, 85:14, 93:12, 102:20
**six** [10] - 35:21, 36:3, 36:5, 37:21, 87:22, 87:23, 100:5, 117:20, 117:23, 118:4
**size** [1] - 116:23
**Skate** [1] - 44:4
**slight** [1] - 84:22
**slightly** [1] - 115:18
**slip** [2] - 118:18, 118:20
**smaller** [1] - 97:16
**smooth** [1] - 104:7
**sole** [2] - 108:22, 112:15
**solely** [3] - 108:5, 111:20, 114:13
**someone** [9] - 11:20, 22:6, 54:2, 62:13, 84:18, 91:8, 106:14, 116:18, 119:6
**somewhere** [1] - 71:23
**son** [2] - 44:3, 102:10

**sorry** [6] - 6:19, 8:11, 11:15, 38:10, 59:22, 61:8
**sort've** [1] - 68:15
**source** [1] - 109:12
**South** [4] - 21:1, 21:13, 94:12, 94:15
**spaces** [6] - 47:12, 48:20, 49:15, 49:20, 52:3, 53:3
**speaking** [3] - 6:19, 6:20, 12:18
**special** [2] - 82:21, 107:17
**specific** [1] - 94:13
**specifically** [7] - 34:12, 59:1, 82:11, 94:4, 95:14, 115:9, 116:7
**specify** [2] - 8:17, 34:15
**specifying** [1] - 36:16
**speculate** [1] - 108:16
**spell** [1] - 5:6
**sperate** [1] - 48:19
**spots** [1] - 8:2
**spouses** [3] - 103:20, 104:5, 106:20
**SS** [1] - 120:3
**stand** [4] - 4:22, 33:1, 48:24, 113:11
**standard** [2] - 17:8, 42:1
**standing** [12] - 10:2, 10:22, 10:24, 24:8, 24:9, 25:4, 48:23, 66:15, 66:17, 66:21, 72:17
**start** [2] - 30:18, 118:8
**started** [7] - 46:19, 49:10, 49:11, 51:7, 51:19, 63:6, 63:10
**state** [3] - 5:6, 33:6, 107:15
**statement** [1] - 94:13
**statements** [1] - 12:16
**states** [1] - 98:14
**station** [2] - 77:22, 78:2
**Station** [6] - 12:8,

12:13, 30:20, 30:21, 78:23, 79:5
**stayed** [3] - 15:11, 15:13, 100:20
**stays** [1] - 109:19
**step** [2] - 30:3, 81:16
**stick** [118] - 9:11, 9:18, 9:23, 10:3, 12:22, 12:24, 13:3, 13:11, 24:12, 24:16, 24:20, 25:1, 25:11, 25:14, 25:20, 27:12, 27:20, 47:6, 51:6, 54:11, 56:6, 56:8, 56:13, 56:19, 57:1, 57:5, 57:20, 67:8, 67:9, 67:15, 67:19, 68:4, 68:8, 68:9, 70:15, 71:6, 72:7, 72:9, 72:13, 72:15, 73:3, 73:11, 73:12, 74:1, 74:7, 74:14, 74:16, 74:20, 74:22, 75:6, 75:10, 75:18, 75:22, 75:24, 76:2, 76:6, 76:11, 76:21, 79:2, 79:8, 79:11, 79:20, 79:21, 79:23, 80:2, 80:3, 80:10, 80:17, 80:22, 81:2, 83:8, 83:17, 83:19, 84:3, 84:14, 85:6, 85:7, 86:5, 86:8, 86:12, 86:22, 86:24, 87:6, 87:11, 88:14, 88:24, 90:1, 96:5, 96:18, 96:23, 97:1, 97:2, 97:7, 97:8, 97:12, 97:15, 97:16, 97:17, 98:1, 98:16, 98:20, 101:4, 101:10, 101:15, 103:4, 104:24, 105:22, 105:24, 106:8, 107:1, 115:9, 116:10
**still** [15] - 71:11, 71:17, 72:12, 75:22, 76:2, 76:9, 76:13, 79:7, 83:11, 84:2, 84:3, 84:7, 103:20, 114:19, 118:5
**stipulate** [1] - 42:19
**stipulated** [1] - 31:16
**stood** [2] - 24:4, 46:17

**stop** [2] - 24:19, 72:2
**stopped** [2] - 25:9, 76:13
**stopping** [1] - 24:15
**stories** [1] - 93:15
**story** [4] - 20:9, 96:7, 102:8, 104:5
**straight** [6] - 56:3, 56:7, 71:10, 71:16, 72:11, 97:10
**strike** [1] - 19:18
**strong** [1] - 114:22
**struck** [2] - 13:11, 105:1
**struggled** [1] - 96:15
**style** [1] - 105:1
**sudden** [1] - 117:15
**sufficient** [2] - 84:22, 89:13
**Suffolk** [1] - 34:16
**suggest** [10] - 82:13, 83:22, 86:3, 87:1, 88:12, 95:19, 97:8, 100:14, 106:17, 107:3
**suggesting** [1] - 94:23
**suggestion** [1] - 105:16
**Suite** [1] - 2:10
**Sunday** [1] - 36:5
**superior** [4] - 16:8, 18:1, 18:7, 99:13
**supervisor** [2] - 18:12, 18:13
**supplemental** [3] - 18:24, 19:2, 19:13
**suppose** [1] - 70:5
**supposed** [11] - 20:19, 21:4, 35:21, 36:2, 36:8, 36:9, 36:11, 36:18, 36:19, 36:21, 45:4
**surrounding** [1] - 116:22
**surrounds** [1] - 102:23
**surveillance** [6] - 30:23, 31:1, 31:9, 31:22, 32:18, 91:2
**Surveillance** [3] -

3:16, 32:6, 32:21
**sustained** [5] - 22:10, 38:6, 52:22, 79:1, 83:21
**swayed** [1] - 108:8
**swear** [1] - 119:11
**sweater** [1] - 7:14
**swing** [10] - 9:23, 74:10, 74:11, 74:16, 74:18, 85:17, 96:23, 97:21, 97:24, 103:6
**swinging** [1] - 89:23
**swings** [2] - 75:18, 98:17
**sworn** [2] - 115:4, 119:14
**swung** [26] - 9:12, 10:3, 27:12, 27:20, 56:13, 75:6, 75:10, 79:11, 79:13, 79:16, 79:18, 79:20, 79:21, 80:2, 83:17, 83:20, 88:24, 90:10, 96:19, 97:9, 97:10, 97:12, 97:18, 98:1, 98:3, 103:4
**sympathies** [1] - 108:8

# T

**taillight** [4] - 55:2, 55:5, 55:6, 100:9
**talks** [3] - 87:8, 87:9, 87:10
**tape** [20] - 3:15, 30:23, 31:2, 31:9, 31:10, 31:12, 31:14, 31:17, 32:6, 32:11, 91:2, 99:1, 99:2, 99:8, 99:9, 99:15, 100:4, 100:23, 101:1
**taping** [1] - 31:1
**telephone** [2] - 20:24, 94:10
**ten** [4] - 62:16, 101:18, 102:9, 105:19
**ten-year-old** [1] - 102:9
**term** [1] - 114:1
**test** [1] - 89:21
**testified** [30] - 11:20,

13:9, 27:11, 33:18, 52:1, 58:7, 58:24, 59:13, 62:1, 65:15, 67:6, 68:19, 69:15, 70:11, 74:1, 76:5, 76:19, 80:24, 83:19, 83:20, 90:9, 94:5, 94:8, 95:4, 95:8, 95:24, 96:4, 97:15, 99:11, 100:22
**testifies** [2] - 88:24, 110:7
**testify** [2] - 56:12, 110:14
**testifying** [3] - 113:12, 113:17, 113:18
**testimony** [63] - 30:16, 37:1, 47:23, 65:6, 66:13, 66:21, 67:2, 67:18, 67:22, 68:24, 69:1, 69:3, 69:9, 69:11, 69:12, 71:1, 73:1, 73:5, 73:17, 75:5, 75:11, 75:23, 76:16, 78:24, 79:7, 79:13, 79:14, 80:7, 81:1, 82:15, 84:1, 85:4, 85:9, 85:13, 85:22, 87:13, 89:22, 90:2, 90:7, 93:6, 93:18, 93:20, 93:21, 93:23, 94:2, 94:16, 94:23, 94:24, 95:20, 103:19, 103:21, 104:18, 104:22, 105:10, 107:3, 112:11, 112:17, 112:21, 113:3, 113:12
**TESTIMONY** [2] - 5:1, 33:3
**text** [40] - 38:13, 39:1, 39:4, 39:12, 39:20, 39:21, 39:23, 40:4, 40:5, 40:6, 40:8, 40:17, 40:20, 40:21, 40:22, 41:5, 41:6, 41:15, 42:4, 42:6, 42:11, 42:16, 42:17, 42:18, 42:23, 43:2, 43:5, 43:12, 44:9, 49:11, 61:16, 63:6, 63:7, 82:15, 94:24, 103:22, 104:4, 104:12,

104:13, 106:22
**texted** [1] - 39:13
**texting** [2] - 38:8, 43:8
**texts** [2] - 38:4, 41:19
**thanking** [1] - 103:15
**THE** [91] - 4:4, 4:5, 4:6, 4:10, 4:12, 4:20, 4:21, 4:23, 7:18, 13:8, 13:17, 22:10, 30:3, 30:5, 30:6, 30:9, 30:12, 30:15, 31:16, 31:21, 32:1, 32:4, 32:7, 32:8, 32:9, 32:11, 32:13, 32:16, 32:20, 33:1, 38:6, 38:9, 38:10, 52:22, 57:23, 58:4, 60:23, 67:23, 81:16, 81:17, 81:19, 81:21, 82:2, 82:5, 82:19, 82:21, 84:9, 85:2, 85:6, 85:18, 85:21, 86:15, 86:21, 87:4, 87:14, 87:17, 87:20, 88:1, 88:8, 88:18, 89:2, 89:4, 89:11, 89:18, 89:24, 90:20, 90:22, 90:24, 91:4, 91:7, 91:11, 91:20, 91:23, 91:24, 92:2, 92:4, 92:9, 92:10, 92:14, 92:15, 92:16, 92:20, 92:22, 92:24, 103:12, 107:9, 118:12, 118:13, 118:14, 118:17, 119:16
**themselves** [2] - 42:22, 49:3
**theory** [1] - 19:4
**thinking** [5] - 65:3, 65:5, 65:23, 66:1
**third** [2] - 100:22, 115:22
**thoughts** [1] - 81:23
**threaten** [1] - 42:24
**three** [9] - 8:2, 17:5, 17:6, 17:13, 39:17, 44:2, 78:14, 82:10, 115:16
**threw** [1] - 99:5
**tilt** [1] - 32:8
**TIME** [1] - 1:17

**timed** [1] - 32:14
**Timothy** [1] - 118:14
**today** [7] - 7:10, 75:3, 75:23, 78:24, 80:7, 81:1, 106:4
**together** [6] - 15:21, 68:10, 81:23, 111:17, 118:22, 119:3
**tolerance** [2] - 29:24, 105:16
**tone** [1] - 6:23
**took** [15] - 11:9, 16:12, 18:7, 24:12, 25:6, 47:4, 52:5, 52:17, 66:14, 83:19, 96:13, 97:8, 98:9, 104:24
**top** [6] - 41:6, 61:9, 62:4, 97:5, 97:21, 103:5
**tossed** [2] - 57:5, 76:21
**total** [1] - 78:14
**Totally** [1] - 39:13
**touch** [6] - 63:22, 73:20, 73:22, 89:9, 115:20, 116:1
**touched** [1] - 115:17
**touching** [7] - 72:7, 84:8, 84:22, 115:22, 116:4
**towards** [9] - 55:3, 56:19, 56:20, 61:14, 65:11, 68:18, 70:11, 71:2, 108:9
**town** [1] - 33:10
**track** [1] - 101:19
**tracker** [1] - 101:17
**traffic** [1] - 49:23
**transcribed** [1] - 119:20
**Transcriber** [1] - 120:5
**transcript** [1] - 120:8
**TRANSCRIPTION** [1] - 1:12
**transporting** [1] - 12:9
**treat** [1] - 105:16
**trial** [8] - 4:10, 19:5, 93:11, 111:5, 117:20,

117:22, 118:8, 120:11
**TRIAL** [1] - 1:9
**tried** [4] - 22:12, 23:13, 96:10, 96:14
**true** [3] - 27:18, 114:10, 120:8
**trunk** [1] - 65:18
**truth** [1] - 112:18
**try** [1] - 51:6
**trying** [12] - 7:1, 9:4, 10:22, 24:17, 24:19, 35:1, 50:5, 50:24, 76:1, 79:17, 80:12, 104:23
**Tuesday** [1] - 79:5
**turn** [4] - 39:16, 40:16, 41:4, 106:8
**turned** [10] - 54:3, 54:15, 54:16, 55:10, 72:19, 73:6, 73:8, 104:24, 105:7
**turning** [2] - 34:11, 72:18
**turret** [6] - 3:15, 31:12, 31:17, 99:8, 99:15
**TV** [1] - 102:9
**Two** [2] - 3:15, 31:17
**two** [46] - 8:2, 9:11, 9:24, 13:11, 20:13, 24:20, 26:4, 26:16, 27:16, 30:19, 36:8, 36:19, 37:6, 37:7, 37:14, 39:17, 41:23, 44:16, 44:19, 44:22, 48:16, 54:10, 56:21, 59:4, 59:15, 61:11, 61:17, 62:14, 68:2, 68:3, 68:8, 70:17, 74:9, 74:17, 76:9, 78:16, 78:21, 80:4, 93:12, 93:15, 97:14, 100:23, 102:15, 105:24, 110:4, 111:5
**two-hour** [1] - 37:14
**type** [1] - 111:4
**types** [1] - 110:4

## U

**ultimately** [2] - 10:14, 16:17
**unacceptable** [1] -

39:14
**unanimous** [1] - 110:3
**unanimously** [2] - 109:21, 118:19
**unanswered** [1] - 108:15
**uncertain** [1] - 9:20
**uncontested** [1] - 35:5
**under** [15] - 10:12, 10:14, 10:20, 11:12, 11:20, 11:21, 12:2, 12:6, 12:15, 16:18, 28:4, 71:21, 73:19, 77:17, 84:12
**understood** [1] - 114:1
**unequivocally** [1] - 95:9
**unexpected** [2] - 117:13, 117:15
**unfair** [3] - 77:12, 77:19, 78:3
**unless** [4] - 18:14, 109:11, 109:20, 109:24
**unpopular** [1] - 108:11
**unreasonable** [1] - 113:13
**up** [63] - 19:5, 20:2, 20:6, 21:4, 26:6, 26:8, 32:8, 36:12, 36:17, 36:18, 36:22, 38:17, 38:21, 45:5, 48:9, 48:14, 51:3, 51:5, 51:11, 51:19, 55:3, 55:22, 59:24, 61:17, 62:15, 62:21, 65:8, 65:12, 65:15, 66:2, 66:18, 67:14, 68:6, 71:11, 71:17, 72:12, 74:2, 75:18, 76:13, 76:19, 78:13, 79:2, 86:11, 86:12, 89:5, 89:22, 91:13, 91:19, 92:21, 96:17, 97:10, 97:14, 97:19, 98:21, 98:22, 99:23, 101:9, 102:16, 107:5, 118:7, 119:9

**upset** [35] - 6:24, 7:21, 12:4, 38:2, 39:8, 44:7, 50:10, 51:2, 53:5, 58:19, 58:20, 58:22, 58:23, 60:15, 60:17, 60:18, 60:19, 60:20, 62:8, 62:10, 62:15, 64:4, 64:9, 64:17, 64:20, 66:14, 77:11, 77:14, 77:15, 77:18, 103:20, 103:24, 104:11, 106:20
**upward** [1] - 86:13
**uses** [1] - 42:1

## V

**vacation** [1] - 35:20
**varies** [1] - 18:2
**vehicle** [10] - 8:13, 9:5, 11:6, 11:8, 13:5, 13:6, 14:3, 14:11, 87:3, 87:12
**vehicles** [1] - 8:3
**verbal** [2] - 28:14, 42:9
**verbatim** [1] - 39:12
**Verdict** [1] - 119:20
**verdict** [5] - 110:2, 118:18, 118:19, 118:20, 119:15
**version** [2] - 113:8
**versus** [1] - 120:13
**Victory** [1] - 2:10
**video** [11] - 3:16, 32:18, 32:21, 86:16, 87:14, 87:23, 101:17, 102:3, 105:18
**videotape** [3] - 93:7, 100:1, 100:2
**view** [2] - 12:21, 25:24
**viewing** [1] - 93:7
**violations** [1] - 37:10
**violent** [1] - 85:17
**visit** [1] - 36:6
**visitation** [3] - 20:20, 23:22, 36:3
**visits** [1] - 95:13
**voiced** [1] - 77:23
**volatile** [1] - 48:17
**vOLUME** [1] - 1:1
**vs** [1] - 1:9

## W

**waited** [3] - 37:24, 46:9, 46:17
**waiting** [2] - 48:24, 62:13
**walk** [9] - 20:2, 48:3, 48:7, 48:12, 51:7, 66:2, 66:17, 80:13, 101:24
**walked** [22] - 15:22, 16:2, 16:5, 19:24, 49:17, 50:1, 51:2, 51:10, 53:14, 65:16, 65:20, 66:14, 66:18, 66:20, 67:15, 80:9, 80:11, 80:14, 98:10, 98:18, 102:9, 102:10
**walking** [6] - 48:14, 49:19, 49:21, 54:9, 76:24, 92:6
**walkway** [1] - 48:14
**wants** [1] - 104:14
**WARD** [57] - 2:9, 7:17, 13:19, 30:1, 30:7, 31:13, 31:20, 31:22, 32:2, 32:5, 32:12, 32:14, 32:17, 32:23, 33:5, 38:12, 44:14, 57:22, 61:7, 61:10, 67:21, 81:8, 81:14, 81:18, 81:20, 82:7, 82:20, 82:23, 83:4, 83:15, 85:1, 85:5, 85:8, 85:20, 85:23, 86:24, 87:5, 87:16, 87:18, 87:22, 88:2, 88:9, 88:19, 89:3, 89:17, 89:21, 90:17, 90:23, 91:3, 91:6, 91:10, 91:15, 91:21, 92:3, 92:5, 92:18, 93:2
**Ward** [4] - 3:5, 3:9, 3:18, 30:14
**watch** [3] - 18:11, 39:24, 101:1
**watched** [1] - 105:19
**ways** [3] - 54:23, 54:24, 76:13
**weapon** [18] - 84:6, 84:13, 84:15, 84:17, 84:22, 84:23, 84:24, 89:7, 89:16, 115:9,

115:13, 115:23, 116:2, 116:11, 116:12, 116:13, 116:18, 116:21
**wearing** [1] - 7:13
**week** [1] - 35:14
**weekend** [10] - 20:21, 22:21, 23:22, 36:6, 44:12, 44:23, 59:6, 95:6, 95:14, 95:22
**weigh** [1] - 69:19
**weight** [4] - 68:12, 69:17, 70:3, 112:10
**West** [5] - 33:9, 33:10, 36:13, 36:23, 47:24
**whacked** [1] - 24:13
**WHEREOF** [1] - 120:16
**whichever** [2] - 4:22, 33:1
**whine** [1] - 46:19
**white** [6] - 39:20, 41:5, 41:20, 42:11, 42:14, 42:20
**whole** [8] - 11:5, 15:24, 32:11, 59:6, 83:16, 84:16, 89:7, 107:16
**wife** [2] - 102:9, 102:15
**William** [4] - 31:12, 58:24, 59:18, 59:23
**Williams** [2] - 120:5, 120:20
**willing** [1] - 118:6
**window** [1] - 50:18
**winter** [1] - 10:8
**witness** [14] - 7:16, 82:16, 86:4, 86:19, 90:9, 110:7, 110:12, 110:14, 112:19, 112:23, 113:2, 113:6, 113:11, 113:19
**WITNESS** [8] - 3:3, 3:7, 4:20, 4:23, 30:5, 30:9, 38:10, 120:16
**witness's** [3] - 112:21, 113:3, 113:10
**witnesses** [4] - 109:16, 112:10, 112:12, 112:16
**wood** [2] - 13:3

**wooden** [1] - 13:2
**word** [1] - 54:4
**works** [1] - 102:16
**world** [1] - 93:13
**would've** [4] - 68:17, 72:15, 72:23
**wound** [1] - 89:22
**write** [5] - 16:21, 17:3, 17:6, 17:12, 118:24
**wrote** [1] - 16:24

## Y

**year** [4] - 5:14, 35:12, 102:9, 102:10
**years** [2] - 33:24, 34:1
**yell** [1] - 81:10
**yelled** [4] - 57:7, 77:2, 98:15, 100:16
**yesterday** [2] - 69:20, 103:17
**yourself** [4] - 62:18, 103:1, 103:7, 103:8
**yourselves** [1] - 108:10
**youth** [1] - 13:3

## Z

**zoom** [1] - 88:11
**zoomed** [2] - 87:22, 88:9
**zooms** [4] - 87:24, 88:2, 100:4, 100:5