Page 1

Volume:  I
Pages:  1 To 38
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 1:17-ev10876-LTS

KAREN CALABRESE-KELLEY,                    )
       Plaintiff,                          )
                           )
    vs.                                    )
                           )
TOWN OF BRAINTREE, et al.,                 )
       Defendants.                         )
                           )

DEPOSITION OF JOHN P. MCNAMARA, a witness called on behalf of the Plaintiff, taken pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, before Susan E. DiFraia, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Cohen Law Group, 500 Commercial Street, Boston, Massachusetts, on Thursday, July 26, 2018, commencing at 11:29 a.m.

Page 2

APPEARANCES:

COHEN LAW GROUP
500 Commercial Street, Suite 4R
Boston, MA 02109
BY:  Jeb S. Penka, Esquire
Tel: 617.523.4552
E-Mail:  Jeb@cohen-law-group.com
Attorney for the Plaintiff.


LOUISON, COSTELLO, CONDON & PFAFF, LLP
101 Summer Street
Boston MA 02110
BY:  Joseph A. Padolsky, Esquire
Tel: 617.439.0305
E-Mail:  Jpadolsky@llcplaw.com
Attorney for the Defendants.

* * * * *

Page 3

E X A M I N A T I O N S

Witness                                                    Page

John P. McNamara

Direct Examination          By Mr. Penka                      4

E X H I B I T S

NONE

Page 4

P R O C E E D I N G S

JOHN P. MCNAMARA

a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PENKA:

Q. All right.  Good morning, sir.  My name is Jeb Penka.  I represent Karen Calabrese-Kelley in this lawsuit.

Have you ever been deposed before?

A. Yes.

Q. So you're familiar with some of the ground rules.  We have a court reporter here so it's easier for her if I speak, then you speak, and vice versa.

A. Yes.

Q. Again, if you don't understand a question, ask me to rephrase it, because if you do answer it and you don't understand it, we're going to assume that you understood the question.  Okay?

Page 5

Feel free to take a break at any time, consult with your attorney at any time, I'd just ask if there's a question before you, you answer that question before taking the break.  Okay?

A.   Yes.

MR. PENKA:  Attorney Padolsky, usual stipulations?

MR. PADOLSKY:  Yes, sir.

Q.   Could you state your name and spell your last name for the record, please.

A.   John Patrick McNamara.

Q.   And prior to this deposition, sir, did you speak with anyone about this deposition?

A.   Yes.

Q.   And who did you speak with?

A.   I spoke with our attorney.

Q.   And did you review any documents in preparation for this deposition?

A.   Yes.

Q.   And what documents did you review, sir?

A.   The police report.

Q.   Have you consumed any drugs or alcohol in the last 24 hours that would impede your ability to answer questions today?

Page 6

A. No.

Q. Are you on any prescription medications, sir?

A. No.

Q. And where do you reside?

A. Abington, Massachusetts.

Q. And how far did you go in school?

A. I have an Associates degree out of Massasoit.

Q. And when did you receive that degree?

A. That was in 1982.

Q. Okay. And after you received that Associates degree, what did you do for employment?

A. I began at the Harwich Police Department.

Q. Okay. And approximately what years was that?

A. That was 1981 to 1985, '86.

Q. And where were you employed after that, sir?

A. I was employed by the Dallas Police Department from April of '86 to December of '86.

Q. Dallas, Texas?

A. Dallas, Texas.

Q. Okay. And after that?

A. In December of '86 I started with the Braintree Police Department.

Q. Okay. And the Braintree Police Department is your current employer, sir?

Page 7

A.  Yes, it is.

Q.  **Do you hold any special licenses?**

A.  As a --

Q.  **CDL?  Any -- you know, anything like that, taxidermy?  Just inquiring.**

A.  No, no.

Q.  **Can you --**

MR. PADOLSKY:  Are you counting a license to carry in your question?

MR. PENKA:  Okay.

Q.  **Do you have a license to carry?**

A.  Yes, I do.

Q.  **And do you have a badge number, sir?**

A.  The badge number changes, it's not permanent, but my badge number at this time is five.

Q.  **Okay.**

A.  We go by our department number which is 70.

Q.  **Okay.  Did you attend the Police Academy, sir?**

A.  Yes, I did.

Q.  **And where did you attend that police academy?**

A.  The Barnstable Police Academy.

Q.  **What sort of training did you go through?**

A.  Basic recruit training, accident investigation, report writing, criminal investigation.

Page 8

Q.   Okay.  Have you had any subsequent retraining
or continuing education.

A.   Yes.

Q.   And what sort of continuing education have you
undergone?

A.   During my time in the police department I've
been -- I am a sexual assault investigator,
rape investigator, for children and adults.  I
teach RAD, Rape Awareness Defense.  I do arson
investigation.  I also do latent print
recovery, crime scene investigation, crime
scene photography.  I have a -- did schooling
in advanced SWAT tactics, bicycle patrol.
There's a list.

Q.   Sure.  And all of them, those things that you
described, do you undertake all those at the
same time?

A.   No that's over the course of my career.

Q.   Okay.  So presently as we sit here today, what
are your duties with the Braintree Police
Department?

A.   Patrolman.

Q.   And how long have you been a patrolman with the
police department?

Page 9

A.  Since I started, 32 years in December.

Q.  Do you do any of those special investigations, the sexual assault investigations, as a patrolman?

A.  I'm still called to do sexual assault, yes.

Q.  And the other thing you described to me, the arson, etc?

A.  I'm available for it, but they usually give that to the detectives who are assigned to the detective bureau right now.

Q.  Okay.  Have you ever been assigned to the detective bureau?

A.  Yes.

Q.  But presently you're just on patrol?

A.  Yes.

Q.  What is your assignment on patrol, your shift assignment?

A.  I work relief shift basically in the 811 sector which is the South Braintree area.

Q.  And 811, is that the cruiser you're assigned to as well?

A.  Yes.  Right now I'm assigned to the -- I have a take-home cruiser.

Q.  Okay.

Page 10

A.   And I have that as an assignment.  That's the 820 car.

Q.   **In the past have you been assigned the 821 cruiser?**

A.   That's correct.

Q.   **Are you aware of the overall domestic violence law enforcement general order?**

A.   Yes.

Q.   **And you're familiar with that document?**

A.   Yes.

Q.   **And when investigating the domestic violence issues, do you follow those protocols and guidelines?**

A.   Yes.

Q.   **Okay.  Do you have any supervisory status when it comes to domestic violence calls?**

A.   No.

Q.   **So in a domestic violence call, what would your role at the scene be?**

A.   Initially when I arrive at the scene I would determine and establish calm, safety in the area, try to separate the parties, if necessary, and then start an investigation, start a conversation with one or the other or

Page 11

whoever might be there.

Q.  If there was a chance a weapon was involved,
what would you do?

A.  I would secure that weapon if it was involved.

Q.  Okay.  Now, in investigating the scene, what do
you do in regards to that?

A.  I would take a look at the scene, take a look
at what possibly would be the evidentiary value
of it; again, establish if there was any damage
done to any property, establish who might be a
witness in the case, and then have somebody
assigned to talk to them at that time, or I
would talk to somebody at the time.

Q.  Okay.  Do you take notes while you're on scene?

A.  If necessary.

Q.  Not always?

A.  Not always.

Q.  Are you tasked with making arrests when it
comes to domestic violence calls?

A.  Yes.

Q.  And what do you base that arrest on?

       MR. PADOLSKY:  Objection.  You can
       answer.

A.  I base the arrest on what I see on scene.

Page 12

Again, the evidence at the scene plus the testimony at the scene.

Q.  Sure.  Are there any mandatory arrests when it comes to domestic violence?

A.  Yes.

MR. PADOLSKY:  Objection.

A.  Yes.

Q.  What would be a mandatory arrest?

A.  Mandatory arrest would be once we establish who's the aggressor or the main party in a disagreement, and continuing the domestic violence role, if it was a physical domestic violence.

Q.  Is there ever occasion to arrest both parties in a domestic violence call?

A.  Yes.

Q.  And is that standard to arrest both parties in a domestic violence call?

A.  Not standard, no.

Q.  Is it discouraged?

MR. PADOLSKY:  Objection.

A.  I wouldn't say -- I wouldn't say discouraged; it is -- it's -- if it is established that -- if it can't be established who was the

Page 13

aggressor, or if it is a mutual combat type situation, then both parties would be subject to arrest.

Q. Okay.  Are there separate guidelines for law enforcement personnel involved in domestic violence situations?

A. Yes.

Q. What are those guidelines?  How do they vary?

A. The guidelines would be if a police officer or law enforcement officer is involved as a suspect in the domestic violence calls, that if he was armed at the time, I would take control of his weapon and notify his department.

Q. And what if the law enforcement personnel was the victim at that time?

A. At that time, standard victim.

Q. Standard victim procedure?

A. Yes.

Q. In your time as an officer, sir, have you ever been the subject of an internal affairs investigation?

A. I don't know if it's been internal affairs investigation.

Q. Has a civilian ever filed a complaint against

Page 14

you?

A. Yes.

Q. And what was that complaint for?

A. There were several over the course --

Q. How many would you say?

A. I couldn't say.  I don't -- I've answered what we call to/from letters about the incident.  I would get a request for -- to respond to either deputy or my lieutenant about an incident and I would write a to/from letter on that.

Q. And how many of those letters have you written in your career?

A. That, I couldn't say for sure.

Q. More than five?

A. I really couldn't say.

Q. Less than ten?

A. I couldn't say a number.

Q. More than one?

A. I believe more than one.

Q. What was the result of those to/from letters?

         MR. PADOLSKY:  Objection.

A. I couldn't tell you.

Q. Have you ever been suspended?

A. I've taken a five-day suspension.

Page 15

Q.   And what was that five-day suspension for?

A.   That was for a -- I had a firearm in my car
     that was broken into, and I reported it to the
     department.

Q.   And that firearm, what was the -- what was the
     reason for the suspension, because it wasn't
     secured properly?

          MR. PADOLSKY:   Objection.

A.   I believe it was a -- it was locked up in a
     case in the car.

Q.   Okay.   Was the firearm stolen?

A.   Yes.

Q.   Have you ever been reprimanded or suspended any
     other times?

A.   Not that I'm aware of.

Q.   Has another officer ever filed a complaint
     against you?

A.   Not that I'm aware of.

Q.   Have you ever been a party to a lawsuit?

A.   I believe once.

Q.   What did that entail?

A.   That was a motor vehicle accident.  I was
     responding to a bank alarm on it during the
     wintertime, and I was going down a center line,

Page 16

car cut in front of me and a minor collision on it, but there was a civil suit involving that.

Q.  You were in a patrol car?

A.  Yes.

Q.  Any lawsuit on a personal level?

A.  No.

Q.  Ever been arrested?

A.  No.

Q.  If I could direct your attention to February 21, 2014, do you recall that day?  Were you working that day?

A.  Yes.

Q.  Where were you working?

A.  In the 811 sector.

Q.  So you were assigned the 811 cruiser?

A.  Yes.

Q.  Roughly around 8:30 did you receive a dispatch?

A.  I responded to a dispatch.

Q.  What was that dispatch for?

A.  There was a call of a possible domestic incident at the parking lot of K-Mart.

Q.  During the dispatch were the parties identified?

A.  No, there was a -- I don't believe the parties

Page 17

were identified.

Q. Were there any identifying characteristics about the parties during the dispatch?

A. I believe I overheard that one party was an off-duty officer, police officer.

Q. And was there a question as to whether the off-duty officer was carrying a firearm?

A. Nothing over the air that I recall.

Q. Since he was a potential off-duty officer, in your mind did you think maybe he had a firearm?

A. It's possible.

Q. Did you investigate if he had a firearm?

A. I did not.

Q. So you were dispatched to the call. Did you -- were you the first to arrive on the scene?

A. I believe I was first on the scene.

Q. And when you arrived on scene what did you do?

A. I saw there were two parties standing by two separate cars. I pulled up to the closest one to me pulling up which was Ms. Calabrese-Kelley, and I started to engage her in conversation.

Q. So at that point you're the first to arrive?

A. Yes.

Page 18

Q.  There's a question as to whether or not there's an off-duty officer there, correct?

A.  Correct.

Q.  And your first piece of action was to go to Mrs. Kelley?

A.  Yes.

Q.  Were you not concerned about a potential firearm?

A.  I didn't know which was the -- was the off-duty officer at the time.

Q.  Okay.  Did the dispatcher alert you as to -- alert anyone as to who potentially was the off-duty officer?

A.  Not that I recall.

Q.  Were you aware who the complaining victim was?

A.  No.

Q.  So you arrived, you saw Mrs. Kelley first, what did you do?

A.  I engaged in conversation.

Q.  What did she tell you?

A.  It was difficult for her to get to tell me what happened.  She was emotional.  She said that she had met her husband there to swap off some equipment there.  She stated that they had

Page 19

missed their other drop-off place and had picked K-Mart as something that was mutual between them.

Q.   Did she say why they had missed their first drop off place?

A.   One of the parties was late.

Q.   Did she tell you who was late?

A.   Not that I recall.

Q.   So as you're having this discussion with Mrs. Kelley about the drop off, did she tell you what happened?

A.   Yes, she said she had taken her bag over to her husband's car, wanted him to take the hockey bag for the oldest daughter, who was not there on scene, he refused taking the hockey bag saying he didn't want to.  And then she stated that she tried to shove the hockey bag into the car, at which time she said she was pushed back by her husband, at which time she -- during that altercation she had taken the hockey stick out and swung it at her husband.

Q.   Okay.  She stated to you that she swung the hockey stick?

A.   Yes, she stated it to me and indicated by

Page 20

swinging her own hands.

Q.   She did state to you that Mr. Kelley had pushed her?

A.   Yes.

Q.   And did she say to you that Mr. Kelley pushed her first?

A.   I believe it was while she was trying to put the hockey bag into the vehicle, was when she stated he put her -- hands on her.

Q.   At the incident did you have any conversations with Mr. Kelley?

A.   No, I don't believe so.

Q.   Did Mr. Kelley tell you why she was giving Mr. Kelley the hockey bag?

A.   She wanted him to take -- bring it to her -- the oldest daughter.

Q.   Did Mrs. Kelley tell you whether Mr. Kelley was accepting the hockey bag?

A.   She said he didn't want to take the hockey bag.

Q.   Did she tell you why he wouldn't take the hockey bag?

A.   That -- I can't recall.

Q.   Did you observe any injuries to Mrs. Kelley?

A.   Yes, she pulled up her pant leg and showed me

Page 21

an abrasion on her knee.

Q.  Anything else?

A.  No, that was it.  She was just complaining about the abrasion to her knee.

Q.  And in your estimation, what caused the abrasion to her knee?

A.  That, I couldn't say for sure.

Q.  Was it consistent with an abrasion from asphalt?

A.  It could have been.  But it was wintertime. The parking lot was wet with salt on it.  I did not see on her pants a wet mark.  There was no debris or salt or sand on it that I had noticed.

Q.  When you arrived on scene did you notice any minor children?

A.  Yes, there were two in her car.

Q.  Did you see the minor children?

A.  Just briefly, I smiled and waved and asked them how they were doing.

Q.  Did you ask them what happened?

A.  No, I didn't.

Q.  Is that customary to not ask minor children what happened?

Page 22

MR. PADOLSKY:  Objection.

A.  It depends on the situation.  There were two adults we were talking to.  Again Mrs. Calabrese was very emotional, ranting actually, and I didn't want to be distracted talking to the children when I had her right beside me.

Q.  **Did any of the officers speak to the children?**

A.  I believe Sergeant Bata may have said "Hi," waved to them to check their well being.

Q.  **Did anyone ask the minor children what happened?**

A.  I don't think so.

Q.  **Did Mrs. Kelley tell you they witnessed what happened?**

A.  She didn't say they witnessed what happened.

Q.  **Did Mrs. Kelley tell you that Mr. Kelley had knocked one of the daughters to the ground?**

A.  She did not tell me that.

Q.  **Did you write a report for this incident, sir?**

A.  No, I did not.

Q.  **Why not?**

A.  I was not required to.

Q.  **Why were you not required to write a report?**

A.  The information obtained from Mrs. Kelley was

Page 23

Q. So you're talking to Mrs. Kelley, waved to the children, exchanged pleasantries, you had gotten this information from her, what happened, if anything, after that?

A. I engaged her, tried to calm her down, I stayed with her the whole time while we were there and sergeant Bata and Officer Clark spoke with Mr. Kelley.  I did see Officer Clark take control of the hockey stick and put it in his cruiser.

Q. Okay.

A. And then Officer Clark and sergeant Bata came over and we spoke to them briefly.

Q. When you saw Officer Clark take control of the hockey stick, where had the hockey stick been?

A. I believe it came out of Mr. Kelley's car.

Q. Do you know why it was in Mr. Kelley's car?

A. No, I do not.

Q. Do you know who placed it in Mr. Kelley's car?

A. No, I don't.

Q. After you observed Officer Clark controlling the hockey stick and such, what happened after

Page 24

that?

A.  At that time I spoke to Officer Clark and Officer -- Sergeant Bata about the information I obtained from Mrs. Calabrese-Kelley.

Q.  And to the extent that you remember here today, she told you that she was pushed first?

A.  She -- I -- she told me she was pushed during the altercation.

Q.  And she stated she swung the hockey stick and made a swinging motion, correct?

A.  That's correct.

Q.  Did you make the assessment that the cut on her knee did not -- was not caused by the ground?

A.  I did not make an assessment.  I said it could have been on the ground, it could have been against the car door when she was trying to push the bag in there.  It could have happen several different ways.

Q.  Did you tell that to Officer Clark or sergeant Bata?

A.  Officer Clark, yes.

Q.  And after you discussed with sergeant Bata and Officer Clark about what Ms. Kelley told you, what happened?

Page 25

A.   Officer Clark and I spoke and it was determined that Mrs. Calabrese-Kelley had been the aggressor in the physical altercation between them.

Q.   **Okay.**

A.   And it was determined that she was to be placed under arrest for domestic assault.

Q.   **And how was that determination made that she was the aggressor?**

A.   The fact that the cars had a significant separation between them, that she had brought the hockey bag over to his car, she had tried to force the hockey bag into the car, she would not take no for an answer when he didn't want her to put the bag in there, and the fact that at one point she did take the hockey stick and did swing it at him.

     Even she said she did not know where she hit him in the car itself, but she did take the action to swing the hockey stick at him.

Q.   **Where was the hockey bag when you arrived at the scene?**

A.   I believe the hockey bag was still in Mr. Kelley's car.  I'm not 100 percent sure.  I

Page 26

didn't see the hockey bag.

Q.   So you don't know where the hockey bag was when there was a struggle regarding the hockey bag?

A.   That's correct.

Q.   Did Mrs. Kelley tell you where the struggle occurred?

A.   It was over by Mr. Kelley's car.

Q.   And that was what Mrs. Kelley told you?

A.   Yes.

MR. PADOLSKY:  Off the record for one second.

(Discussion off the record)

MR. PENKA:  All set.

Q.   So we were discussing the analysis as to who was the aggressor, correct, you stated it was based on the area where the altercation occurred, correct?

A.   Yes, correct.

Q.   It was based on what Mrs. Kelley had told you, correct?

A.   That's correct.

Q.   Was it based on anything else?

A.   It was based on the information that sergeant Bata and Officer Clark had obtained from Mr.

Page 27

Kelley.

Q.  So it was a consensus between the three of you?

A.  That's correct.

Q.  You all agreed that Mrs. Kelley was the aggressor?

A.  That is correct.

Q.  And when you investigate, do you assess the credibility of the parties on scene?

A.  At some times, yes.

Q.  Does that come into play when you make an overall assessment as to who an aggressor is?

A.  For the most part, the actions that are report on who the aggressor is, the actions taken by -- actions we can determine from the evidence on scene and testimony.

Q.  And just to be sure, you had no contact with Mr. Kelley on scene?

A.  I don't believe so, no.

Q.  So the only basis for what you contributed to the assessment is what Mrs. Kelley had told you, correct?

A.  Yes.

Q.  So after the assessment was made that Mrs. Kelley was the aggressor, was she placed under

Page 28

        arrest?

A.   Not immediately.

Q.   Okay.

A.   We arranged for Mr. Kelley to take the two
     minor children with him, wait until they were
     out of sight, as a courtesy to -- we do that on
     several occasions.  The children are already
     shocked from the occurrence, so we don't want
     to do that any further.

Q.   Was this a case of a mandatory arrest?

A.   Out of our policy, yes.

Q.   What was the mandatory arrest, the nature of
     that, what made it mandatory?

A.   The fact that we determined she was the
     aggressor in the physical altercation.

Q.   Okay.  After she was arrested, did anyone read
     Mrs. Kelley her rights?

A.   After the arrest I believe she was given her
     rights by lieutenant Michella (phonetic).

Q.   When would that have occurred?

A.   During the booking process.

Q.   She was not made aware of her rights at the
     time of the arrest, though /EURBS  objection.

A.   I believe at the time of the arrest there was

Page 29

no further testimony elicited after the arrest was made.

Q. **So there was no cause to read her her Miranda Rights at that time, is that your position?**

MR. PADOLSKY:  Objection.

A. At that time I don't know what Officer Clark had done but -- I don't know at that time.  At that time the questioning of her ended at that time.

Q. **When you initially arrived and spoke with Mrs. Kelley, did you advise her that she had any rights at that time?**

A. At that time, no.

Q. **So Mrs. Kelley's arrested, and what happened next?**

A. I transported her to the police station.

Q. **Okay.**

A. On the way to the police station -- I believe it was on the way to the police station, I requested an ambulance to respond to the police station.

Q. **Why did you request an ambulance?**

A. One, to take a look at her knee, because she had an abrasion on it, and secondly I wanted

Page 30

them to take a psychological evaluation.

Q. **Why was that?**

A. Because of the way she was ranting at such a high level, communication was difficult, difficult to have a focus on anything. There was nothing we could do to calm her down.

Q. **Did Mrs. Kelley tell you she suffered from any mental health issues?**

A. No.

Q. **So in your experience, and arrestee who is in that state should be checked out for psych?**

A. In that high state, yes, because we don't know what kind of physical problems may manifest from that so it's a good idea to have someone checked out mentally.

Q. **So you were transporting her. Was there any conversation in the cruiser at that time?**

A. On the way back just to have her -- just telling her she has to calm down, she has to be able to talk sensibly, just to calm down so she can talk clear to the lieutenant.

Q. **And the lieutenant was the watch commander at that time?**

A. That's correct.

Page 31

Q. Any other conversation with Mrs. Kelley while you transported her?

A. No.

Q. Were there any statements made at the scene after the arrest to Mrs. Kelley?

A. Not after the arrest, no.

Q. So you arrive at the station -- you brought her to the station?

A. Yes.

Q. You arrived.  What happened?

A. I brought her into the booking area, she was uncuffed at that time, and she was turned over to Lieutenant Michella for the booking process.

Q. And once you turned her over, what did you do?

A. I stood by the door to the booking area while the -- while she was seen by the ambulance personnel who arrived on scene, and then I stayed through some of the booking until Officer Clark showed up at the scene.

Q. And what was the emergency medical technician's assessment of her?

          MR. PADOLSKY:  Objection.

Q. Did they tell you?

A. They did not.  I was there when they checked

Page 32

her knee, and the knee did not require any medical service on it.  I don't believe they spoke of anything else.

Q.  What about a psych eval at that point?

A.  Nothing at that point.

Q.  And you had communicated your concerns to the lieutenant?

A.  Yes.

Q.  Did you communicate your concerns to the EMT's regarding her psych?

A.  I don't believe so.

Q.  So you're there present during the booking, present during the EMTs, what happens next?

A.  At that time I -- I believe Officer Clark came in to talk to the lieutenant, and at that time I went back to patrol.

Q.  So you handed off whatever duties to Officer Clark that needed to be done?

A.  Yes.

Q.  How is it decided who writes the report?

A.  It is the initial sector officer who writes the report on it.  If the sector is not available, it will be the other officer who was first responder.

Page 33

Q.   So you stated you were the 811 that night?

A.   That's correct.

Q.   I'm going to suggest to you sergeant Bates was the 817; is that right?

A.   That's correct.

Q.   So Officer Clark, do you recall his assignment that night?

A.   I believe he was in the 815 cruiser which was East Braintree.

Q.   So that would have been the area that was covered by the K-Mart?

A.   No, K-Mart is covered from 814.  I believe the car call initially went out to the 814, 815 car.  I was nearby and told them I would respond to the area.

Q.   So if it's not in the area, the first responding officer is tasked with the report?

A.   No, if it was 814, 815, if the five officer went there, they were the two officers that came as the responding officer.  We often have officers respond from other areas.

Q.   So the dispatch went out, "We need 814 or 815"?

A.   Yes.

Q.   You happened to be close by so that's why you

Page 34

arrived first?

A. Yes.

Q. So Officer Clark arrives and you handed off your duty, your duty ends at that point?

A. Yes.

Q. And you went back on the road?

A. Yes.

Q. Officer Clark wrote the report?

A. That's correct.

Q. Did you see the report?

A. Not until we went to the court date.

Q. What court date was that?

A. The trial date.

Q. The criminal trial?

A. Yes.

Q. Did you testify at the criminal trial?

A. No, I did not.

Q. Do you know why you didn't testify?

A. The district attorney said my testimony wasn't necessary.

Q. Did she give you a reason why it wasn't necessary?

A. No.

            MR. PADOLSKY:  I'm going to object.  I

Page 35

think that's actually privileged as part of the --

MR. PENKA:  You can -- strike that.

Q.  So when you reviewed the report of sergeant -- excuse me -- of Officer Clark, did you find any inconsistencies in that report?

A.  Not really.

Q.  Not really?

A.  Not really.  I read the report.

Q.  So was there any inconsistency in there?

A.  Inconsistent as to what?

Q.  As to what occurred that night?

A.  No.

Q.  I'm going to show you a document.  For the record, this is what was marked as Exhibit 1 to sergeant Bata's deposition.  All set?

A.  Yes.

Q.  If I could call your attention to the fifth paragraph that begins "sergeant Bata and Officer McNamara spoke to Karen."

A.  Yes.

Q.  So these statements that are contained in that paragraph, these are statements that were relayed to you initially and then you relayed

Page 36

Q. them to Officer Clark; is that correct?

A. That's correct.

Q. The last sentence says, "It did not appear that the ground caused it, but her bumping the door might have."

A. That's correct.

Q. Is that your assessment?

A. I believe that's what I told -- what I might have suggested to Officer Clark because of what I saw, her knee or what I did not see on her knee.

Q. And you're identifying a lack of debris, salt, etc?

A. And wet, yes.

Q. And what were the conditions that night, weather conditions?

A. I don't know if it was clear or not.  It was cold.  There was a lot of ice melt on the surface.

Q. The parking lot was wet?

A. It was wet, yes.

Q. So in your estimation, the knee injury to Ms. Kelley was not caused by the push?

A. Not -- I didn't make that determination.  As I

Page 37

said, it could have been one or the other.

Q. **Okay. After you passed off the duties to Officer Clark, did you have any other occasion to interact with Mr. or Mrs. Kelley?**

MR. PADOLSKY: Objection.

A. No.

Q. **Did you see them outside of the court date you described to us previously?**

A. Just that last court date.

Q. **Okay.**

MR. PENKA: I got nothing else.

MR. PADOLSKY: Thank you. All set.

THE COURT REPORTER: Did you want a copy of the transcript?

MR. PADOLSKY: Yes, please. PDF fine.

(Whereupon, the deposition was concluded at 12:15 p.m.)

Page 38

C E R T I F I C A T E

I, Susan E. DiFraia, Certified

Shorthand Reporter and Notary Public in and for

the Commonwealth of Massachusetts, do hereby

certify that the foregoing transcript, Volume

I, is a true and accurate transcription of my

stenographic notes taken on July 26, 2018.

_____

Susan E. DiFraia

Notary Public

My commission expires 10/10/20

* * * * *