Page 1

VOL. I
PAGES 1 - 46
EXHIBITS - SEE INDEX


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.:  1:17-CV10876-LTS

*****************************
KAREN CALABRESE-KELLEY,
    Plaintiff,                    *
vs.                              *
                                 *
TOWN OF BRAINTREE, ET AL.,       *
    Defendants.
*****************************

DEPOSITION of OFFICER DAVID CLARK, taken on behalf of the Plaintiff, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Darlene E. Curley-Sullivan, a Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the office of Cohen Law Group, 500 Commercial Street, Suite 4R, Boston, Massachusetts, on Friday, August 3, 2018, commencing at 10:14 a.m.

**DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL       8/3/2018**

Page 2

APPEARANCES:

For the Plaintiff:
    COHEN LAW GROUP
    500 Commercial Street, Suite 4R
    Boston, Massachusetts 02109
    BY JEB S. PENKA, ESQ.
    617.523.4552
    jeb@cohen-law-group.com

For the Defendants:
    LOUISON, COSTELLO, CONDON & PFAFF, LLP
    101 Summer Street, 4th Floor
    Boston, Massachusetts 02110
    BY JOSEPH A. PADOLSKY, ESQ.
    617.439.0305
    Jpadolsky@lccplaw.com

Page 3

                        I N D E X
Deposition of:

OFFICER DAVID CLARK


                        Direct Cross Re-Direct Re-Cross
By Mr. Penka:           4


Exhibit:                Description                Page

No. 1    Braintree's Police Dept.
         Narratives for incident
         Number 2014000002864..................20

Nos. 2-3 Photocopies of Black/White
         Photographs..........................37


         (Original exhibits attached to
         Mr. Penka's transcript.)

Page 4

P R O C E E D I N G S

OFFICER DAVID CLARK, a witness called on behalf of the Plaintiff, first having been satisfactorily identified by presenting a Massachusetts driver's license, was duly sworn and testified as follows:

DIRECT EXAMINATION BY MR. PENKA:

**Q.    Good morning, sir.  My name is Attorney Jeb Penka.  I represent Ms. Karen Calabrese-Kelley in this lawsuit, and we are here for your deposition this morning.**

MR. PENKA:  Joe, usual stipulations?

MR. PADOLSKY:  Yes, sir.

MR. PENKA:  Okay.

**Q.    (BY MR. PENKA)  All right.  Sir, state your name and spell your last name.**

A.    David Clark, C-L-A-R-K.

**Q.    And prior to attending this deposition, did you discuss it with anybody?**

A.    No.

**Q.    And did you review any documents or anything prior to this deposition?**

A.    No.

DAVID CLARK KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL      8/3/2018

Page 5

Q.   Okay.   Have you ever been deposed before?

A.   Yes.

Q.   Okay.   So you're familiar with the process enough?

A.   Yes.

Q.   All right.   So as you can see, we do have a court reporter here.   So if we could just do an I speak, you speak sort of thing.   We'll try to observe that.

If you don't understand a question, please ask me to rephrase it; because if you answer without asking for me to rephrase, we're going to assume you understood the question, okay?

A.   Yes.

Q.   Feel free take a break, at any time. Consult with your attorney, at any time.   I just ask that if there's a question before you, you answer the question prior to taking that break, okay?

A.   Understood.

Q.   Excellent.

All right.   Sir, have you consumed any drugs or alcohol in the lat 24 hours that would impair your ability to testify today?

Page 6

A.   No.

Q.   Do take any prescription medication?

A.   Yes.

Q.   And would that prescription medication prevent you from testify today?

A.   No.

Q.   Okay.  Would you state your place of residence, sir.  And we can limit it to the municipality or town since, as an officer, we won't get into the private stuff.

MR. PADOLSKY:  Don't state your actual address, just the town and the state.

A.   Easton Massachusetts.

Q.   (BY MR. PENKA)  Thank you.

Are you married?

A.   Yes.

Q.   Do you have children?

A.   Yes.

Q.   How many children?

A.   Two.

Q.   Okay.  How far did you go in school, sir?

A.   I have a master's degree.

Q.   And where is that from?

A.   Western New England College.

Page 7

Q.   An what's the master's degree in?

A.   Criminal administration -- criminal justice administration.

Q.   And your bachelor's degree?

A.   Business management.

Q.   And where was the obtained?

A.   Westfield State College.  Westfield State University now.

Q.   Okay.  And what year did you obtain your master's, sir?

A.   I'm going to say, off the top of my head, 2001, 2002.

Q.   Okay.  That's fine.  And what year did you obtain your bachelor's degree?

A.   1995.

Q.   Do you hold any special licences?

A.   Just an EMT license.

Q.   EMET, EMT B?

A.   Yes.

Q.   And when did you obtain that certification?

A.   1998.

Q.   You've continually held it since then?

A.   Yes.

Q.   And are you currently employed, sir?

Page 8

A.    Yes.

Q.    And where are you employed?

A.    Braintree Police Department.

Q.    And how long have you been employed by the Braintree Police Department?

A.    Over 18 years.

Q.    Eighteen years.  And what is your current job title with the Braintree Police Department?

A.    Patrol officer.

Q.    Patrol officer.  Have you always been a patrol officer with them?

A.    I did a short time as a detective.

Q.    And were you assigned to a special unit as a detective?

A.    No, just general detective.

Q.    All right.  As a patrol officer, what are your general duties?

A.    Patrol, calls for service, investigations.

Q.    What sort of training did you have prior to joining the Braintree Police Department?

A.    I have the reserve police academy.  I also have the full-time academy.

Q.    Okay.  When did you finish the academies, sir?

DAVID CLARK KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL   8/3/2018

Page 9

A.   The reserve academy goes back to 1996.  The full-time academy goes back to 1997.

Q.   Okay.  Have you had any continuing education throughout your employment?

A.   Yes.

Q.   And what sort of continuing education do you have?

A.   We do in-service education.

Q.   And what does that entail?

A.   Law updates, first aid updates; things like that.

Q.   Holding the EMT B while you're working, do you ever -- do they ever crossover, or do you strictly -- will you provide BLS, or...

A.   If it's called for.  I do first aid, and things like that, yes.

        MR. PENKA:  Can we go off the record.

        (Discussion off the record.)

        MR. PENKA:  We go can go back on.

Q.   (BY MR. PENKA)  Now, through the continuing education in-service education, you're familiar with the General Orders --

A.   Yes.

Q.   -- of the Police Department of Braintree?

DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL    8/3/2018

Page 10

A.   Yes.

Q.   And are you familiar with the Domestic Violence General Order?

A.   Yes.

Q.   And so when you get a domestic violence call, what are your duties at that point?

MR. PADOLSKY:  Objection.

You can answer if you understand the question.

A.   My duties in a domestic violence call are to safeguard people, investigate the crime, determine any charges.

Q.   (BY MR. PENKA)  Sure.  Let's go through some of that stuff.

So when you're dispatched to a domestic violence incident, what do you do prior to arriving on the scene?

A.   Dispatch usually gives us what they have.

Q.   What do you mean by "what they have"?

A.   What -- the nature of the call, any information they have.

Q.   Anything they've obtained on the 911 call?

A.   Usually.

Q.   Do they obtain any other information beyond

Page 11

what is told to them on the 911 call?

A.    Sometimes.  Sometimes premise history.
They might know -- there might be a past history
with the caller that we -- that the department
knows about.

Q.    Sure.  So if they have a past history, will
that include sort of a BOP for someone?

A.    Sometimes a BOP, yes.

Q.    Okay.  So once you arrive on the scene,
what is your duty at that point?

MR. PADOLSKY:  Objection.

A.    Basically try to gather information, keep
the scene calm.  Determine the -- investigate the
crime, if there's any claim, and determine if
there's any need for arrest or...

Q.    Sure.  Generally, how many officers are
dispatched to a domesticae violence call?

A.    At least two.

Q.    And what's the reason for that?

A.    Sometimes domestics are volatile.

Q.    While you are on the scene, do you
interview all present?

A.    Sometimes.

MR. PADOLSKY:  Objection.

Page 12

Q.   (BY MR. PENKA)  Why would you -- what would be the difference?  What would arise?

MR. PADOLSKY:  Objection.

A.   Sometimes people -- sometime you have to separate the parties.  You might just deal with one person and have the other officer deal with the other person.

Q.   (BY MR. PENKA)  Okay.  And if there is an arrest to be made in a domestic violence situation, what -- how do you make that decision?

A.   Based on probable cause.

Q.   And what is your definition of "probable cause"?

A.   The facts that a reasonable person would believe that a crime has been committed.

Q.   Okay.  In domestic violence, is there an instance where arrest is mandatory?

A.   The law states "you shall arrest."

(Court Reporter asks witness to repeat answer.)

THE WITNESS:  "You shall arrest."

Q.   (BY MR. PENKA)  "You shall arrest" for what?

(No response.)

Page 13

For domestic violence?

A.    For -- yes.

Q.    Yes, okay.

What about dual arrests?

A.    Dual arrests are discouraged.

Q.    And why is that?

A.    I don't know why.

Q.    Now, in the instance that a domestic violence call involves law enforcement personnel, are there separate polices governing that situation?

A.    I believe it's still the same policy.

Q.    Um-huhm.  And within that same policy, what does it dictate when law enforcement personnel's involved?

A.    A supervisor responds.

Q.    A supervisor responds.  Is there a difference between if it's your department or if it's another department?

A.    No.

Q.    So any time there's law enforcement personnel involved, the supervisor is dispatched to the scene, correct?

A.    Correct.

Page 14

Q.   Okay.  Are there any other differences between a general domestic violence call and a domestic violence call involving law enforcement?

MR. PADOLSKY:  Objection.

A.   No.

Q.   (BY MR. PENKA)  Okay.  If the -- if it's reported the law enforcement personnel involved in domestic violence was the aggressor and may or may not have the firearm, what do you do about the firearm?

A.   If he's aggressive, we confiscate the firearm.

Q.   For long?

A.   I don't know.

Q.   Until it's deemed safe to return it?

A.   Probably.

Q.   Something like that?

A.   Yeah.

Q.   Sure.  Now, in your time in the Braintree Police Department, have you ever been the subject of an internal affairs investigation?

A.   No.

Q.   Has a civilian ever filed a complaint against you?

Page 15

A.   Not that I know of.

MR. PENKA:  Can we go off the record for one second.

(Discussion off the record.)

(Recess.)

Q.   (BY MR. PENKA)  Sir, I think I was asking you, have you ever had a complaint filed against you by a civilian?

A.   Not that I know of.

Q.   Not that you know of.  Has another officer ever filed a complaint against you?

A.   No.

Q.   Have you ever had a lawsuit filed against you?

A.   No.

Q.   Have you ever been involved in a lawsuit before?

A.   No.

Q.   Okay.  To your knowledge, have you ever broken protocols or rules and regulations for which a complaint was instituted?

MR. PADOLSKY:  Objection.

A.   No.

Q.   (BY MR. PENKA)  Okay.  All right.  First,

Page 16

sir, if I could direct your attention to February 21, 2014.  Do you recall that evening?

A.   Yes.

Q.   And what were your doing at that time?

A.   I was assigned to patrol, and I was -- dispatched to a call.

Q.   Okay.  At that time, what shift were you assigned to; if you recall?

A.   The relief shift.

Q.   And that's the two-thirty to ten-thirty shift?

A.   Yes.

Q.   And you were assigned a patrol car at that time?

A.   Yes.

Q.   Do you recall what patrol car that was?

A.   "815."

Q.   "815."  And what sector does 815 cover in Braintree.

A.   It covers East Braintree, from the Weymouth linen to the Quincy line and up to Commercial Street.

Q.   And included in that sector is the K-Mart, 350 Grossman Drive; is that included in the

Page 17

815 Sector?

A.    Actually, no.  But that was -- the other units were tied up, so they sent me.

Q.    Okay.  What sector does the K-Mart --

A.    "814."

Q.    "814," okay.  So during that relief shift, do you recall receiving a domestic violence call around eight-thirty that evening?

A.    Yes.

Q.    And what was the substance of the dispatch?

A.    I don't recall.

Q.    You were dispatched to a call, though?

A.    Yes.

Q.    And where did you go?

A.    Basically, the parking lot of K-Mart.

Q.    And so you received the information from the dispatcher?

A.    Correct.

Q.    And when you arrived on the scene, what did you observe when you arrived at the K-Mart?

A.    There was two parked cars in the parking lot; female out of one, male out another.

Q.    Okay.  Did you observe anything else regarding the weather, or time of night, or

Page 18

anything?

MR. PADOLSKY:  Objection.

A.   No.

Q.   (BY MR. PENKA)  Okay.  Was it well-lit where the two parked cars were?

MR. PADOLSKY:  Objection.

A.   It was a parking lot.

Q.   (BY MR. PENKA)  Okay.  So you arrived on scene.  You noticed the two parked cars, and a man outside one and a woman outside another, correct?

A.   Correct.

Q.   And then what did you do?

A.   I believe I -- I don't think I was the first on the scene.

Q.   Okay.

A.   So I believe Sergeant Bata was already on the scene.  Officer McNamara was already on the scene --

Q.   Sure.

A.   -- from my recollection.

Q.   So you were the second or third to arrive?

A.   Correct.

Q.   Were you directed to do anything, at that time, by Sergeant Bata?

**DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL      8/3/2018**

A.    No.

Q.    So what did you do?

A.    I stayed on the scene.  They were both talking to people.

Q.    When you say "they were both talking to" --

A.    Both officers were talking to people.

Q.    And who were the "people"?

A.    One was 'Kelley-Calabrese' (sic), and the other was William Kelley.

Q.    Okay.  And did you speak with either Mr. Kelley or Ms. Calabrese-Kelley?

A.    My memory is exhausted.

Q.    Okay.  Do you recall writing a report for this matter?

A.    I did.

Q.    Okay.  You authored that report?

A.    Yes.

Q.    You signed it?

A.    Yes.

Q.    You reviewed it?

A.    Yes.

Q.    Okay.  I show you a document that has been previously marked from Sergeant Bata's deposition as "Exhibit 1."  Take a moment to review that

Page 20

document.

(Witness reviews document.)

MR. PENKA:  And we'll mark that as "1," please, when he's finished reviewing it.

(Exhibit No. 1, Braintree's Police Dept., Narratives for incident Number 2014000002864, marked for identification.)

Q.   (BY MR. PENKA)  Now, Officer Clark, in reading that report, is that your report from this incident?

A.   Yes.

Q.   Is that your name and employee number at the bottom?

(Witness reviews document.)

A.   Yes.

Q.   Okay.  And that indicates your signature for this report?

A.   Yes.

Q.   Okay.  Now, after reading the report, is your memory refreshed as to what you did that evening?

A.   Yes.

Q.   Okay.  Now, you stated previously that you arrived on the scene, either the second or third

Page 21

to arrive, and that Sergeant Bata and Officer McNamara had begun discussions with Mr. Kelley and Ms. Calabrese-Kelley; is that correct?

A.   Correct.

Q.   All right.  So what happened after you arrived on the scene?

A.   I approached Mr. Kelley with Sergeant Bata.

Q.   Okay.  And what did you -- did you ask Mr. Kelley questions?

A.   No.

Q.   What did you do?

A.   I basically stood by and listened.

Q.   Did Sergeant Bata ask him questions?

A.   Yes.

Q.   And what did you learn from Mr. Kelley?

A.   That he -- him and his wife have been divorced for two years.  They were doing a child exchange.

Q.   Sure.

A.   During the exchange, Ms. Calabrese-Kelley wanted to place the hockey bag in the car.  He didn't want it in the car because it didn't belong to that particular child, and he blocked her from

Page 22

entering the car because of a previous incident.

Q.   Okay.

A.   And then she either fell on the ground, or hit her head -- hit her head and knee on the door. And, at some point, a hockey stick was produced and was hit with the hockey stick.

Q.   Okay.  Did Mr. Kelley tell you or tell Sergeant Bata that Ms. Calabrese-Kelley hit her knee on the door?

A.   I don't know if he did or she did.

Q.   Did you speak to Mrs. Calabrese-Kelley?

A.   I did not speak to her.

Q.   So if she did state that, that would have been stated to someone else?

A.   Yes.

Q.   Okay.  If I could direct your attention to the third paragraph in your report, sir.  The second to last sentence states:  "Karen had called him and stated that she was running late and was in the South shore area."  Did I read that correctly?

        (Witness reviews document.)

A.   Yes.

Q.   And is that what Mr. Kelley stated to you

Page 23

and Sergeant Bata?

A.   I believe so.

Q.   Okay.  Directing your attention to the following paragraph, the third line down, the sentence that reads:  "He stated that Karen had gotten out and tried to give him a hockey bag and stick that belongs to his other daughter that he did not have this weekend."  Did I read that correctly?

(Witness reviews document.)

A.   Yes.

Q.   And is that what Mr. Kelley told you?

A.   Yes.

Q.   The following sentence states:  "He would not take it," correct?

(Witness reviews document.)

A.   Correct.

Q.   And the "it" refers to the hockey bag?

A.   Correct.

Q.   And did Mr. Kelley tell you he would not take it?

A.   Correct.

Q.   And what was his reasoning for not taking the hockey bag?

DAVID CLARK KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL       8/3/2018

Page 24

A.   I don't know.

Q.   Okay.  When you arrived on scene, where was the hockey stick?

(Witness reviews document.)

A.   In the back of his vehicle.

Q.   The back of Mr. Kelley's vehicle?

A.   Yes.

Q.   Where was that hockey bag?

(Witness reviews document.)

A.   Don't know.

Q.   Okay.  Did Mr. Kelley tell you how the hockey stick got in the back of his car?

A.   I don't recall.

Q.   All right.  So you had no contact with Ms. Calabrese-Kelley that evening at the scene, correct?

A.   Correct.

Q.   Did you have any contact with her after?

A.   I transported her to the station.

Q.   You transported her to station?

A.   I believe I transported her.

(Witness reviews document.)

I'm sorry.  Officer McNamara transported her.

Page 25

Q.    Officer McNamara transporter her, but you came to the station later to write the report?

A.    Correct.

Q.    And is it correct in assuming that you entered the report on February 24th -- 21st, 2014 at 22:24, which is more commonly known as 10:24 p.m.?

(Witness reviews document.)

A.    Correct.

Q.    Okay.  Did Mr. Kelley tell you that he pushed Ms. Calabrese-Kelley?

A.    Is it okay if I look at my report?

Q.    Yes, of course.  Whatever helps you to refresh your memory.

(Witness reviews document.)

Do you recall?

A.    All I wrote in my report is that he "blocked her."

Q.    Did you -- when you arrived on the scene was that the first time you met Mr. Kelley?

A.    Correct.

Q.    Did you know Mr. Kelley previously at all?

A.    No.

Q.    Ever run across him in any fashion?

Page 26

A.   No.

Q.   When you arrived on the scene, did you know what Mr. Kelley did for his occupation?

A.   I believe it was dispatched as an off-duty police officer.

Q.   And dispatched -- when you say "dispatched," is that over the "turret tape" as it's known?

A.   I don't recall, but I think it was.

Q.   And this is a dispatch that all officers hear and communicate on, correct?

A.   Correct.

Q.   The radio, so to speak?

A.   Yes.

Q.   What was stated over the dispatch; if you recall?

A.   I don't recall.

Q.   And did they state who called 911?

        MR. PADOLSKY:  Objection.

        (Witness reviews document.)

A.   I don't have it in my report.  I don't know.

Q.   (BY MR. PENKA)  Okay.  When you have a domestic violence situation, does it matter who

Page 27

calls 911 first?

A.   No.

Q.   And why not?

A.   It just doesn't.

Q.   The person reporting could be lying?

A.   Could be.

Q.   All right.  So when you have a 911 call, you go in fresh, so to speak?

MR. PADOLSKY:  Objection.

You can answer.

A.   Yes.

Q.   (BY MR. PENKA)  Okay.  You use your observation and investigation skills to determine what happened?

A.   Yes.

Q.   Okay.  Does credibility play into that?

A.   It does.

Q.   It does weigh as a factor?

A.   Sure.

Q.   Did you find Mr. Kelley to be credible this evening -- that evening?

A.   Yes.

Q.   And what did you base that off of?

A.   Just what I -- just what I saw and heard.

Page 28

Q.    Okay.  Do you recall Mr. Kelley's demeanor at that time?

A.    He was calm.

Q.    Okay.  Mr. Kelley stated he had been hit by a hockey stick, correct?

A.    Yes.

Q.    Did you ask where he had been hit?

A.    I didn't ask him anything.

Q.    Did Sergeant Bata ask him where he had been hit?

A.    Yes.

Q.    And did Mr. Kelley indicate where he had been hit?

A.    On the back of his legs.

Q.    Did you or Sergeant Bata ask to see the injury?

A.    I didn't.

Q.    Was there any indication that Mr. Kelley had been, in fact, hit on the back of the legs?

MR. PENKA:  Objection.

A.    No.

Q.    (BY MR. PENKA)  Do you remember any observation that would give rise to him having, in fact, been hit on the back of the legs?

Page 29

MR. PADOLSKY:  Objection.

A.    No.

Q.    (BY MR. PENKA)  For this incident, do you know how many 911 calls were made?

A.    No.

Q.    In the event more than one 911 call was made, is that relayed over the radio?

A.    Could be.

Q.    All right.  Went you arrived on the scene and were with Mr. Kelley, did you or Sergeant Bata ask him if he was carrying a weapon?

A.    I didn't.

Q.    Okay.  Did Sergeant Bata?

A.    Don't know.

Q.    When you arrived on the scene, you did have the knowledge that he was an off-duty officer, correct?

A.    Correct.

Q.    So there was no -- no desire to -- or no action to inquire if he had a weapon on him at that time?

MR. PADOLSKY:  Objection.

A.    No.

Q.    (BY MR. PENKA)  Service or personal?

Page 30

MR. PADOLSKY:  Objection.

A.   No.

Q.   (BY MR. PENKA)  Okay.  Looking at your report, sir, at the top there, so we were able to see where you input your first initial report, correct?

(Witness reviews document.)

A.   Correct.

Q.   That was February 21st around 10:30?

A.   Correct.

Q.   If you go across there, it says:  "Reviewed by Sergeant Charles Bata," correct?

(Witness reviews document.)

A.   Correct.

Q.   And he would have edited that the next day, at some point, correct, given that it says 2/22/2014?

(Witness reviews document.)

To the right of his name.

MR. PADOLSKY:  (Indicating.)

A.   Oh, correct.

Q.   (BY MR. PENKA)  Okay.  So did you review this report at any time after authoring it?

A.   No.

DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL    8/3/2018

Page 31

Q.    Did you do any further investigation regarding the incident?

A.    No.

Q.    Okay.  Were you aware of any surveillance video, at that time?

A.    No.

Q.    Were you aware, at that time, if K-Mart had surveillance video?

A.    I became aware later they had surveillance video.

Q.    But not at that time?

A.    No.

Q.    Did you know, prior to responding to this incident that we've been discussing, that K-Mart had surveillance video?

A.    I knew about inside, yes.

Q.    Okay.  So at that time, you were not aware of K-Mart having exterior surveillance video?

A.    Correct.

Q.    Okay.  So you stayed with Mr. Kelley the entire time, correct?

A.    I believe so.

Q.    All right.  There were minor children on the scene; is that correct?

DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL   8/3/2018

Page 32

A.   Yes.

Q.   Did you have any interaction with the minor children?

A.   No.

Q.   Did anyone interview the minor children about what happened?

A.   I believe Sergeant Bata and Officer McNamara did.

Q.   They had some intersection with them?

A.   I believe so.

Q.   Were you within hearing distance?

A.   No.

Q.   Okay.  So whatever interaction they may had had, you weren't privy to?

A.   No.

Q.   You were just with Mr. Kelley the entire time?

A.   I believe so.

Q.   Did Mr. Kelley show you anything during the time you were with him?

     (No response.)

     MR. PADOLSKY:  Objection.

Q.   (BY MR. PENKA)  Did he go into his car and retrieve something and then show it to you?

Page 33

A.   Not that I recall.

Q.   Okay.  Who made the decision to arrest Ms. Calabrese-Kelley?

A.   Sergeant Bata.

Q.   And at what point did Sergeant Bata make that decision?

A.   After he talked to the people on the scene.

Q.   And who did he speak with?

A.   I believe he spoke to Mr. Kelley and Ms. Calabrese-Kelley.

Q.   Okay.  Before you authored this report, did you speak with Officer McNamara about what was said between he and Mrs. Calabrese-Kelley?

(Witness reviews document.)

A.   No, I did not.

Q.   You did not speak to Officer McNamara before authoring this report?

A.   No.

Q.   You spoke with Sergeant Bata?

A.   Correct.

Q.   Okay.  If I could direct your attention to the third paragraph up from the bottom, the second sentence begins:  "She stated that William pushed her first."  Is that correct?  Did I read that

Page 34

correctly?

(Witness reviews document.)

A.    Correct.

Q.    And where would you have you gotten that information?

A.    Probably from Sergeant Bata.

Q.    Sergeant Bata.  So Sergeant Bata would have told you that Karen -- what Karen stated, correct?

A.    Correct.

Q.    If you look at that last sentence in that third paragraph, you state:  "It did not appear that the ground caused it, but her bumping the car door might have."  Did I read that correctly?

(Witness reviews document.)

A.    Correct.

Q.    Who made that determination?

A.    I did.

Q.    And how did you make that determination?

A.    Based on my training and experience.  There was no dirt on the cut from the parking lot.

Q.    And when did you observe that?

A.    Booking.

Q.    So at the scene -- because you testified you only stayed with Mr. Kelley, correct?

Page 35

A.   Correct.

Q.   So you wouldn't have seen Mrs. Calabrese-Kelley's cut at the scene?

A.   Correct.

Q.   About what time did you note Mrs. Calabrese-Kelley cut on her knee?

A.   I don't recall.

Q.   Fair to say, prior to authoring this report?

A.   Correct.

Q.   Do you recall receiving a request for Production of Documents in this case?

A.   Correct.

Q.   And you worked with your attorney to produce certain documents; is that correct?

A.   Correct.

Q.   I'm going to show you two photos.  Do you recall -- take a look at them, please.

        (Witness reviews photographs.)

A.   Correct.

Q.   All right.  And do you recognize those?

A.   Yes.

Q.   And what do you recognize those to be?

A.   The photos I took of Ms. Calabrese-Kelley's

DAVID CLARK KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL     8/3/2018

Page 36

knee.

Q.   Okay.  And is that photo in the same or substantially same condition as how you remember her knee looking that evening?

A.   Yes.

Q.   Okay.  Where is her pant leg in that photo?

(Witness reviews photograph.)

A.   Up.

Q.   Okay.  Do you recall at what time you took those photos?

A.   No.

Q.   Are the photos generally date stamped or time stamped that are taken?

A.   Could be.

Q.   But not always?

A.   Depends on the camera.

Q.   What camera did you use?

A.   I don't recall.

Q.   Would it have been a department camera?

A.   Yes.

Q.   Do the department cameras have date stamps or time stamps?

A.   I don't know.

Q.   Have you ever used a department camera in a

DAVID CLARK KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL     8/3/2018

Page 37

previous investigation where they did have date stamps or time stamps on them?

A.   No.

Q.   So none of -- to your recollection, none of the department cameras have date stamps or time stamps; is that correct?

A.   I -- not that I recall.

Q.   Not that you recall, okay.

So this last sentence of your report that we just discussed, the one that reads:  "It did not appear that the ground caused it, but her bumping the car door might have."  You did not make that determination until you took these photos?

A.   Correct.

MR. PADOLSKY:  Are we going to mark those?

MR. PENKA:  Yes.

We can mark both of those.

I'm sorry.  Thanks, Joe.

(Exhibit Nos. 2-3, Photocopies of Black/White Photographs, marked for identification.)

Q.   (BY MR. PENKA)  Okay.  All right.  So

Page 38

you're at the scene.  Sergeant Bata made the determination to make an arrest, correct?

A.   Correct.

Q.   Did anyone read Ms. Calabrese-Kelley her Miranda Rights at that time?

A.   Not that I recall.

Q.   Okay.  And who transported Ms. Calabrese-Kelley?

A.   Officer McNamara.

Q.   And what were you doing while Officer McNamara transported her?

A.   I believe I headed back to the station.

Q.   And what happened when you arrived at the station?  Was Ms. Calabrese-Kelley already there?

A.   I believe so.

Q.   Okay.  And what did you observe?

A.   A booking.

Q.   Um-huhm.

A.   She was upset.

Q.   Okay.  Where was she placed?

A.   She'd be seated at the bench.

Q.   She was seated at the bench.  Was she secured?

A.   She was probably unsecured --

Page 39

Q.    Okay.

A.    -- at that time.

Q.    Did she request medical attention for her knee?

A.    I don't know if she requested it, but paramedics did come and look at it.

Q.    Had you taken the photos by the time the paramedics had arrived?

A.    No.

Q.    Okay.  And what did the paramedics -- what was their assessment; if you recall?

A.    I don't recall.

Q.    Did you have any discussion with them regarding Ms. Calabrese-Kelley's injuries?

A.    No.

Q.    Okay.  So Ms. Kelley -- Ms. Calabrese-Kelley begins to go through the booking process.  She was fingerprinted?

A.    Yes.

Q.    Who did the fingerprinting?

A.    The station officer.

Q.    The station officer.  Is that Lieutenant Moschella?

A.    No.

Page 40

Q.    Who was that?

A.    I don't know.  Whoever the station officer was that night.

Q.    Okay.

A.    Lieutenant Moschella would have done the booking, but there's a station officer to assist him.

Q.    Okay. So she was fingerprinted.  What else happened to her during the booking process?

A.    Photographed.

Q.    Would that be a mug shot, or would that be those photographs that were produced and marked?

A.    A mug shot.

Q.    So during the booking process, were those photos taken?

A.    No.

Q.    Okay.  So she was booked, photographed, fingerprinted.  Anything else during the booking process that she underwent?

A.    No.

Q.    No.  Okay.  Was she able to be bailed out that evening?

A.    Yes.

Q.    Do you recall who bailed her out?

Page 41

A.   I do not.

Q.   Prior to her being bailed out, did you take those photos that have been previously marked as "2" and "3"?

A.   Yes.

Q.   Where did you take those photos?

A.   I believe the station lobby.

Q.   So had she been released at that point?

A.   Yes.

Q.   So you took the photos after she had been released?

A.   Yes.

Q.   Okay.  Do you recall what time she was released?

A.   I do not.

Q.   Do you recall whether she was released before or after you authored Exhibit 1?

A.   I believe before.

Q.   Did you have any further contact with Ms. Calabrese-Kelley or Mr. Kelley?

A.   No, I did not.

Q.   Did you testify at the criminal matter?

A.   I did.

Q.   Okay.  Just one second.  Let me see if I

Page 42

**have anything further.**

**(Mr. Penka briefly reviews notes.)**

MR. PENKA:  All right.  I have nothing else.

Joe, do you have anything?

MR. PADOLSKY:  No questions.

(Whereupon, the deposition concluded at 10:58 a.m.)

**DAVID CLARK  KAREN CALABRESE-KELLEY v. TOWN OF BRAINTREE, ET AL      8/3/2018**

Page 43

C E R T I F I C A T I O N

I, DARLENE E. CURLEY-SULLIVAN, a Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 3rd day of August, 2018, at 10:14 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination was reduced to said typewritten transcript under my direction; and that this is a true record of the testimony given by the witness, to the best of my skill and ability.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this examination is taken.  And, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 11th day of August, 2018.

_____
DARLENE E. CURLEY-SULLIVAN,
Court Reporter/Notary Public

My Commission Expires:  August 1, 2025

***PLEASE NOTE***
THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT REPORTER.

Page 44

CERTIFICATE

I, OFFICER DAVID CLARK, do hereby certify that I have read the foregoing transcript of my testimony under oath, and except for any corrections or changes noted on the Errata Sheet, I further certify under the pains and penalties of perjury that said transcript is a true and accurate record of said testimony.  Executed this _____ day of _____, 2018.

_____
OFFICER DAVID CLARK
SIGNED UNDER THE PAINS
AND PENALTIES OF PERJURY

ERRATA SHEET DISTRIBUTION INFORMATION and
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to, JOSEPH A. PADOLSKY, ESQUIRE.  When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the Original forwarded to JEB S. PENKA, ESQUIRE, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO THE DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefore on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.  Add additional sheets, if necessary.  Please refer to the above instructions for Errata Sheet distribution information.

ERRATA SHEET

CASE:  KAREN CALABRESE-KELLEY vs. TOWN OF

BRAINTREE, ET AL.

WITNESS:  OFFICER DAVID CLARK

DATE TAKEN:  AUGUST 3, 2018


PAGE          LINE          CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SIGNATURE/DATE: _____